CASE NO. No. 26-11899

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

JANE DOE (S.F.), et al.,

*Plaintiffs-Appellees,*

v.

ROYAL CARIBBEAN CRUISES LTD.,

*Defendant-Appellant,*

and

ARVIN JOSEPH MIRASOL,

*Defendant.*

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF
FLORIDA

Case No. 1:24-cv-23953-DPG/DSW

---

**PLAINTIFFS-APPELLEES' COMBINED MOTION FOR SUMMARY
AFFIRMANCE OR, IN THE ALTERNATIVE,
MOTION TO EXPEDITE APPEAL**

---

| | |
|---|---|
| Adam M. Moskowitz | Jason R. Margulies |
| Florida Bar No. 984280 | Michael A. Winkleman |

Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
8883 S.W. 131 Street
Miami, FL 33176
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

Jacqueline Garcell
**LIPCON, MARGULIES & WINKLEMAN, P.A.**
2800 Ponce de Leon Boulevard
Suite 1480
Coral Gables, FL 33134
Telephone: (305) 373-3016
jmargulies@lipcon.com
mwinkleman@lipcon.com
jgarcell@lipcon.com

Thomas A. Tucker Ronzetti
**TUCKER RONZETTI, P.A.**
5760 SW 46th Terrace
Miami, FL 33155-6015
Telephone: (301) 546-4638
tr@tuckrlaw.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiffs-Appellees certify that the following persons and entities may have an interest in the outcome of this appeal. Plaintiffs-Appellees are individuals proceeding pseudonymously and have no parent corporation, and no publicly held corporation owns 10% or more of any Plaintiff-Appellee.

1. Adam M. Moskowitz, The Moskowitz Law Firm, PLLC, counsel for Plaintiffs-Appellees

2. Arvin Joseph Mirasol, Defendant

3. Darrin P. Gayles, United States District Judge

4. Detra Shaw-Wilder, United States Magistrate Judge

5. Elizabeth Irazabal, counsel for Plaintiffs-Appellees

6. Hamilton, Miller & Birthisel, LLP, counsel for Royal Caribbean Cruises Ltd.

7. Jacqueline Garcell, counsel for Plaintiffs-Appellees

8. Jane Doe (S.F.) and the other named Doe and Junior Doe Plaintiffs-Appellees proceeding pseudonymously in Case No. 1:24-cv-23953-DPG/DSW

9. Jason R. Margulies, counsel for Plaintiffs-Appellees

10. Jerry D. Hamilton, counsel for Royal Caribbean Cruises Ltd.

11. John J. Sullivan, counsel for Royal Caribbean Cruises Ltd.

ii

12. Joseph M. Kaye, The Moskowitz Law Firm, PLLC, counsel for Plaintiffs-Appellees

13. Kassandra Doyle Taylor, counsel for Royal Caribbean Cruises Ltd.

14. Krista Fowler Acuna, counsel for Royal Caribbean Cruises Ltd.

15. Kurt K. Lunkenheimer, counsel for Royal Caribbean Cruises Ltd.

16. Leo A. Wiesinger, The Moskowitz Law Firm, PLLC, counsel for Plaintiffs-Appellees

17. Lipcon, Margulies & Winkleman, P.A., counsel for Plaintiffs-Appellees

18. Marc E. Weiner, counsel for Plaintiffs-Appellees

19. Michael A. Winkleman, counsel for Plaintiffs-Appellees

20. Royal Caribbean Cruises Ltd., Defendant-Appellant

21. The Moskowitz Law Firm, PLLC, counsel for Plaintiffs-Appellees

22. Thomas A. Tucker Ronzetti, Tucker Ronzetti, P.A., counsel for Plaintiffs-Appellees

23. Tucker Ronzetti, P.A., counsel for Plaintiffs-Appellees

24. All putative class members and passengers similarly situated to Plaintiffs-Appellees as described in the district-court class-certification filings.

Dated: June 3, 2026                          Respectfully submitted.

By: */s/Adam M. Moskowitz*                   Jason R. Margulies
Adam M. Moskowitz                            Michael A. Winkleman
Florida Bar No. 984280                       Jacqueline Garcell
                                             Marc E. Weiner

iii

Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
8883 S.W. 131 Street
Miami, FL 33176
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

**LIPCON, MARGULIES & WINKLEMAN, P.A.**
2800 Ponce de Leon Boulevard
Suite 1480
Coral Gables, FL 33134
Telephone: (305) 373-3016
jmargulies@lipcon.com
mwinkleman@lipcon.com
jgarcell@lipcon.com
mweiner@lipcon.com

Thomas A. Tucker Ronzetti
**TUCKER RONZETTI, P.A.**
5760 SW 46th Terrace
Miami, FL 33155-6015
Telephone: (301) 546-4638
tr@tuckrlaw.com

*Counsel for Plaintiffs-Appellees*

iv

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................4

THE COURT SHOULD SUMMARILY AFFIRM ...................................................6

    A.    The EFAA Independently Bars Arbitration of the Entire Case..............6

    B.    Section 30527 Independently Bars Arbitration of Plaintiffs' Personal Injury Claims. ...............................................................................................9

    C.    The Order Should Be Affirmed Even Without Reaching Every Statutory Issue. .................................................................................................11

THE AUTOMATIC STAY IMPOSES ONGOING HARM WHICH JUSTIFIES EXPEDITION................................................................................................11

IN THE ALTERNATIVE, THE COURT SHOULD EXPEDITE THIS APPEAL .................................................................................................................12

CONCLUSION.....................................................................................................13

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*CBS Inc. v. PrimeTime 24 Joint Venture*,
  245 F.3d 1217 (11th Cir. 2001 ..................................................................8

*Coinbase, Inc. v. Bielski*,
  599 U.S. 736 (2023) ..................................................................3, 11, 12

*DePierre v. United States*,
  564 U.S. 70 (2011) ...................................................................................10

*Diaz-Roa v. Hermes Law, P.C.*,
  757 F. Supp. 3d 498 (S.D.N.Y. 2024) .................................................8, 9

*Doe (J.K.) v. Celebrity Cruises, Inc.*,
  792 F. Supp. 3d 1371 (S.D. Fla. 2025) .....................................................9

*Groendyke Transp., Inc. v. Davis*,
  406 F.2d 1158 (5th Cir. 1969) ...................................................................6

*Johnson v. Everyrealm, Inc.*,
  657 F. Supp. 3d 535 (S.D.N.Y. 2023) .......................................................9

*United States v. Aldrich*,
  566 F.3d 976 (11th Cir. 2009) ...............................................................3, 7

*United States v. Burke*,
  504 U.S. 229 (1992) ................................................................................10

**Statutes and Rules**

9 U.S.C. § 16(a)(1)(B) ...................................................................................1

9 U.S.C. § 401 ............................................................................................2, 7

9 U.S.C. § 402 ......................................................................................2, 7, 8, 9

18 U.S.C. § 2246(3) .................................................................................2, 3, 7

46 U.S.C. § 30527 ...................................... 2, 3, 5, 6, 9, 10, 11, 13

Fed. R. App. P. 27 .......................................................................................1, 12

11th Cir. R. 27-1 ......................................................................................1, 6, 12

## <u>PLAINTIFFS-APPELLEES' COMBINED MOTION FOR SUMMARY AFFIRMANCE OR, IN THE ALTERNATIVE, MOTION TO EXPEDITE APPEAL</u>

Pursuant to Federal Rule of Appellate Procedure 27, Eleventh Circuit Rule 27-1 and Internal Operating Procedure 3 to Rule 27-1 (Motions to Expedite Appeals), and this Court's inherent authority to summarily affirm orders presenting no substantial question, Plaintiffs-Appellees respectfully move this Court to summarily affirm the District Court's May 26, 2026 Order Adopting the Report and Recommendation and Denying Royal Caribbean's Omnibus Motion to Stay Litigation and Compel Arbitration, ECF No. 125. In the alternative, Plaintiffs-Appellees request expedited briefing and earliest practicable submission under the abbreviated schedule set forth below.

### I. INTRODUCTION

This is an interlocutory appeal under 9 U.S.C. § 16(a)(1)(B) from an order refusing to compel arbitration of claims arising from a Royal Caribbean stateroom attendant's alleged sexual exploitation of passengers, including minors, aboard Symphony of the Seas. The District Court adopted in full Magistrate Judge Shaw-Wilder's Report and Recommendation and held that two independent federal statutes bar Royal Caribbean from forcing these passengers into individual arbitration: the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C.

1

§§ 401-02 ("EFAA"), and 46 U.S.C. § 30527 ("Section 30527"). ECF No. 125 at 2; ECF No. 110 at 6-19.

Royal Caribbean's appeal should be summarily affirmed because the EFAA resolves this appeal. The statute says that, "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute," no predispute arbitration agreement is "valid or enforceable with respect to a case" filed under federal, tribal, or state law that "relates to" such a dispute. 9 U.S.C. § 402(a). The statute further directs that the applicability and enforceability issue is for the court, not an arbitrator. 9 U.S.C. § 402(b).

The operative complaint alleges exactly the kind of case Congress removed from forced arbitration. The R&R found that Defendant Arvin Mirasol, a Royal Caribbean stateroom attendant, allegedly placed hidden cameras in Plaintiffs' cabin bathrooms, recorded passengers and minor children while undressed and engaged in private activities, entered staterooms and hid under beds to record naked passengers with his phone, and used the recordings for sexual gratification. ECF No. 110 at 2-3.

The R&R's EFAA holding is also grounded in binding Eleventh Circuit law. The EFAA defines a "sexual assault dispute" by reference to a "nonconsensual sexual act or sexual contact," and incorporates the definition of "sexual contact" in 18 U.S.C. § 2246. 9 U.S.C. § 401(3). The Eleventh Circuit has held that § 2246(3)'s

2

plain meaning includes self-touching and masturbation because Congress used the phrase "any person." *United States v. Aldrich*, 566 F.3d 976, 979 (11th Cir. 2009). Royal Caribbean's contrary argument requires this Court to add a victim-presence or awareness requirement that appears nowhere in either the EFAA or § 2246(3).

Royal Caribbean's appeal should also be summarily affirmed because Section 30527 clearly bars arbitration of Plaintiffs' personal injury claims for emotional distress, mental suffering, and psychological injury. The term "personal injury" in § 30527(a)(1)(B) includes both physical and non-physical injuries, as based on the statute's plan and unambiguous meaning, and the statute's revision and legislative history. The R&R held that "the plain and unambiguous meaning of 'personal injury' encompasses both bodily injury claims and emotional injury claims, such as claims for mental suffering, that flow from '[a]ny invasion of a personal right.'"

Royal Caribbean's Notice of Appeal also invokes *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), and asserts that the notice "automatically necessitates a stay of this action" and that the action "must now be 'administratively closed'" until the appeal is resolved. ECF No. 128 at 1 n.1. *Coinbase*, however, identified the remedy for the delay imposed by Section 16(a) arbitration appeals: courts of appeals should use "robust tools" including summary affirmance and expedition and should proceed with "appropriate expedition." 599 U.S. at 745, 747. The Court should use those tools. Otherwise, Plaintiffs and absent class members could be subject to significant

delay because Royal Caribbean seeks appellate review of an order correctly applying two federal statutes to deny forced arbitration.

## II. BACKGROUND

Plaintiffs are passengers and families who allege that Royal Caribbean is liable for a sexual-exploitation and video-voyeurism scheme committed by Mirasol while he served as a Royal Caribbean stateroom attendant aboard Symphony of the Seas. The R&R found that the conduct at issue allegedly occurred during twelve cruises between December 2023 and February 2024. ECF No. 110 at 2. It further found that, without passengers' knowledge or consent, Mirasol placed hidden cameras in cabin bathrooms and recorded Plaintiffs, including minor children, while undressed and engaged in private activities; that he later used the recordings for masturbation; and that he also entered staterooms and hid under beds to record guests naked with his phone. *Id.* at 2-3.

Plaintiffs assert claims for invasion of privacy by video voyeurism and sexual assault, vicarious strict liability, intentional and negligent infliction of emotional distress, negligent security, general negligence, breach of the implied covenant of good faith and fair dealing, and negligent hiring and retention. ECF No. 110 at 3. Royal Caribbean moved to stay the litigation and compel arbitration under its passenger ticket contract. *Id.* at 3-4; ECF No. 57.

4

On April 22, 2026, Magistrate Judge Shaw-Wilder recommended that Royal Caribbean's motion be denied. ECF No. 110. The R&R held that the EFAA applies because Plaintiffs sufficiently alleged a sexual-assault dispute, that the case was filed under state law and relates to the sexual-assault dispute, and that once the EFAA applies it renders the arbitration agreement unenforceable as to the entire case. *Id.* at 6-13. The R&R separately held that 46 U.S.C. § 30527 bars arbitration of Plaintiffs' personal injury claims, including emotional and psychological injuries, because "personal injury" is broader than "physical injury." *Id.* at 13-19.

Royal Caribbean objected. ECF No. 116. Plaintiffs responded that Royal Caribbean's objections tried to rewrite the EFAA by adding a victim-presence requirement and tried to rewrite § 30527 by turning "personal injury" into "physical injury." ECF No. 117 at 3-10. On May 26, 2026, the District Court adopted the R&R in full. ECF No. 125. The District Court stated that Judge Shaw-Wilder found both the EFAA and § 30527 preclude enforcement of Royal Caribbean's arbitration provision, that the "majority" of Royal Caribbean's objections "rehash arguments it raised in the Motion," and that, after de novo review, the Court agreed with the R&R's "well-reasoned findings and recommendation." *Id.* at 2.

The January 14, 2025 district-court stay halted all deadlines pending resolution of Royal Caribbean's arbitration motion. ECF No. 42. The Magistrate Judge later recommended consolidation of this case with ten related cases,

designation of this case as the lead case, a consolidated amended complaint conforming to the Sixth Amended Complaint, and a briefing schedule for any consolidated motion to dismiss. ECF No. 120 at 5-6. The consolidation R&R also noted that the pending class-certification motion seeks certification of issues including the EFAA arbitration issue and vicarious liability. *Id.* at 2. Royal Caribbean's Notice of Appeal asserts that every pretrial proceeding must stop and that the case must be administratively closed. ECF No. 128 at 1 n.1.

### III. THE COURT SHOULD SUMMARILY AFFIRM

Summary affirmance is appropriate when "the position of one of the parties is clearly right as a matter of law so that there can be no substantial question as to the outcome." *Groendyke Transp., Inc. v. Davis*, 406 F.2d 1158, 1162 (5th Cir. 1969); *see also* 11th Cir. R. 27-1 at I.O.P. 3. That standard is met here. The EFAA independently bars forced arbitration of this entire case; § 30527 separately bars arbitration of the personal injury claims; and Royal Caribbean cannot obtain reversal unless it defeats both independent statutory grounds. Both holdings leave no substantial question as to the outcome of the case.

### A. The EFAA independently bars arbitration of the entire case.

The EFAA provides that no predispute arbitration agreement "shall be valid or enforceable with respect to a case" filed under federal, tribal, or state law that "relates to" a sexual-assault or sexual-harassment dispute, at the election of the

person alleging such conduct. 9 U.S.C. § 402(a). Congress also made courts responsible for deciding the EFAA's applicability and the enforceability of the arbitration agreement. *Id.* § 402(b).

Plaintiffs allege a "sexual assault dispute" under 9 U.S.C. § 402 because the case involves nonconsensual sexual contact. The EFAA defines "sexual assault dispute" as a dispute involving a nonconsensual sexual act or sexual contact, with "sexual contact" defined by 18 U.S.C. § 2246 or similar applicable law. 9 U.S.C. § 401(3). Section 2246(3) defines "sexual contact" to include intentional touching of listed body parts "of any person" with an intent to abuse, humiliate, harass, degrade, or arouse or gratify sexual desire. In *Aldrich*, this Court held that the plain meaning of § 2246(3) includes masturbation because Congress used "any person," for the definition of "sexual contact" and not "another person" as was used in the definition of "sexual act." 566 F.3d at 979 ("We believe that § 2246(2)(D) clearly indicates that Congress used the phrase 'any person' when it meant to include the offender himself, as well as another individual, and the phrase 'another person' when it meant to exclude the offender.").

Royal Caribbean's objections to the R&R turned on an extratextual addition. It argued that the alleged self-touching cannot count because Plaintiffs were not physically touched, present, or aware when Mirasol used their secretly captured images for sexual gratification. ECF No. 116 at 10-11. But neither § 2246(3) nor the

7

EFAA contains a presence, awareness, or body-touching requirement. The R&R already correctly rejected Royal Caribbean's invitation to "read in a requirement of victim presence or awareness when the sexual contact occurs." ECF No. 110 at 9. Courts may not add words Congress omitted. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001).

Nor may Royal Caribbean isolate the hidden-camera recordings from the sexual gratification to avoid the EFAA. The complaint alleges a single course of nonconsensual sexual exploitation: a stateroom attendant used his access to passengers' cabins to secretly record passengers and children in bathrooms and showers and to use those images as the objects of his sexual desire. The EFAA's operative phrase is "relates to." 9 U.S.C. § 402(a). The R&R therefore correctly held that Plaintiffs "allege conduct constituting a sexual assault dispute," that the case was filed under state law, and that the case relates to that dispute. ECF No. 110 at 13.

Any pleading-standard argument would not alter the outcome. Even if a plausibility standard applies, the allegations are more than plausible. They identify the actor, the cruise ship, the time period, the method, the private cabin spaces, the victims' lack of knowledge and consent, the sexual purpose, and the injuries. ECF No. 110 at 2-3, 10-11. While the District Court correctly applied the "nonfrivolous claims" standard from *Diaz-Roa*, the allegations satisfy a plausibility standard as

8

well. ECF No. 110 at 10 (citing *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 533 (S.D.N.Y. 2024)).

Finally, the EFAA bars arbitration of the entire case, not merely selected counts. ECF No. 110 at 12-13. Congress made predispute arbitration agreements unenforceable "with respect to a *case*" that relates to a sexual-assault dispute. 9 U.S.C. § 402(a) (emphasis added). The R&R correctly applied that text and held that once the EFAA is triggered, the arbitration bar applies to the entire case. ECF No. 110 at 12-13 (citing *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 558 (S.D.N.Y. 2023); *Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d 1371, 1381 (S.D. Fla. 2025)); *see also Diaz-Roa*, 757 F. Supp. 3d at 532-33.

### B. Section 30527 independently bars arbitration of Plaintiffs' personal injury claims.

The District Court also correctly adopted the R&R's independent holding under 46 U.S.C. § 30527. The statute prohibits a passenger-vessel owner from including in a contract a provision limiting "the right of a claimant for personal injury or death to a trial by court of competent jurisdiction." 46 U.S.C. § 30527(a)(1)(B). Royal Caribbean's ticket provision purports to require arbitration of "claims for mental or emotional distress or injury not arising out of bodily injury." ECF No. 110 at 3. The R&R correctly held that § 30527 prevents Royal Caribbean from enforcing that provision against Plaintiffs' emotional and psychological personal injury claims. *Id.* at 13-19.

9

Royal Caribbean's argument depends on rewriting "personal injury" to mean only "physical injury" or "bodily injury." *Id.* at 14. But Congress used the broader term "personal injury" in § 30527(a) and the narrower phrase "physical injury" in § 30527(b). Different terms in the same statute presumptively have different meanings. *DePierre v. United States*, 564 U.S. 70, 83 (2011). If Congress had intended § 30527(a)(1)(B) to protect only bodily injury claims, it knew how to say so.

The ordinary legal meaning of "personal injury" is not limited to physical injury. The Supreme Court has recognized that traditional personal injury harms include "pain and suffering, emotional distress, harm to reputation, or other consequential damages." *United States v. Burke*, 504 U.S. 229, 239 (1992). That is especially true here, where the alleged personal injury arises from sexual exploitation of passengers and children in the uniquely private setting of passenger cabins and bathrooms.

Any argument about conflict within the statute also fails. Section 30527(b) addresses when ticket provisions may limit liability for emotional distress, mental suffering, and psychological injury; § 30527(a)(1)(B) separately protects the right of a claimant for personal injury to a court trial. There is no conflict in Congress both regulating certain liability-limitation clauses and separately prohibiting contractual removal of personal injury claims from court. And even if Royal Caribbean had a

10

colorable argument under § 30527, that would not justify reversal because the EFAA independently bars arbitration of the whole case.

### C. The order should be affirmed even without reaching every statutory issue.

This Court may affirm on any ground supported by the record. Here, the District Court adopted two independent statutory grounds. ECF No. 125 at 2. Because the EFAA alone renders Royal Caribbean's predispute arbitration agreement unenforceable with respect to this case, Royal Caribbean cannot obtain reversal unless it defeats the EFAA. It cannot. The Court should summarily affirm without requiring full merits briefing on every alternative statutory argument.

## IV. THE AUTOMATIC STAY IMPOSES ONGOING HARM WHICH JUSTIFIES EXPEDITION

Royal Caribbean's Notice of Appeal asserts that *Coinbase* automatically requires an "all-encompassing" stay of "all pre-trial and trial proceedings" and that the case "must now be administratively closed" until the appeal ends. ECF No. 128 at 1 n.1. *Coinbase* held that a district court must stay proceedings involved in a Section 16(a) appeal from the denial of arbitration. 599 U.S. at 738, 743. But Coinbase also explained that courts of appeals have tools to prevent that stay from becoming a delay device. *Id.* at 745 ("[T]he courts of appeals possess robust tools to prevent unwarranted delay and deter frivolous interlocutory appeals. For example, a

11

party can ask the court of appeals to summarily affirm, to expedite an interlocutory appeal, or to dismiss the interlocutory appeal as frivolous.").

Here, there is good cause for expedition. This case involves alleged sexual exploitation of passengers and minors on twelve cruises. The related cases share common legal and factual questions, and the Magistrate Judge has already recommended consolidation, a lead case, a master docket, lead consolidation counsel, a consolidated amended complaint conforming to the Sixth Amended Complaint, and coordinated motion practice. ECF No. 120 at 2, 5-6. The pending class-certification motion seeks certification of issues including the EFAA arbitration issue and Royal Caribbean's vicarious liability for Mirasol's wrongdoing. *Id.* at 2. The *Coinbase* stay freezes those proceedings, delays discovery and disclosures, and delays notice and adjudication for victims and absent class members, which are all reasons favoring expedition.

## V. IN THE ALTERNATIVE, THE COURT SHOULD EXPEDITE THIS APPEAL

If the Court declines to summarily affirm, Plaintiffs-Appellees respectfully request that the Court expedite this appeal under Federal Rule of Appellate Procedure 27 and Eleventh Circuit Rule 27-1, Internal Operating Procedure 3, and adopt the following abbreviated schedule:

| **Filing** | **Proposed Deadline** |
|---|---|
| Appellant's opening brief | 21 days after the order granting expedited briefing |

| | |
|---|---|
| Appellees' answering brief | 21 days after service of Appellant's opening brief |
| Appellant's reply brief | 10 days after service of Appellees' answering brief |
| Extensions | No extensions absent extraordinary circumstances |

Plaintiffs-Appellees further request submission on the papers, or, if the Court desires oral argument, placement on the earliest available oral-argument calendar after briefing.

## VI. CONCLUSION

The governing law compels affirmance. The EFAA makes Royal Caribbean's predispute arbitration agreement unenforceable with respect to this case; § 30527 independently bars arbitration of Plaintiffs' personal injury claims; and the District Court adopted both holdings after *de novo* review. Plaintiffs-Appellees respectfully request that this Court summarily affirm the District Court's May 26, 2026 Order, ECF No. 125, or, in the alternative, expedite this appeal and enter the proposed briefing schedule set forth above.

Date: June 3, 2026                                      Respectfully submitted,

Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
8883 S.W. 131 Street
Miami, FL 33176

Jason R. Margulies
Michael A. Winkleman
Jacqueline Garcell
**LIPCON, MARGULIES & WINKLEMAN, P.A.**
2800 Ponce de Leon Boulevard
Suite 1480
Coral Gables, FL 33134
Telephone: (305) 373-3016

13

**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

jmargulies@lipcon.com
mwinkleman@lipcon.com
jgarcell@lipcon.com

Thomas A. Tucker Ronzetti
**TUCKER RONZETTI, P.A.**
5760 SW 46th Terrace
Miami, FL 33155-6015
Telephone: (301) 546-4638
tr@tuckrlaw.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This motion complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 26.1-3(c), this motion contains approximately 2,805 words. This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

By: */s/ Adam M. Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2026 I electronically filed the foregoing Motion with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. All participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

By: */s/ Adam M. Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280

## **APPENDIX**

**Appendix A** — Plaintiffs' Motion to Certify Nationwide Issue Classes, Pursuant to Federal Rules and Incorporated Memorandum of Law, ECF No. 39

**Appendix B** — Paperless Order dated January 14, 2025 on Status Conference, ECF No. 42

**Appendix C** — Royal Caribbean's Omnibus Motion to Stay Litigation and Compel Arbitration and Memorandum of Law, ECF No. 57

**Appendix D** — Sixth Amended Complaint, ECF No. 95

**Appendix E** — Report and Recommendation on Royal Caribbean's Omnibus Motion to Stay Litigation and Compel Arbitration, ECF No. 110

**Appendix F** — Royal Caribbean's Objections to the Report and Recommendation, ECF No. 116

**Appendix G** — Plaintiffs' Response in Opposition to Royal Caribbean's Objections, ECF No. 117

**Appendix H** — Report and Recommendation on Consolidation and Case Management, ECF No. 120

**Appendix I** — Plaintiffs' Second Supplement to Motion for Issue Class Certification and for Appointment of Co-Lead Class Counsel, ECF No. 121

**Appendix J** — Order Adopting Report and Recommendation and Denying Royal Caribbean's Omnibus Motion to Stay Litigation and Compel Arbitration, ECF No. 125

**Appendix K** — Notice of Appeal, ECF No. 128

# Appendix A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 24-CV-23953-DPG

JANE DOE (S.F.), on behalf of herself and all
others similarly situated, et al.,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD., and
ARVIN JOSEPH MIRASOL,

      Defendants.

_____/

**PLAINTIFFS' MOTION TO CERTIFY NATIONWIDE ISSUE CLASSES, PURSUANT TO FEDERAL RULES 23(a), 23(b)(3), AND 23(c)(4), AND INCORPORATED <u>MEMORANDUM OF LAW</u>**

Plaintiff[1] Jane Doe (S.F.) ("Putative Class Representative") respectfully requests the Court certify the specific questions and issues outlined below.

## BACKGROUND FACTS

Importantly, the relevant facts of this case are undisputed. Defendant Arvin Joseph Mirasol, over the course of 12 specific cruises that Defendant RCCL operated aboard the *Symphony of the Seas*, admittedly committed a series of sexual assault and/or harassment against a litany of passengers (over a hundred) assigned to cabins for which Mirasol served as stateroom attendant.[2] Mirasol admitted and pled guilty to hiding cameras in passengers' bathrooms *and* to using his RCCL Master Key surreptitiously *hide underneath their beds* to film them taking showers.[3] Horrifically, Mirasol's victims included children at ages ranging from ***only 2 to 17 years old***.[4]

The FBI confiscated multiple electronic devices from Mirasol that were full of videos of these children in various states of undress—focusing specifically on their genitals.[5] He even filmed himself installing a camera in a guest's bathroom.[6] Mirasol admitted to committing these sexual assaults because he would "pleasure himself and masturbate" to the videos.[7] Fortunately, his sexual assaults on board RCCL were stopped and he was arrested only after three Plaintiffs helped authorities locate his hidden camera in Plaintiffs' cabin bathroom on February 26, 2024. He has now been sentenced to **30 years in prison** for his crimes.[8]

---

[1] Because of the nature of these allegations, Putative Class Representative is referred to by pseudonym and initials. Her name was provided directly to Defendant, ROYAL CARIBBEAN CRUISES LTD. ("RCCL"), and is available, upon request, to counsel and/or parties.

[2] *See U.S. v. Mirasol*, Case No. 24-cr-60046-MD, ECF No. 23 (S.D. Fla. June 5, 2024).

[3] *Id.*

[4] *Id., see also* https://www.justice.gov/usao-sdfl/pr/cruise-ship-employee-sentenced-30-years-prison-placing-hidden-cameras-inside-passenger.

[5] *Id., see also id.*

[6] *Id., see also id.*

[7] *Id., see also id.*

[8] *See U.S. v. Mirasol*, ECF No. 35 (S.D. Fla. August 28, 2024); *see also,*

1

It is beyond peradventure that "child sex crimes are among the most egregious and despicable of societal and criminal offenses," and Mirasol's sentence is well-deserved. *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009). Over the course of 12 cruises spanning a mere 3 months, his conduct may have victimized up to 960 passengers, and his sexual assault and/or harassment of them has left them suffering real damages for which RCCL should be held liable. *See, e.g.,* ECF No. 36 ("Compl."), ¶¶ 31, 52–60. Indeed, when MIRASOL accessed passenger cabins, including Plaintiffs' passenger cabins, it was in the course and scope of his duties as a stateroom attendant employed and subject to control by RCCL. Compl. ¶ 13.

Even after these atrocities were committed by an RCCL employee, to RCCL customers, *on RCCL's ship*, RCCL has not agreed to take any responsibility. Instead, they have shockingly: (1) refused to notify the clearly identifiable RCCL passengers that were all located in Mirasol's cabins, (2) sought to silence Mirasol's sexual victims by demanding they dismiss the cases they brought in their desired forum before this Court in favor of secret arbitration, and (3) deprived them of their day in court, the only avenue to obtain any real, personal justice for the harm they have suffered. In fact, RCCL has advocated for having all of its victims' claims litigated together because, according to RCCL, they are ***substantially the same claims***, which RCCL acknowledged in its December 11, 2024 "Notice of Similar Actions," requesting the Court to transfer and consolidate all seven (7) of these pending cases (comprising hundreds of individual sexual victim class members) to avoid "unnecessary duplication of judicial labor," ECF No. 26. In fact, RCCL has already expressed to Class Counsel that they will assert an identical defense to all of these related actions (and any that may be filed), namely to move to compel the claims to individual arbitration and prevent any class allegations. ECF No. 31.

---

https://www.justice.gov/usao-sdfl/pr/cruise-ship-employee-sentenced-30-years-prison-placing-hidden-cameras-inside-passenger.

But RCCL's uniform efforts violate the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. §§ 401–402, which (as Plaintiff will fully brief in response to RCCL's impending motion to compel arbitration) renders RCCL's arbitration agreement invalid and unenforceable in this case as to *all* class members. That is because the EFAA provides, "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a).

The EFAA was enacted to "restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration that often favors the company over the individual." H.R. Rep. No. 117-234 at 4 (2022).[9] The EFAA's drafters were specifically concerned with how corporate entities like RCCL are abusing their adhesive "Terms of Service" in millions of consumer transactions, like purchasing a cruise, as a means to unfairly take away the basic right to a trial in open court, particularly in critical cases like these, which relate to sexual assault or sexual harassment.

---

[9] In particular, Congress recognized that in the EFAA's absence, mandatory arbitration clauses often entitle companies "to choose the arbitrator who decides the case, as well as the rules of procedure and evidence that apply, and the distribution of costs of the arbitration," "protect the company by keeping the records of an arbitration secret," permit employers to retaliate against their victims "without fear of their actions becoming public through the courts," and "prevent[ ] victims from sharing their stories." *Id.* "This allows for the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers." *Id.*

3

In order for the EFAA to apply, as recently explained by Judge Lewis A. Liman of the Southern District of New York, "a plaintiff need only plead nonfrivolous claims relating to sexual assault or to conduct alleged to constitute sexual harassment, with the sufficiency of those claims to be reserved for proper merits adjudication, be it a motion to dismiss, motion for judgment on the pleadings, motion for summary judgment, or trial." *Diaz-Roa v. Hermes Law, P.C.*, No. 24-CV-2105 (LJL), 2024 WL 4866450, at \*14 (S.D.N.Y. Nov. 21, 2024). Importantly—unlike most arbitration issues—whether the EFAA applies to a dispute is *expressly* a question **for this Court** rather than an arbitrator, regardless of any delegation clause. 9 U.S.C. § 402(b).

The beauty of F.R.C.P. 23 is that it provides this Court with a plethora of creative procedures to efficiently manage these types of class actions. Moreover, it is hard to imagine any undisputed facts that would benefit more from the certification of specific issues and questions.

One crucial reason that class certification is extremely helpful under these admitted facts — unlike possibly most other employment contexts — is because Eleventh Circuit law holds RCCL strictly liable for all of Mirasol's admitted sexual assaults. The standard federal jury instruction is that "a cruise ship operator is strictly liable for intentional wrongful acts, including sexual assaults committed by its crew members against passengers during the cruise." Moreover, the Eleventh Circuit holds that "the defendants owe a non-delegable duty to protect their passengers from crew member assaults and thereby safety transport their cruise passengers." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891 (11th Cir. 2004). Simply put, this same analysis will be the exact same for every proposed sexual assault class member.

Undersigned Counsel has had great success in recent years in obtaining certification of issues under Rule 23(c)(4), which allows the Court to focus on resolving issues that will materially advance the litigation as a whole for all members of the affected class. *See In re FieldTurf Artificial*

4

*Turf Mktg. & Sales Pracs. Litig.*, 2023 WL 4551435, at *2–3, 10 (D.N.J. July 13, 2023) (certifying issue classes although individualized inquiry necessary for causation and damages, reasoning that "resolution of the proposed issue classes will allow for one trial with a single, preclusive determination regarding [defendant's] conduct, rather than repeated trials regarding the same evidence of the alleged defect and deception").

Of course, there can be no dispute that these claims will ultimately require individual trials to determine damages. However, Putative Class Representative respectfully submits that, before conducting any of those damage trials, this Court should first make the threshold determination as to (1) the applicability of the EFAA and whether it invalidates and renders unenforceable RCCL's ticket contract that requires individual arbitration (the "Arbitration Issue"),[10] and (2) whether, when Mirasol accessed passenger cabins, including Plaintiffs' passenger cabins, it was in the course and scope of his duties as a stateroom attendant employed and subject to control by RCCL, rendering RCCL vicariously liable for his admitted wrongdoing (the "Vicarious Liability Issue").

Accordingly, Putative Class Representative requests the Court certify these issues, so we can at the onset of this case fully brief and litigate the Arbitration Issue, and if successful, proceed to litigating the case on the merits in order to resolve the Vicarious Liability Issue.

The proposed Issues Class is defined as follows:

---

[10] As an additional basis for concluding RCCL's individual arbitration provision is invalid and unenforceable here, 46 U.S. Code § 30527 provides that "[t]he owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting . . . the right of a claimant for personal injury or death to a trial by court of competent jurisdiction." While § 30527 delineates some exceptions to this, it prohibits RCCL from limiting liability for a crewmember or the owner, master, manager, agent, or operator of the vessel where "emotional distress, mental suffering, or psychological injury is . . . intentionally inflicted by a crewmember," or "in a case involving sexual harassment, sexual assault, or rape." *Id.*

> All passengers aboard Royal Caribbean's vessel, *Symphony of the Seas*, between December 1, 2023, and February 26, 2024, and who stayed in cabins aboard the vessel which were serviced by Defendant Mirasol as Stateroom Attendant.

> Excluded from the Class are Defendants and their officers, directors, affiliates, legal representatives, and employees, any customers who make a timely election to be excluded, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

Plaintiffs further seek appointment of The Moskowitz Law Firm, PLLC as Lead Class Counsel at this stage, pursuant to Fed. R. Civ. P. 23(g).

## **LEGAL ARGUMENT**

The main purpose of a class action is to facilitate judicial economy by avoiding multiple suits on the same subject matter, providing a feasible means for asserting the rights of those who would have no realistic day in court without a class action, and deterring inconsistent results, assuring a uniform, singular determination of rights and liabilities. *Am. Pipe & Constr., Co. v. Utah*, 414 U.S. 538 (1974). The Putative Class Representative seeks a narrow certification order that utilizes Rules 23(a), 23(b)(3), and 23(c)(4) to certify the Arbitration Issue and the Vicarious Liability Issue for class-wide resolution.[11]

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992); *Griffin v. Carlin*, 755 F.2d 1516, 1531 (11th Cir. 1985). Rule 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). As a threshold matter, courts consider whether "the proposed class is adequately defined and clearly ascertainable." *Palm Beach Golf Ctr.-Boca, Inc.*

---

[11] *Jones v. Desantis*, No. 4:19cv300-RH/MJF, 2020 WL 5646124, at *2 (N.D. Fla. Apr. 7, 2020) (a plaintiff may move for class certification of selected counts only) (citing, *inter alia*, *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968)).

*v. Sarris*, 311 F.R.D. 688, 693 (S.D. Fla. 2015).[12] Additionally, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004).

Further, Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." *See In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 697 (N.D. Ga. 2003) (certifying issues of "Defendants' duty to Plaintiffs and whether Defendants breached that duty"). "The theory of Rule [23(c)(4)] is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member." *Nelson v. Walmart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007). The Court has this tool and others at its disposal to facilitate commonsense treatment of the common claims and issues as part of its class certification. In doing so, Plaintiffs do not concede in any way that individual issues will predominate in the damages phase—rather, Plaintiffs believe it is in the best interests of the case, and the court, to advance the litigation until such a decision has been made and Putative Class Representative are ready to seek certification on additional bases. *Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 WL 3268340 (S.D. Fla. Mar. 19, 2020) (Goodman, M.J.) (recommending certifying a liability issue class and bifurcating proceedings into liability and damages phases where defendant's liability would be determined regarding uniform representations made to the class); *Las Olas Co. v. Fla. Power & Light Co.*, No. CACE19019911-18, 2020 WL 9874296 (Fla. 17th Cir. Ct. Dec. 14, 2020), *aff'd per curiam Infratech Corp. v. Las*

---

[12] In *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), the Eleventh Circuit disavowed the "administrative feasibility" requirement for establishing ascertainability of class members as a precondition to certification.

*Olas Co.*, 320 So. 3d 751 (Fla. 4th DCA 2021), *reh'g denied* (Fla. 4th DCA July 13, 2021) (affirming certification of a liability issue class and proceeding to a bifurcated jury trial regarding defendants' liability for causing a single-incident mass tort—which trial lasted one week and resulted in favorable liability verdict for the class). Courts throughout this Circuit have also demonstrated the utility of this approach. *See Andreas-Moses v. Hartford Fire Ins. Co.*, 326 F.R.D. 309 (M.D. Fla. June 18, 2018) ("The Court will exercise its discretion under Rule 23(c)(4) to certify a merits-only class and bifurcate damages from the merits."); *Navelski*, 244 F. Supp. 3d 1275 (same); *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 317 (S.D. Fla. 2001) (explaining that "the Court may either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a *res judicata* finding of liability").

Putative Class Representative submits the Court should certify the Arbitration Issue and the Vicarious Liability Issue classes under Rule 23(a), (b)(3), and (c)(4) so they can move forward expeditiously on deciding these two central issues—a method of organizing this litigation that Plaintiffs' counsel has used with very recent success in both state and federal class actions.

## I.      **The Putative Class Representative has Standing.**

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (quoting *Gen. Tel. Co. of Sw.*, 457 U.S. at 156) (internal quotations and citation omitted).[13] "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact,

---

[13] At the class certification stage, courts "may review both the allegations in the complaint and evidence in the record so far to determine whether the named plaintiffs . . . have established Article III standing[.]" *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 n.6 (11th Cir. 2023).

(2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560). "An economic injury is the 'epitome' of a concrete injury." *Lewis v. Mercedes-Benz USA, LLC*, 530 F.Supp.3d 1183, 1202 (S.D. Fla. 2021) (citing *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019).

Here, Putative Class Representative clearly has standing as they were a passenger aboard the *Symphony of the Seas* during the subject period, assigned a passenger cabin to which Marisol was an attendant, and was victimized by Marisol's acts of sexual assault and/or sexual harassment, which he conducted in the course and scope of his employment with Defendant RCCL, and which resulted in Marisol capturing and/or publishing images of the Putative Class Representative while undressed and engaging in private activities, without Plaintiffs' prior knowledge or consent. Compl. ¶¶ 9–17. As a result, Putative Class Representative suffers from severe emotional distress, which manifests physically, causing physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact. *Id.* In turn, Putative Class Representative suffered an injury in fact that is fairly traceable to Defendants' challenged conduct and that is likely to be redressed by a favorable judicial decision. *See Spokeo*, 578 U.S. at 338.

Therefore, for the foregoing reasons, Putative Class Representative has standing because they have adequately alleged injury in fact, traceability, and redressability in connection with these claims related to Defendant Marisol's sexual assault and/or harassment. Putative Class Representative thus possesses standing as to the Arbitration Issue and the Vicarious Liability Issue.

## II.   The Issue Classes Are Clearly Ascertainable.

To be ascertainable, the proposed class need only be "adequately defined such that its membership is capable of determination." *Cherry*, 986 F.3d at 1304 (rejecting any requirement to demonstrate administrative feasibility). In assessing a proposed class's ascertainability, this Circuit looks only to whether membership in each proposed class "turns on [] objective, verifiable criteri[a][.]" *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1370 (11th Cir. 2021). Plaintiffs need not show "precisely how" they will use these criteria to ascertain class members. *Id.*

Here, membership in the Proposed Class can be readily determined from RCCL's own corporate records. *See* Compl. ¶ 47 ("Further, upon information and belief, RCCL is in sole and exclusive custody of the passenger manifests to show the identity and contact information of the passengers who were assigned to cabins serviced by MIRASOL aboard the vessel between December 2023 and February 26, 2024."). *See, e.g., In re Health Insurance*, 2021 WL 1341881, at *7 (M.D. Fla. Mar. 23, 2021) (settlement class adequately defined and clearly ascertainable where membership was objectively determinable from corporate records). These corporate records are exactly the sort of objective, verifiable criteria necessary to establish ascertainability. *Rensel*, 2 F.4th at 1370 (class was ascertainable because membership could be readily determined using the offeror's internal records or "submissions of claims forms verified by transaction records").

## III.   Plaintiffs and These Issue Classes Satisfy the Requirements of Rule 23(a).

Rule 23(a) requires "numerosity, commonality, typicality, and adequacy." *Valley Drug Co.*, 350 F.3d at 1188.

### A. The Classes are so numerous that joinder of all members is impracticable.

"To establish numerosity, [a plaintiff] must show that the class is so numerous that joinder of all members is impracticable." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D.

10

674, 684 (S.D. Fla. 2013) (internal quotes and citation omitted). "While mere allegations of numerosity are insufficient, Rule 23(a)(1) imposes a generally low hurdle, and a plaintiff need not show the precise number of members in the class." *Id.*; *accord*, *Palm Beach Golf Ctr.*, 311 F.R.D. at 695. The "general rule of thumb in the Eleventh Circuit is that 'less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Manno*, 289 F.R.D. at 684 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see, e.g., Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986).

Numerosity is easily satisfied for the Proposed Class, given that this action alone identifies 52 putative class members as plaintiffs, with a reasonable basis to assert that class members may reach 960. *See* Compl. ¶ 31 ("Thus, MIRASOL'S victims may include up to 960 passengers (up to 12 cruises; times up to 20 passenger cabins; times up to 4 passengers per cabin; equals up to 960 passengers)."). Accordingly, numerosity exists.

### B. There are questions of law and fact common to all Class members.

Commonality requires the identification of at least one issue that by its nature "is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Proof of commonality is a "relatively light burden*." County of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 667 (S.D. Fla. 2010) (internal quotation marks and citation omitted). Commonality "does not require that all the questions or law and fact raised by the dispute be common." *Id.* "What matters to class certification . . . [is] the capacity of a class-wide proceeding to generate common ***answers*** apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted) (emphasis original).

Commonality is readily found where, as here, "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride,* 220 F.R.D. at 687; *Agan v. Katzman & Korr, P.A.,* 222 F.R.D. 692, 697 (S.D. Fla. 2004).

First, courts have regularly found that a defendant's common defense to all class members' claims supports commonality. *See Shutler v. Citizens Disability LLC*, 347 F.R.D. 663, 675 (S.D. Fla. 2024) (Moore, J.) (granting class certification and finding predominance where defendant's "defense is common to Plaintiff and all putative class members," such that "the class will prevail or lose together on its claims without the need for 'mini-trials'"); *Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 686 (S.D. Fla. 2013) (Scola, J.) ("On this defense, all class members will prevail or lose together, making this another common issue to the class."); *see also Broin v. Philip Morris Companies, Inc.*, 641 So. 2d 888, 891 (Fla. 3d DCA 1994) (affirming certification where "[t]he trial will emphasize defenses applicable to the class as a whole," which "will aid judicial efficiency and economy, and is warranted to avoid duplicitous litigation of these common issues"); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 166–67 (2d Cir. 1987) (holding that military contractor "defense is common to all of the plaintiffs' cases, and thus satisfies the commonality requirement of Rule 23(a)(2)").

Second, courts in this District and elsewhere have also found the question of a defendant's vicarious liability for a co-defendant's conduct supports commonality. *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 335–36 (S.D. Fla. 1996) (Moreno, J.) (granting class certification and finding that question of defendants' vicarious liability was common and predominant); *see also Kristensen v. Credit Payment Services*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (granting class certification and finding question of vicarious liability was common and predominant).

The Arbitration Issue and Vicarious Liability Issue are both common legal issues subject to class-wide resolution that will determine "in one stroke" the validity of Putative Class Representative's claims. *See In re Terazosin Hydrochloride,* 220 F.R.D. at 687. Thus, because the resolution of the Arbitration Issue and Vicarious Liability Issue will affect all proposed class members, commonality is satisfied. *See In re FieldTurf,* 2023 WL 4551435, *6–11; *Navelski*, 244 F. Supp. 3d at 1309; *Las Olas Co.*, 2020 WL 9874296.

### C. Plaintiffs' claims are typical of those of the Classes.

"[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman*, 221 F.3d at 1279. The focus of the typicality requirement is whether the named plaintiff will advance the interests of the class members by advancing his own interests. *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 698 (S.D. Fla. 2004); *Herman*, 320 F.R.D. at 293 (same). Much like the commonality requirement, the typicality requirement does not require that the claims of the Putative Class Representative and the proposed class be identical: all that is required is that "the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

Putative Class Representative possesses the same interest as the proposed Class because, like the proposed class, they were a passenger on a subject cruise (subject to the same ticket contract with arbitration provision) and were assigned a passenger cabin to which Defendant Mirasol was an attendant. Compl. ¶¶ 9–17. More specifically, the Putative Class Representative share a "nexus" with the proposed Class with respect to the Arbitration Issue and the Vicarious Liability Issue because their claims are based on the same theory. *See Rensel*, 2021 WL 4134984,

13

at *8 (holding typicality satisfied where Putative Class Representative alleged that defendants' solicitation of unregistered securities violated securities law). For one, the Arbitration Issue will be resolved by answering the same question for Putative Class Representative and the Class: whether the EFAA invalidates RCCL's mandatory arbitration provision because these claims relate to Mirasol's sexual assault and/or harassment. The Vicarious Liability Issue also rests on one issue: whether, "when MIRASOL accessed passenger cabins, including Plaintiffs' passenger cabins, it was in the course and scope of his duties as a stateroom attendant employed and subject to control by RCCL" such that RCCL is vicariously liable for his conduct. Compl. ¶ 13.

In sum, the claims of the named plaintiffs and unnamed plaintiffs alike all "arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

Accordingly, the typicality requirement is satisfied.

**D. Plaintiffs will fairly and adequately protect the interests of the Classes.**

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where (i) counsel for the class is qualified and competent to vigorously prosecute the action, and (ii) the interests of the Putative Class Representative are not antagonistic to the interests of the Classes. *See, e.g.*, *Fresco v. Auto Data Direct, Inc.*, 2007 WL 2330895, at *2 (S.D. Fla. May 14, 2007). The central component of adequacy is the absence of conflicts of interest between the named representative and the class. *Amchem*, 521 U.S. at 625–26 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks and citations omitted)).

No such fundamental conflict exists here because, certainly, no Class member has an interest in a negative resolution of the Arbitration Issue or the Vicarious Liability Issue as either would extinguish their claims, likely resulting in the permanent loss of their ability to recover for the harm they suffered. *See id.*; *Rensel*, 2021 WL 4134984 at *2–3, *8–9 (holding investors in cryptocurrency tokens adequate representatives for class of defrauded investors who purchased the same alleged unregistered securities). The Putative Class Representative's and the Class Members' interests, as well as counsel's interests, are fully aligned in seeking a favorable resolution of these issues. As Putative Class Representative proves their own claims, they will also prove those of millions of absent Class members, and thus "share the true interests of the class." *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988); *Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) (ruling that the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members").

Moreover, as set forth below at greater length in the context of Rule 23(g), proposed Class Counsel is highly experienced in prosecuting class action litigation. *See*, *e.g., In re: FieldTurf,* Case No. 3:17-md-02779-MAS-TJB, ECF No. 377 (D.N.J. Dec. 13, 2024) (granting final approval to nationwide class settlement where Undersigned Counsel was appointed Co-Lead Counsel); *Fruitstone v. Spartan Race, Inc.*, No. 20-cv-20836-BLOOM/Louis, 2021 WL 2012362, at *12 (S.D. Fla. May 20, 2021) (finding in approving class settlement that Class Counsel's "reputation, diligence, expertise, and skill are reflected in the excellent results they have achieved"); *Feller v. Transamerica Life Ins. Co.*, No. 16-cv-01378 CAS (GJSx), 2019 WL 6605886, at *6 (C.D. Cal. Feb. 6, 2019) (same, finding Class Counsel "have demonstrated that they have fully and competently prosecuted all causes of action, claims, theories of liability, and remedies reasonably

available to the Settlement Class Members"); *In Re: Champlain Towers South Collapse Litigation*, Case No. 2021-015089 CA 01 (Fla. 11th Jud. Cir. July 16, 2021).

**IV.    Plaintiffs and These Issue Classes Satisfy the Requirements of Rule 23(b).**

Under Rule 23(b)(3), the Court must find "the questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

**a.    Common questions of law or fact predominate.**

The requirement that common questions of law or fact predominate means "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989) (citation omitted); *Carriuolo v. Gen. Motors Co.*, 823 F.3d977, 985 (11th Cir. 2016) (The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." (quoting *Amchem*, 521 U.S. at 623)). The predominance inquiry seeks to determine the evidentiary effect of adding plaintiffs to the Class. If adding more plaintiffs requires the introduction of "significant amounts of new evidence," this suggests that individual issues are important. *Klay,* 382 F.3d at 1255. Conversely, if adding more plaintiffs leaves the amount of evidence needed to prove the claims "relatively undisturbed," common issues likely predominate. *Id.* Here, too, the addition or subtraction of any given member from the Proposed Classes would have no substantial effect on the nature or quantity of the evidence offered to prove Defendants' liability, readily satisfying *Brown*'s practical test of predominance.

First, as with commonality, courts have regularly found that a defendant's common defense to all class members' claims supports predominance. *See Shutler*, 347 F.R.D. at 675 (granting class

16

certification and finding predominance where defendant's "defense is common to Plaintiff and all putative class members," such that "the class will prevail or lose together on its claims without the need for 'mini-trials'"); *Manno*, 289 F.R.D. at 686 ("On this defense, all class members will prevail or lose together, making this another common issue to the class."); *see also Broin*, 641 So. 2d at 891 (affirming certification where "[t]he trial will emphasize defenses applicable to the class as a whole," which "will aid judicial efficiency and economy, and is warranted to avoid duplicitous litigation of these common issues"); *In re Agent Orange*, 818 F.2d at 166–67 (finding predominance and holding "a class trial in a federal court [on military contractor defense] is a method of adjudication superior to the alternatives. If the defense succeeds, the entire litigation is disposed of. If it fails, it will not be an issue in the subsequent individual trials.").

Second, courts in this District and elsewhere have also found the question of a defendant's vicarious liability for a co-defendant's conduct supports predominance. *Walco*, 168 F.R.D. at 335–36 (granting class certification and finding that question of defendants' vicarious liability was common and predominant); *see also Kristensen*, 12 F. Supp. 3d at 1306 (granting class certification and finding question of vicarious liability was common and predominant).

Nor does proof of causation undermine predominance. Indeed, while individual causation and damages questions are recognized as no bar to class certification, *Brown*, 817 F.3d at 1239 ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'") (quotation omitted); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.") (internal citations omitted), it is not an issue even remotely presented by the requested *issue class*, which will not at this stage seek to adjudicate any Class Members' damages,

17

but would rather focus on adjudicating the Arbitration Issue and Vicarious Liability Issue. *In re FieldTurf*, 2023 WL 4551435, at \*9 ("Finally, the Court is not concerned about management difficulties that may arise as a result of certifying these two discrete issues while leaving other aspects of liability and damages to individual adjudication.") [14]

Common issues predominate with respect to the causes of action the Putative Class Representative seeks to certify. For example, the Arbitration Issue involves RCCL's uniform ticket contract, the substantially similar facts regarding Marisol's sexual assault and/or harassment of Putative Class Representative and the Class Members, and whether the EFAA (or 46 U.S. Code § 30527) renders RCCL's arbitration agreement invalid and unenforceable. As another example, the Vicarious Liability Issue involves considering uniform facts to determine whether RCCL is vicariously liable for Marisol's sexual assault and/or harassment of Class Members, such as his use of his RCCL-provided key card to access Putative Class Representative's and the Class Members' cabins during the course and scope of his duties as a stateroom attendant. This evidence would remain the same regardless of class size or composition. Thus, predominance is met.

**b.  A class action is superior to adjudicating thousands of individual cases.**

Rule 23(b)(3) superiority requires the court to analyze "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Palm Beach Golf Ctr.*, 311 F.R.D. at 699 (quoting *Klay*, 382 F.3d at 1269); *Muzuco v. Re\$ubmitIt, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013) (citations omitted). Here, there can be little doubt as to

---

[14] That some class members ultimately may not be successful on their damage claims **does not** defeat certification where common issues otherwise predominate. *Navelski*, 244 F. Supp. 3d at 1309 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.")); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (observing that it is inevitable "that a class will often include persons who have not been injured by the defendant's conduct;" but "[s]uch a possibility or indeed inevitability does not preclude class certification")).

the judicial efficiency in litigating the issue as to the applicability of the Defendant RCCL's arbitration defense to the claims of the potential hundreds of Mirasol's victims of his sexual assault and/or harassment class-wide rather than individually.

There are hundreds of potential Class members whose claims are based on an alleged common course of conduct, rendering the litigation more manageable as a class action than as thousands of individual suits. *See In re: Fieldturf*, 2023 WL 4551435, *9 ("Finally, the Court is not concerned about management difficulties that may arise as a result of certifying these two discrete issues while leaving other aspects of liability and damages to individual adjudication. *See Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004) ("[C]ourts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication—or, perhaps more realistically, settlement."")).

A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, after RCCL became aware of Mirasol's admitted heinous acts, they failed to notify the individual Class Plaintiffs. Further, upon information and belief, RCCL is in sole and exclusive custody of the passenger manifests to show the identity and contact information of the passengers who were assigned to cabins serviced by Mirasol aboard the vessel between December 2023 and February 26, 2024. Thus, it is unlikely that the vast majority of individual plaintiffs, having not been notified by RCCL, would discover the violations of their privacy, sexual harassment, and sexual assault; nor assume the burden and the cost of this complex litigation, and the Purported Class Representative and counsel is not aware of any significant numbers of class members who are interested in individually controlling the prosecution of a separate action. The interests of justice will be served by resolving the common disputes of the class members with Defendants in a single forum, and individual actions by class members, many of whom are citizens

19

and residents of different states would not be cost effective. The class consists of a finite, identifiable number of individuals which will make the matter manageable as a class action.

## APPOINTMENT OF CLASS COUNSEL

To appoint class counsel, the Court must consider: (1) "the work counsel has done," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources [] counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Proposed Class Counsel have decades of experience handling class action litigation, are among the most experienced and capable in the field of maritime claims for cruise ship passenger injuries, including class actions, and have successfully represented claimants in other litigation relating to sexual assault and sexual harassment of cruise passengers by crewmembers, have demonstrated a sound knowledge of the legal issues pertaining to Putative Class Representative's and the Class's claims against RCCL, and certainly have the collective financial wherewithal to capably prosecute these claims on a class-wide basis. *See* Firm Resume attached as **Exhibit A**. The Moskowitz Law Firm PLLC has been appointed Co-Lead Counsel in *In Re: FTX Cryptocurrency Collapse Litigation* (MDL 3076), where they have worked extremely efficiently with the more than fifteen other law firms working for Plaintiffs. Their appointment as Co-Lead Class Counsel is both appropriate and warranted.

## CONCLUSION

For these reasons, the Court should (a) certify the proposed Issue Classes; (b) appoint the Putative Class Representative to serve as Class Representative; and (c) appoint The Moskowitz Law Firm, PLLC to serve as Co-Lead Class Counsel for the Proposed Issue Class. A Proposed Order appointing interim class counsel accompanies this Motion as **Exhibit B**.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Plaintiff respectfully requests oral argument pursuant to Local Rule 7.1(b)(2). This case and the Plaintiff's motion raises complex questions of law and fact regarding whether the Class should be certified. Given the importance of these questions to the determination of this case, the Plaintiff believes the Court's decision-making process would be significantly aided by oral argument. Plaintiff estimates just one hour will be necessary for oral argument.

Dated: January 14, 2025

Respectfully submitted,

**By: /s/ Adam M. Moskowitz**
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

**Jason R. Margulies, Esq.**
jmargulies@lipcon.com
**Michael A. Winkleman, Esq.**
mwinkleman@lipcon.com
**Jacqueline Garcell, Esq.**
jgarcell@lipcon.com
**Marc E. Weiner, Esq.**
mweiner@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the forgoing was filed on January 14, 2025, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280

22

# Exhibit A



For more than 25 years, the lawyers at The Moskowitz Law Firm, PLLC ("The Moskowitz Law Firm") have successfully litigated significant class action and complex commercial cases involving the rights of consumers, investors, and businesses. The Firm and its attorneys consistently rank among the most highly regarded litigation attorneys locally and on the national stage — according to clients, judges, opponents, and professional journals — for effectiveness in and out of the courtroom.

*Adam Moskowitz*. Mr. Moskowitz is the Founder and Managing Partner of The Moskowitz Law Firm and is experienced in all forms of class action claims, including civil conspiracy claims under the Racketeering Influenced and Corrupt Organizations ("RICO") Act. Mr. Moskowitz serves and has served as Lead Counsel in some of the largest class action cases in Florida and nationwide. Mr. Moskowitz has been an Adjunct Professor at the University of Miami School of Law teaching Class Action Litigation for over 26 years. Adam has received numerous awards for his results including the "Most Effective Lawyer Award" for his work in litigating and resolving numerous nationwide force-placed insurance cases. Mr. Moskowitz filed one of the first class action lawsuits regarding these practices and has since spearheaded class action litigation in over 32 nationwide class actions brought against the largest banks or mortgage servicers and the force-placed insurers across the country, reaching 30 settlements to date totaling over $4.2 billion dollars for the proposed nationwide classes of over 5.3 million homeowners.[1]



---

[1] *See for example Williams v. Wells Fargo Bank, N.A.,* No. 11-cv-21233 (S.D. Fla.) (final approval granted); *Saccoccio v. JPMorgan Chase Bank N.A.,* No. 13-cv-21107 (S.D. Fla.) (final approval granted); *Diaz v. HSBC Bank (USA), N.A.,* No. 13-cv-21104 (S.D. Fla.) (final approval granted); *Fladell v. Wells Fargo Bank, N.A.,* No. 13-cv-60721 (S.D. Fla.) (final approval granted); *Hamilton v. SunTrust Mortg., Inc.,* No. 13-cv-60749 (S.D. Fla.) (final approval granted); *Hall v. Bank of Am., N.A.,* No. 12-cv-22700 (S.D. Fla.) (final approval granted); *Lee v. Ocwen Loan Servicing, LLC,* No. 14-cv-60649 (S.D. Fla.) (final approval granted); *Braynen v. Nationstar Mortg.*, LLC, No. 14-cv-20726 (S.D. Fla.) (final approval granted); *Wilson v. Everbank,* N.A., No. 14-cv-22264 (S.D. Fla.) (final approval granted); *Montoya v. PNC Bank, N.A.,* No. 14-cv-20474 (S.D. Fla*.)* (final approval

Prior to filing the FPI class actions, Adam Moskowitz served as Co-Lead Counsel in one of the largest MDLs, *In re: Managed Care Litigation*, MDL No. 1334. The MDL was finalized about 6 years ago and was actively litigated for about 7 years. Plaintiffs brought suit against the seven largest managed care providers on behalf of approximately 600,000 physicians alleging that these defendants engaged in a civil conspiracy in violation of the RICO Act. Adam Moskowitz worked almost all of his time assisting the Co-Lead team with every aspect of the case, including taking and defending depositions, coordinating with co-counsel, working with scientists, drafting pleadings, and helping with settlement efforts. Through this litigation before Judge Moreno, plaintiffs were able to revise the manner in which managed care is conducted with physicians throughout the country, and obtained almost a billion dollars in monetary relief. To date, this is the only certified nationwide RICO class action to be upheld by the Eleventh Circuit Court of Appeal.

Mr. Moskowitz was recently appointed Co-Lead Counsel for the Economic Loss and Property Damage Track in *In re: Champlain Towers South Condominium Collapse Litigation*, Case No. 2021-015089-CA-01 (Fla. 11th Jud. Cir.) to bring class claims on behalf of the victims of the catastrophic collapse of the Champlain Towers South condominium in Surfside, Florida.  This resulted in a settlement for the victims of over $1.3 billion.

Mr. Moskowitz was appointed as Co-Lead counsel in *In re Transamerica COI Litigation*, Case No. 2:16-cv-01378-CAS-AJW (C.D. Cal.), and reached a finally-approved nationwide settlement for a certified class of nationwide consumers who purchased life insurance policies from Transamerica Life Insurance Company, a subsidiary of Aegon—one of the world's largest providers of life insurance, pension solutions and asset management products—which resulted in recovering a gross Settlement Common Fund of over $100 million, as well as extremely valuable injunctive relief for the nationwide class. Mr. Moskowitz also personally resolved the sole objection to the settlement with the objector's counsel who brought separate "copycat" Transamerica COI class actions in Iowa. Judge Snyder also recently granted final approval of a nationwide class action settlement regarding a very similar COI nationwide class action against Transamerica for the 2017 COI increases, which is currently pending appeal. *Thompson v. Transamerica Life Insurance Company*, No. 2018-cv-5422-CAS, ECF No. 197 (C.D. Cal. Sept. 16, 2020). Further, in *In re Fieldturf Multi District Litigation*, Case No. 3:17-md-02779-MAS-TJB (D.N.J.), U.S. District Judge Michael A. Shipp recently appointed Mr. Moskowitz as Co-Lead counsel for all of the plaintiffs

---

granted)*; Almanzar v. Select Portfolio Servicing,* No. 14-cv-22586 (S.D. Fla.) (final approval granted); *Jackson v. U.S. Bank, N.A.,* No. 14-cv-21252 (S.D. Fla.) (final approval granted); *Circeo-Loudon v. Green Tree Servicing, LLC,* No. 14-cv-21384 (S.D. Fla.); *Beber v. Branch Banking & Trust Co.*, No. 15-cv-23294 (S.D. Fla.) (final approval granted); *Ziwczyn v. Regions Bank, No.* 15-cv-24558 (S.D. Fla.) (final approval granted); *McNeil v. Selene Finance, LP,* No. 16-cv-22930 (S.D. Fla.); *McNeil v. Loancare, LLC,* No. 16-cv-20830 (S.D. Fla.) (final approval granted) (final approval granted); *Edwards v. Seterus, Inc.*, No. 15-cv-23107 (S.D. Fla.) (final approval granted); *Cooper v. PennyMac Loan Servicing*, LLC, No. 16-cv-20413 (S.D. Fla.) (final approval granted). *Strickland, et al. v. Carrington Mortgage Services, LLC, et al.*, 16-cv-25237 (S.D. Fla.) (final approval granted for three separate settlements); *Quarashi et al v. Caliber Home Loans Inc. et al.;* 16-9245 (D.N.J.) (final approval granted).

after numerous class actions brought against Fieldturf were consolidated in the District of New Jersey earlier last year. The claims were brought on behalf of municipalities related to the marketing and sale of allegedly defective artificial fields, and class certification was granted.

Mr. Moskowitz has been appointed Lead and Co-Lead counsel in numerous other state and federal class actions, including resolving one of the nation's largest consumer class actions, *LiPuma vs. American Express*, No. 04-cv-20314 (S.D. Fla.). Mr. Moskowitz was also appointed Class Counsel in a finally-approved nationwide settlement with Spartan Race, Inc., in a nationwide class action arising from Spartan Race's business practices relating to its Racer Insurance Fee, *see Fruitstone v. Spartan Race, Inc.*, No. 1:20-cv-20836-BLOOM/Louis (S.D. Fla.), as well as in *Collins v. Quincy Bioscience, LLC*, No. 19-22864-Civ-COOKE/Goodman, ECF No. 200 (S.D. Fla. Nov. 18, 2020), where Magistrate Judge Jonathan Goodman for the United States District Court for the Southern District of Florida granted final approval of a nationwide class action settlement resolving claims of a nationwide class of purchaser of the memory improvement supplement Prevagen.

Recently, in *Cherry v. Dometic Corp.*, No. 19-13242 (11th Cir. Feb 2, 2021), Mr. Moskowitz was successful in overturning a denial of class certification for failing to demonstrate the "administrative feasibility" of identifying class members. This decision represents a sea change in class action litigation in the Eleventh Circuit, which now joins the Second, Sixth, Seventh, Eighth and Ninth Circuits in rejecting any heightened ascertainability requirement purportedly inherent in Federal Rule of Civil Procedure 23(a).

In *Pain Clinic et al. v. Allscripts Healthcare Solutions, Inc.,* 12-49371 (Fla 11th Cir. Ct. 2012), Mr. Moskowitz reached a nationwide settlement against Allscripts Healthcare Solution on behalf of thousands of small physician practices regarding the sale and marketing of defective electronic healthcare software. Mr. Moskowitz has also served as Lead, Co-lead or as part of Plaintiffs' counsel in various nationwide class actions including *In re: Marine Hose Antitrust Litigation*, No. 08-MDL-1888-Graham/Turnoff (S.D. Fla.); *Natchitoches Parrish Hospital v. Tyco (In re Sharps Containers)*, No. 05-cv- 12024 (D. Mass.) (serving as co-lead counsel in a nationwide antitrust class action on behalf of direct purchasers of containers for the disposal of sharp medical instruments); *Texas Grain Storage Inc. v. Monsanto Co.*, No. 5:2007-cv-00673 (W.D. Texas) (serving as co-lead counsel with Bruce Gerstein in a nationwide antitrust class action on behalf of direct purchasers of genetically modified seeds); *In re: Hypodermic Products Antitrust Litigation*, MDL No. 1730, No. 05-cv-1602 (JLL/CCC) (D. N.J.) (Linares, J.) (obtaining final approval of a nationwide settlement of an antitrust class action on behalf of direct purchasers of needle products); *In re: Mushroom Direct Purchase Antitrust Litigation*, No. 06-cv-00620l (E.D. Pa.) (representing direct purchasers of fresh agaricus mushrooms sold in the United States east of the Rocky Mountains in antitrust class action); *Miller v. Dyadic International*, No. 07-cv-80948 (S.D. Fla.) (consolidated securities fraud class action against biotech company arising out of material misstatements and omissions regarding financial improprieties of its subsidiaries in violation of federal securities laws); *Louisiana Wholesale v. Becton Dickinson, et al.*, No. 05-cv-01602 (D.N.J.); and *Bruhl v. Price Waterhouse Coopers, International, et al.*, No. 03-cv-23044 (S.D. Fla.).  Adam is currently lead and co-lead counsel in numerous other class actions currently pending in state and federal courts across the country.

Mr. Moskowitz's practice also encompasses various other complex commercial litigation matters, arbitrations before FINRA and numerous jury trials. Adam obtained one of the largest jury verdicts in Miami-Dade County (over $100 million dollars) in a jury trial against a global agricultural company on behalf of growers from the United States and Costa Rica. Adam has also served as chairperson in numerous NASD securities arbitrations, and actively participates in local and national seminars and panels, lectures across the country regarding class action litigation, and has published numerous articles on class action practices and settlements.[2] Mr. Moskowitz has actively served on numerous state and national class action organizations, including being appointed to the Duke Law Center for Judicial Studies Advisory Council and serves as the Topics Coordinator. The Council brings together all federal judges, experienced plaintiffs' and defense attorneys, and academics to develop practical solutions to legal issues by way of rule changes, best practices, guidelines, and principles. The Council conducts numerous national seminars each year, attended by hundreds of class action practitioners and federal and state judges. One such seminar was the "National Townhall Meeting Developing a Useful Framework to Address Alcohol Abuse, Drug Addiction, and Anxiety/Depression Among Bench, Bar, and Related Professionals," which included many great speakers (39 Panelists for 8 Panels), including many federal judges. Adam is married to his wife Jessica and has three children, Serafina, Michael and Samantha and is very active with his children's school Temple Beth Am in Miami, Florida. Attached are two personal articles about Adam Moskowitz, including one regarding his family being named "Family of the Year" for their synagogue this past year, based mainly on the great dedication and pro bono service by his wife to his children's school.

---

[2] *See, e.g., The Right Way to Calculate Attorneys' Fees in Class Actions*, December 4, 2015, available at http://www.law360.com/articles/733534/the-right-way-to-calculate-atty-fees-in-class-actions.

**Howard Bushman**. Howard Bushman is a Partner at The Moskowitz Law Firm and a seasoned litigator with over 23 years of experience prosecuting nationwide class actions and mass tort litigation. Mr. Bushman is a central figure in litigating the lender placed insurance class actions listed in Footnote 1. Further, most recently, Mr. Bushman led the firm's prosecution of *In re: Lincoln National COI Litigation Case* No.: 2:16-cv-6605-GJP (E.D.Pa..) and *In re: Lincoln National 2017 COI Rate Litigation* 2:17-cv-04150-GJP (E.D.Pa.) which reached a finally-approved nationwide settlement for a class of nationwide consumers who purchased life insurance policies serviced by Lincoln National, recovering a Settlement Common Fund of over $100 million.



Mr. Bushman prosecuted claims on behalf of investors who invested in a ponzi scheme perpetrated by Equialt, LLC. These claims resulted in a settlement of $44 million. *SEC v. Davison, et al*., Case No. 8:20-cv-00325-MSS-UAM, pending in the United States District Court for the Middle District of Florida. He has also effectively litigated the following class actions: *Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology Solutions, Inc. et al.,* Case No.: 10-20715-CIV-ALTONAGA/BROWN (S.D. Fla.) (multi-million dollar settlement on behalf of a nationwide class of copier lessees whom were overcharged for their monthly payments); *Aarons et al. v. BMW of North America, LLC*, Case No. 2:11-cv-07667-PSG (S.D.Cal.) (multi-million dollar settlement on behalf of a nationwide class of owners of defective Mini-Cooper vehicles); *Lockwood et al. v. Certegy Check Services, Inc.*, Case No.: 8:07-CV-01657-SDM-MSS (M.D. Fla.) (nationwide data breach action resulting in a settlement valued at over $75 million dollars; *Brenda Singer v. WWF Operating Company*, Case No.: 13-CV-21232 (S.D. Fla. 2013) (nationwide litigation regarding alleged deceptive marketing of evaporated cane juice; successfully settled nationwide class action over deceptive labeling of evaporated cane juice); *In Re: Countrywide Financial Corp. Customer Data Security Breach Litigation,* Case No. 3:08-MD-01998-TBR (WDKY) (class action on behalf of over 17 million consumers, achieved a settlement valued at over $300 million dollars); *Eugene Francis v. Serono Laboratories, Inc., et al.* ("Serostim")*,* Case No. 06-10613 PBS (U.S. District Court of Mass.) ($24 million cash settlement in a nationwide class action litigation against multiple entities regarding the deceptive and illegal marketing, sales and promotional activities for the AIDS wasting prescription drug Serostim); *In Re: Guidant Corp. Implantable Defibrillators Products Liability Litigation*, MDL No. 1708 (U.S. District of Minnesota) ($245 million dollar settlement for patients in this nationwide mass tort class action regarding the sale of defective cardiac defibrillators and pacemakers); *In Re: Zicam Cold Remedy Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2096 (mass tort involving over $15 million settlement).

Mr. Bushman has extensive experience litigating antitrust matters throughout the state of Florida as well. *See In re: Photochromic Lens Antitrust Litigation*, MDL No. 2173, No. 8:10–md–02173–T–27EA (M.D. Fla.) (nationwide indirect purchaser antitrust class action on behalf of purchasers of photochromic lenses); *In re Florida Cement and Concrete Antitrust Litigation (Indirect Purchaser Action)*, No. 09-23493-CIV-Altonaga/Brown (S.D. Fla.) (statewide indirect purchaser antitrust class action on behalf of purchasers of cement); *Anna Vichreva v. Cabot Corporation, et al.*, No. 03-27724-CA-27 (Fla. 11th Jud. Cir. Ct.) (litigated and obtained the largest per-consumer Carbon Black state court antitrust class action settlement in the country).

As passionate for the law as he is for giving back to the local community, Howard recently received the Eleventh Judicial Circuit and Miami-Dade County Bar Associations' Put Something Back Pro Bono Service Award.

*Joseph Kaye.* Joey is a Partner at The Moskowitz Law Firm. Joey's practice focuses on multi-state consumer class action litigation, complex commercial litigation and multidistrict litigation. His experience litigating a broad range of disputes, including consumer protection, cryptocurrency, insurance, mass tort, construction defect, products liability, federal antitrust and securities litigation matters, allows him to serve as a valuable asset in representing the Firm's clients.



Joey contributes to the Firm's success by taking a leading role in many of its largest cases. Joey's recent significant involvements include serving as a member of the Steering Committee and Co-Chair of the Briefing Committee in the multidistrict litigation arising out of the collapse of the FTX cryptocurrency exchange, litigating putative nationwide class action suits arising out of the implosion of cryptocurrency exchanges Voyager Digital and Binance, as well as numerous finally-approved nationwide class action settlements of claims of unfair and deceptive practices by large corporations in their marketing and sales of various consumer products and services, health supplements, insurance and investment products.

Joey has also been instrumental in favorably expanding the law on important areas of class action litigation for plaintiffs. In *Las Olas Company Inc., et al. v. Florida Power & Light Company, et al.*, representing a class of businesses forced to close after contractors negligently ruptured a water main during a directional drilling operation, Joey helped The Moskowitz Law Firm attain the first reported decision since the Florida Supreme Court decided *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006), affirming a litigated certification of a liability issue class pursuant to Florida Rule of Civil Procedure 1.220(d)(4). *Infratech Corp. v. Las Olas Co.*, 320 So. 3d 751 (Fla. 4th DCA 2021). Joey then helped the Firm attain a jury verdict finding the contractor 98% liable for the class's damages. The 17th Judicial Circuit Court then finally approved a class action settlement that paid damages to all class members who submitted valid claims and included valuable injunctive relief.

Joey has also had great success in opposing objections and attaining final approval of nationwide class action settlements, as in *Fruitstone v. Spartan Race, Inc.*, No. 1:20-cv-20836-BLOOM/Louis (S.D. Fla.) (arising from Spartan Race's business practices relating to its Racer Insurance Fee) and *Collins v. Quincy Bioscience, LLC*, No. 19-22864-Civ-COOKE/Goodman, ECF No. 200 (S.D. Fla. Nov. 18, 2020) (involving claims of purchasers of the memory improvement supplement, Prevagen), where they achieved the *Collins* settlement after Magistrate Judge Jonathan Goodman recommended certification of a litigated Florida statewide issue class pursuant to Federal Rule of Civil Procedure 23(c)(4), which would have bifurcated the proceedings into liability and damages phases. *Collins*, No. 19-22864-Civ-COOKE/Goodman, ECF No. 119 (S.D. Fla. Mar. 19,

2020).   Joey was also integral in helping to overturn the onerous "administrative feasibility" requirement imported into the "ascertainability" standard for class certification, which benefits class action plaintiffs throughout the nation. *Cherry v. Dometic*, 986 F.3d 1296 (11th Cir. 2021).

Joey was also actively involved in litigating to protect the interests of victims of the collapse of the Champlain Towers South Condominium before Judge Michael Hanzman in the Miami-Dade Complex Business Litigation Division in *In re: Champlain Towers South Collapse Litigation*, No. 2021-015089-CA-01, which resulted in over a billion dollar settlement for the victims that was finally approved by the Court one year after the tragic collapse.

Prior to joining The Moskowitz Law Firm, Joey began his practice at 23 years old at a commercial litigation boutique in Aventura, where he represented businesses and individuals in a variety of disputes involving breach of contract, commercial transactions, fraud, business torts, deceptive and unfair trade practices, intellectual property, probate, guardianship, and trust litigation, at both the trial and appellate court levels, as well as in arbitration. For example, Joey successfully represented plaintiffs in *Oded Meltzer, et al. v. NMS Capital Group LLC, et al.*, Case No. 1:17-cv-23068-UU (S.D. Fla.), who sought a declaratory judgment that they were not bound to an arbitration agreement they entered into as representatives of their business entities, and an injunction enjoining defendants from joining them as parties to arbitration of a multi-million-dollar dispute with those business entities. Joey obtained a preliminary injunction on the papers without a hearing, which caused the defendants to stipulate to entry of a final judgment and permanent injunction. Further, Joey authored the answer brief and litigated an appeal in *Yehezkel Nissenbaum, et al. v. AIM Recovery Services, Inc.*, Case No. 3D15-1000 (Fla. 3d DCA 2015), which resulted in the Third District Court of Appeal issuing a *per curiam* affirmance upholding a final judgment exceeding $125,000.000. Similarly, in *Dantro LLP, et al. v. In rem Dantro Fund, et al.*, Case No. 12-ca-001643 (Fla. 20th Jud. Cir.), after obtaining a final summary judgment entitling plaintiff limited liability partnerships to recover $90,000.00 from the Court Registry after it was stolen by their former managing partner, Joey successfully sought an order entitling plaintiffs to recover their attorneys' fees and costs in maintaining the action against the former managing partner in his individual capacity as the real party in interest because he entered an appearance and sought to obtain the stolen funds for himself, purportedly on behalf of the dissolved partnerships. Joey argued and won the motion before the trial court, then successfully defended the order on appeal to the Second District Court of Appeal. *See Edward Adkins v. Dantro LLP, et al.*, Case No. 2D16-4751 (Fla. 2d DCA 2017).

A life-long Florida native, Joey attained a Bachelor's degree in Creative Writing from Florida State University (B.A., 2012) and a Juris Doctorate degree from the University of Miami School of Law (J.D., *magna cum laude*, 2015).

While at the University of Miami, Joey was a member of the Race and Social Justice Law Review, served as Dean's Fellow for the Contracts and Elements courses, earned the Dean's Certificate of Achievement in Evidence and Elements courses, received honors in litigation skills, and was on the Dean's List multiple times.

Joey also gained invaluable experience as a judicial intern for the Honorable Magistrate Judge Jonathan Goodman in the United States District Court for the Southern District of Florida, and as a certified legal intern for the Miami-Dade State Attorney's Office, Misdemeanor Domestic Violence Division.

Joey's attention to detail and commitment to professionalism ensure that clients will receive individualized attention and care in crafting creative legal solutions to meet their particularized needs.

He is a Member of the American Bar Association, the Florida Bar, the North Carolina Bar, the Dade County Bar Association, and is admitted to practice in the State of Florida, the United States District Courts for the Southern, Middle, and Northern Districts of Florida, as well as the United States Court of Appeals for the Eleventh Circuit.

Joey currently resides in Pinecrest, Florida, with his wife, Melody, and daughters, Soleil and Mischa, who inspire him every day to keep fighting for those who need it most. "I can feel proud when I tell them what I do for a living, and that I do it all for them, to make the world we live in better. It's a beautiful thing."

***Barbara Lewis.*** Barbara is an Associate Attorney at The Moskowitz Law Firm. Most of her practice has focused on representing consumers in multi-state class action litigation, complex commercial litigation and multidistrict litigation. She handles a broad range of disputes, including force-placed insurance litigation and complex nationwide litigation relating to health insurance, products liability, false advertising, fraudulent business practices, and other consumer issues. Her fluency in Spanish makes her a valued source to the firm's Hispanic and multicultural clients in South Florida. She has authored various publications including *Amending Rule 23: Modernizing Class Notice and Debunking Bad-Faith Objectors*, published by the Federal Litigation Section of the Federal Bar Association (SideBAR) in Spring 2017, and *Lawsuits Target Hiden Fees, Pass-Through Charges*, published by the Daily Business Review in July 2016.



Barbara also briefly worked at Clarke Silverglate, P.A. where her practice consisted of litigating employment law and general commercial matters. She defended employers against a variety of discrimination and wrongful termination lawsuits in federal and state court. She was instrumental in authoring and arguing various discovery motions against the plaintiff in a contentious sexual harassment dispute which led to a successful mediation. Barbara also represented insurance companies nationwide in a variety of breach of contract actions. In this capacity, she briefed and successfully obtained summary judgment in *Dwyer v. Globe Life and Accident Insurance Company*, Case No. 2:19-cv-14071 (S.D. Fla.), where the plaintiff demanded accidental death insurance benefits on behalf of an insured who had overdosed on illegal drugs. The court's opinion not only clarified existing Florida insurance law, but also created new Florida law on accidental death coverage.

Barbara was born in Cuba but has been a long time Miami resident. She obtained her Bachelor's degree with honors in Government from the University of Virginia in 2012, and her Juris Doctorate degree *cum laude* from the University of Miami School of Law in 2015. While at the University of Miami, Barbara earned the CALI Excellence for the Future Award and Dean's Certificate of Achievement, awarded to the highest scoring student in the class, in her Legal Communication and Research courses. She interned at the Investor Rights Clinic, where she represented under-served investors in securities arbitration claims against their brokers before the Financial Industry Regulatory Authority (FINRA). She was also a member of the school's International Moot Court Program and earned Second Place in the Moot Madrid competition, an international commercial arbitration competition that is conducted entirely in Spanish.



The Moskowitz Law Firm focuses only on large-scale class actions and complex commercial litigation, typically against parties represented by larger, premier law firms. Its attorneys have played a leading role in significant class actions and complex litigation across the country that have made a real difference in the world and on behalf of consumers across the country. With deep roots in the local Miami community, the attorneys at The Moskowitz Law Firm have been avid supporters of several non-profit and education related organizations for over two decades, earning the good will of colleagues, clients and neighbors. After teaching Class Action Litigation at the University of Miami for over 26 years, in 2016, Adam Moskowitz, along with his other co-counsel in the force placed cases, organized the University of Miami Class Action Conference, and annual event which included Class Action Panels with various federal judges, state attorney generals and numerous plaintiff and defense counsel and awards scholarships to students interested in class action litigation.

# 2019 'Family of the Year'

### *We Salute the Moskowitz Family, honored as the Committee of 100's 2019 'Family of the Year'*

Each year, Temple Beth Am is proud to recognize an outstanding family of volunteers. Congratulations to the *Moskowitz Family* — **Jessica**, **Adam, Serafina, Michael** and **Samantha** — who were honored on March 10, 2019 as recipients of the *Committee of 100's 2019 "Family of the Year" Award*, for their continued participation in our Temple community and their ongoing commitment to congregational leadership.



**Jessica**'s TBAM journey began almost a decade ago in the Tot Shabbat and Mommy and Me programs, with the oldest of her three Temple Beth Am Day School students **Serafina**. She has been involved as a lay leader in the Temple Beth Am Day School for several years, including being a room parent, and for two years was Co-Chair of the Day School Annual Auction (2017 and 2018). Jessica is a member of the Day School Board, and is now Co-President of **PATIO** (Parent and Teacher Involvement Organization). She previously chaired the Grandparents & Special Friends Day Committee, served as Vice



President of the Elementary School on the PATIC Board and is currently enrolled in Temple Beth Am's Atideynu leadership training program.

**Adam**, founding partner of **The Moskowitz Law Firm**, is in his 26th year on the faculty at the University of Miami School of Law teaching Class Action Litigation, and donates his salary back to the school for student scholarships. He helped establish the annual Class Action Forum at the UM School of Law. Last year, Adam helped organize a new group of parent volunteers to launch the inaugural Day School Chanukah Games on December 21, 2018 — **watch video**. All 230 elementary school students participated in 12 physical and mental activities, and Opening and Closing Ceremonies. Adam is active in the Alexander Muss High School in Israel program, having been a student and then a *Madrich* (counselor). He is passionate about Israel and works tirelessly in behalf of AIPAC in Washington, DC. A member of the "Beyond the Curve" Capital Campaign Committee, he proudly coaches his daughter's 3rd grade Beth Am Basketball League team and is a frequent guest reader in his childrens' classrooms.



**Serafina** *(pictured at right)* is a third grader at Temple Beth Am Day School where she began her studies in Early Childhood in Junior Pre-Nursery. She enjoys art, tennis, Beth Am Basketball League, spending time with her friends and setting out on her own path in life.

**Michael**, a first grader at Temple Beth Am Day School who also began here in the Early Childhood, also loves playing tennis at Coral Oaks, basketball and spending time with friends and family in Miami and North Carolina.

In Fall 2019, **Samantha**, a Pre-K student, will find her way across the quad to Kindergarten. Eager to learn to read and write, her spunky personality comes shining through, especially during After School U's Hip Hop.

(Family Photo by Anastasia Murphy — *Stasia Shoots)*

# dbr
# DAILY BUSINESS REVIEW

**March 26, 2018**     **Circulation: 25,128/ UMV: 57,146**

# National Class Action Litigator Opens Up About Stress, Quitting Drinking

**by Celia Ampel**

Adam Moskowitz realized a few years ago that he needed to make a change.

One of the top federal class action lawyers in the country, Moskowitz has led enormous cases including force-placed insurance litigation that recovered more than $5 billion for homeowners who alleged their mortgage servicers took kickbacks from insurers.

But with huge victories came a lot of stress — and he wasn't handling it well.

"As the cases became more stressful and they became larger and I was traveling a lot more, I found myself getting more unhealthy," said Moskowitz, who was leading the class action practice at Kozyak Tropin & Throckmorton in Coral Gables. "A lot of the lifestyles of lawyers involve drinking and involve celebration. When you win a big case, you open champagne."

Drinking became his go-to method for relieving stress, and while it wasn't affecting his work, he felt he was on a "path to destruction." Moskowitz realized something had to give.

"Having a beautiful wife and having three kids made me really analyze my situation," he said. "I looked around and there were terrible things happening to people. People were committing suicide that I knew."

A lot of lawyers deal with mental health issues but don't feel they can talk about them, he said. The issue has become a focus of the Florida Bar, particularly after the suicide of powerhouse litigator Ervin Gonzalez last year.

"You're fighting people so often that they're looking for any weakness in you, and you don't want to admit, maybe, that you have a problem," Moskowitz said. "Or you don't want to seek help from those people that you're probably around the most because of this competition and how vicious our industry can be."

Moskowitz quit drinking and got back to old habits of running races and practicing yoga. The resulting mental clarity gave the 50-year-old the resolve to strike out on his own, leaving the firm he'd joined as a second-year associate in 1993. He still has working and personal relationships with his old partners at Kozyak Tropin, but that firm wasn't his dream.

"I want my own future," he said. "I want to create my own legacy and have my own traditions and really focus in on class actions."

Two months after founding the Moskowitz Law Firm with partner



J. ALBERT DIAZ

Coral Gables litigator Adam Moskowitz said he wants to help stoke honest conversations about stress and mental health in the legal profession.

### ADAM MOSKOWITZ

**Born:** 1967, New York City

**Spouse:** Jessica Moskowitz

**Children:** Serafina, Michael, Samantha

**Education:** University of Miami, J.D., 1993; Syracuse University, B.A., 1989

**Experience:** Founding and managing partner, The Moskowitz Law Firm, 2018-present; Partner, associate and class action chairman, Kozyak Tropin & Throckmorton, 1993-2018; Associate, Friedman, Rodriguez, Ferraro & St. Louis, 1993

Howard Bushman, Moskowitz leads a firm with four attorneys, several support staff and an office in downtown Coral Gables. He admits he's scared, but mentors such as legendary Miami attorney Aaron Podhurst told him they were scared, too — and it all worked out.

Moskowitz knows about perseverance, starting with his upbringing after his father left.

"My mom was amazing," he said. "With nothing, she moved to Miami with my sister and I, and she worked five jobs. Five jobs. She was a nurse. She was a receptionist. She was a hostess. She did summer jobs — she worked at my summer camp as the nurse so we could go for free."

Moskowitz said his mother also begged a private school to let him attend on a scholarship. From there he went to college, studied abroad in London and worked in Israel, all thanks to her.

### BENLATE CASES

When he graduated from the University of Miami School of Law, he joined a five-attorney firm that sent him during his second week to speak with a grower whose claimed his plants were dying because of the DuPont Co. fungicide Benlate. The firm took about 70 similar cases.

"They said, 'Adam, you go handle them,' " Moskowitz said. " 'You go travel around the state of Florida to Apopka, to Dade City, to Plant City, to Tallahassee.' I was a first-year associate. I knew nothing. I was getting killed. … I was learning trial by fire."

But he broke the cases open during a trip to Costa Rica when he learned about Benlate studies done there that produced "horrible" results. In sworn interrogatories, DuPont said it had not done any testing in Costa Rica. Moskowitz's firm made a long-shot move and asked the judge to strike the pleadings and find against DuPont on liability — and she did.

The resulting settlements led to infighting over money and ethical issues among the partners, and the firm broke up. Moskowitz decided to take his cases with him to Kozyak Tropin. As a second-year associate, he negotiated a contract that would give him a percentage of the fees. Soon afterward, he did the openings and closings for a trial that led to a $130 million jury verdict against DuPont.

Forced-place insurance has been much of Moskowitz's focus for the past decade. He's also known for representing victims of Scott Rothstein's $1.2 billion Ponzi scheme and serving as lead counsel in a currency-conversion class action against American Express

and securities litigation against Lancer Partners, among other cases.

At his new firm, he's leading class action litigation alleging life insurance companies are charging illegal rates to people near the end of their lives.

### TAKE CARE

His career isn't not slowing down. But Moskowitz now understands the importance of taking care of himself. He's thrilled about organizing the kids' field day at his synagogue, quipping that these days, he'd rather make the Temple Beth Am Commentator than the front page of the Wall Street Journal.

Moskowitz hopes he can inspire even one attorney struggling with drinking or stress to do something about it.

"The tragedies are these people who commit suicide and they leave their children orphans," he said, beginning to choke up. "We had somebody in our school who died — her son is in our son's class. I can only imagine if my son grew up without a father. Maybe if that lawyer or that person says, 'Yeah, things are rough, but you know, Adam went through it, and he's a tougher person as a result of dealing with it. Maybe I'll go see somebody. Maybe I'll go talk to somebody.' "

**Celia Ampel covers South Florida litigation. Contact her at campel@alm.com or on Twitter at @CeliaAmpel.**

## David Boies



Since its founding in 1997 David Boies has been the Chairman of Boies Schiller & Flexner LLP. Prior to 1997 Mr. Boies was a partner at Cravath, Swaine & Moore.

Mr. Boies attended and received a B.S. from Northwestern University (1964), an LL.B., magna cum laude from Yale University (1996), and an LL.M. from New York University (1967).

He is a member of Phi Beta Kappa, a Fellow of the American College of Trial Lawyers and the International Academy of Trial Lawyers; and a Trustee of the Cold Spring Harbor Laboratory and New York University Law School Foundation. He is the author of numerous publications including Courting Justice (2004), Redeeming the Dream (with Ted Olson), and Public Control of Business (with Paul Verkuil) (1977). He has taught courses at New York University Law School and Cardozo Law School.

Mr. Boies is a leading class action lawyer whose cases have included many of the largest and most successful class actions in history, four of which have resulted in more than $1 billion. He is currently lead counsel or co-lead counsel for plaintiffs In re: Blue Cross Blue Shield Antitrust Litigation, MDL 2406, U.S District Court, Northern District of Alabama; In re: Takata Airbag Products Liability Litigation, MDL 2599, U.S. District Court, Southern District of Florida (Miami); In re: Google Digital Advertising Antitrust Litigation, MDL 3010, U.S. District Court, Southern District of New York; and In re: Grupo Televisa Sec. Litigation, U.S. District Court, Southern District of New York. Brown v. Google LLC, U.S. District Court, Northern District of California, No. 4:20-cv-03664.

He is the recipient of Honorary Doctor of Laws degrees from New York University, the University of Redlands, New York Law School and the University of New Hampshire

School of Law, and an Honorary Doctor of Letters degree from Chicago Theological Seminary.

Mr. Boies has been selected as one of the 100 Most Influential People in the World by Time Magazine. He has been named Global International Litigator of the Year by Who's Who Legal an unprecedented seven times, as well the Litigator of the Year by The American Lawyer; the Lawyer of the Year by The National Law Journal; runner-up Person of the Year by Time magazine; the Antitrust Lawyer of the Year by the New York Bar Association; and Star Individual by *Chambers USA.* He has been named in *Best Lawyers in America* for more than 25 years, Lawdragon 500 Leading Lawyers from 2005 to 2019 and in 2013, was named one of the Top 50 Big Law Innovators of the Last 50 Years by The American Lawyer. His awards include the ABA medal from the American Bar Association, the Award of Merit from the Yale Law School, the Vanderbilt Medal from New York University Law School, the Pinnacle Award from the International Dyslexia Association, the William Brennan Award from the University of Virginia, the Role Model Award from Equality Forum, the Lead by Example Award from the National Association of Women Lawyers, the Eisendrath Bearer of Light Award from the Union of Reform Judaism, a Lifetime Achievement Award form the Mississippi Center for Justice, the National Equality Award from the Human Rights Campaign, and the Award for Public Service from the Woodrow Wilson Center.

Mr. Boies served as Chief Counsel and Staff Director of the U.S. Senate Antitrust Subcommittee in 1978 and Chief Counsel and Staff Director of the U.S. Senate Judiciary Committee in 1979.

In 1991-1993, Mr. Boies was counsel to the Federal Deposit Insurance Corporation, recovering US$1.2 billion from companies who sold junk bonds to failed savings and loan associations. In 1998-2000, he served as special trial counsel for the US Department of Justice in its antitrust suit against Microsoft.

In 2000, Mr. Boies served as lead counsel for former Vice President Al Gore in connection with litigation relating to the Florida vote count. In 2009-2013, as co-lead counsel for the plaintiffs in *Perry v Brown*, he won a judgement establishing for the first time the United States constitutional right for gay and lesbian citizens to marry.

Mr. Boies recovered a record US$4 billion for his client American Express in its landmark antitrust case against Visa and MasterCard; successfully defended NASCAR in antitrust litigation that charged NASCAR with monopolizing the market for championship auto racing; won a jury verdict for his client Starr international in a case against AIDavid BG over the ownership of US$4.5  billion in disputed assets; and won a US$1.3 billion jury verdict for his client Oracle against SAP for copyright infringement.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 24-CV-23953-DPG

JANE DOE (S.F.), on behalf of herself and all
others similarly situated, et al.,

        Plaintiffs,

v.


ROYAL CARIBBEAN CRUISES LTD., and
ARVIN JOSEPH MIRASOL,

        Defendants.

_____/

**[PROPOSED] ORDER APPOINTING INTERIM LEAD CLASS COUNSEL**

THIS CAUSE came before the Court upon Plaintiff Jane Doe's (S.F.) Motion to Certify Nationwide Issue Classes, Pursuant to Federal Rules 23(a), 23(b)(3), and 23(c)(4), and Incorporated Memorandum of Law (the "Motion to Certify"). In connection with the Motion to Certify, Plaintiff asks the Court to appoint The Moskowitz Law Firm PLLC as Lead Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 23(g)(3) provides that "[t]he court may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3). When appointing interim lead counsel, courts generally look to the same factors used to determine the adequacy of class counsel under Rule 23(g)(1)(A), which calls for the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable

1

law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). "Courts normally take a deferential approach in reviewing the lead plaintiff's selection of class counsel." Cooper v. DJSP Enterprises, Inc., No. 10-61261-CIV, 2010 WL 11552871, at *4 (S.D. Fla. Nov. 24, 2010).

Upon review of the credentials set forth in the Motion to Certify for The Moskowitz Law Firm, PLLC, the undersigned finds that they possess the requisite experience and resources to represent the interests of the class members.

Thus, it is **ORDERED AND ADJUDGED** as follows:

1. The Moskowitz Law Firm PLLC is appointed as Interim Lead Class Counsel.

**DONE AND ORDERED** in Chambers at Miami, Florida this __ day of January, 2025.

HONORABLE DARRIN P. GAYLES
United States District Judge

Copies furnished to: All Counsel of Record

2

# Appendix B

| | |
|---|---|
| **From:** | cmecfautosender@flsd.uscourts.gov |
| **To:** | flsd_cmecf_notice@flsd.uscourts.gov |
| **Subject:** | Activity in Case 1:24-cv-23953-DPG Doe (S.F.) v. Royal Caribbean Cruises, LTD. et al Order Staying Case |
| **Date:** | Tuesday, January 14, 2025 4:50:15 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Southern District of Florida

### Notice of Electronic Filing

The following transaction was entered on 1/14/2025 at 4:49 PM EST and filed on 1/14/2025
**Case Name:** Doe (S.F.) v. Royal Caribbean Cruises, LTD. et al
**Case Number:** 1:24-cv-23953-DPG
**Filer:**
**Document Number:** 42(No document attached)

**Docket Text:**
**PAPERLESS ORDER. As set forth at the status conference on January 14, 2025, all deadlines in this matter are stayed pending the Court's resolution of Defendant Royal Caribbean Cruises Ltd.'s ("RCL") forthcoming Consolidated Motion to Compel Arbitration (the "Motion to Compel"). Plaintiffs shall have until February 26, 2025, to add additional parties. RCL shall file its Motion to Compel on or before March 26, 2025. Plaintiffs shall file their consolidated response to the Motion to Compel on or before April 28, 2025. RCL shall file its reply in support of the Motion to Compel on or before May 19, 2025. The Motion, Response, and Reply each shall not exceed 30 pages. Signed by Judge Darrin P. Gayles on 1/14/2025. (hs01)**

**1:24-cv-23953-DPG Notice has been electronically mailed to:**

Adam M. Moskowitz    adam@moskowitz-law.com, dione@moskowitz-law.com, rejane@moskowitz-law.com, service@moskowitz-law.com

Annalisa Gutierrez    agutierrez@hamiltonmillerlaw.com, jhamilton@hamiltonmillerlaw.com, vfish@hamiltonmillerlaw.com

Hayley Harrison Ryan    hryan@cozen.com

Jacqueline Garcell    jgarcell@lipcon.com, jmargulies@lipcon.com, jschneider@lipcon.com, mwinkleman@lipcon.com

Jason Robert Margulies    crewlawyer@aol.com, fpadilla@lipcon.com, kcuellar@lipcon.com, myepez@lipcon.com, ydelgado@lipcon.com

Jerry Dean Hamilton    jhamilton@hamiltonmillerlaw.com, smarroquin@hamiltonmillerlaw.com

John J. Sullivan    JSullivan@cozen.com

Joseph M. Kaye    joseph@moskowitz-law.com, dione@moskowitz-law.com, rejane@moskowitz-law.com, service@moskowitz-law.com

Kassandra Cecilia Doyle Taylor    ktaylor@hamiltonmillerlaw.com, carrese@hamiltonmillerlaw.com, ochiong@hamiltonmillerlaw.com, olopez@hamiltonmillerlaw.com

Krista Fowler Acuna    kacuna@hamiltonmillerlaw.com, jlondon@hamiltonmillerlaw.com, mmontesdeoca@hamiltonmillerlaw.com, zcolangelo@hamiltonmillerlaw.com

Kurt Konrad Lunkenheimer    kklunkenheimer@cozen.com, jbonilla@cozen.com

Marc E Weiner    mweiner@lipcon.com, dpaz@lipcon.com, gortiz@lipcon.com, jmargulies@lipcon.com, mwinkleman@lipcon.com

Michael A. Winkleman    mwinkleman@lipcon.com, dpaz@lipcon.com

**1:24-cv-23953-DPG Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

Arvin Joseph Mirasol
02507-511
FDC Miami
Inmate Mail/Parcels
33 NE 4th Street
Miami, FL 33132

# Appendix C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

---

*C.B. et al.,*

      Plaintiffs,               No.  24-cv-25089-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*D.M. et al*,

      Plaintiffs,               No. 24-cv-24988-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*Doe (S.F.) et al*,

      Plaintiffs,               No. 24-cv-23953-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*Doe,*

      Plaintiff,               No. 24-cv-24039-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation,

      Defendant.

---

*Doe et al,*

      Plaintiffs,                       No. 25-cv-20138-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation,

      Defendant.

---

*Doe et al,*

      Plaintiffs,                       No. 25-cv-20485-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation,

      Defendant.

---

*J.L.S. et al,*

      Plaintiffs,                       No. 24-cv-24139-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation, and ARVIN JOSEPH MIRASOL, a citizen and
resident of the Republic of the Philippines,

      Defendants.

---

*K.T. et al,*

      Plaintiffs,                       No. 24-cv-24193-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*M.S. et al*,

      Plaintiffs,               No. 24-cv-24738-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*T.L. et al*,

      Plaintiffs,               No. 24-cv-25009-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*V.V., et al*,

      Plaintiffs,               No. 25-cv-20051-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation,

      Defendant.

---

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS ......................................................................................................................... 4

    I.    Plaintiffs' Claims Address Emotional and Mental Distress Damages
    Suffered after They Learned That They Had Previously Been Subjected to
    Voyeurism .................................................................................................. 4

    II.    Plaintiffs Concede That They Entered into the Contract That Governs
    This Dispute ............................................................................................... 6

    III.    The Contract Contains an Arbitration Clause That Must Be Broadly
    Interpreted and That Requires Arbitration of Their Claims for Mental and
    Emotional Distress ..................................................................................... 7

    IV.    The International Plaintiffs' Contracts Require All Claims to Be
    Brought in the Courts of England and Wales ............................................. 9

ARGUMENT ............................................................................................................... 10

    I.    Federal Law Favors Arbitration, Resolves All Doubts in Favor of Arbitration,
    And Strongly Presumes Arbitration Agreements to Be Valid .............................. 10

    II.    Plaintiffs' Contract Requires Arbitration of All Their Claims ........................... 11

    III.    No Statute Overrides the Presumed Validity of Plaintiffs'
    Agreement to Arbitrate ............................................................................. 16

        A.    If There is Any Doubt, Lack of Clarity or Ambiguity on
        Whether a Statute Bars Plaintiffs' Agreement to Arbitrate,
        the Court Must Compel Arbitration ............................................. 16

        B.    Maritime Statute 46 U.S.C. § 30527 Does Not Bar, and in
        Fact Supports, Compelling Arbitration under Plaintiffs' Agreement to
        Arbitrate ..................................................................................... 17

        C.    The Ending Forced Arbitration Act Also Supports the Agreement to
        Arbitrate ..................................................................................... 23

    IV.    The Canadian and Chilean Plaintiffs' Claims Must Be Dismissed ..................... 27

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013)..................................................................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................26

*AT&T Mobility v. Concepcion*,
    563 U.S. 333 (2011)..............................................................................................10, 11

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986)............................................................................................ *passim*

*Bazemore v. Jefferson Capital Sys., LLC*,
    827 F.3d 1325 (11th Cir. 2016) ...............................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................26

*Burch v. P.J. Cheese, Inc.*,
    861 F.3d 1338 (11th Cir. 2017) ...............................................................................16

*C.B. et al. v. Royal Caribbean Cruises Ltd., et al*,
    No. 24-cv-25089-DPG, Dkt. No. 17................................................................. *passim*

*Canobinoti, LLC v. Woods*,
    2021 WL 4479006 (S.D. Fla. Sept. 30, 2021) .........................................................14

*Carnival Cruise Lines, Inc. v. Shute*,
    499 U.S. 585 (1991)..............................................................................................17, 19

*Cellairis Franchise, Inc. v. Connor Enterprises, Inc.*,
    2015 WL 12844484 (N.D. Ga. Mar. 17, 2015).......................................................14

*Chan v. Soc'y Expeditions, Inc.*,
    39 F.3d 1398 (9th Cir. 1994) ...................................................................................18

*City of Miami Beach v. Guerra*,
    746 So. 2d 1159 (Fla. Dist. Ct. App. 1999) (Florida has no "common law tort
    related to sexual harassment.") ...............................................................................27

*CompuCredit Corp. v. Greenwood*,
    565 U.S. 95 (2012)................................................................................................ *passim*

ii

*Cook v. Ross Island Sand & Gravel Co.*,
    626 F.2d 746 (9th Cir. 1980) ........................................................................18

*Cosgun v. Seabourn Cruise Line*,
    666 F. Supp. 3d 1270 (S.D. Fla. 2023) .........................................................10

*D.B.C. ex rel. M.A.M. v. Pierson*,
    2014 WL 2155017 (N.D. Ala. May 22, 2014)............................................15, 22, 31

*Davis v. S. Energy Homes, Inc.*,
    305 F.3d 1268 (11th Cir. 2002) ..........................................................16, 17, 22, 23

*DeLuca v. Royal Caribbean Cruises, Ltd.*,
    244 F. Supp. 3d 1342 (S.D. Fla. 2017) ..........................................................17, 20

*Dextel Terrebonne v. K-Sea Transportation Corp.*,
    2002 WL 34106288 (E.D. La. Sept. 13, 2002), *aff'd sub nom. Terrebonne v.*
    *K-Sea Transp. Corp.,* 477 F.3d 271 (5th Cir. 2007) ................................................20

*Doe (S.F.) et al v. Royal Caribbean Cruises Ltd. et al*,
    No. 24-cv-23953-DPG, Dkt. No. 44 ................................................... *passim*

*Doe v. Royal Caribbean Cruises, Ltd., et al*,
    No. 24-cv-24039-DPG, Dkt. No. 1 ................................................... *passim*

*E.E.O.C. v. Waffle House, Inc.*,
    534 U.S. 279 (2002)...........................................................................11

*Erlich v. Menezes*,
    21 Cal.4th 543 (1999) ......................................................................15, 22

*Est. of Myhra v. Royal Caribbean Cruises, Ltd.*,
    695 F.3d 1233 (11th Cir. 2012), *superseded by statute on other grounds*
    *irrelevant to the Court's analysis, as stated in Caron v. NCL (Bahamas) Ltd.*,
    910 F.3d 1359 (11th Cir. 2018) .......................................................18, 19

*Farris v. Carnival Corp.*,
    2018 WL 3699333 (S.D. Fla. Apr. 5, 2018) ...............................................11, 13, 21

*Geraci v. Conte*,
    2000 WL 1739294 (Ohio Ct. App. Nov. 22, 2000) .......................................15, 22

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991)................................................................... *passim*

*Gonzalez v. Carnival Corp.*,
    2024 WL 4863892 (S.D. Fla. Nov. 22, 2024)............................................24, 25, 27

*Gravillis v. Coldwell Banker Residential Brokerage Co.*,
  143 Cal. App. 4th 761 (2006) ..................................................................................15, 22

*In re Elec. Mach. Enterprises, Inc.*,
  479 F.3d 791 (11th Cir. 2007) .............................................................................17, 22, 23

*In re Wiand*,
  2012 WL 611896 (M.D. Fla. Jan. 4, 2012)...............................................................16, 23

*Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*,
  898 F.3d 1087 (11th Cir. 2018) ........................................................................................11

*J.L.S. et al v. Royal Caribbean Cruises Ltd. et al*,
  No. 24-cv-24139-DPG, Dkt. No. 10 ...................................................................... *passim*

*Jones v. Waffle House.*,
  866 F.3d 1257 (11th Cir. 2017) ..................................................................................10, 13

*K.T. v. A Place for Rover*,
  2023 WL 7167580 (E.D. Pa. Oct. 31, 2023), *reconsideration denied*, 2024
  WL 1356221 (E.D. Pa. Mar. 29, 2024)........................................................25, 27, 32

*Kamau v. Slate*,
  2012 WL 5390001 (N.D. Fla. Oct. 1, 2012) .............................................................26

*Knutsen v. State Farm Fire & Cas. Co.*,
  375 F. Supp. 3d 514 (D. Vt. 2019)...............................................................................15, 22

*Mercury Telco Grp., Inc. v. Empresa De Telecommunicaciones De Bogota S.A.
E.S.P.*,
  670 F. Supp. 2d 1350 (S.D. Fla. 2009) ............................................................................12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).........................................................................................................21

*Moore v. Bamboo Retreats, LLC*,
  2021 WL 3029569 (Cal. Ct. App. July 19, 2021)...................................................15, 22

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
  460 U.S. 1 (1983).......................................................................................................10, 13

*Nationwide Gen. Ins. Co. v. Pelkey*,
  2021 WL 2895643 (M.D. Fla. July 9, 2021) ..................................................14, 15, 22

*Nationwide Mut. Ins. Co. v. Pasiak*,
  2012 WL 310772 (Conn. Super. Ct. Jan. 9, 2012)...................................................15, 22

*Nationwide Prop. & Cas. Co. v. Lacayo*,
2008 WL 4831743 (M.D. Ala. Nov. 3, 2008)................................................................15, 22

*Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*,
2024 WL 3925757 (S.D.N.Y. Aug. 23, 2024)................................................................24, 27

*Nolde Bros. v. Loc. No. 358, Bakery & Confectionery Workers Union, AFL-CIO*,
430 U.S. 243 (1977)................................................................10, 13, 23

*Offshore Marine Towing v. Gismondi*,
473 F. Supp. 3d 1353 (S.D. Fla. 2020) ................................................................10

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967)................................................................12

*Sea-Land Serv. v. Gaudet*,
414 U.S. 573 ................................................................18

*Shearson/American Express Inc. v. McMahon*,
482 U.S. 220 (1987)................................................................21

*Shultz v. Fla. Keys Dive Ctr., Inc.*,
224 F.3d 1269 (11th Cir. 2000) ................................................................19

*Sims v. Clarendon Nat. Ins.*,
336 F. Supp. 2d 1311 (S.D. Fla. 2004) ................................................................11

*Singh v. Meetup LLC et al.*,
2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024)................................................................25

*Steelworkers v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960)................................................................12, 14

*Turner v. Sedgwick Claims Mgmt. Servs., Inc.*,
2015 WL 225495 (N.D. Ala. Jan. 16, 2015)................................................................19

*Unite Here Loc. 355 v. Hollywood Greyhound Track, Inc.*,
2009 WL 10668617 (S.D. Fla. Apr. 16, 2009) ................................................................14

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
515 U.S. 528 (1995)................................................................21

*Yost v. Everyrealm, Inc.*,
657 F. Supp. 3d 563 (S.D.N.Y. 2023)................................................................26, 27

*Young v. City of Los Angeles*,
2024 WL 3055489 (C.D. Cal. Apr. 11, 2024) (18 U.S.C. § 1801 is a "criminal
statute" which "does not create a private civil right of action.")................................................................26

**Statutes**

7 U.S.C. § 26(n)(2) ...............................................................................................21, 22

9 U.S.C. § 2.................................................................................................................10

9 U.S.C. §§ 3 & 4..........................................................................................................1

9 U.S.C. § 401(3) ........................................................................................................24

18 U.S.C. § 1801..........................................................................................................25

18 U.S.C. § 2246(2)(D).................................................................................................24

18 U.S.C. § 2246(3) .....................................................................................................24

46 U.S.C. App. § 183c .................................................................................................17

46 U.S.C. § 30527........................................................................................................17

46 U.S.C. § 30527(a)-(b) .............................................................................................20

Coast Guard Authorization Act, Pub. L. 104–324, § 1129(b), 110 Stat. 3901,
    3984–85.................................................................................................................18

Ending Forced Arbitration Act, 9 U.S.C. § 402.................................................... *passim*

Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ......................3

Federal Arbitration Act .......................................................................................... *passim*

Fla. Stat. § 810.145 .................................................................................................25, 26

120 Stat 1485 ..............................................................................................................19

**Other Authorities**

H.R. REP. 109-170, 45, 2006 U ....................................................................................19

Title 18 .......................................................................................................................24

**<u>DEFENDANT ROYAL CARIBBEAN CRUISES, LTD.'S OMNIBUS MOTION TO STAY LITIGATION AND COMPEL ARBITRATION AND MEMORANDUM OF LAW IN SUPPORT OF SAME</u>**

Defendant Royal Caribbean Cruises, Ltd. ("Royal Caribbean") hereby moves under 9 U.S.C. §§ 3 & 4 to stay this litigation and compel arbitration ("Motion") against 127 Plaintiffs (collectively, "Plaintiffs") across eleven different plaintiffs' groups[1] and, in support thereof, states as follows:

**<u>PRELIMINARY STATEMENT</u>**

Plaintiffs bring several claims against Royal Caribbean, seeking to hold it liable for the mental and emotional distress that they allege to have suffered generally months after they were passengers on a Royal Caribbean cruise. Plaintiffs allege that, while they were on a Royal Caribbean cruise, a former crewmember, Arvin Mirasol ("Mirasol"), engaged in voyeurism though the use of a hidden camera and other secret acts and that, when they later learned of Mirasol's actions, they suffered mental and emotional injuries.

Plaintiffs' claims that they suffered mental and emotional injuries, however, must be settled in arbitration, not in this Court. Plaintiffs agreed in their digitally signed ticket-contract ("Contract") that all claims for mental or emotional injury must be resolved through arbitration.

---

[1] *See Doe (S.F.) et al v. Royal Caribbean Cruises Ltd. et al*, No. 24-cv-23953-DPG ("S.F."), Dkt. No. 44 ("S.F. FAC"); *Doe v. Royal Caribbean Cruises, Ltd., et al*, No. 24-cv-24039-DPG ("Doe"), Dkt. No. 1 ("Doe Compl."); *C.B. et al. v. Royal Caribbean Cruises Ltd., et al*, No. 24-cv-25089-DPG ("C.B."), Dkt. No. 17 ("C.B. SAC"); *D.M. et al v. Royal Caribbean Cruises Ltd., et al*, No. 24-cv-24988-DPG ("D.M."), Dkt. No. 1 ("D.M. Compl."); *K.T. et al v. Royal Caribbean Cruises Ltd. et al*, No. 24-cv-24193-DPG ("K.T."), Dkt. No. 10 ("K.T. SAC"); *J.L.S. et al v. Royal Caribbean Cruises Ltd. et al*, No. 24-cv-24139-DPG ("J.L.S."), Dkt. No. 10 ("J.L.S. FAC"); *M.S. et al v. Royal Caribbean Cruises Ltd. et al*, No. 24-cv-24738-DPG ("M.S."), Dkt. No. 1 ("M.S. Compl."); *T.L. et al v. Royal Caribbean Cruises Ltd. et al*, No. 24-cv-25009-DPG ("T.L."), Dkt. No. 1 ("T.L. Compl."); *V.V. v. Royal Caribbean Cruises Ltd. et al.*, No. 25-cv-20051-DPG ("V.V."), Dkt. No. 1 ("V.V. Compl."); *Doe v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20138-DPG ("L.R."), Dkt. No. 1 ("L.R. Compl."); *Doe et al v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20485-DPG ("R.M."), Dkt. No. 1 ("R.M. Compl.").

The agreed-to Contract requires its arbitration provision to be construed broadly and exempts emotional distress injuries from arbitration only if—inapplicable here—they "arise out of bodily injury" and therefore constitute an inarbitrable "personal injury." In other words, Plaintiffs' Contract requires arbitration unless the emotional distress resulted from physical injury. Here, however, Plaintiffs allege that their emotional distress resulted from the discovery of Mirasol's secret, voyeuristic acts, not from a physical injury inflicted by Mirasol. Indeed, none of the Plaintiffs allege any harmful physical contact with Mirasol, and nearly all of them never allege that they even met him. There can be no other reading of Plaintiffs' Complaints: their injuries, which occurred after (often months after) Mirasol's secret voyeurism, originated from (or constitute) emotional distress, not any physical, bodily injury. Plaintiffs' claims must be arbitrated.

Importantly, the Contract and federal law unambiguously require the Contract's arbitration provision to be construed broadly.  The Contract does this in two ways.  It requires its mandatory arbitration provision to be "broadly interpreted," and it requires any exclusion from that arbitration provision to be "narrowly" interpreted.  Federal policy, as enshrined in the Federal Arbitration Act ("FAA") and implemented by the courts, also strongly favors enforcement of the Contract's mandatory arbitration provision.  Federal law requires courts to resolve all doubts in favor of arbitration and, as held by the Supreme Court, to compel arbitration whenever there is ***any*** contractual interpretation supporting arbitration. Here, there is not only such an interpretation; there is no interpretation to the contrary.

Plaintiffs have signaled that they will argue that the Contract's explicit agreement to arbitrate their claims is somehow negated by two statutes.  This argument, however, faces a daunting burden that they cannot meet. To escape their express agreement to arbitrate, federal law embodied in the Federal Arbitration Act requires Plaintiffs to establish that Congress enacted a

2

statute that clearly and explicitly bars arbitration of Plaintiffs' claims.  If Congress remained silent, if the statute contains multiple plausible readings or ambiguities, or if Congress was anything other than crystal clear in prohibiting arbitration of Plaintiffs' claims, the Court must resolve these doubts in favor of compelling arbitration.

Here, if anything, Congress was clear that Plaintiffs' agreed-to arbitration provision should be enforced. Congress in essence memorialized in a federal maritime statute, discussed in great detail in the body of this brief, the same parameters that exist in Plaintiffs' agreed-to arbitration provision.  In particular, the maritime statute recognizes—and has for almost 90 years—the Contract's distinction between, on the one hand, personal injury claims that result from physical or bodily injury and, on the other hand, emotional distress claims not caused by bodily injury. This statute, like the Contract, bars arbitration of only the personal injury claims involving physical or bodily injury.  It imposes no such bar, however, (and has not for the many decades of its existence) on the arbitration of emotional distress claims not caused by physical or bodily injury, which are Plaintiffs' claims here. As made clear by the Supreme Court, where, as here, Congress merely remained silent or failed to clearly and explicitly bar arbitration, the parties' arbitration agreement must be enforced according to its terms.  Maybe more important, there is a dearth of decisions in which courts applied this maritime statute to bar arbitration of purely emotional distress claims like those asserted here by Plaintiffs—in fact, to date, Royal Caribbean has found no such decision.

Plaintiffs also cite a plainly inapplicable statute, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), which bars only the arbitration of claims that plausibly allege sexual assault or sexual harassment or a violation of such a statute. Yet here, Plaintiffs allege voyeurism and do not allege any actual facts that could amount to sexual assault or harassment or that could give rise to a violation of such a statute.  As to Royal Caribbean, they

3

only assert claims for intentional and negligent infliction of emotional distress, negligence, invasion of privacy, and breach of implied contractual duties. Under clear law, these factual allegations and these common law claims fall well outside the ambit of the EFAA.

In short, Plaintiffs' claims are subject to arbitration under the agreed-to arbitration provision and neither of the statutes to which Plaintiffs point changes that. The Action should be stayed pending the arbitration of Plaintiffs' claims. Also, as discussed in more detail below, the claims by certain International Plaintiffs (defined below) must be dismissed because they are filed in the wrong court.

## FACTS

**I.      Plaintiffs' Claims Address Emotional and Mental Distress Damages Suffered after They Learned That They Had Previously Been Subjected to Voyeurism**

Plaintiffs' own allegations establish that they seek to hold Royal Caribbean liable for emotional and mental distress damages caused only after they learned that a Royal Caribbean employee, Arvin Mirasol, had previously subjected them to secret voyeurism. Specifically, they allege that, while they were one of the Royal Caribbean cruises conducted between December 1, 2023 and February 26, 2024, Mirasol secretly recorded them via hidden cameras that he had installed in their rooms. *See* S.F. FAC ¶¶ 1, 15, 23; C.B. SAC ¶¶ 1, 15, 23; Doe Compl. ¶¶ 1-2, 3; D.M. Compl. ¶¶ 29, 33, 36; K.T. SAC ¶¶ 25, 28, 31; J.L.S. FAC ¶¶ 11, 14, 17; M.S. Compl. ¶¶ 12, 15, 17; T.L. Compl. ¶¶ 22, 25, 28; L.R. Compl. ¶ 17; RM Compl. ¶ 17. Some Plaintiffs (not all) also allege that Mirasol, again without their knowledge, would secretly "hide under the bed" and record them. *See* S.F. FAC ¶ 50; C.B. SAC ¶ 39; Doe Compl. ¶ 32; D.M. Compl. ¶ 47; T.L. Compl. ¶ 39.

Importantly, no Plaintiff alleges that Mirasol damaged them through physical contact. Instead, their Complaints make clear that they were not aware of Mirasol's actions as he conducted

them. Instead, Plaintiffs' allege that they learned of Mirasol's secret recordings later, and, for most Plaintiffs, over six months after their cruise. *See* S.F. FAC ¶¶ 34, 116; C.B. SAC ¶¶ 34, 105; Doe Compl. ¶ 35; D.M. Compl. ¶ 37; K.T. SAC ¶ 33; T.L. Compl. ¶ 29; L.R. Compl. ¶ 17; RM Compl. ¶ 17; *see generally* J.L.S. FAC; M.S. Compl.

These subsequent disclosures of Mirasol's actions caused their alleged emotional distress. *See* S.F. FAC ¶¶ 15, 23, 41; C.B. SAC ¶¶ 15-16, 23; Doe Compl. ¶¶ 1, 3; D.M. Compl. ¶¶ 33, 35-36; K.T. SAC ¶¶ 28, 30-31; J.L.S. FAC ¶¶ 14, 34, 37, 50, 53; M.S. Compl. ¶¶ 15, 17, 33, 36, 49, 52; T.L. Compl. ¶¶ 25, 27-28; L.R. Compl. ¶¶ 17-20; RM Compl. ¶¶ 17-20. Accordingly, they allege throughout their Complaints that this later discovery of Mirasol's "video voyeurism" caused them "emotional distress." *See, e.g.*, S.F. FAC ¶¶ 17, 41, 65-67, 72-73, 77, 82-83, 88, 92; *see also id.* ¶¶ 17, 41, 66, 73, 82, 88 (alleging they suffer from "crying"); *id.* ¶¶ 67, 77, 83, 92 ("mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders"); *see also* C.B. SAC ¶¶ 16, 55-56, 62, 71, 77; Doe Compl. ¶¶ 38, 58, 73; D.M. Compl. ¶¶ 35, 49-50, 56, 68-69, 76-77, 87-88, 95-96, 100; K.T. SAC ¶¶ 30, 40-41, 48, 56-57, 62, 70, 83; J.L.S. FAC ¶¶ 34-35, 37-38, 50-51, 53-54; M.S. Compl ¶¶ 33-34, 36-37, 49-50, 52-53; T.L. Compl. ¶¶ 27, 41-42, 48, 52, 59-60, 68-69, 73, 79-81, 87-88, 92; L.R. Compl. ¶¶ 17-20; RM Compl. ¶¶ 17-20.

Plaintiffs' Complaints also do not allege that their emotional harm resulted from a bodily injury inflicted by Mirasol. To the contrary, they allege no inappropriate contact with Mirasol. Rather, they limit their claims to Mirasol's secret recordings through hidden cameras and other acts of voyeurism that they claim violated their privacy, which caused them mental and emotional distress. Based on these allegations, Plaintiffs variously bring several claims against Mirasol: (1) intentional infliction of emotional distress ("IIED"); (2) negligent infliction of emotional distress

5

("NIED"); (3) invasion of privacy; and (4) punitive damages. *See* S.F. FAC ¶¶ 48-52, 61-67; 78-83; C.B. SAC ¶¶ 37-41, 50-56, 67-72; D.M. Compl. ¶¶ 44-50, 61-69, 82-89; K.T. SAC ¶¶ 34-41, 52-57; J.L.S. FAC ¶¶ 36-38, 46-47, 52-54, 62-63; M.S. Compl. ¶¶ 35-37, 45-46, 51-53, 61-62; T.L. Compl. ¶¶ 36-42, 53-61, 74-81. Plaintiffs also variously bring eleven claims against Royal Caribbean: (1) vicarious strict liability for Mirasol's IIED; (2) vicarious strict liability for Mirasol's invasion of privacy; (3) vicarious strict liability for Mirasol's video voyeurism; (4) vicarious strict liability for Mirasol's negligence; (5) NIED; (6) general negligence; (7) negligent security; (8) negligent failure to warn; (9) negligent supervision; (10) breach of the implied covenant of good faith and fair dealing; and (11) punitive damages. *See* S.F. FAC ¶¶ 53-60, 68-77; 84-116; C.B. SAC ¶¶ 42-49, 57-66, 73-105; Doe Compl. ¶¶ 40-74; D.M. Compl. ¶¶ 51-60, 70-81, 90-114; K.T. SAC ¶¶ 42-51, 58-91; J.L.S. FAC ¶¶ 32-35, 39-45, 48-51, 55-58, 59-61; M.S. Compl. ¶¶ 31-34, 38-44, 47-50, 54-60; T.L. Compl. ¶¶ 43-52, 62-73, 82-106; L.R. Compl. ¶¶ 23-31, 32-45, 46-55, 56-67, 68-76, 77-89, 90-103, 104-112; R.M. Compl. ¶¶ 23-31, 32-46, 47-57, 58-70, 71-80, 81-93, 94-108, 109-117.

Plaintiffs do not allege that Royal Caribbean or any of its other employees knew of Mirasol's conduct. Plaintiffs also do not allege that Royal Caribbean itself is directly liable for IIED or invasion of privacy, or video voyeurism. Rather, on these claims, they seek to hold Royal Caribbean strictly and vicariously liable for Mirasol's conduct. S.F. FAC ¶¶ 53-60, 68-77; C.B. SAC ¶¶ 42-49, 57-66; Doe Compl. ¶¶ 40-74; D.M. Compl. ¶¶ 51-60, 70-81; K.T. SAC ¶¶ 42-51, 58-65; J.L.S. FAC ¶¶ 39-42, 55-58; M.S. Compl. ¶¶ 38-41, 54-57; T.L. Compl. ¶¶ 43-52, 62-73; L.R. Compl. ¶¶ 23-31, 85; R.M. Compl. ¶¶ 23-31, 89.

## II.    Plaintiffs Concede That They Entered into the Contract That Governs This Dispute

Plaintiffs concede that they and Royal Caribbean executed the Contract, and that the Contract, which nearly all of them digitally signed, governs this dispute. S.F. FAC ¶ 105 ("At all

times material hereto, [Royal Caribbean] and the Plaintiffs and all others similarly situated were parties to a passenger ticket contract."); C.B. SAC ¶ 94 (same); Doe Compl. ¶ 18 (acknowledging that the "passenger-ticket contract" controls); L.R. Compl. ¶ 5 (same); R.M. Compl. ¶ 5 (same); D.M. Compl. ¶ 21 (acknowledging "the operative ticket contract"); K.T. SAC ¶ 19 (same); T.L. Compl. ¶ 14 (same); J.L.S. FAC ¶ 11 (acknowledging "contractual period"); M.S. Compl. ¶ 12 (same); *see* Declaration of Amanda Campos ("Campos Declaration") ¶¶ 6-7 (confirming that nearly all Plaintiffs digitally signed the American, Canadian, or Chilean Contract, which are attached to the Campos Declaration as Exhibit A, B, and C, respectively).  The T.L. Plaintiffs have confirmed that the Contract is the "operative contract."  T.L. Compl. ¶ 14.  Royal Caribbean is continuing to investigate the method by which those Plaintiffs executed their operative ticket-contracts. *See* Campos Declaration ¶ 7.

**III.     The Contract Contains an Arbitration Clause That Must Be Broadly Interpreted and That Requires Arbitration of Their Claims for Mental and Emotional Distress**

The Contract references an arbitration provision on its first page in all caps and in **bold**:

> **YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS 3, AND 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS…INCLUDING TIME LIMITS AND FORUM FOR CLAIMS AND SUITS, APPLICABLE LAW, [AND] ARBITRATION.**

Contract at 1 (emphasis in original).

Paragraph 10(c) lays out the "**MANDATORY ARBITRATION**" provision.  It broadly requires arbitration of all claims between Plaintiffs and Royal Caribbean and specifically requires arbitration of claims for mental or emotional distress or injury. Contract, § 10(c). It states that "any dispute or claim between you and us must be arbitrated" and that the "agreement to arbitrate is intended to be broadly interpreted." Contract, § 10(c). The arbitration requirement "includes, but is not limited to" "claims arising out of or relating to this Agreement and/or the Cruise…or any

7

other aspect of the relationship between you and us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory." *Id.* § 10(c)(i).

Importantly, it requires arbitration of all mental or emotional distress claims, like Plaintiffs', that were not caused by bodily injury. *Id.* (requiring arbitration of "claims for mental or emotional distress or injury ***not arising out of bodily injury***.") (emphasis added). It also makes clear that the arbitration requirement "is intended to be broadly interpreted." *Id.* ¶10(c)(i). The arbitration clause goes on to exclude "personal injury, illness, or death" claims (unlike Plaintiffs' emotional distress claims) from arbitration and require that this exclusion be "narrowly" interpreted. *Id.* § 10(c)(ii). Thus, the Contracts' arbitration clause makes an important distinction between (i) claims (like Plaintiffs') for mental or emotional distress or injury not arising from bodily injury, which must be arbitrated, and (ii) claims for personal injury, illness or death, which are not to be arbitrated.

Some Plaintiffs allege that physical symptoms resulted from their emotional distress. *See* S.F. FAC ¶¶ 17, 41, 52, 60, 66-67, 73, 77, 82-83, 88, 92, 99, 104, 116 (alleging that Plaintiffs' "severe emotional distress" is "causing the Plaintiffs physical sickness" "physical pain" and "physical impact"); C.B. SAC ¶¶ 16, 41, 49, 55-56, 62, 66, 71-72, 77, 81, 88, 93, 105 (same); D.M. Compl. ¶¶ 50, 60, 68-69, 77, 81, 88, 89, 96, 100, 108 (same); T.L. Compl. ¶¶ 42, 52, 60, 61, 69, 73, 80-81, 88, 92, 100, 106 (same); J.L.S. FAC ¶¶ 35, 38, 42, 45, 47, 51, 54, 58, 61, 63 (alleging "pain and suffering"); M.S. Compl. ¶¶ 34, 37, 41, 44, 46, 50, 53, 57, 60, 62 (same). This is the opposite of what the narrow exclusion from arbitration requires. Contract, § 10(c)(i) (requiring arbitration if the alleged emotional distress arose "out of bodily injury," not the other way around).

In short, Plaintiffs' claims of mental and emotional distress and injury lie right at the center of the Contract's requirement to arbitrate. As does Plaintiffs' contract-based claim for breach of

8

the implied covenant of good faith and fair dealing. *Id.* § 10(c)(i) (requiring arbitration of claims "based in contract."). Notably, the Plaintiffs, all of whom acknowledge the Contract, (S.F. FAC ¶ 105; C.B. SAC ¶ 94; Doe Compl. ¶ 18; L.R. Compl. ¶ 5; R.M. Compl. ¶ 5; D.M. Compl. ¶ 21; K.T. SAC ¶ 19; J.L.S. FAC ¶ 11; M.S. Compl. ¶ 12; T.L. Compl. ¶ 14), and some of whom even directly acknowledge the "predispute arbitration agreement" (S.F. FAC ¶ 36; C.B. SAC ¶ 36), do not even attempt to dispute that its express language mandates arbitration of their claims.

**IV.    The International Plaintiffs' Contracts Require All Claims to Be Brought in the Courts of England and Wales**

Some of the C.B. Plaintiffs are citizens and residents of Canada (C.B. SAC 1(p)-(s)) ("Canadian Plaintiffs"), and the V.V. Plaintiffs are citizens and residents of Chile ("Chilean Plaintiffs" and, together with the Canadian Plaintiffs, "International Plaintiffs"). VV. Compl. ¶¶ 2-3. The International Plaintiffs agreed in their signed ticket-contracts ("Canadian Contract" and "Chilean Contract," respectively) to only bring claims in the Courts of England and Wales, establishing that they are in the wrong court.

The Canadian Contract provides:

EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ALL DISPUTES, CLAIMS OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS.  GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS OF ENGLAND AND WALES.

Canadian Contract, § 10(a)(i).

Similarly, the Chilean Contract provides that, "[i]f the dispute is not resolved by [Arbitration or] Alternative Dispute Resolution, you must issue legal proceedings in the Courts of England and Wales." Chilean Contract, § 5.9.

The Canadian and Chilean Contracts further make clear that English law, and English law alone, applies, regardless of whether claims are resolved in Court or in arbitration. Canadian Contract, § 10(a)(ii) ("ALL DISPUTES OR CLAIMS WHATSOEVER," "WHETHER RESOLVED IN COURT OR IN ARBITRATION," are "GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW."); Chilean Contract, § 5.9 ("The contract between us is governed by the laws of England and Wales.").

## **ARGUMENT**

### I.     **Federal Law Favors Arbitration, Resolves All Doubts in Favor of Arbitration, And Strongly Presumes Arbitration Agreements to Be Valid**

It is "hornbook law" that the Federal Arbitration Act embodies the "'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Jones v. Waffle House.*, 866 F.3d 1257, 1263-64 (11th Cir. 2017) (quoting *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011)).  Courts must resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25 (1983); *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016). This extends to maritime arbitration agreements, establishing them as presumptively "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *Cosgun v. Seabourn Cruise Line,* 666 F. Supp. 3d 1270, 1294 (S.D. Fla. 2023) (quoting 9 U.S.C. § 2); *Offshore Marine Towing v. Gismondi,* 473 F. Supp. 3d 1353, 1356 (S.D. Fla. 2020).  When interpreting a maritime arbitration agreement, courts must therefore apply a "strong presumption favoring arbitrability." *Nolde Bros. v. Loc. No. 358, Bakery & Confectionery Workers Union, AFL-CIO,* 430 U.S. 243, 244 (1977).

Plaintiffs bear a heavy burden to defeat this strong presumption. *Farris v. Carnival Corp.,* 2018 WL 3699333, at *4 (S.D. Fla. Apr. 5, 2018). They cannot do so unless they show "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650 (1986). This is an "affirmative duty . . . by way of affidavit or allegation of fact to show cause" why arbitration is not required. *Sims v. Clarendon Nat. Ins.*, 336 F. Supp. 2d 1311, 1314 (S.D. Fla. 2004). They must present "the most forceful evidence of a purpose to exclude the claim from arbitration," otherwise arbitration is required, *AT&T Techs.,* 475 U.S. at 650, and the Court must then stay all proceedings. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 (1991); *AT&T Mobility*, 563 U.S. at 344.

## II.     Plaintiffs' Contract Requires Arbitration of All Their Claims

"[A]rbitration is a matter of contract," so issues "arising out of arbitration agreements are generally resolved by contract-law principles." *Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.,* 898 F.3d 1087, 1092 (11th Cir. 2018). The Court must review the agreement and determine "whether the parties agreed to arbitrate a dispute," *E.E.O.C. v. Waffle House, Inc.,* 534 U.S. 279, 294 (2002)), "according to [the contract's] terms," *Internaves*, 898 F.3d at 1092; *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (holding that "courts must rigorously enforce arbitration agreements according to their terms"). Again, importantly, all doubts must be resolved in favor of arbitration.

There is no dispute that the Contract controls here, and it is clear that the Contract requires arbitration of Plaintiffs' claims. For one, most Plaintiffs explicitly concede that the Contract, which most or all digitally signed (*see* Campos Declaration ¶¶ 6-7), controls, (S.F. FAC ¶ 105; C.B. SAC ¶ 94; Doe Compl. ¶ 18; L.R. Compl. ¶ 5; R.M. Compl. ¶ 5; D.M. Compl. ¶ 21; K.T. SAC ¶ 19; J.L.S. FAC ¶ 11; M.S. Compl. ¶ 12; T.L. Compl. ¶ 14), with some Plaintiffs directly

11

acknowledging their "predispute arbitration agreement" (S.F. FAC ¶ 36; C.B. SAC ¶ 36) and purporting to attach it to their Complaint. *See* Doe Compl. ¶ 18. Many Plaintiffs even seek to enforce the Contract's terms through their implied covenant claims. S.F. FAC ¶ 105-16; C.B. SAC ¶ 94-105. All 127 Plaintiffs acknowledge the controlling effect of the Contract, and none dispute in their Complaints that its broad arbitration agreement covers their claims.

This is because there is no argument otherwise. The Contract "broadly" requires mandatory arbitration of "any dispute or claim between you and us," including all "claims arising out of or relating to this Agreement and/or the Cruise . . . or any other aspect of the relationship between you and us," regardless of the "legal theory." Contract, § 10(c)(i)-(ii). Such "broad" language renders the FAA's strong federal policy favoring arbitration "particularly applicable" and requires the Court to give significant weight to the strong presumption in favor of arbitrability. *AT&T,* 475 U.S. at 650 (interpreting similar provision) (citing *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-585 (1960)); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 398 (1967) (same); *Mercury Telco Grp., Inc. v. Empresa De Telecommunicaciones De Bogota S.A. E.S.P.,* 670 F. Supp. 2d 1350, 1355 (S.D. Fla. 2009) (same).

The Contract's arbitration provision is not merely broad. It is also specific in requiring arbitration of the very claims that Plaintiffs bring here (mental and emotional distress claims) and explicit as to its broad reach. It requires arbitration of all "claims for mental or emotional distress or injury," so long as such distress does not "aris[e] out of bodily injury." Contract, § 10(c)(i). In other words, unless one's damages ***originated*** from a physical, bodily injury, arbitration is required.

Here, Plaintiffs concede that their mental and emotional injuries arose after Mirasol's conduct, and most concede that their injuries occurred months after their cruises when they first

learned of Mirasol's secret, voyeuristic acts. *See* S.F. FAC ¶¶ 34, 116; C.B. SAC ¶¶ 34, 105; Doe Compl. ¶ 35;  D.M. Compl. ¶ 37; K.T. SAC ¶ 33; T.L. Compl. ¶ 29; L.R. Compl. ¶¶ 17-20; R.M. Compl. ¶¶ 17-20; *see generally* J.L.S. FAC; M.S. Compl.

Also, no Plaintiff alleges receiving any bodily injury from Mirasol while on the cruise (*see generally* S.F. FAC; C.B. SAC; Doe Compl.; D.M. Compl.; K.T. SAC; J.L.S. FAC; M.S. Compl.; T.L. Compl; L.R. Compl.; R.M. Compl.) and, indeed, no Plaintiff alleges anything beyond a routine interaction with him, with nearly all the Plaintiffs never alleging that they even met him. In assessing whether these allegations qualify as "claims for mental or emotional distress or injury" that must be arbitrated (as they unambiguously do), the Contract is clear that it must be "broadly" interpreted in favor of arbitration. Contract, § 10(c)(i).

The Contract is similarly clear that its limited, inapplicable exclusion of "personal injury" claims from arbitration must be interpreted narrowly, thereby clarifying that emotional distress claims do not constitute "personal injury" claims unless they arose from some physical, "bodily injury." Contract, § 10(c)(i)-(ii). Since Plaintiffs' claims assert emotional distress that arose months after the cruise and not from any physical contact or bodily injury caused by Mirasol, they are subject to mandatory arbitration under the Contract. And to the extent there are any doubts about this (and there are none), such doubts must be resolved in favor of arbitration. Not only does the Contract twice make clear that doubts must be resolved in favor of arbitration, (Contract, § 10(c)(i)-(ii)), but it is also "basic hornbook law" that federal policy as embodied in the FAA (*Jones,* 866 F.3d at 1263-64) "strongly favors the enforcement of agreements to arbitrate" (*Farris,* 2018 WL 3699333, at *1) and requires "any doubts" to be "resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25; *Nolde*, 430 U.S. at 244 (nothing that there is a "strong presumption favoring arbitrability"). Based on the unambiguous language of the Contract, its two explicit interpretative

13

principles, and longstanding federal policy enshrined under the FAA, Plaintiffs' claims, which are rooted in mental and emotional distress and injury caused months after the cruise by the revelation of previous hidden voyeurism, can only be arbitrated.

The statutory and contractual requirement that the arbitration agreement be broadly interpreted is powerful. All that is needed to require arbitration is some "interpretation" of the arbitration provision that covers Plaintiffs' emotional distress claims. *AT&T,* 475 U.S. at 650 (holding that arbitration is required "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute…only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail") (citing *Steelworkers*, 363 U.S. at 582-585); *Unite Here Loc. 355 v. Hollywood Greyhound Track, Inc.,* 2009 WL 10668617, at *1 (S.D. Fla. Apr. 16, 2009) (same); *see also Canobinoti, LLC v. Woods*, 2021 WL 4479006, at *6 (S.D. Fla. Sept. 30, 2021) (resolving "doubt" in favor of arbitrability and compelling arbitration); *Cellairis Franchise, Inc. v. Connor Enterprises, Inc.*, 2015 WL 12844484, at *3 (N.D. Ga. Mar. 17, 2015) (compelling arbitration where arbitration clause was "ambiguous as to what claims, if any, are arbitrable").  Here, it is not just some "interpretation" of the arbitration provision that covers Plaintiffs' claims.  The explicit and only interpretation of the arbitration provision does so.

Courts interpreting similar provisions nationwide are unanimous: Plaintiffs' claims must be arbitrated. Courts routinely confirm that claims rooted in emotional, rather than physical, injury do not constitute personal injury/bodily injury claims. In *Nationwide Gen. Ins. Co. v. Pelkey,* 2021 WL 2895643, at *1 (M.D. Fla. July 9, 2021), the plaintiff brought claims for, *inter alia,* IIED and invasion of privacy after the defendant recorded her engaging in a private sexual act. The court held that, like here, the emotional distress claims were not "bodily injury" claims excluded from

14

the parties' arbitration agreement because, to be so excluded, the emotional distress claims must have been "the direct result of bodily harm." *Id.* (citing *D.B.C. ex rel. M.A.M. v. Pierson*, 2014 WL 2155017, at *4 (N.D. Ala. May 22, 2014) (holding that physical injuries caused by a mental injury did not constitute "bodily injury"); *Nationwide Prop. & Cas. Co. v. Lacayo,* 2008 WL 4831743, at *3 (M.D. Ala. Nov. 3, 2008) (adopting identical interpretation of the same provision); *Nationwide Mut. Ins. Co. v. Pasiak,* 2012 WL 310772, at *8 (Conn. Super. Ct. Jan. 9, 2012) (same); *Knutsen v. State Farm Fire & Cas. Co.,* 375 F. Supp. 3d 514, 520–22 (D. Vt. 2019) (adopting identical interpretation of similar provision); *Gravillis v. Coldwell Banker Residential Brokerage Co.,* 143 Cal. App. 4th 761, 770 (2006) (compelling arbitration because plaintiff alleged that her emotional distress caused physical harm [rather than the reverse]: "if emotional distress were considered a bodily injury, the arbitration exclusion in the Agreement could apply in virtually every dispute, rendering the arbitration provision a nullity") (citing *Erlich v. Menezes*, 21 Cal.4th 543, 554-555 (1999) (holding that the question is whether the origins of the injury are physical or emotional: "[t]he only physical injury alleged is [plaintiff's] heart disease, which flowed from the emotional distress and *not directly* from the [alleged conduct]") (emphasis added)); *Geraci v. Conte*, 2000 WL 1739294, at *6 (Ohio Ct. App. Nov. 22, 2000) (holding that claims of emotional distress with subsequent physical symptoms, as a result of video voyeurism, did not constitute "bodily injury": "physical sickness, which occurred as a result of [appellant's] emotional distress, is excluded"); *Moore v. Bamboo Retreats, LLC,* 2021 WL 3029569, at *3 (Cal. Ct. App. July 19, 2021) (arbitrator ruling that "emotional distress" claims did not constitute "personal injury" claims).

There need only be a plausible interpretation of the Contract that requires arbitration of Plaintiffs' claims to thereby require the Court to compel arbitration. But, here, there is no plausible

15

interpretation otherwise. The Contract makes clear that Plaintiffs' claims, which Plaintiffs repeatedly allege consist of and originate from emotional distress, are expressly subject to arbitration under the very terms of the arbitration clause.

Beyond their emotional distress claims, Plaintiffs also bring contract-based claims seeking to enforce the Contract's implied covenant of good faith and fair dealing. S.F. FAC ¶¶ 105-116 C.B. SAC ¶¶ 94-105. These claims fall under the broad agreement to arbitrate, which covers all claims between Plaintiffs and Royal Caribbean, regardless of "legal theory," and even specifically covers claims "based in contract." Contract, § 10(c)(i). In short, Plaintiffs' contract-based claims are also subject to binding arbitration, and, again, there is no plausible reading otherwise.

### III. No Statute Overrides the Presumed Validity of Plaintiffs' Agreement to Arbitrate

#### A. If There is Any Doubt, Lack of Clarity or Ambiguity on Whether a Statute Bars Plaintiffs' Agreement to Arbitrate, the Court Must Compel Arbitration

To rely on a statute to override an agreement to arbitrate, Plaintiffs must show that the statute "clearly" and "*explicitly*" bars arbitration. *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1273 (11th Cir. 2002) (emphasis in original); *see also CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 104 (2012); *Davis,* 305 F.3d 1268, 1274 (11th Cir. 2002) (noting that, "unless Congress has clearly expressed an intention to preclude arbitration . . . party is bound by its agreement to arbitrate" and that, "[i]n every [] case that the Supreme Court has considered, it has upheld binding arbitration" unless the statute "*explicitly* preclude[d] arbitration") (emphasis in original).

This is a "daunting" burden for Plaintiffs to meet. *In re Wiand*, 2012 WL 611896, at *4 (M.D. Fla. Jan. 4, 2012) (citing *Davis*, 305 F.3d at 1273). If there is any doubt, the Court must find "in favor of arbitration." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1350 (11th Cir. 2017). If Congress is "silent," the "FAA requires the arbitration agreement to be enforced according to its terms." *CompuCredit*, 565 U.S. at 104 (reversing Ninth Circuit and enforcing arbitration

16

agreement); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991) (holding that arbitration was required since Congress "did not explicitly preclude arbitration"). If application of the statutory ban is not "clear" or "ambiguous," the Court must compel arbitration. *Davis*, 305 F.3d at 1274-76; *In re Elec. Mach. Enterprises, Inc.,* 479 F.3d 791, 796 (11th Cir. 2007).  In short, unless there is an undeniable statutory prohibition on the agreement to arbitrate—meaning one that does not allow for any contrary interpretation—the Court must enforce the parties' express agreement to arbitrate. *Id.* at 1350; *Davis,* 305 F.3d at 1274-76; *In re Elec.,* 479 F.3d at 796; *CompuCredit,* 565 U.S. at 104; *Gilmer*, 500 U.S. at 26; *AT&T*, 475 U.S. at 650.

> **B.        Maritime Statute 46 U.S.C. § 30527 Does Not Bar, and in Fact Supports, Compelling Arbitration under Plaintiffs' Agreement to Arbitrate**

Congress long ago enacted a statute codifying what are essentially the same key operative terms used in Plaintiffs' arbitration agreement.  Specifically, Plaintiffs agreed in their Contract that, on the one hand, mental and emotional distress claims not arising out of bodily injury must be arbitrated while also agreeing that, on the other hand, "personal injury" claims would not be arbitrated.

Dating back as far as 1936, federal maritime law now codified in 46 U.S.C. § 30527 ("Maritime Statute") made the same distinction.  Congress enacted the Maritime Statute to prohibit shipowners from contractually limiting passengers' ability to pursue physical injury claims. *DeLuca v. Royal Caribbean Cruises, Ltd.*, 244 F. Supp. 3d 1342, 1346 (S.D. Fla. 2017); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595-97 (1991). As originally codified as an amendment at Section 4283B of the Revised Statutes of the United States (46 U.S.C. App. § 183c), the Maritime Statute barred such limitations only if they involved claims for "bodily injury"—in other words, a physical injury. The 1936 Maritime Statute confirms that, in instances of death or "bodily injury," contracts cannot relieve a ship owner from liability or weaken a claimant's right to "a trial

by a court of competent jurisdiction." *See* Section 4283B (attached hereto as **Exhibit D**). In short, the Maritime Statute did not allow shipowners to require arbitration for claims of bodily injury. The Maritime Statute did not bar any such limitations of emotional distress claims.  In fact, in 1936, emotional distress claims did not exist under maritime law. *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1409 (9th Cir. 1994) (recognizing, for the first time, that emotional distress claims are cognizable under maritime law) (citing *Sea-Land Serv. v. Gaudet*, 414 U.S. 573, 585 n.17 (barring claims for "mental anguish or grief" under maritime law); *Cook v. Ross Island Sand & Gravel Co.*, 626 F.2d 746, 752 (9th Cir. 1980) (same)).

In 1996, just two years after *Chan* opened the door for emotional distress claims under maritime law, Congress amended the Maritime Statute to address such claims, adding a new section to the Maritime Statute to address claims for "emotional distress, mental suffering, or psychological injury." *See* Coast Guard Authorization Act, Pub. L. 104–324, § 1129(b), 110 Stat. 3901, 3984–85; *Est. of Myhra v. Royal Caribbean Cruises, Ltd.*, 695 F.3d 1233, 1243 n.29 (11th Cir. 2012), *superseded by statute on other grounds irrelevant to the Court's analysis, as stated in Caron v. NCL (Bahamas) Ltd.*, 910 F.3d 1359, 1364 n.2 (11th Cir. 2018). In this new section, Congress only barred, under certain circumstances, limitation of "liability" of emotional distress claims. *Id.* It did not in any way prohibit or limit contracts from requiring arbitration of emotional distress claims.

The 1996 amendment's placement of restrictions on limitation of liability clauses, while placing no restrictions on arbitration clauses, was consistent with the original intent of the Maritime Statute, which was designed to preserve maritime passengers' right to pursue compensation for physical injury claims—also referred to as "bodily injury" claims. The amendment's primary effect was, in subsection (a), to restrict owners from using limitation of

18

liability clauses to deprive passengers of any recourse for such bodily injury. *Est. of Myhra,* 695 F.3d at 1243 (citing legislative history); *Shultz v. Fla. Keys Dive Ctr., Inc.,* 224 F.3d 1269, 1271 (11th Cir. 2000) (same); *Carnival,* 499 U.S. at 602 (Stevens, J., dissenting) (noting that limitation of liability clauses are the "principal subject of the statute."). Arbitration clauses, on the other hand, are far less onerous. They do not deprive a maritime passenger of recourse, but rather prescribe their adjudicative forum. *Turner v. Sedgwick Claims Mgmt. Servs., Inc.,* 2015 WL 225495, at *14 (N.D. Ala. Jan. 16, 2015) (stating that "the Supreme Court has frequently observed that an arbitration agreement is but a species of forum-selection agreement, which designates an arbitral forum rather than a judicial one") (citing cases). Accordingly, subsection (b) of the 1996 Maritime Statute addressed only emotional distress (not bodily injury) claims and did not prohibit arbitration of those claims.

In 2006, Congress again amended the Maritime Statute, this time to insert "personal injury" where bodily injury had previously been used. This was a clarification, not a change to the meaning of the statute. The Eleventh Circuit made this clear in 2012, stating that the inclusion of the "slight[]" "modifi[cation]" to the "language" of the Maritime Statute was not a "substantive change" to its meaning. *Est. of Myhra,* 695 F.3d at 1243 n.29. This is consistent with Congress's intent that the modern term "personal injury," as used in the 2006 amended iteration of the Maritime Statute, was to be interchangeable with "bodily injury," as used in prior iterations. Congress confirmed that it was not substantively changing the Statute and only intended to "conform to the understood policy, intent, and purpose of the Congress in the original enactments" and "remove ambiguities." CODIFICATION OF TITLE 46, PL 109–304, October 6, 2006, 120 Stat 1485; H.R. REP. 109-170, 45, 2006 U.S.C.C.A.N. 972, 992 (clarifying that the terms were swapped for readability purposes).

19

Accordingly, under Congress's reaffirmed intent for the Maritime Statute, the 2006 statute's language, and the Eleventh Circuit's reading, the Maritime Statute continues, as it has for decades, to only bar the arbitration of physical injury claims, not emotional distress claims. It continues to treat "personal injury" claims and "emotional distress" claims differently, addressing "personal injury" claims in subsection (a) and addressing "emotional distress, mental suffering, and psychological injury" claims in subsection (b). 46 U.S.C. § 30527(a)-(b). Subsection (a) continues to bar ship owners from contractually limiting liability for "personal injury" claims or requiring arbitration of such claims. *See id.* § 30527(a)(1)(A)-(B). Subsection (b), on the other hand, remains the only section that addresses "emotional distress, mental suffering, and psychological injury" claims, and it prohibits only the limitations of liability for such claims, *id.* § 30527(b), not (consistent prior iterations) the arbitration of such claims. *Id.*

Congress has made its intent crystal clear. Nothing at law restricts the parties' contractual agreement to arbitrate claims for emotional distress. *CompuCredit*, 565 U.S. at 104 (noting that, if a statute is "silent" on whether claims can be arbitrated, the arbitration agreement must be enforced); *Gilmer*, 500 U.S. at 26. The arbitration provision in Plaintiffs' Contracts in no way limits "liability." *Dextel Terrebonne v. K-Sea Transportation Corp.,* 2002 WL 34106288, at *2 (E.D. La. Sept. 13, 2002), *aff'd sub nom. Terrebonne v. K-Sea Transp. Corp.,* 477 F.3d 271 (5th Cir. 2007) (interpreting the Maritime Statute and holding that an arbitration "agreement does not exempt [a party] from liability" but, instead, "merely requires that the dispute be resolved through arbitration"); *DeLuca*, 244 F. Supp. 3d at 1346 (noting that the Maritime Statute's restrictions on (1) limitations of liability and (2) arbitration are separate and distinct).

Thus, Maritime Statute subsection (a)'s current prohibition on limitations of liability for personal injury (bodily injury) claims does not restrict the parties' right to require arbitration of

20

emotional distress claims, which subsection (b) on emotional injuries does not prohibit. As Plaintiffs' claims are emotional distress claims not arising out of bodily injury, which, by both Contract and Statute, is separate and distinct from a claim for "personal injury," this case is simply another "non-personal injury" case that must be arbitrated. *Farris*, 2018 WL 3699333, at *4 (holding that courts in the "maritime context" "compel[] arbitration for non-personal injury claims.") (citing cases).  We have seen no decision of a federal court rejecting arbitration under the Maritime Statute of pure emotional and psychological injuries not caused by a bodily injury.

The Supreme Court has repeatedly reached the same conclusion. In *CompuCredit*, the Supreme Court assessed whether a statutory bar on restricting "liability" prevented the parties from agreeing to arbitrate. 565 U.S. at 102. The Court, citing decades of its own precedent, found it did not, holding that "we have repeatedly recognized that contractually required arbitration of claims" does not interfere with a statutory bar on limiting "liability." *Id.* (citing *Gilmer*, 500 U.S. at 28; and *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987); and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)); *see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 538 (1995) (statutory prohibition on limiting liability did not affect the parties' right to arbitrate).

The Maritime Statute's irrelevant limitation of liability restrictions is nowhere near sufficient to override the FAA's strong preference for arbitration. As the Supreme Court put it, "[h]ad Congress meant to prohibit" the arbitration of emotional distress claims, "it would have done so in a manner less obtuse." *CompuCredit*, 565 U.S. at 102. Indeed, "[w]hen it has restricted the use of arbitration in other contexts it has done so with a clarity" that is nowhere present in the Maritime Statute. *Id.* at 102 (citing, *e.g.*, 7 U.S.C. § 26(n)(2) ("No predispute arbitration agreement shall be valid or enforceable…")).

21

At best for Plaintiffs, the Maritime Statute stays "silent" on the arbitrability of emotional distress claims—thus, the parties' agreement to arbitrate must "be enforced according to its terms." *CompuCredit*, 565 U.S. at 104; *Gilmer*, 500 U.S. at 26.  Similarly, its restriction on arbitrating "personal injury" claims in subsection (a) is neither clear nor explicit enough to also preclude arbitration of emotional distress claims exclusively addressed in subsection (b). This distinction between the two types of claims is not only recognized in the operative Contract in this dispute but has also been recognized in the Maritime Statute for decades.  In fact, courts across the country have routinely confirmed that emotional distress claims do not constitute personal injury/bodily injury claims. *Nationwide Gen.,* 2021 WL 2895643, at *1; *D.B.C.*, 2014 WL 2155017, at *4; *Nationwide Prop.,* 2008 WL 4831743, at *3; *Nationwide Mut.,* 2012 WL 310772, at *8; *Knutsen,* 375 F. Supp. 3d at 520–22; *Gravillis,* 143 Cal. App. 4th at 770; *Erlich*, 21 Cal.4th at 554-555; *Geraci*, 2000 WL 1739294, at *6; *Moore,* 2021 WL 3029569, at *3.

If Congress intended to override nationwide jurisprudence and bar arbitrability of emotional distress claims, the amendments of the Maritime Act needed to be explicit. Under the longstanding federal public policy in favor of arbitration, Congress *had to be* more explicit to justify Plaintiffs' reading of the Maritime Statute. At best for Plaintiffs, Congress, has, at minimum, remained "silent" (*CompuCredit*, 565 U.S. at 104), "ambiguous" or not "clear" as to whether emotional distress claims may be arbitrated. *Davis*, 305 F.3d at 1274-76; *In re Elec.,* 479 F.3d at 796. Once again, if Congress "meant to prohibit" the arbitration of emotional distress, it would not have done so in such a confusing, roundabout manner—"it would have done so in a manner less obtuse." *CompuCredit*, 565 U.S. at 102 (citing, *e.g.*, 7 U.S.C. § 26(n)(2)).

This ends the analysis.  All that is needed to require arbitration here is an interpretation of the Maritime Statute that permits arbitration; arbitration can only be avoided if Congress "clearly"

22

and "*explicitly*" precluded it. *Davis*, 305 F.3d at 1274-76 (emphasis in original); *CompuCredit,* 565 U.S. at 104; *Gilmer*, 500 U.S. at 26; *In re Elec.,* 479 F.3d at 796; *AT&T*, 475 U.S. at 650. Yet far from explicit preclusion, the Maritime Statute says nothing suggesting that emotional distress claims cannot be arbitrated, instead distinguishing arbitration clauses from the far more onerous limitation of liability clauses, and only barring the limitation of liability of emotional distress claims. Nor does the Maritime Statute's legislative history support Plaintiffs' arguments—rather, it only confirms that the Maritime Statute, intended to protect maritime passengers, appropriately dealt with the more burdensome limitation of liability clauses more harshly.

Nor is there any case law that can support Plaintiffs' arguments; indeed, in the eighty-nine years since the Maritime Statute was enacted in 1936, we have seen no Court decisions ruling against the arbitrability of purely emotional distress claims. Plaintiffs simply cannot satisfy their "daunting" burden to overcome the strong presumption in favor of arbitration. *In re Wiand*, 2012 WL 611896, at *4; *Nolde*, 430 U.S. at 244.

C.      **The Ending Forced Arbitration Act Also Supports the Agreement to Arbitrate**

Plaintiffs do not even try to dispute that they voluntarily and expressly agreed, via both broad and specific language, to arbitrate their claims. Instead, they have taken the position that their agreement to arbitrate should be somehow overridden by the Ending Forced Arbitration Act, 9 U.S.C. § 402 ("EFAA"). S.F. FAC ¶¶ 36; C.B. SAC ¶¶ 36. But the EFAA does nothing to disrupt the parties' contractual agreement to arbitrate Plaintiffs' claims. The EFAA only bars the arbitrability of a case that "relates to [a] sexual assault dispute or [] sexual harassment dispute." *Id.* § 402(a). This case is neither.

None of the 127 Plaintiffs, across nine different Plaintiffs' groups, ever allege sexual harassment or sexual assault, whether in form or substance. Plaintiffs bring claims against Royal

Caribbean here for invasion of privacy, IIED, NIED, general negligence, negligent security, negligent failure to warn, breach of the implied covenant of good faith and fair dealing, and punitive damages—they do not bring a single claim for sexual assault or sexual harassment. Nor do they allege any actual facts that even suggest physical or sexual contact from Mirasol, instead alleging that they were only harmed afterward—often several months after their cruise when they learned that Mirasol had previously secretly recorded them without their knowledge. Such allegations of "voyeurism," and resultant emotional distress, simply do not constitute sexual assault or harassment.

Like Plaintiffs themselves, the EFAA is equally clear that Mirasol's alleged conduct does not constitute sexual assault or harassment. The EFAA defines a "sexual assault dispute" as one "involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent." 9 U.S.C. § 401(3). The referenced section 2246 of title 18, in turn, defines "sexual act" and "sexual contact" solely to encompass physical contact between two individuals. *See, e.g.,* 18 U.S.C. § 2246(2)(D) ("the intentional touching, not through the clothing, of the genitalia of another person…"); *id.* § 2246(3) ("the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person…"). None of these definitions apply here.

As for sexual harassment, for a claim to so qualify under the EFAA, Plaintiffs must plausibly allege that Mirasol's "conduct violated a law prohibiting sexual harassment." *Gonzalez v. Carnival Corp.,* 2024 WL 4863892, at *4 (S.D. Fla. Nov. 22, 2024) (citing cases); *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.,* 2024 WL 3925757, at *7 (S.D.N.Y. Aug. 23, 2024) (such allegations cannot be "implausible or frivolous."). Plaintiffs' invasion of privacy, IIED,

24

NIED, negligence, implied covenant, and punitive damages claims certainly do not allege the violation of a law prohibiting sexual harassment. And the Southern District of Florida is in accord, making clear that where a plaintiff brings such "common law" claims, they do not "allege conduct that violates a law prohibiting sexual harassment." *Gonzalez*, 2024 WL 4863892, at *4 (assessing IIED arising out of alleged sexual harassment and sexual assault: "Plaintiff does not allege conduct that violates a law prohibiting sexual harassment but only brings a state common law claim for IIED. Therefore, the EFAA does not apply to the instant Action and does not render the Arbitration Clause invalid."); *K.T. v. A Place for Rover*, 2023 WL 7167580, at *1 (E.D. Pa. Oct. 31, 2023), *reconsideration denied*, 2024 WL 1356221 (E.D. Pa. Mar. 29, 2024) (plaintiff alleged that defendant used hidden cameras to secretly film plaintiffs in various stages of undress, and brought claims for IIED, NIED, and claims under Pennsylvania's wiretapping statute and human trafficking statute. Compelling arbitration, as the EFAA did not apply: plaintiffs did "not allege a claim for 'sexual harassment' as the term is defined in the EFAA.").

The video voyeurism statutes cited by Plaintiffs offer nothing to the contrary. *See* S.F. FAC ¶ 6 (citing 18 U.S.C. § 1801 and Fla. Stat. § 810.145); C.B. SAC ¶ 6 (same); Doe Compl. ¶ 50 (citing Fla. Stat. § 810.145). For one, they do not purport to cover sexual assault or harassment, and merely concern video voyeurism without including any reference to sexual assault or harassment in the body of the statute. *See* 18 U.S.C. § 1801; Fla. Stat. § 810.145; *see also K.T.*, 2023 WL 7167580, at *1 (EFAA did not apply to claims brought under human trafficking statute, which protected individuals who were a "victim of the sex trade," as statute did not specifically cover "sexual assault" or "sexual harassment."); *Singh v. Meetup LLC et al.*, 2024 WL 4635482, at *2 (S.D.N.Y. Oct. 31, 2024) (EFAA did not apply to claims brought under New York statute

which barred "harassment" on the basis of "sex"; "sex-based" harassment did not necessarily constitute "sexual harassment," as defined under the EFAA).

Further, Plaintiffs only cite criminal statutes, which do "not create a private civil right of action." *Young v. City of Los Angeles*, 2024 WL 3055489, at *3 (C.D. Cal. Apr. 11, 2024) (18 U.S.C. § 1801 is a "criminal statute" which "does not create a private civil right of action."); *Kamau v. Slate*, 2012 WL 5390001, at *9 (N.D. Fla. Oct. 1, 2012) (dismissing claim for video voyeurism based on Fla. Stat. Ann. § 810.145: "there is no provision providing for a civil cause of action."). Since the EFAA is only triggered where the alleged "sexual harassment claim [is] capable of surviving dismissal at the threshold of a litigation," these criminal video voyeurism statutes, which cannot sustain a civil claim, and certainly cannot sustain a civil claim of sexual harassment, do nothing to void Plaintiffs' express agreement to arbitrate. *Yost v. Everyrealm, Inc.,* 657 F. Supp. 3d 563, 585 (S.D.N.Y. 2023) ("at a minimum," the EFAA can only bar arbitration where allegations, "if true," would [] state a judicially cognizable claim.") (citing cases).

Nor do Plaintiffs' factually unsupported efforts to style their allegations or claims as for "sexual assault" (S.F. FAC ¶¶ 28, 48-99; C.B. SAC ¶¶ 28, 37-81;  D.M. Compl. ¶ 39; T.L. Compl. ¶ 31; L.R. Compl. ¶¶ 23-31; R.M. Compl. ¶¶ 23-31), "sexual offenses" (K.T. SAC ¶ 72 ), or "sexual crimes" (J.L.S. FAC ¶ 60; M.S. Compl. ¶ 43), have any legal effect. Nor does Plaintiffs bald titling of their claims as "IIED by video voyeurism and sexual assault." S.F. FAC at ¶¶ 61-77; C.B. SAC ¶¶ 50-66. Wordsmithing, without facts or the necessary content, does transform their assertions to sexual assault or harassment claims. It is a well-established that when evaluating the viability of a complaint, courts focus on the substance of the factual allegations and not labels. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("labels and conclusions…will not do.") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The only relevant inquiry here is whether

26

Plaintiffs plausibly alleged that Royal Caribbean's conduct "violated a law prohibiting sexual harassment," and here they have failed to cite a single example of such a law or actual facts alleged by them, rather than labels, that implicate such a law. *Gonzalez,* 2024 WL 4863892, at *4 (citing cases); *K.T.*, 2023 WL 7167580, at *1; *Newton*, 2024 WL 3925757, at *7 (same); *Yost,* 657 F. Supp. 3d at 585 (it is not enough for a lawsuit to merely "describe[] conduct in the vernacular as 'sexual harassment.'"); *City of Miami Beach v. Guerra*, 746 So. 2d 1159, 1160 (Fla. Dist. Ct. App. 1999) (Florida has no "common law tort related to sexual harassment."). Since none of Plaintiffs' claims describe sexual assault or sexual harassment in substance or cite a sexual assault or sexual harassment law that can reasonably be implicated by their factual allegations, they cannot escape their express and voluntary agreement to arbitrate their claims.

## IV.      The Canadian and Chilean Plaintiffs' Claims Must Be Dismissed

This Court does not have jurisdiction to hear the Canadian or Chilean Plaintiffs' claims. Both the Canadian and Chilean Plaintiffs expressly agreed in their signed Contract that they could only bring claims in the courts of England and Wales, to the exclusion of all other courts or tribunals. Canadian Contract, § 10(a)(i) ("ALL DISPUTES…MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS."); Chilean Contract, § 5.9 ("If the dispute is not resolved by" arbitration or "Alternative Dispute Resolution, you must issue legal proceedings in the Courts of England and Wales."). The Canadian and Chilean Plaintiffs also agreed that "ENGLISH LAW" alone covers their claims, making it particularly improper for the Court to exercise jurisdiction. Canadian Contract, § 10(a)(i); Chilean Contract, § 5.9 ("The contract between us is governed by the laws of England and Wales."). Quite simply, the Canadian and Chilean Plaintiffs filed their claims in the wrong court, and they must be dismissed.

27

**CONCLUSION**

This Action should be stayed in its entirety in favor of arbitration.

**WHEREFORE**, Defendant, ROYAL CARIBBEAN CRUISES, LTD., moves the Court

for entry of an Order granting its Omnibus Motion and to Stay Litigation and Compel Arbitration.

28

## S.D. FLA. LOCAL RULE 7.1 CERTIFICATION

Counsel for Defendant hereby certifies that pursuant to Local Rule 7.1(a)(3)(A), it has conferred with Plaintiffs' counsel regarding this motion and, further, that Plaintiffs oppose the relief sought in this motion.

## REQUEST FOR HEARING

Defendant hereby requests a hearing on its Motion to Stay Litigation and Compel Arbitration, in light of the importance of the issues raised in the Motion, which will determine whether litigation will proceed at all. Defendant estimates that it will require at least one hour for oral argument.

**Respectfully submitted,**

Kurt K. Lunkenheimer, Esq.
Florida Bar No. 1059216
Hayley H. Ryan, Esq.
Florida Bar No. 1032623
COZEN O'CONNOR
200 S. Biscayne Blvd., Suite 3000
Miami, FL 33132
Telephone: (305) 704-5940
kklunkenheimer@cozen.com
hryan@cozen.com

John J. Sullivan, Esq. (*pro hac vice* to be filed)
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 453-3729
jsullivan@cozen.com

*Co- Counsel for Defendant, Royal Caribbean Cruises, Ltd.*

29

and

Jerry D. Hamilton, Esq.
Florida Bar No. 970700
Krista Fowler Acuna, Esq.
Florida Bar No. 650791
Annalisa Gutierrez, Esq.
Florida Bar No. 97940
Kassandra Doyle Taylor, Esq.
Florida Bar No. 68645
HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 379-3686
hmb-symphony-team@hamiltonmillerlaw.com
*Co- Counsel for Defendant, Royal Caribbean Cruises, Ltd.*

30

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 26, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel in the above-captioned cases either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

_____

Kurt K. Lunkenheimer

## SERVICE LIST

Justin B. Shapiro, Esq.
Bernardo Pimentel II, Esq.
LEESFIELD & PARTNERS, P A
2350 South Dixie Hwy.
Miami, FL 33133
shapiro@leesfield.com
pimentel@leesfield.com
alpizar@leesfield.com
gonzalez@leesfield.com
*Counsel for Plaintiff, Jane Doe*

Jay Halpern
Halpern Santos & Pinkert, P.A.
150 Alhambra Circle
Coral Gables, FL 33134
Email: Jay@hsptrial.com
*Counsel for Plaintiffs, D.M., et al.*

LORETTA GUEVARA, ESQ.
lguevara@hickeylawfirm.com
LISA GOODMAN, ESQ.
lgoodman@hickeylaw.com
JOHN H. HICKEY, ESQ.
hickey@hickeylawfirm.com
HICKEY LAW FIRM, P.A.
12150 SW 128th Court, Suite 225
Miami, Florida 33186

Nicholas I. Gerson
ngerson@gslawusa.com
Philip M. Gerson
pgerson@gslawusa.corn
Edward S. Schwartz
eschwartz@gslawusa.corn
David L. Markel
dmarkel@gslawusa.com
GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, Florida 33145
Telephone: (305) 371-6000
Facsimile: (305) 371-5749
*Counsel for Plaintiffs, V.V., et al.* and
*Plaintiffs, K.T., et al.*

Jason R. Margulies, Esq.
jmargulies@lipcon.com
Michael A. Winkleman, Esq.
mwinkleman@lipcon.com
Jacqueline Garcell, Esq.
jgarcell@lipcon.com
Marc E. Weiner, Esq.
mweiner@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.

Telephone: (305) 371-8000
Facsimile: (305) 371-3542
*Counsel for Plaintiff Jane Doe*

Spencer Marc Aronfeld
Abby Ivey
Mathias Hayashi
1 Alhambra Plaza Penthouse
Coral Gables, FL 33134
Phone: 305-441-0440
Aronfeld@aronfeld.com
Aivey@aronfeld.com
Mhayashi@aronfeld.com
*Counsel for Plaintiffs, C.B., et al.*

Jay Halpern
Halpern Santos & Pinkert, P.A.
150 Alhambra Circle
Coral Gables, FL 33134
Email: Jay@hsptrial.com
*Counsel for Plaintiffs, T.L., et al.*

Sagi Shaked, Esq.
Brian L. Harvell, Esq.
SHAKED LAW FIRM, P.A.
20900 NE 30th Ave., Suite 715
Aventura, FL 33180
Telephone No.: 305-937-0191
Facsimile No.: 305-937-0193
filingcourtdocuments@gmail.com
shakedservice@gmail.com
sagi@miamiattys.com
*Counsel for Plaintiffs, J.L.S., et al.*

2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204
and
Adam M. Moskowitz
The Moskowitz Law Firm
Continental Plaza
3250 Mary Street
Suite 202
Miami, FL 33133
305.740.1423 main
786.309.9561 direct
adam@moskowitz-law.com
*Counsel for Plaintiffs, Jane Doe (S.F.), et al.*

Prosper Shaked
Florida Bar No. 111764
Prosper Shaked Accident Injury Attorneys PA
15520 W Dixie Hwy
North Miami Beach, FL 33162
prosper@prosperlaw.com
*Counsel for Plaintiffs, M.S., et al.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

---

*C.B. et al.,*

      Plaintiffs,                 No. 24-cv-25089-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*D.M. et al,*

      Plaintiffs,                 No. 24-cv-24988-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*Doe (S.F.) et al,*

      Plaintiffs,                 No. 24-cv-23953-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

      Defendants.

---

*Doe,*

      Plaintiff,                  No. 24-cv-24039-DPG

**DECLARATION OF AMANDA CAMPOS IN SUPPORT OF OMNIBUS MOTION TO STAY LITIGATION AND COMPEL ARBITRATION**

vs.

ROYAL   CARIBBEAN   CRUISES   LTD., a   Liberian
Corporation,

      Defendant.

---

*Doe et al,*

      Plaintiffs,                No. 25-cv-20138-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD., a   Liberian
Corporation,

      Defendant.

---

*Doe et al,*

      Plaintiffs,                No. 25-cv-20485-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD., a   Liberian
Corporation,

      Defendant.

---

*J.L.S. et al,*

      Plaintiffs,                No. 24-cv-24139-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD., a   Liberian
Corporation, and ARVIN JOSEPH MIRASOL, a citizen and
resident of the Republic of the Philippines,

      Defendants.

---

*K.T. et al,*

      Plaintiffs,                No. 24-cv-24193-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

     Defendants.

---

*M.S. et al*,

     Plaintiffs,          No. 24-cv-24738-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

     Defendants.

---

*T.L. et al*,

     Plaintiffs,          No. 24-cv-25009-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

     Defendants.

---

*V.V., et al*,

     Plaintiffs,          No. 25-cv-20051-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation,

     Defendant.

---

I, Amanda Campos, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      My name is Amanda Campos. I am more than 18 years of age and am competent to make this declaration.

2.      I am the Senior Director of Guest Claims for Royal Caribbean Cruises, Ltd. ("Defendant").   I have held this position at all relevant times and could and would testify competently to all facts stated herein if called as a witness in this Action.

3.      I make the statements herein based on my personal knowledge and records kept by Defendant in the ordinary course of business.

4.      I am familiar with the allegations in this lawsuit, and I am submitting this declaration in support of Defendant Royal Caribbean Cruises Ltd.'s Omnibus Motion to Stay Litigation and Compel Arbitration ("Motion").

5.      I reviewed Defendant's records and confirmed that all Plaintiffs entered into Ticket Contracts with Defendant for cruises beginning on December 10, 2023, December 24, 2023, December 30, 2023, January 7, 2024, January 13, 2024, January 21, 2024, January 27, 2024, February 4, 2024, February 10, 2024, February 14, 2024, February 18, 2024, and February 24, 2024.  A true and accurate copy of the Ticket Contract entered into between all Plaintiffs that are citizens of the United States and Defendant is attached hereto as **Exhibit A**, a true and accurate copy of the Ticket Contract entered into between all Plaintiffs that are citizens of Canada and Defendant is attached hereto as **Exhibit B**, and a true and accurate copy of the Ticket Contract entered into between all Plaintiffs that are citizens of Chile and Defendant is attached hereto as **Exhibit C**.

6.      I have also confirmed that nearly all Plaintiffs digitally signed their respective Ticket Contracts, or had their Ticket Contract digitally signed by their parent/guardian.

7.      Defendant has yet to confirm that the two Plaintiffs in *T.L. et al v. Royal Caribbean Cruises Ltd. et al*, No. 24-cv-25009-DPG or their authorized agent digitally signed their Ticket Contracts.  Defendant is continuing to investigate this issue.

8.      Given that all Plaintiffs are proceeding with their initials instead of their full names, I am not attaching copies of Plaintiffs' digital signatures.  If the Court requires that we file the digital signatures with the Court, our attorneys would do so under seal unless the Court instructs otherwise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   March 26, 2025

_____
Amanda Campos

# EXHIBIT A

IMPORTANT NOTICE TO GUESTS

THIS CRUISE/CRUISETOUR TICKET CONTRACT IS APPLICABLE ONLY TO GUESTS WHOSE PRIMARY COUNTRY OF RESIDENCE IS THE UNITED STATES OF AMERICA ("U.S."). IF YOUR PRIMARY COUNTRY OF RESIDENCE IS NOT THE U.S. THEN PLEASE VISIT https://www.RoyalCaribbean.com/guest-terms/ TO DETERMINE THE CRUISE/CRUISETOUR TICKET CONTRACT OR BOOKING TERMS AND CONDITIONS THAT APPLY TO YOU. PLEASE REFER TO SECTION 2.i BELOW FOR THE DEFINITION OF "PRIMARY COUNTRY OF RESIDENCE."

THIS CRUISE/CRUISETOUR TICKET CONTRACT CONTAINS IMPORTANT LIMITATIONS ON THE RIGHTS OF GUESTS. IT IS IMPORTANT THAT YOU CAREFULLY READ ALL TERMS OF THIS TICKET CONTRACT. YOU EXPRESSLY AGREE TO THE TERMS HEREIN, AND AGREE AND UNDERSTAND THAT YOU ARE BOUND BY THE PROVISIONS OF THIS AGREEMENT FROM THE TIME OF BOOKING AND AFTER THE CRUISE TERMINATES. YOU AGREE THAT CARRIER MAY CHANGE, MODIFY, AND UPDATE THE TERMS OF THIS TICKET CONTRACT, THAT NOTICE OF SUCH CHANGE MAY OR MAY NOT BE GIVEN, AND THAT YOU NONETHELESS AGREE TO BE BOUND BY ANY SUCH CHANGE OR MODIFICATION.

YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS 3, AND 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS ON YOUR RIGHTS TO ASSERT CLAIMS FOR PERSONAL INJURIES, ILLNESS OR DEATH, AND BAGGAGE AND PERSONAL PROPERTY LOSS OR DAMAGE, AGAINST CARRIER, THE VESSEL, RELATED ENTITIES AND THEIR OFFICERS, AGENTS AND EMPLOYEES AND OTHER THIRD PARTIES, INCLUDING TIME LIMITS AND FORUM FOR CLAIMS AND SUITS, APPLICABLE LAW, ARBITRATION, AND WAIVER OF JURY TRIAL, CLASS ACTIONS AND IN REM PROCEEDINGS.

IF YOU ARE THE PERSON MAKING A BOOKING YOU ARE ALSO DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTION 16.a TO UNDERSTAND YOUR RESPONSIBLITIES AS THE LEAD GUEST.

1. INTRODUCTION:

This Cruise/CruiseTour Ticket Contract ("Ticket Contract" or "Agreement") describes the terms and conditions that will apply to the relationship between Guest and Carrier for the Cruise or CruiseTour covered by this Ticket Contract. The terms and conditions set forth in this Ticket Contract, together with the Cruise Fare due for Your Cruise or CruiseTour, constitutes the entire agreement between Carrier and Guest. Except as otherwise expressly provided herein, this Agreement supersedes any other representations or agreements that may have been made relating to the subject matter of this Agreement, the Cruise or the CruiseTour, including but not limited to anything stated in brochures, advertisements, and other promotional materials, by Carrier, its parent, subsidiary or affiliated companies, or any of their respective employees, or third persons such as travel agents, but excluding the terms of the Cruise Lines International Association ("CLIA") Passenger Bill of Rights that the Vessel's Operator has adopted as a requirement of being a member of CLIA. In the event of a direct conflict between a provision of this Ticket Contract and a provision of the CLIA Passenger Bill of Rights in effect at the time of booking (the "CLIA Passenger Bill of Rights"), the CLIA Passenger Bill of Rights controls.

Purchase or use of this Ticket Contract, whether or not signed by Guest, shall constitute the agreement by Guest, on behalf of himself and all other persons traveling under this Ticket Contract (including any accompanying minors or other persons for whom the Ticket Contract was purchased), to be bound by the terms and conditions of this Ticket Contract. In addition, Guest acknowledges the availability of and Guest agrees to abide by the terms and conditions, including but not limited to certain payment terms such as minimum deposit requirements and payment due dates, which appear in the applicable Carrier brochure or online at https://www.RoyalCaribbean.com. In the event of any conflict between such other brochure or website materials and this Ticket Contract, the terms of this Ticket Contract shall prevail.

2. DEFINITIONS:

a. "Agreement" shall have the meaning given to it in Section 1 above.

b. "Carrier" shall include: (i) the Vessel, or any substituted ship; its launches or crafts; and (ii) the Vessel's Operator, owner, manager and charterer.

c. "Cruise" means the specific cruise covered by this Ticket Contract, as the same may be modified and shall include those periods during which Guest is embarking or disembarking the Vessel and those periods when Guest is on land while the Vessel is in port.

d. "CruiseTour" means the combined vacation package officially published and offered by Carrier, which includes the applicable Cruise and associated Land Tour.

e. "Operator" means the entity identified in Section 20 below.

f. "Guest" or "Your" means all persons traveling under this Ticket Contract and persons in their care, together with their respective heirs and representatives. "Guest" shall include the plural and the use of the masculine shall include the feminine. Notwithstanding, other policies referenced herein, communications from Carrier, and other posted notices may interchangeably use the term "Passengers" as well when referring to Guests.

g. "Land Tour" means the land tour component of a CruiseTour to be provided either prior to the initial embarkation on the Cruise or after the final debarkation from the Cruise. "LTO" means to operator of the Land Tour portion of any CruiseTour.

h. "Lead Guest" means the Guest who initiated the Cruise or Cruise Tour booking for themselves, and/or for one or more other Guests named on the booking, whether the booking was made by Lead Guest directly with Carrier or through a travel agent. The Lead Guest is usually the first Guest named on the booking.

i. "Primary Country of Residence" means the country where you primarily reside at the time of booking the Cruise. This should be indicated by you, the Lead Guest, or another agent or representative of yours at the time of booking the Cruise or at online check-in.

j. "Transport" means the railcars, buses and other modes of transportation or accommodation provided by a LTO in connection with a Land Tour.

k. "U.S. Cruise(s)" means a Cruise or Cruises in which the Vessel's planned itinerary includes embarkation, disembarkation or a call at a port in the United States of America, including its territories.

l. "Vessel" means the ship owned or chartered or operated by Operator on which Guest may be traveling or against which Guest may assert a claim, as well as any substituted ship used in the performance of this Ticket Contract.

## 3. CRUISE FARE TERMS:

a. **Cruise Fare.** "Cruise Fare" means the amount paid and/or due from Guest for the Cruise or CruiseTour which includes carriage onboard the Vessel, full board, and ordinary Vessel food and entertainment. The Cruise Fare does not include alcoholic beverages, specialized tea and coffee beverages, fresh or cold press juices, energy drinks, spa treatments and salon services, exercise classes, select premium dining and entertainment, internet access, casino and gambling activities, shore excursions, photographs, video arcade, phone calls, laundry services, satellite connection for mobile phones, travel insurance, medical insurance, baggage insurance, medical services, shoreside expenses or transfers, airfare, or hotel accommodations (unless included in a CruiseTour), or any other incidental charge or expense that you incur.  Also excluded from the Cruise Fare are: (i) Taxes and Fees; and (ii) any Fuel Supplement, which, subject to applicable law and the terms of this Agreement, Carrier expressly reserves the right to impose or pass along with no right of cancellation by Guest implied.  This listing is not intended to be exhaustive and additional exclusions or fees may apply.

b. **Taxes, Fees, and Port Expenses.** Taxes, fees, and port expenses (collectively, "Taxes and Fees") include fees, charges, costs and taxes imposed on Carrier, by governmental or quasi-governmental authorities, as well as third party fees and charges relating to the Vessel's navigation, operations or presence in a port or harbor. By way of example, and not limitation, Taxes and Fees may include immigration-related fees, passenger head taxes, dockage fees, wharfage fees, inspection fees, pilotage, canal tolls, navigation fees, environmental impact fees, charges relating to the cost of acquiring government-mandated carbon emission allowances, or charges related to berthing, stevedoring, baggage handling or storage, and security services.  Guest acknowledges that Taxes and Fees are estimated by Carrier at the time of booking and subject to change.  Carrier may pass through any increases to applicable Taxes and Fees at any time after booking.  Carrier may, in its sole discretion, require Guest to prepay such increase in Taxes and Fees prior to boarding the Vessel or apply such increase to Guest's onboard folio at the time of sailing.  Guest's refusal or failure to prepay any such increase may be deemed a cancellation by Guest.

c. **Fuel Supplement.** Subject to the terms of this Section, Carrier reserves the right, without prior notice to Guest, to impose a fuel supplement charge (the "Fuel Supplement"). Carrier may impose such Fuel Supplement either at the time of booking or thereafter at any time prior to sailing.  If the Fuel Supplement is imposed at the time of booking, Carrier will display the amount and frequency (or a fixed price representing the same) together with the Cruise Fare, Taxes and Fees, and Gratuities on Carrier's website and Guest's booking confirmation.  If at any time after booking, the closing price of: (i) West Texas Intermediate Fuel exceeds US$65.00 per barrel; or (ii) Henry Hub Natural Gas Spot Price exceeds US$3.00 per Metric Million British Thermal Unit on the New York Mercantile Stock Exchange, Carrier may impose a Fuel Supplement of up to US$12.00 (or its equivalent in the currency of the booking) per Guest, per day.  Carrier may, in its sole discretion, require Guest to prepay the Fuel Supplement prior to boarding the Vessel or apply such charge to Guest's onboard folio at the time of sailing.  Guest's refusal or failure to prepay any Fuel Supplement may be deemed as a cancellation by Guest.

d. **Gratuities.** For Guest's convenience, a discretionary service gratuity ("Gratuities") will be automatically added daily to the onboard account of each Guest, except as otherwise provided below. Gratuities are subject to adjustment, at Guest's discretion, onboard the Vessel until the morning of disembarkation. Gratuities will not be automatically added to the Guest's onboard account if they are included in the Cruise Fare, as reflected in the Guest's booking confirmation, if the Guest pre-pays them, or if the laws of the Guest's primary country of residence do not permit them to be added automatically.

e. **Correction of Errors.** In the event that a Cruise or CruiseTour is booked but the Cruise Fare listed, quoted or advertised through any website, Carrier sales person, travel agent or any other source is inaccurate or unavailable due to an electronic error, typographical error, human error or any other error causing the Cruise or CruiseTour to be sold, or listed for sale, quoted or advertised, in a quantity or for an amount not intended by Carrier, Carrier reserves the right to correct the erroneous fare by requesting Guest to pay the correct amount intended, re-berthing Guest in other accommodations onboard the Vessel, or by canceling this Agreement in exchange for a full refund. For the avoidance of doubt, in no event shall Carrier be obligated to honor any such booking resulting from the error or otherwise be liable in such circumstances.

f. **Promotional Cruise Fares.** Carrier offers promotional Cruise Fares (or other offers) that may modify the cancellation terms set forth in Section 8, impose a minimum stateroom occupancy requirement, require payment of a non-refundable deposit, or accelerate the Cruise Fare payment schedule. With respect to Cruise Fares which are contingent on minimum occupancy requirements, cancellation by one or more Guests in a stateroom may result an adjustment to the remaining Guests' Cruise Fare based on the prevailing rates at the time of cancellation, plus any single supplements (if applicable), with no right of cancellation by Guest(s) implied.  With respect to Cruise Fares which require payment of a non-refundable deposit, such deposit shall be become immediately due and payable at the time of booking and will not be refunded at any time after paid by Guest.  Change fees also apply.

g. **Payment and Refunds of the Cruise Fare.** Guest agrees to pay, and Carrier reserves the right to collect, the Cruise Fare due for the accommodations booked. Failure to make timely final payment in full of the Cruise Fares due for all Guests in a stateroom may result in cancellation of the reservation for the entire stateroom.  Guest agrees that the Carrier shall not be liable to make any refund to Guest for Ticket Contracts that are wholly or partially unused by Guest except as otherwise expressly stated herein.

h. **Payment for Onboard Charges.** Guest further agrees to pay in full before the end of the Cruise, and Carrier reserves the right to collect, all charges for entertainment, goods and services incurred by Guest, or incurred by Carrier on Guest's behalf.

## 4. BAGGAGE, PROPERTY AND LIMITATIONS OF LIABILITY:

a. **Baggage Limits and Prohibited Items.** Each adult Guest is permitted to carry onboard the Vessel or check-in only the wearing apparel and personal effects reasonably necessary for the Cruise, including suitcases, trunks, valises, satchels, bags, hangers containing clothing, toiletries and similar items. In no event shall any Guest bring on board the Vessel or check-in, or in connection with the Land Tour, any illegal controlled substances (including medical marijuana), fireworks, live animals (except under the terms of Section 13.e below), weapons, firearms, explosives or other hazardous materials, or any other items prohibited by applicable law or Carrier policy. Marijuana possession and/or use, including medical marijuana, and possession or use of any illegal drugs, is strictly prohibited in many jurisdictions visited and on the Vessel at all times, as well as in terminals, during shore excursions or any other part of the Cruise, regardless of any local, state, or other laws which might permit use or possession of marijuana. Guests who violate the laws of any jurisdiction are subject to being reported to law enforcement or customs authorities, arrest and prosecution. Guests who bring on board dangerous items, marijuana in any form, or any illegal drugs or controlled substances are also subject to immediate disembarkation or denial of boarding. Guests shall have no claim for refund, loss, damage, inconvenience, or compensation whatsoever under any of these circumstances. Guest shall be responsible to notify Carrier in advance of the Cruise if there is any question as to the permissibility of taking any item or substance onboard the Vessel. Carrier reserves the right to refuse to permit any Guest to take on board the Vessel or on any mode of Transport any item Carrier deems inappropriate.

b. **Liability for Loss of or Damage to Baggage.** Unless negligent, Carrier is neither responsible nor liable for any loss of or damage to Guest's property, whether contained in luggage or otherwise. Liability for loss of or damage to Guest's property in connection with any air or ground transportation shall be the sole responsibility of the provider of the service and in accordance with applicable limitations.

c. **Limitation of Liability for Lost or Damaged Property.** Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property during the Land Tour portion of a CruiseTour is limited to $300.00 per Guest. Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property for the cruise (or for the cruise only portion of a CruiseTour) shall be limited to $300.00 per Guest, unless Guest declares the true value of such property in writing to the Carrier at the address specified below in Section 10.a.iii for non-U.S. Cruises or 10.b.iii for U.S. Cruises, and pays Carrier within 10 days of final payment for the Cruise, a fee of five percent (5%) of the amount that such value exceeds $300.00. In such event, Carrier's liability shall be limited to its true declared value, but not exceeding $5,000.

d. **Limited Carriage.** Carrier does not undertake to carry as baggage any tools of trade, household goods (including but not limited to appliances and furniture) fragile or valuable items, precious metals, jewelry, documents, negotiable instruments or other valuables, including but not limited to those specified in Title 46 of the United States Code, Appendix Section 181. Each Guest warrants that no such item will be presented to Carrier within any receptacle or container as baggage, and hereby releases Carrier from any liability whatsoever for loss of or damage to such items when presented to Carrier in breach of this warranty. In no event shall Carrier be liable for normal wear or tear of luggage or property, or loss of or damage to jewelry, cash, negotiable paper, photographic/electronic, medical or recreational equipment, dental hardware, eyewear, medications or other valuables unless they are deposited with Carrier on the Vessel for safekeeping against receipt (LTOs do not accept valuables for deposit). Carrier's liability, if any, for loss of or damage to valuables so deposited shall not exceed the amounts indicated in Section 4.c above.

5. PUBLIC HEALTH; MEDICAL CARE; OTHER PERSONAL SERVICES; KNOWING ACCEPTANCE OF THE RISKS:

a. **Recommended Consultation with Personal Physician.** Guests are encouraged to discuss the advisability of travel and participation in onboard and shoreside activities with their personal physicians.

b. **Availability of Medical Care.** Due to the nature of travel by sea and the ports visited, the availability of medical care onboard the Vessel and in ports of call may be limited or delayed and medical evacuation may not be possible from the Vessel while at sea or from every location to which the Vessel sails.

c. **Relationship with Service Providers.** To the extent Guests retain the services of medical personnel or independent contractors on or off the Vessel, Guests do so at their sole risk. Any medical personnel attending to a Guest on or off the Vessel, if arranged by Carrier, are provided solely for the convenience of the Guest, work directly for the Guest, and shall not be deemed to be acting under the control or supervision of Carrier, as Carrier is not a medical provider. Likewise, any onboard concessions (including but not limited to the gift shops, spas, beauty salon, art program, photography, formalwear concessions) are either operated by or are independent contractors on board the Vessel, on Transport or elsewhere and are provided solely for the convenience of the Guest. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and not acting as agents or representatives of Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such persons or entities. Guest acknowledges that the Vessel's hairdresser, manicurist, art auctioneer, gift shop personnel, spa personnel, wedding planners and other providers of merchandise and personal services are employees of independent contractors and that Carrier is not responsible for their actions.

d. **Payment for Medical or Personal Care Services.** Guest shall pay for all medical care or other personal services requested or required, whether onboard or ashore, including the cost of any emergency medical care or transportation incurred by Carrier and any costs associated with the provision of medical services as referenced in the CLIA Passenger Bill of Rights. If Guest is unable to pay and the Carrier pays for such expenses, then Guest shall reimburse Carrier for those expenses.

e. **Health, Travel and Risk Acknowledgement.** GUEST ACKNOWLEDGES, UNDERSTANDS AND ACCEPTS THAT WHILE ABOARD THE VESSEL, IN TERMINALS AND BOARDING AREAS, OR DURING ACTIVITIES ASHORE AND/ OR WHILE TRAVELING TO OR FROM THE VESSEL, GUEST OR OTHER GUESTS MAY BE EXPOSED TO COMMUNICABLE ILLNESSES, INCLUDING BUT NOT LIMITED TO AIRBONE DISEASES LIKE INFLUENZA, COVID-19, COLDS AND NOROVIRUS. GUEST FURTHER UNDERSTANDS AND ACCEPTS THAT THE RISK OF EXPOSURES TO THESE COMMUNICABLE ILLNESSES AND OTHERS IS INHERENT IN MOST ACTIVITIES WHERE PEOPLE INTERACT OR SHARE COMMON FACILITIES, IS BEYOND CARRIER'S CONTROL, AND CANNOT BE ELIMINATED UNDER ANY CIRCUMSTANCES. GUEST KNOWINGLY AND VOLUNTARILY ACCEPTS THESE RISKS AS PART OF THIS TICKET CONTRACT, INCLUDING THE RISK OF SERIOUS ILLNESS OR DEATH ARISING FROM SUCH EXPOSURES, AND/OR ALL RELATED DAMAGES, LOSS, COSTS AND EXPENSES OF ANY NATURE WHATSOEVER.

6. SHORE EXCURSIONS, TOURS, FACILITIES OR OTHER TRANSPORTATION:

All arrangements made for or by Guest for transportation (other than on the Vessel) before, during or after the Cruise or CruiseTour of any kind whatsoever, as well as air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, including all related conveyances, products or facilities, are made solely for Guest's convenience and are at Guest's risk. The providers, owners and operators of such services, conveyances, products and facilities are independent contractors and are not acting as agents or representatives of Carrier.  Even though Carrier may collect a fee for, or otherwise profit from, making such arrangements and offers for sale shore excursions, tours, hotels, restaurants, attractions, the Land Tour and other similar activities or services taking place off the Vessel for a profit, Carrier does not undertake to supervise or control such independent contractors or their employees, nor maintain their conveyances or facilities, and makes no representation, whether express or implied, regarding their suitability or safety.  In no event shall Carrier be liable for any loss, delay, disappointment, damage, injury, death or other harm whatsoever to Guest which occurs on or off the Vessel or the Transport as a result of any acts, omissions or negligence of any independent contractors. See also Section 19 below.

Guest acknowledges that the Vessel will be sailing to foreign countries where the laws, regulations, customs and business practices may vary greatly from those of Guest's home country.  As a result, there may be significant differences in modes of transportation mode and their quality, infrastructure (e.g., poorly maintained roads), regulations, and driving practices in the countries visited during the Cruise.  Guests are responsible for familiarizing themselves with the associated risks and travel warnings at www.travel.state.gov, or the equivalent travel advisory system in Guest's country, prior to sailing.

7. CANCELLATION, DEVIATION, OR SUBSTITUTION BY CARRIER:

a. **Cancellation by Carrier Generally.** Carrier has the right, without prior to notice to Guest, to cancel all or any portion of this Agreement at any time prior to Guest boarding the Vessel for the Cruise or commencing a Land Tour, whichever occurs first. In such case, Guest's sole and exclusive remedy shall be for the issuance of a refund or future cruise credit for all or the proportionate value of the cancelled Cruise or CruiseTour.  Unless otherwise provided herein, Guest agrees that a refund or future cruise credit shall be Guest's sole and exclusive remedy and Carrier shall have no further liability for damages or compensation of any kind.  Carrier's right to cancel this Agreement shall be in addition to Carrier's right to cancel the Cruise or CruiseTour.

b. **Deviations by Carrier.** Carrier may for any reason at any time and without prior notice, cancel, advance, postpone or deviate from any scheduled sailing, port of call, destination, lodging or any activity on or off the Vessel, or substitute another vessel or port of call, destination,

lodging or activity. Carrier shall not be liable for any claim whatsoever by Guest, including but not limited to loss, compensation or refund, by reason of such cancellation, advancement, postponement, or deviation, except as provided in Section 7.d below with respect to mechanical failures or as otherwise required by applicable law. For the avoidance of doubt, the terms of this Section 7.b apply equally with respect to either a Cruise or CruiseTour.

Case 1:24-cv-23953-DPG Document 57-1 Entered on FLSD Docket 03/26/2025 Page 10 of 50
USCA11 Case: 26-11899 Document: 7 Date Filed: 06/03/2026 Page: 124 of 314

c. **Cancellation or Deviation by Carrier Caused by Circumstances Beyond Carrier's Control.** If Carrier's performance hereunder is, hindered or adversely affected, or in the opinion of Carrier or the Master is likely to be hindered or adversely affected, in whole or in part, as a result of war, hostilities, blockages, prevailing weather conditions (e.g., tropical cyclones or the presence of ice), labor conflicts, strikes onboard or ashore, breakdown of Vessel, congestion, docking difficulties, medical or lifesaving emergencies, declared pandemics, public health emergencies or outbreak of communicable disease, quarantines, national or regional emergencies, seizure under legal process or any other cause whatsoever, or if Carrier or the Master considers that for any reason whatsoever, proceeding to, attempting to enter, or entering or remaining at the port on an itinerary may expose the Vessel to risk or loss or damage or delay, Guest and her baggage may be landed at any port, or if the Guest has not embarked on the Cruise or commenced the Land Tour the entire Cruise may be canceled, at which time the responsibility of Carrier shall cease.

d. **Early Termination Due to Mechanical Failures.** In the event that a Cruise (or the cruise component of a CruiseTour) is canceled or terminated early due to mechanical failures, Guest shall have a right to: (i) a full refund of the Cruise Fare if the entire Cruise is canceled, or a partial refund if the Cruise is terminated early; (ii) transportation selected by Carrier to the Vessel's scheduled port of disembarkation or the Guest's home city (as determined by Carrier), if Guest has travelled to the Vessel; and (iii) lodging selected by Carrier, if disembarkation and an overnight stay in an unscheduled port are required due to the Cruise or cruise component of a CruiseTour being cancelled or terminated early because of such mechanical failures.

e. **Substitution and Transfers.** Carrier has the right to substitute the Vessel for any other vessel or means of transportation, regardless of whether owned or operated by the Carrier, and to re-berth Guest thereon, without liability or compensation to Guest of any kind. Carrier shall further have the right to transfer Guest and/or Guest's luggage to other carriers, whether by air, land or sea toward the final port of disembarkation. Transfers for the convenience of Guest, or in compliance with a government order pursuant to Section 7.f, shall be at the sole and exclusive cost to Guest.

f. **Compliance with Government Orders.** Carrier shall have the right to comply with any orders, recommendations, or directions whatsoever given by any governmental entity or by persons purporting to act with such authority, without liability for loss, compensation of any kind whatsoever or refund to Guest, unless otherwise required by applicable law.

8. CANCELLATION BY GUEST; EARLY DISEMBARKATION:

a. **General.** Except as otherwise provided in this Section 8, Guest is not entitled to any refund, payment, compensation or credit for any cancellation initiated by Guest.

b. **Cancellation of Cruise or CruiseTour Reservation**. Cruise reservations that are cancelled by Guest prior to the sail date, and CruiseTour reservations that are cancelled by Guest prior to the first day of the CruiseTour, may be subject to a cancellation charge. The amount of the cancellation charge shall be determined as shown in the table below and shall vary depending on how far in advance of the sail date (or first day of the CruiseTour) the Operator receives notice of cancellation.

| Cruise Length: | Days to Sailing*: | Cancellation Charge (Per Guest): |
|---|---|---|
| 1 – 4 nights | 75+ days | No charge (except for non-refundable deposit amounts) |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| 5 – 14 nights | 90+ days | No charge (except for non-refundable deposit amounts) |
| | 89 – 75 days | 25% of total price |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| 15+ nights | 120+ days | No charge (except for non-refundable deposit amounts) |
| | 119 – 61 days | 25% of total price |
| | 60 – 41 days | 50% of total price |
| | 40 – 25 days | 75% of total price |
| | 24 days or less | 100% of total price |
| **For World Cruise cancellation charges, please refer to https://www.RoyalCaribbean.com instead.** | | |

*Or number of days prior to the first day of the CruiseTour, if the associated Land Tour is scheduled to begin prior to the Cruise. For bookings made outside of the U.S., a different cancellation policy may apply. Contact your local office or travel agent for details.

c. **Cancellation of a Land Tour.** For Guests who have booked a CruiseTour and desire to cancel their Land Tour segment while retaining the Cruise, refunds of the Cruise Fare (including any applicable Fuel Supplement) for the Land Tour segment shall be made in accordance with the

following cancellation policy: Guests who convert their CruiseTour to a cruise-only booking within forty-two (42) days of the start date of the Land Tour segment will be subject to a cancellation charge. The amount of that charge varies depending on the location of the CruiseTour and/or its length. For the specific amount of the charge, visit https://www.RoyalCaribbean.com.

Case 1:24-cv-23953-DPG   Document 57-1   Entered on FLSD Docket 03/26/2025   Page 11 of 50
USCA11 Case: 26-11899   Document: 7   Date Filed: 06/03/2026   Page: 125 of 314

d. **Refunds.** If a Cruise or CruiseTour reservation is cancelled, and all cancellation charges have been paid to Carrier, any prepaid Taxes and Fees, Gratuities and Fuel Supplement shall be refunded. Otherwise, the balance of any prepaid Taxes and Fees, Gratuities and Fuel Supplement shall be refunded, after deducting any cancellation charges that apply.  Cancellation by Guest after the Cruise or CruiseTour has begun, early disembarkation of Guest for any reason, including pursuant to any provision of this Agreement, or "no-shows," shall be without refund, compensation, or liability on the part of Carrier whatsoever.  If Carrier received payment via credit card and a refund is owed, the refund will be made to that credit card.  If Carrier received payment from your travel agent and a refund is owed, the refund will be provided back to that travel agent.

e. **Cancellation Policy for Single and Higher Occupancy Staterooms.** The cancellation charges set forth above are based on double occupancy staterooms. Cancellation charges will be assessed on a per-Guest basis.  Cancellation charges may vary for single occupancy staterooms, or for third, fourth or fifth Guests booked in a single stateroom.  Consult your travel agent or call Royal Caribbean International for further details.

f. **Other Cancellation Charges.** For cancellations of air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, travel insurance, pre-booked onboard services (e.g., spa, photography or wedding services) and pre-booked arrangements (e.g., specialty dining), see the applicable terms and conditions for any applicable cancellation charges.

9. GUEST'S OBLIGATION TO COMPLY WITH AGREEMENT, APPLICABLE LAWS, AND RULES OF CARRIER; INDEMNIFICATION:

a. Guest shall at all times comply with the provisions of this Agreement, all applicable laws, and rules, policies and regulations of Carrier, the Vessel and the Transport (as the same may be changed from time to time with or without notice). Guest agrees not to enter any areas of the Vessel designated for crew only, including crew quarters, under any circumstances whatsoever. Guest further agrees that Carrier may prohibit or restrict Guest from bringing any alcoholic beverages for consumption onboard the Vessel and agrees to comply with any Carrier policy covering such matters. Nothing in this Agreement shall grant to Guest any right to market, advertise, promote, provide or sell products or services to other guests onboard the Cruise or CruiseTour and Guest shall be prohibited from doing so.

b. Guests are solely responsible to maintain in their possession all passports, visas and other travel documents required for embarkation, travel and disembarkation at all ports of call. Guests assume full responsibility to determine through their travel agent or the appropriate government authority the necessary documents. Guest agrees to provide to Carrier (at Carrier's reasonable request) any travel documents. Carrier shall return such travel documents to Guest by no later than the end of the Cruise.

c. Guest understands and agrees that Carrier has a zero tolerance policy for illegal activity and shall report such activity to the appropriate authorities.

d. Each adult Guest undertakes and agrees to supervise at all times any accompanying minors to ensure compliance with the provisions of this Section 9.

e. Carrier may also change accommodations, alter or cancel any activities of, deny service of alcohol to, confine to a stateroom or quarantine, search the stateroom, property or baggage of any Guest, change a Guest's Land Tour, disembark or refuse to embark the Guest and/or any Guest responsible for any minor Guest, or restrain any Guest at any time, without liability, at the risk and expense of the Guest when, in the sole opinion of Carrier or the Master, the Guest's conduct or presence, or that of any minor for whom the Guest is responsible, is believed to present a possible danger, security risk or be detrimental to himself or the health, welfare, comfort or enjoyment of others, or is in violation of any provision of this Agreement.

f. Guest, or if a minor, his parent or guardian, shall be liable for and indemnify Carrier, the Vessel and the Transport from any civil liability, fines, penalties, costs or expenses incurred by or imposed on the Vessel, the Transport or Carrier arising from or related to Guest's conduct or failure to comply with any provisions of this Section 9, including but not limited to: (i) any purchases by or credit extended to the Guest; (ii) requirements relating to immigration, customs or excise; or (iii) any personal injury, death or damage to persons or property caused directly or indirectly, in whole or in part, by any willful or negligent act or omission on the part of the Guest.

g. Carrier shall not be required to refund any portion of the Cruise or CruiseTour Fare paid by any Guest who fails for any reason, to be onboard the Vessel or Transport by the embarkation cut-off time applicable to the specific Cruise or CruiseTour or the boarding cut-off time applicable at any port of call or destination or point of departure as the case may be, and shall not be responsible for lodging, meals, transportation or other expenses incurred by Guest as a result thereof. Embarkation procedures and cut-off times for cruises are available at https://www.RoyalCaribbean.com. Boarding procedure cut-off times for any port of call or destination or point of departure are as announced on the applicable Cruise or CruiseTour. Carrier shall have no obligation to any Guest to deviate from any scheduled sailing or port of call or destination.

h. Guest acknowledges that for certain voyages, such as a round-trip voyage commencing in a United States port, the Guest must complete the entire voyage and that failure to do so may result in a fine or other penalty being assessed by one or more governmental agencies. Guest hereby agrees to pay any such fine or penalty imposed because Guest failed to complete the entire voyage and to reimburse Carrier in the event it pays such fine or penalty.

i. Carrier may refuse to transport any Guest, and may remove any Guest from the Vessel or Transport at any time, for any of the following reasons: (i) whenever such action is necessary to comply with any government regulations, directives or instructions; (ii) when a Guest refuses to permit search of his person or property for explosives, weapons, dangerous materials or other stolen, illegal or prohibited items; (iii) when a Guest refuses upon request to produce positive identification; or (iv) for failure to comply with Carrier's rules and procedures, including, for example, Carrier's Guest Health, Safety and Conduct Policy or Carrier's policies against fraternization with crew; or (v) Guest's passage is denied by Carrier pursuant to its Refusal to Transport Policy. Carrier's Guest Health, Safety and Conduct Policy and Refusal to Transport Policy are available online at https://www.RoyalCaribbean.com.

j. In the interests of safety and security, Guests and their baggage are subject to inspection, including but not limited to monitoring electronically, with or without the Guest's consent or knowledge.

k. If Carrier exercises its rights under this Section 9, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation, loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation, unless otherwise provided in Carrier's refund policy or provided herein.

10. FORUM SELECTION; GOVERNING LAW; TIME LIMITS TO BRING SUIT; ARBITRATION; CLASS ACTION WAIVER:

a. **FOR CRUISES WHICH ARE NOT U.S. CRUISES NOR CRUISETOURS INCLUDING A U.S. CRUISE,** THE FOLLOWING SECTIONS 10.a.i, 10.a.ii, and 10.a.iii APPLY:

Case 1:24-cv-23953-DPG   Document 57-1   Entered on FLSD Docket 03/26/2025   Page 12 of 50
USCA11 Case: 26-11899   Document: 7   Date Filed: 06/03/2026   Page: 126 of 314

(i) **FORUM SELECTION:** EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ALL DISPUTES, CLAIMS OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS.  GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS OF ENGLAND AND WALES.

(ii) **GOVERNING LAW:**  THIS AGREEMENT AND ALL DISPUTES OR CLAIMS WHATSOEVER BY GUEST ARISING FROM OR RELATED TO THIS AGREEMENT SHALL IN ALL RESPECTS, AND WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW.  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.a.ii APPLIES TO ALL DISPUTES AND CLAIMS WHETHER RESOLVED IN COURT OR IN ARBITRATION.  EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, GUEST AGREES THIS CHOICE OF LAW SUPERSEDES AND PREEMPTS ANY PROVISION OF LAW OF ANY OTHER COUNTRY, STATE, OR TERRITORY.

(iii) **TIME LIMITS TO PROVIDE NOTICE AND FILE A CLAIM:**

**(A) FOR PERSONAL INJURY/ILLNESS/DEATH CLAIMS:**  NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR PERSONAL INJURY, ILLNESS OR DEATH OF ANY GUEST UNLESS WRITTEN NOTICE OF THE CLAIM, WITH FULL PARTICULARS, IS DELIVERED TO CARRIER AT THE FOLLOWING ADDRESS, C/O RCL CRUISES LTD., BUILDING 7, THE HEIGHTS, BROOKLANDS, WEYBRIDGE, SURREY, ENGLAND, KT13 0XW OR VIA EMAIL TO claims.intl@rccl.com, WITHIN SIX (6) MONTHS FROM THE DATE OF THE INJURY, ILLNESS OR DEATH AND SUIT IS COMMENCED (FILED) WITHIN ONE (1) YEAR FROM THE DATE OF SUCH INJURY, ILLNESS OR DEATH AND PROCESS SERVED WITHIN 120 DAYS AFTER FILING, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

**(B) FOR ALL OTHER CLAIMS:**  NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT, UNLESS ARBITRATION IS COMMENCED WITHIN ONE (1) YEAR FROM THE DATE SUCH CAUSE AROSE OR BE FOREVER BARRED, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

b. **FOR U.S. CRUISES AND CRUISETOURS INCLUDING A U.S. CRUISE,** THE FOLLOWING SECTIONS 10.b.i, 10.b.ii, 10.b.iii and 10.b.iv APPLY:

(i) **FORUM SELECTION:**  EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ANY DISPUTE, CLAIM OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA LOCATED IN MIAMI-DADE COUNTY, FLORIDA, U.S. TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS.  AS FOR THOSE LAWSUITS WHICH THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA LOCATED IN MIAMI-DADE COUNTY, FLORIDA, U.S. LACKS SUBJECT MATTER JURISDICTION, THE DISPUTE, CLAIM OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE BROUGHT BEFORE A COURT LOCATED IN MIAMI-DADE COUNTY, FLORIDA, U.S. TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS.  GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS REFERENCED IN THIS SECTION WHICH ARE LOCATED IN MIAMI-DADE COUNTY, FLORIDA, U.S.

(ii) **GOVERNING LAW:**  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN, THIS AGREEMENT AND ALL DISPUTES OR CLAIMS WHATSOEVER BY GUEST ARISING FROM OR RELATED TO THIS AGREEMENT SHALL IN ALL RESPECTS AND WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE GENERAL MARITIME LAW OF THE UNITED STATES OF AMERICA, AND, WHEN APPLICABLE, THE U.S. DEATH ON THE HIGH SEAS ACT (46 U.S.C. § 30301 ET SEQ.).  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.b.ii APPLIES TO ALL DISPUTES AND CLAIMS WHETHER RESOLVED IN COURT OR IN ARBITRATION.  EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, GUEST AGREES THIS CHOICE OF LAW SUPERSEDES AND PREEMPTS ANY PROVISION OF LAW OF ANY OTHER STATE, TERRITORY OR COUNTRY.

(iii) **TIME LIMITS TO PROVIDE NOTICE AND FILE A CLAIM:**

**(A) FOR PERSONAL INJURY/ILLNESS/DEATH CLAIMS:**  NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR PERSONAL INJURY, ILLNESS OR DEATH OF ANY GUEST UNLESS WRITTEN NOTICE OF THE CLAIM, WITH FULL PARTICULARS, IS DELIVERED TO THE CARRIER AT THE FOLLOWING ADDRESS, C/O ROYAL CARIBBEAN CRUISES LTD., 1050 CARIBBEAN WAY, MIAMI, FL 33132 OR VIA EMAIL TO guestclaims@rccl.com, WITHIN SIX (6) MONTHS FROM THE DATE OF THE INJURY, ILLNESS OR DEATH AND SUIT IS COMMENCED (FILED) WITHIN ONE (1) YEAR FROM THE DATE OF SUCH INJURY, ILLNESS OR DEATH AND PROCESS SERVED WITHIN 120 DAYS AFTER FILING, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

**(B) FOR ALL OTHER CLAIMS:**  NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT, UNLESS ARBITRATION IS COMMENCED WITHIN ONE (1) YEAR FROM THE DATE SUCH CAUSE AROSE OR BE FOREVER BARRED, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

(iv) **CLASS AND REPRESENTATIVE ACTION RELIEF WAIVER:**  GUEST MAY BRING CLAIMS AGAINST CARRIER ONLY IN GUEST'S INDIVIDUAL CAPACITY. EVEN IF THE APPLICABLE LAW PROVIDES OTHERWISE, GUEST AGREES THAT ANY ARBITRATION OR LAWSUIT AGAINST CARRIER, VESSEL OR TRANSPORT WHATSOEVER SHALL BE LITIGATED OR ARBITRATED BY GUEST INDIVIDUALLY AND NOT AS A MEMBER OF ANY CLASS OR AS PART OF A CLASS OR REPRESENTATIVE ACTION, AND GUEST EXPRESSLY AGREES TO WAIVE ANY LAW ENTITLING GUEST TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION.

c. **MANDATORY ARBITRATION OF CERTAIN CLAIMS FOR ALL CRUISES:** PLEASE READ THIS SECTION 10.c CAREFULLY. IT AFFECTS YOUR AND OUR RIGHTS IF THERE IS A DISPUTE.  It requires you and us to resolve most disputes in arbitration after first trying to work them

out between you and us. Arbitration is less formal than a lawsuit in court and uses a neutral arbitrator instead of a judge or jury. Discovery is more limited in arbitration than in court. Arbitrators can award the same individualized remedies that a court can award. Their rulings are legally binding and subject to very limited review by courts. Arbitration will take place on an individual basis. Class and representative proceedings are not allowed, and you and we cannot seek, and arbitrators cannot award, relief on behalf of others.

In this Section 10.c only, references to "we" "us", and "our" include Carrier's and/or Operator's past, present, and future parents, subsidiaries, affiliates and joint venturers, as well as our and each of those entities' agents, employees, predecessors, successors, and assigns. In this Section 10.c only, references to "you" and "your" includes Guest, as well as your and each of those person's assignees, heirs, trustees, agents, or other representatives. This Section 10.c does not preclude you or us from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against you or us on the other's behalf. BY AGREEING TO ARBITRATE, YOU AND WE EACH WAIVE THE RIGHT TO SUE IN COURT, TO TRIAL BY JURY, OR TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION. This Section 10.c shall survive termination of this Agreement or any other agreement between you and us.

(i) **Claims Subject to Arbitration:** Except as otherwise provided in Section 10.c.ii below, any dispute or claim between you and us must be arbitrated. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to this Agreement and/or the Cruise, purchases of other goods or services, or any other aspect of the relationship between you and us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory;
- claims that arose before this Agreement or any prior agreement between you and us (including, but not limited to, claims relating to advertising or disclosures for any of our products or services);
- claims for mental or emotional distress or injury not arising out of bodily injury;
- claims relating to the retention, protection, use, or transfer of information about you or any of your reservations for any of our products or services;
- claims relating to communications with you, regardless of sender, concerning any of our products or services, including emails and automatically dialed telephone calls and text messages; and
- claims that may arise after the termination of this Agreement and/or the Cruise.

(ii) **Claims Not Subject to Arbitration:** You and we agree that the following disputes or claims cannot be arbitrated:

- claims arising from personal injury, illness or death; and
- disputes over the scope and enforceability of this Section 10.c, whether a dispute or claim can or must be brought in arbitration, or whether Sections 10.c.iv, 10.c.vii, or 10.c.viii have been violated.

These exclusions from arbitration are intended to be interpreted narrowly.

(iii) **Pre-Arbitration Notice of Disputes and Informal Resolution:** Before either you or we commence arbitration, the claimant must first send a written Notice of Dispute to the other ("Notice"). Any such Notice to Carrier must be sent by U.S. mail or professional courier service to Carrier c/o: Legal Department, Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida 33132 ("Notice Address"). Any such Notice to you will be sent to your address on file with your reservation for the Cruise. The Notice must include: (a) the claimant's name, mailing address, email address, and phone number; (b) the claimant's loyalty number (if applicable); (c) reservation number for the Cruise; and (d) onboard folio number (if applicable); (e) a description of the nature and basis of the claim or dispute; and (f) the specific relief sought. The Notice must be personally signed by you (if you are the claimant) or by our business representative (if we are the claimant). Please be advised that we cannot disclose information about your reservation to anyone but you, the Lead Guest or your travel agent (if you or the Lead Guest used a travel agent to book or service your Cruise reservation), unless you provided us with signed, written permission to do so. Accordingly, if you retained an attorney to submit your Notice, please also provide signed written authorization for us to discuss your reservation and share our records regarding you with your attorney.

After the Notice containing all of the information above has been received, within 60 days, either you or we may request an individualized discussion (by telephone or videoconference) regarding settlement ("Informal Settlement Conference"). You and we must work together in good faith to select a mutually agreeable time during business hours for the Informal Settlement Conference (which can be after the 60-day period). You and our business representative must both personally participate in the Informal Settlement Conference, unless otherwise agreed in writing. Your and our lawyers (if any) may also participate.

Any applicable statute of limitations or contractual limitations periods will be tolled during the "Informal Resolution Period," which is the period between the date that a fully complete Notice is received by either you or us and the later of: (i) 60 days later; or (ii) the date an Informal Settlement Conference is completed, if timely requested.

(iv) **Commencing Arbitration:** An arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. Any court of competent jurisdiction will have authority to enforce this Section 10.c.iv, including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice and participating in a timely requested Informal Settlement Conference. Any court of competent jurisdiction also may enjoin the assessment or collection of arbitration fees incurred as a result of such arbitrations. Further, unless prohibited by applicable law, the arbitrator shall not accept nor administer any arbitration unless the claimant has complied with the Notice and Informal Settlement Conference requirements of Section 10.c.iii.

(v) **Arbitration Procedure:** The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by Section 10.c.iv, and will be administered by the AAA. (If the AAA is unavailable or unwilling to administer arbitrations consistent with this Section 10.c, another arbitration provider shall be selected by mutual agreement or by the court.) The AAA Rules are available online at www.adr.org or by writing to the Notice Address. As in court, you and we agree that any counsel representing someone in arbitration certifies that they will comply with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose. The arbitrator is authorized to impose any sanctions available under that rule, the AAA Rules, or applicable federal or state law against all appropriate represented parties and counsel. The arbitrator may consider rulings in arbitrations involving different claimants against us, but an arbitrator's ruling is not binding in other proceedings. Except as provided in Section 10.c.vii below, the arbitrator shall apply the substantive law that governs this Agreement, set forth in Section 10.a.ii or Section 10.b.ii, and can award the same individualized remedies (including punitive and statutory damages and statutory attorney's fees and costs) that a court could award under applicable law. Unless you and we agree otherwise, the arbitration will be decided based on papers submitted by you and us. The arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which either you or we are entitled.

(vi) **Arbitration Fees:** We will pay all AAA filing, administration, case-management, hearing, and arbitrator fees ("AAA Fees") if we initiate an arbitration. If the aggregate value of your claims is US$750 or less, we will pay all AAA Fees, so long as you have fully complied with the Notice and Informal Settlement Conference requirements in Section 10.c.iii. In such cases, we will pay the filing fee directly to the AAA upon receiving a written request at the Notice Address that you have commenced arbitration or, if the AAA makes you pay the filing fee, we will send that amount to the AAA and request that the AAA reimburse you. If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. If the aggregate value of your claims is US$750 or more, you will pay all AAA Fees. In such cases, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules or this Section 10.c.vi. For mass arbitration filings, you agree to pay all administrative fees for AAA to initiate the mediation process for the mass arbitration filings.

(vii) **Requirement of Individual Arbitration:** The arbitrator may award declaratory or injunctive relief only in favor of the individual claimant seeking relief and only to the extent necessary to provide relief warranted by that claimant's individual claim. YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person, and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general proceedings; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court after all other claims and requests for relief have been arbitrated.

(viii) **Mass Arbitrations:** If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. You agree to this process even though it may delay the arbitration of your claim. In the first stage, we and claimants' counsel will each select up to 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators. In the meantime, no other cases may be filed or proceed in arbitration, and the AAA must not assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the first stage is completed, the claimants must engage in a single mediation of all remaining cases, and we will pay the mediation fee. If the remaining claimants and we cannot agree how to resolve the remaining cases after mediation, we and claimants' counsel will repeat the process of selecting and filing up to 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, with four differences. First, a total of 100 cases may be filed in the third and later stages. Second, the cases will be randomly selected. Third, arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available. Fourth, mediation is optional at the election of counsel for the claimants.

Between stages, counsel will meet and confer regarding ways to improve the efficiency of the staged proceedings, including whether to increase the number of cases filed in each stage. Either party may also negotiate with AAA regarding the amount or timing of AAA fees.

If this Section 10.c.viii applies to a Notice, the Informal Resolution Period for the claims and relief set forth in that Notice will be extended (including the tolling of any applicable statute of limitations or contractual limitations period for the claims and requested relief) until that Notice is selected for a staged proceeding, withdrawn, or otherwise resolved. A court will have the authority to enforce this Section 10.c.viii, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of AAA fees.

This Section 10.c.viii and each of its requirements are intended to be severable from the rest of Section 10.c.viii. If, after exhaustion of all appeals, a court decides that the staging process in this Section 10.c.viii is not enforceable, then the cases may be filed in arbitration and the payment of AAA filing, administration, case-management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed rather than when the arbitrations are initiated.

(ix) **Future Changes to this Section:** Notwithstanding any provision in this Agreement to the contrary, you and we agree that if we make any future change to this Section 10.c (other than a change to the Notice Address), you may reject that change by sending us written notice within thirty (30) days of the first notice of the change to the Notice Address provided above. To be effective, your rejection must include your name, mailing address, email address, phone number, booking reference, and a statement personally signed by you that you wish to reject the change to this Section 10.c. By rejecting that future change, you are agreeing that you will arbitrate any dispute or claim between you and us in accordance with the language of this provision, as amended by any changes that you did not timely reject.

11. SECURITY:

IN THE EVENT OF AN IN REM PROCEEDING AGAINST THE VESSEL, GUEST HEREBY IRREVOCABLY AGREES THAT THE POSTING OF A LETTER OF UNDERTAKING FROM ANY OF CARRIER'S INSURERS SHALL CONSTITUTE AN ADEQUATE AND APPROPRIATE FORM OF SECURITY FOR THE IMMEDIATE RELEASE OF THE VESSEL IN LIEU OF ARREST.

12. LIMITATIONS OF LIABILITY:

a. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, CARRIER SHALL NOT BE LIABLE FOR INJURY, DEATH, ILLNESS, DAMAGE, DELAY OR OTHER LOSS TO PERSON OR PROPERTY, OR ANY OTHER CLAIM BY ANY GUEST CAUSED BY ACT OF GOD, WAR, TERRORISM, CIVIL COMMOTION, LABOR TROUBLE, GOVERNMENT INTERFERENCE, PERILS OF THE SEA, FIRE, ORDERS BY GOVERNMENT AGENCIES RESTRICTING TRAVEL FOR ANY REASON, PUBLIC HEALTH EMERGENCY, OR OUTBREAKS OF COMMUNICABLE DISEASE, INFLUENZA, COVID-19, COLDS AND NOROVIRUS, QUARANTINES, NATIONAL OR REGIONAL EMERGENCIES, THEFTS OR ANY OTHER CAUSE BEYOND CARRIER'S REASONABLE CONTROL, OR ANY ACT NOT SHOWN TO BE CAUSED BY CARRIER'S NEGLIGENCE.

b. GUEST AGREES TO SOLELY ASSUME THE RISK OF INJURY, DEATH, ILLNESS OR OTHER LOSS, AND CARRIER IS NOT RESPONSIBLE FOR GUEST'S USE OF ANY ATHLETIC OR RECREATIONAL EQUIPMENT; OR FOR THE NEGLIGENCE OR WRONGDOING OF ANY INDEPENDENT CONTRACTORS, INCLUDING BUT NOT LIMITED TO PHOTOGRAPHERS, SPA PERSONNEL OR ENTERTAINERS; OR FOR EVENTS TAKING PLACE OFF THE CARRIER'S VESSELS, LAUNCHES OR TRANSPORTS, OR AS PART OF ANY SHORE EXCURSION, TOUR OR ACTIVITY.

c. CARRIER HEREBY DISCLAIMS ALL LIABILITY TO THE GUEST FOR DAMAGES FOR EMOTIONAL DISTRESS, MENTAL SUFFERING OR PSYCHOLOGICAL INJURY OF ANY KIND UNDER ANY CIRCUMSTANCES, WHEN SUCH DAMAGES WERE NEITHER THE RESULT OF A PHYSICAL INJURY TO THE GUEST, NOR THE RESULT OF GUEST HAVING BEEN AT ACTUAL RISK OF PHYSICAL INJURY, NOR WERE INTENTIONALLY INFLICTED BY THE CARRIER. WITHOUT LIMITING THE PRECEDING SENTENCE, IN NO EVENT WILL CARRIER BE LIABLE TO GUEST FOR ANY CONSEQUENTIAL, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES.

d. ON INTERNATIONAL VOYAGES THAT EMBARK OR DISEMBARK IN A PORT OF A EUROPEAN UNION MEMBER STATE AND DO NOT EMBARK, DISEMBARK OR CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED UNDER EU REGULATION 392/2009 ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. ON INTERNATIONAL CRUISES THAT DO NOT EMBARK OR DISEMBARK IN EITHER A PORT IN A EUROPEAN UNION MEMBER STATE OR A U.S. PORT, AND WHICH DO NOT CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED IN THE ATHENS CONVENTION RELATING TO THE CARRIAGE OF GUESTS AND THEIR LUGGAGE BY SEA, 1974 AND THE PROTOCOL OF 2002 TO THAT CONVENTION (TOGETHER, THE "ATHENS CONVENTION") ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 400,000 SPECIAL DRAWING RIGHTS ("SDR") PER GUEST (APPROXIMATELY U.S. $552,000) IF THE GUEST PROVES THAT THE INCIDENT WAS A RESULT OF CARRIER'S FAULT OR NEGLECT. AN SDR IS AN INTERNATIONALLY RECOGNIZED MONETARY MEASUREMENT WHOSE VALUE FLUCTUATES DEPENDING ON THE DAILY EXCHANGE RATE AS PUBLISHED BY THE INTERNATIONAL MONETARY FUND AT WWW.IMF.ORG OR IN THE WALL STREET JOURNAL. IF THE LOSS OR DAMAGE WAS CAUSED BY A SHIPPING INCIDENT, DEFINED AS A SHIPWRECK, CAPSIZING, COLLISION OR STRANDING OF THE SHIP, EXPLOSION OR FIRE IN THE SHIP, OR DEFECT IN THE SHIP (AS DEFINED BY THE EU REGULATION AND ATHENS CONVENTION), CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000). COMPENSATION FOR LOSS CAUSED BY A SHIPPING INCIDENT CAN INCREASE TO A MAXIMUM OF 400,000 SDRS PER GUEST (APPROXIMATELY U.S. $552,000) UNLESS CARRIER PROVES THAT THE SHIPPING INCIDENT OCCURRED WITHOUT CARRIER'S FAULT OR NEGLECT. SHIPPING INCIDENTS DO NOT INCLUDE ACTS OF WAR, HOSTILITIES, CIVIL WAR, INSURRECTION, NATURAL DISASTERS, OR INTENTIONAL ACTS OR OMISSIONS OF THIRD PARTIES. IN CASES WHERE THE LOSS OR DAMAGE WAS CAUSED IN CONNECTION WITH WAR OR TERRORISM, CARRIER'S LIABILITY FOR ANY PERSONAL INJURY OR DEATH (WHETHER OCCURRING DURING A SHIPPING INCIDENT OR A NON-SHIPPING INCIDENT) IS LIMITED TO THE LOWER OF 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000) OR 340 MILLION SDRS (APPROXIMATELY U.S. $469,200,000) PER SHIP PER INCIDENT. PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR CRUISES COVERED BY EU REGULATION 392/2009 OR THE ATHENS CONVENTION.

UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY FOR LOSS OR DAMAGE TO CABIN LUGGAGE IS LIMITED TO 2,250 SDR (APPROXIMATELY U.S. $3,181).

IN ADDITION, GUESTS EMBARKING A CRUISE IN A EUROPEAN MEMBER STATE PORT ARE AFFORDED RIGHTS UNDER EU REGULATION 1177/2010.

FOR A COPY OF EU REGULATION 392/2009, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/? URI=CELEX:32009R0392&FROM=EN . FOR A COPY OF THE ATHENS CONVENTION AND THE 2002 PROTOCOL THERETO, VISIT HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/VOLUME%201463/VOLUME-1463-I-24817-ENGLISH.PDF AND HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/NO%20VOLUME/24817/A-24817-080000028053BF55.PDF (FULL TEXT IN ENGLISH BEGINS AT PAGE 40). FOR A COPY OF EU REGULATION 1177/2010, VISIT https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/? uri=CELEX:32010R1177&qid=1698341808558.

e. ALL THE RESTRICTIONS, EXEMPTIONS FROM, AND LIMITATIONS OF LIABILITY PROVIDED HEREIN OR AUTHORIZED BY THE LAWS OF THE UNITED STATES, INCLUDING BUT NOT LIMITED TO, TITLE 46 OF THE UNITED STATES CODE §§ 30501 THROUGH 30509, AND 30511, SHALL APPLY TO ALL U.S. CRUISES AND CRUISETOURS THAT INCLUDE A U.S. CRUISE.

f. EXCEPT IN THE CASE OF PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST, OR WHERE THIS AGREEMENT EXPRESSLY PROVIDES OTHERWISE, GUEST AGREES THAT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, CARRIER'S AGGREGATE LIABILTY TO GUEST SHALL BE LIMITED TO A FUTURE CRUISE CREDIT NOT TO EXCEED THE VALUE OF THE CRUISE FARE PAID TO CARRIER FOR THE CRUISE OR CRUISETOUR ASSOCIATED WITH SUCH CLAIM.

g. THIRD PARTY BENEFICIARIES

The exclusions and limitations of liability of Carrier set forth in the provisions of this Ticket Contract (including, but not limited to, those contained in this Section 12) as well as all rights, defenses and immunities set forth in this Agreement (including, but not limited to, the forum selection, time limitation, and governing law provisions contained in Section 10) shall also apply to and be for the benefit of certain designated third party beneficiaries which include the parent, subsidiary, affiliate, and successor companies and assigns of all the entities described in Section 2.b above or in this Section 12.g; the officers, directors, employees, agents, crew and pilots of all the entities described in Section 2.b above or in this Section 12.g, and all agents, independent contractors, suppliers, and concessionaires, physicians and medical personnel, retail shop personnel, health and beauty staff, fitness staff, shore excursion providers, tour operators (including, but not limited to, the LTO), shipbuilders, manufacturers and designers of the Vessel or Transport, and/or suppliers and installers of all component parts, launches, appurtenances, craft or facilities, whether provided at sea or on shore, belonging to the Vessel or any substituted ship or Transport, or owned or operated by its owners, operators, managers, agents, charterers, contractors, concessionaires or others; as well as owners and operators of all shoreside properties at which the Vessel or any substituted ship or the Transport may call.

13. FITNESS TO TRAVEL; DENIAL OF BOARDING; MINORS:

a. **Fitness to Travel.** Guest warrants that he and those traveling with him are fit for travel and that such travel will not endanger themselves or others.

b. **Minors.** Any Guest under the age of eighteen (18) shall be considered a minor and must travel with a parent or legal guardian or such other person as may be permitted by Carrier's policies.

c. **Minimum Age.** No Guest under the age of twenty-one (21) will consume any alcoholic beverages while on board the Vessel or Transport except as may be permitted by Carrier's policy. No Guest under the age of twenty-one (21) will be booked in a stateroom unless accompanied by an adult twenty-one (21) years of age or older, except for minors sailing with their parents or guardians in adjacent staterooms, or for under-aged married couples (proof of marriage is required) or except as otherwise permitted by Carrier's policy. Carrier reserves the right to request proof of age at any time and Guest's age on the date of sailing determines his or her status for the entire cruise vacation. The accompanying adult Guest also

Case 1:24-cv-23953-DPG Document 57-1 Entered on FLSD Docket 03/26/2025 Page 15 of 50
USCA11 Case: 26-11899 Document: 7 Date Filed: 06/03/2026 Page: 129 of 314

agrees that, under no circumstances will a minor be left aboard the Vessel, except in the supervision of a Vessel-organized minor care program, while the adult Guest leaves the Vessel.

d. **Pregnancy and Infants.** Pregnant women who will enter the twenty-fourth (24th) week or more of estimated gestational age at any time during the Cruise or CruiseTour will be ineligible to sail, and agree not to book the cruise or board the Vessel or Transport under any circumstances. No infants under a specific age (at least six (6) months for most cruises but twelve (12) months for other cruises) shall be booked on a cruise or CruiseTour, nor brought onboard the Vessel or Transport by any Guest under any circumstances. The most current minimum age requirements are available online at https://www.RoyalCaribbean.com.

e. **Special Needs.** Any Guest with mobility, communication or other impairments, or other special or medical needs that may require medical care or special accommodations during the cruise or CruiseTour, is strongly advised to notify Carrier of any such condition at the time of booking. Any Guest using a service animal must notify the Carrier at the time of booking. Guest agrees to accept responsibility and reimburse Carrier for any loss, damage or expense whatsoever related to the presence of any service animal brought on board the Vessel or Transport.  Guests acknowledge and understand that certain international safety requirements, shipbuilding standards, and/or applicable regulations involving design, construction or operation of the Vessel may restrict access to facilities or activities for persons with mobility, communication or other impairments or special needs.  Guests requiring the use of a wheelchair must provide their own wheelchair (that must be of a size and type that can be accommodated on the Vessel) as wheelchairs carried on board are for emergency use only.

f. **Policy Violations.** Carrier shall have the right to deny boarding for violations of Carrier's Refusal to Transport Policy, Carrier's Guest Health, Safety and Conduct Policy or any of the policies set forth in this Section 13. If Carrier exercises its rights under this Section 13 for violations of policy, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation.

g. **Recreational Water Facilities.** Our recreational water facilities do not have a lifeguard on duty. Children must be supervised by a parent or legal guardian at all times while in the pools, whirlpools and other recreational water feature areas.

14. ONBOARD ACTIVITIES RISK DISCLOSURE AND ACKNOWLEDGMENT:

Guest agrees to read the descriptions below of activities onboard the Vessel before boarding the Vessel.  Participation in the onboard activities is voluntary.  Not all activities are available on all vessels.  Guest agrees and acknowledges there may be a risk when participating in the activities described below.  In addition to reading the warning and acknowledgement of risk below, Guest agrees to read warning signs onboard the Vessel and convey both the warning and acknowledgment of risk below and warning signs onboard to every Guest named in their booking, including minors.

Guests may engage in supervised or unsupervised sporting activities including but not limited to, basketball, volleyball, and soccer. Guests must consider their own physical fitness and ability before participating.  Guests must wear footwear and clothing appropriate for the activity and follow posted rules or direction of staff.  Rules, equipment, and activity areas may not be regulation.  Age restrictions may apply for certain activities or competitions.

Fleetwide:

a. <u>Rock Climbing Wall</u>. Allows Guests to climb as high as 60 feet above deck (depending on the Vessel) on the Rock Climbing Wall while wearing a safety harness. Restrictions: Must be at least 6 years of age; weight restrictions apply based on equipment and must be able to fit into the harness.  Clothing: must wear shorts or pants, socks, dry clothes and climbing shoes which will be provided, no skirts or bikini bottoms.

On Several Vessels:

b. <u>Ice Skating Rink</u>. Guests may engage in unsupervised ice skating during specific hours. Restrictions: Children under 5 years of age must be accompanied on the rink by a parent or Legal Guardian.  Ice skates and helmets will be provided.  Must wear helmet, long pants and socks.  It is the responsibility of the Guest to make sure that their skates and helmet, and those of any minors, fit properly and are properly fastened.

c. <u>Zipline</u>. Allows Guests to race across on a Zip Line suspended nine decks above the Vessel's Boardwalk®.   Restrictions:  Must weigh no less than 75lbs and no more than 275 lbs, and be at least 52 inches tall.

d. <u>RipCord® by iFLY</u>. Allows Guests to float suspended in the air in this skydiving simulator on deck.    Restrictions: Must be at least 3 years of age.  Guests shorter than 6 feet must weigh less than 230 lbs.  Guests 6 feet and taller must weigh less than 250 lbs.  Must wear equipment provided.

e. <u>Circus Trapeze School</u>. Trapeze School at the SeaPlex® allows Guests to take flying trapeze lessons.  Safety mats are provided to cushion Your landing.  Restrictions: Must be at least 6 years of age, and able to climb a ladder and hang on a trapeze.

f. <u>Roller Skating Rink</u>. Guests may engage in unsupervised roller skating at the Vessel's roller-skating rink.  Restrictions: Children under 5 years of age must be accompanied on the rink by a parent or Legal Guardian. Helmets must be worn. All other safety equipment provided is optional, but highly recommended.  It is the responsibility of Guest to make sure that their skates, and helmet, and those of any minors, fit properly and are properly fastened.

g. <u>Sky Pad</u>ˢᴹ. Allows Guests to participate in a supervised bungee trampoline experience. Guest must be strapped into a safety harness, will be fitted with a virtual reality headset, and suspended by bungee cords over a trampoline.  During this activity, Guest determines how high to jump or whether to jump at all.  Restrictions: Must be at least 5 years old to jump and at least 7 years old to jump while wearing a virtual reality headset. Otherwise, wearing of virtual reality headset is optional.   Participants must weigh at least 20 lbs and no more than 240 lbs.

h. <u>FlowRider</u>. The FlowRider® surf simulator causes 30,000 gallons of water per minute to rush underneath the rider at 30 mph creating force similar to 5-ft ocean waves in the rear wipe-out area, whereas in the front wipe-out area the water depth may be as little as 1 inch.  Although the fall area is padded, there is a high risk of injury upon falling and upon being swept by the rushing water into the back of the rear wipe-out area and forced against the back wall.  Participants must be at least 58 inches tall to stand up surf and 52 inches to Boogie Board.  No loose articles may be worn including knee braces, arm braces, leg braces, hats or sunglasses.

<u>WARNING/ACKNOWLEDGMNENT OF RISK</u>: THE ACTIVITIES LISTED ABOVE ARE ALL VOLUNTARY AND ARE NOT SUITABLE FOR ALL GUESTS. YOU OR YOUR CHILDREN MAY SUFFER MINOR OR SERIOUS PHYSICAL INJUR(IES) OR DEATH. THE RISKS OF INJURY INCLUDE (BUT ARE NOT LIMITED TO): BROKEN BONES, FRACTURES, CONCUSSIONS, DIZZINESS, MOTION SICKNESS,

DISLOCATIONS, CONTUSIONS, TORN LIGAMENTS AND TENDONS, SPRAINS AND STRAINS, CUTS TO THE HEAD, BODY AND/OR LIMBS, BUMPS AND BRUISES, PROPERTY LOSS OR DAMAGE, ABRASIONS AND/OR LACERATIONS, ALTHOUGH RARE, CATASTROPHIC INJURIES MAY OCCUR, AND COULD INCLUDE PERMANENT DISABILITY, SPINAL INJURY PARALYSIS, OR DEATH. PARTICIPANTS ELECT TO VOLUNTARILY PARTICIPATE IN THE ACTIVITY(IES) WITH FULL KNOWLEDGE AND ACCEPTANCE OF ANY AND ALL RISKS ASSOCIATED WITH THE ACTIVITY AND IDENTIFIED ABOVE. PARENTS AND LEGAL GUARDIANS TRAVELLING WITH MINOR CHILDREN WHO ENGAGE IN THE ACTIVITY ARE DEEMED TO HAVE WARNED THE CHILDREN OF THESE RISKS AND ASSUMED THE RISK ON THE CHILD'S BEHALF.

15. USE OF PHOTOS, VIDEOS OR RECORDINGS:

a. **Capture and Use of Likeness.** Guest hereby grants to Carrier, and others working for Carrier or on its behalf, the unrestricted right and permission to visually and audiovisually record, capture, photograph Guest's name, likeness, silhouette, photograph, picture, voice, actions, conversations, statements, appearances, biographical data, monikers, signature, endorsement, social media handles, any performance of any musical compositions, and/or other distinctive attributes of any kind related to Guest and certain other intellectual property rights and characteristics and so-called publicity rights (collectively, "Likeness") and any result of Guest's appearance in any manner that Carrier desires, including but not limited to during or in connection with the Cruise or CruiseTour. Guest further grants Carrier, its parent, subsidiary and affiliated companies, and their respective agents, affiliates, legal representatives, and others working for them or on their behalf, and their respective licensors, licensees, successors or assigns (collectively with Carrier the "Grantees") the full, irrevocable, exclusive and unrestricted right to use, print, produce, publish, copy, display, perform, exhibit, transmit, broadcast, disseminate, market, advertise, sell, lease, license (with the right to sublicense), transfer, create derivative works from, publicly display and otherwise exploit Guest's Likeness, in whole or in part, severally or in connection with any and all photographs, films, and/or other recordings taken and/or made of or by me in connection with the Cruise or CruiseTour (the "Materials") on a perpetual, worldwide, royalty-free basis, in any and all media now known or hereinafter devised, for any lawful purpose whatsoever including but not limited to in connection with the advertising, promotion, marketing and publicity of the Grantees, and to permit others to do the same, which right shall include the full right and permission to edit, change or substitute any and all captions or photos Guest may use, take or post in connection with this Agreement.

b. **Ownership of Materials.** Carrier shall exclusively own all now known or hereafter existing intellectual property rights and interests (including the copyright, and all other allied and/or ancillary rights and interests) of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Materials and any other results and proceeds hereunder (such "Results and Proceeds", including, without limitation, all copyrights and renewals and extensions thereof). If under applicable law the foregoing is not effective to place authorship and ownership thereof and all rights in the Results and Proceeds in Carrier, then by way of assignment and transfer of present and future copyright and otherwise, Guest hereby irrevocably grants, transfers, sells, and assigns to Carrier, all right, title and interest therein, whether now in existence or hereafter created, including, without limitation, all rights of ownership and authorship in and to the Results and Proceeds and all versions thereof throughout the universe and in perpetuity to Carrier (or its designee). Without limiting the generality of the foregoing, Guest hereby grants Carrier the right to change, add to, take from, translate, reformat, or reprocess the Results and Proceeds in any manner Carrier may in its sole discretion determine.

c. **Carrier Consent Required.** Guest hereby agrees that any recording (whether audio or video or otherwise) or photograph of Guest, other guests, crew or third parties created or made during or in connection with the Cruise or CruiseTour, or depicting the Vessel, its design, equipment or otherwise, shall not be used for any commercial purpose, in any media broadcast or for any other nonprivate use without the express prior written consent of Carrier in each instance.

16. LEAD GUEST; YOUR TRAVEL AGENT:

a. **Lead Guest.** Lead Guest shall be responsible for the administration of, and correspondence with respect to, the Cruise or CruiseTour booking for all purposes, whether communicating with Carrier directly or through a travel agent. Lead Guest represents and warrants to Cruise Line that they have the requisite authority to make the booking, including any amendments and/or cancellations thereto, on behalf of each Guest named in the booking. By making a Cruise or CruiseTour booking, Lead Guest is deemed to have read, understood and agreed to this Agreement on behalf of themselves and each Guest named in the booking. The Lead Guest shall be responsible and liable for the: (a) full payment of any deposits and balances due; (b) confirmation and provision of details for each Guest named in the booking (including anyone who is later added or substituted); and (c) the prompt communication to each Guest named in the booking of any information issued by Cruise Line, including, without limitation, a copy of any booking confirmations, invoices and this Agreement. If Lead Guest utilizes a travel agent in connection with the Cruise booking, Lead Guest's travel agent shall undertake the foregoing on Lead Guest's behalf.

b. **Travel Agent.** Guest acknowledges and confirms that any travel agent utilized by themselves or by the Lead Guest in connection with booking the Cruise and/or issuance of this Ticket Contract is, for all purposes, Guest's agent and Carrier shall not be liable for any representation made by said travel agent. Guest shall remain liable at all times to Carrier for the price of passage. Guest understands and agrees that receipt of this Ticket Contract or any other information or notices by Guest's travel agent or the Lead Guest shall be deemed receipt by Guest as of the date of receipt by the travel agent or Lead Guest. Guest acknowledges that Carrier is not responsible for the financial condition or integrity of any travel agent.

17. SEVERABILITY:

Any provision of this Agreement that is determined in any jurisdiction to be unenforceable for any reason shall be deemed severed from this Agreement in that jurisdiction only and all remaining provisions shall remain in full force and effect.

18. TRANSFERS AND ASSIGNMENTS:

This Ticket Contract may not be assigned, sold or otherwise transferred by the Guest. Among other things, this means that the Guest cannot sell or transfer this Ticket Contract to someone else, and Carrier shall not be liable to the Guest or any other person in possession of a Ticket Contract for honoring or refunding such Ticket Contract when presented by such other person. Carrier may assign, convey or transfer its rights in this Agreement to any parent, subsidiary or affiliate of Carrier who is scheduled to operate the Vessel at the time of the Cruise.

19. RELATIONSHIP TO OTHER PURCHASES; GLOBAL PURCHASE TERMS AND CONDITIONS:

To the extent permitted or required by law, this Agreement also covers Carrier's Royal Travel Protection℠ travel protection products, and any shore excursions, land and hotel packages purchased through Royal Caribbean Cruises Ltd., d/b/a Royal Caribbean International, or RCL Cruises Ltd.

Please note that the purchase of any goods or services, other than the Cruise or CruiseTour, whether purchased on the Vessel or off, made through Royal Caribbean Cruises Ltd. d/b/a Royal Caribbean International, or RCL Cruises Ltd., are also subject to Royal Caribbean International's Global Purchase Terms and Conditions. Such goods and services include, but are not limited to, shore excursions, transportation, air arrangements, tours, hotels, restaurants, attractions and other similar activities or services. Any dispute or claim arising out of the purchase of, or participation in, such goods or services must be brought against the independent contractor providing, owning and/or operating such services,

conveyances, products or facilities. For a copy of the Global Purchase Terms and Conditions please visit https://www.RoyalCaribbean.com/guest-terms/. NOTWITHSTANDING ANY PROVISIONS OF THE GLOBAL PURCHASE TERMS AND CONDITIONS, ANY AND ALL DISPUTES OR CLAIMS MADE AGAINST CARRIER MUST BE BROUGHT IN ACCORDANCE WITH THE FORUM SELECTION, GOVERNING LAW, AND OTHER LIMITATION PROVISIONS SET FORTH IN THIS AGREEMENT.

20. OPERATOR:

Depending upon the Cruise, the Operator for a Royal Caribbean International sailing shall be one of the following entities:

- Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- RCL Cruises Ltd., Building 7, The Heights, Brooklands, Weybridge, Surrey, England, KT13 0XW
- RCL Cruises (Cyprus) Limited, Neocleous House, 195 Makarios III Avenue, 1-5th, Limassol, CY-3030 Cyprus.

The Operator of your Cruise will be indicated on your booking invoice.

R(US)DEC2023

# EXHIBIT B

**CRUISE/CRUISETOUR RESALE TICKET CONTRACT – CANADA**

<u>IMPORTANT NOTICE TO GUESTS</u>

**THIS CRUISE/CRUISETOUR RESALE TICKET CONTRACT IS APPLICABLE ONLY TO GUESTS WHOSE PRIMARY COUNTRY OF RESIDENCE IS CANADA.  IF YOUR PRIMARY COUNTRY OF RESIDENCE IS NOT CANADA, THEN PLEASE VISIT https://www.RoyalCaribbean.com/guest-terms/ TO DETERMINE THE CRUISE/CRUISETOUR TICKET CONTRACT OR BOOKING TERMS AND CONDITIONS THAT APPLY TO YOU. PLEASE REFER TO SECTION 2.i BELOW FOR THE DEFINITION OF "PRIMARY COUNTRY OF RESIDENCE."**

**THIS CRUISE/CRUISETOUR RESALE TICKET CONTRACT CONTAINS IMPORTANT LIMITATIONS ON THE RIGHTS OF GUESTS. IT IS IMPORTANT THAT YOU CAREFULLY READ ALL TERMS OF THIS TICKET CONTRACT.  YOU EXPRESSLY AGREE TO THE TERMS HEREIN, AND AGREE AND UNDERSTAND THAT YOU ARE BOUND BY THE PROVISIONS OF THIS AGREEMENT FROM THE TIME OF BOOKING AND AFTER THE CRUISE TERMINATES. YOU AGREE THAT CARRIER MAY CHANGE, MODIFY, AND UPDATE THE TERMS OF THIS TICKET CONTRACT, THAT NOTICE OF SUCH CHANGE MAY OR MAY NOT BE GIVEN, AND THAT YOU NONETHELESS AGREE TO BE BOUND BY ANY SUCH CHANGE OR MODIFICATION.**

**YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS 3, AND 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS ON YOUR RIGHTS TO ASSERT CLAIMS FOR PERSONAL INJURIES, ILLNESS OR DEATH, AND BAGGAGE AND PERSONAL PROPERTY LOSS OR DAMAGE, AGAINST CARRIER, THE VESSEL, RELATED ENTITIES AND THEIR OFFICERS, AGENTS AND EMPLOYEES AND OTHER THIRD PARTIES, INCLUDING TIME LIMITS AND FORUM FOR CLAIMS AND SUITS, APPLICABLE LAW, ARBITRATION, AND IN REM PROCEEDINGS.**

**IF YOU ARE THE PERSON MAKING A BOOKING YOU ARE ALSO DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTION 16.a TO UNDERSTAND YOUR RESPONSIBLITIES AS THE LEAD GUEST.**

1. INTRODUCTION:

This Cruise/CruiseTour Resale Ticket Contract ("Ticket Contract" or "Agreement") describes the terms and conditions that will apply to the relationship between Guest and Carrier for the Cruise or CruiseTour covered by this Ticket Contract.  The terms and conditions set forth in this Ticket Contract constitutes the entire agreement between Carrier and Guest.  Except as otherwise expressly provided herein, this Agreement supersedes any other representations or agreements that may have been made  relating to the subject matter of this Agreement, the Cruise or the CruiseTour, including but not limited to anything stated in brochures, advertisements, and other promotional materials, by Carrier, its parent, subsidiary or affiliated companies, or any of their respective employees, or third persons such as travel agents or a Third Party Reseller (as defined in Section 2.k below), but excluding the terms of the Cruise Lines International Association ("CLIA") Passenger Bill of Rights that the Vessel's Operator has adopted as a requirement of being a member of CLIA.  In the event of a direct conflict between a provision of this Ticket Contract and a provision of the CLIA Passenger Bill of Rights in effect at the time of booking (the "CLIA Passenger Bill of Rights"), the CLIA Passenger Bill of Rights controls.

Your particular cruise space was sold by Carrier to a Third Party Reseller that is reselling or otherwise providing that space to You.  Third Party Reseller may establish its own terms and conditions that govern the relationship between You and Third Party Reseller.  Any such terms and conditions shall not modify the terms and conditions of this Ticket Contract.  Among other things, Third Party Reseller may offer entertainment or amenities or other programs (collectively "Third Party Amenities") that are not part of the Cruise or CruiseTour sold to the Third Party Reseller.  Carrier bears no responsibility for the marketing or performance of any Third Party Amenities and disclaims any liability to Guest for the same.  In addition, the Cruise Fare (as defined Section 3.a below), payment and cancellation/refund terms and conditions for the Cruise Fare are established by Third Party Reseller.  Carrier shall bear no responsibility for providing any refunds, cruise credit or any other form of compensation to Guest for their Cruise or CruiseTour; such refunds, cruise credit or any other form of compensation shall be the sole responsibility of Third Party Reseller.

Purchase or use of this Ticket Contract, whether or not signed by Guest, shall constitute the agreement by Guest, on behalf of himself and all other persons traveling under this Ticket Contract (including any accompanying minors or other persons for whom the Ticket Contract was purchased), to be bound by the terms and conditions of this Ticket Contract.  In addition, Guest acknowledges the availability of and Guest agrees to abide by the terms and conditions, which appear in the applicable Carrier brochure or online at https://www.RoyalCaribbean.com (excluding the Cruise Fare, payment terms, and cancellation/refund terms which shall be established by Third Party Reseller).  Except for the items excluded by the preceding sentence, in the event of any conflict between Third Party Reseller's terms, or other brochure or website materials and this Ticket Contract, the terms of this Ticket Contract shall prevail.

2. DEFINITIONS:

a. "Agreement" shall have the meaning given to it in Section 1 above.

b. "Carrier" shall include: (i) the Vessel, or any substituted ship; its launches or crafts; and (ii) the Vessel's Operator, owner, manager and charterer.

c. "Cruise" means the specific cruise covered by this Ticket Contract, as the same may be modified and shall include those periods during which Guest is embarking or disembarking the Vessel and those periods when Guest is on land while the Vessel is in port.

d. "CruiseTour" means the combined vacation package officially published and offered by Carrier, which includes the applicable Cruise and associated Land Tour.

e. "Operator" means the entity identified in Section 20 below.

f. "Guest" or "You" means all persons traveling under this Ticket Contract and persons in their care, together with their respective heirs and representatives. "Guest" shall include the plural and the use of the masculine shall include the feminine. Notwithstanding, other policies referenced herein, communications from Carrier, and other posted notices may interchangeably use the term "Passengers" as well when referring to Guests.

g. "Land Tour" means the land tour component of a CruiseTour to be provided either prior to the initial embarkation on the Cruise or after the final debarkation from the Cruise. "LTO" means to operator of the Land Tour portion of any CruiseTour.

h. "Lead Guest" means the Guest who initiated the Cruise or Cruise Tour booking for themselves, and/or for one or more other Guests named on the booking, whether the booking was made by Lead Guest directly with Carrier or through a travel agent. The Lead Guest is usually the first Guest named on the booking.

i. "Primary Country of Residence" means the country where you primarily reside at the time of booking the Cruise. This should be indicated by you, the Lead Guest, or another agent or representative of yours at the time of booking the Cruise or at online check-in.

j. "Transport" means the railcars, buses and other modes of transportation or accommodation provided by a LTO in connection with a Land Tour.

k. "Third Party Reseller" shall mean the unrelated third party to whom Carrier has sold all available passenger berths on the Cruise or CruiseTour covered by this Agreement.

l. "Vessel" means the ship owned or chartered or operated by Operator on which Guest may be traveling or against which Guest may assert a claim, as well as any substituted ship used in the performance of this Ticket Contract.

3. CRUISE FARE TERMS:

a. **Cruise Fare.** "Cruise Fare" means the amount paid and/or due from Guest to Third Party Reseller for the Cruise or CruiseTour which includes carriage onboard the Vessel, full board, ordinary Vessel food and entertainment, and any other inclusions as are established by Third Party Reseller.

b. **Taxes, Fees, and Port Expenses; Fuel Surcharges.** Charges to Guest for taxes, fees and port expenses, and any fuel surcharges, are established by Third Party Reseller and are due and payable by Guest to such Third Party Reseller.

c. **Payment and Refunds of Cruise Fare.** Guest acknowledges that payment for Cruise Fare has been made to Third Party Reseller. Guest agrees that Carrier shall not be liable to make any refund to Guest for Ticket Contracts that are wholly or partially unused by Guest and that Guest shall solely seek refunds of the Cruise Fare from Third Party Reseller.

d. **Payment for Onboard Charges.** Guest further agrees to pay Carrier in full before the end of the Cruise, and Carrier reserves the right to collect, all charges for entertainment, goods and services incurred by Guest, or incurred by Carrier on Guest's behalf.

4. BAGGAGE, PROPERTY AND LIMITATIONS OF LIABILITY:

a. **Baggage Limits and Prohibited Items.** Each adult Guest is permitted to carry onboard the Vessel or check-in only the wearing apparel and personal effects reasonably necessary for the Cruise, including suitcases, trunks, valises, satchels, bags, hangers containing clothing, toiletries and similar items. In no event shall any Guest bring on board the Vessel or check-in, or in connection with the Land Tour, any illegal controlled substances (including medical marijuana), fireworks, live animals (except under the terms of Section 13.e below), weapons, firearms, explosives or other hazardous materials, or any other items prohibited by applicable law or Carrier policy. Marijuana possession and/or use, including medical marijuana, and possession or use of any illegal drugs, is strictly prohibited in many jurisdictions visited and on the Vessel at all times, as well as in terminals, during shore excursions or any other part of the Cruise, regardless of any local, state, or other laws which might permit use or possession of marijuana. Guests who violate the laws of any jurisdiction are subject to being reported to law enforcement or customs authorities, arrest and prosecution. Guests who bring on board dangerous items, marijuana in any form, or any illegal drugs or controlled substances are also subject to immediate disembarkation or denial of boarding. Guests shall have no claim for refund, loss, damage, inconvenience, or compensation whatsoever under any of these circumstances. Guest shall be responsible to notify Carrier in advance of the Cruise if there is any question as to the permissibility of taking any item or substance onboard the Vessel. Carrier reserves the right to refuse to permit any Guest to take on board the Vessel or on any mode of Transport any item Carrier deems inappropriate.

b. **Liability for Loss of or Damage to Baggage.** Unless negligent, Carrier is neither responsible nor liable for any loss of or damage to Guest's property, whether contained in luggage or otherwise. Liability for loss of or damage to Guest's property in connection with any air or ground transportation shall be the sole responsibility of the provider of the service and in accordance with applicable limitations.

c. **Limitation of Liability for Lost or Damaged Property.** Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property during the Land Tour portion of a CruiseTour is limited to $300.00 per Guest. Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property for the cruise (or for the cruise only portion of a CruiseTour) shall be limited to $300.00 per Guest, unless Guest declares the true value of such property in writing to the Carrier at the address specified below in Section 10.b.i, and pays Carrier within 10 days of final payment for the Cruise, a fee of five percent (5%) of the amount that such value exceeds $300.00. In such event, Carrier's liability shall be limited to its true declared value, but not exceeding $5,000.

d. **Limited Carriage.** Carrier does not undertake to carry as baggage any tools of trade, household goods (including but not limited to appliances and furniture) fragile or valuable items, precious metals, jewelry, documents, negotiable instruments or other valuables, including but not limited to those specified in Title 46 of the United States Code, Appendix Section 181. Each Guest warrants that no

such item will be presented to Carrier within any receptacle or container as baggage, and hereby releases Carrier from any liability whatsoever for loss of or damage to such items when presented to Carrier in breach of this warranty. In no event shall Carrier be liable for normal wear or tear of luggage or property, or loss of or damage to jewelry, cash, negotiable paper, photographic/electronic, medical or recreational equipment, dental hardware, eyewear, medications or other valuables unless they are deposited with Carrier on the Vessel for safekeeping against receipt (LTOs do not accept valuables for deposit). Carrier's liability, if any, for loss of or damage to valuables so deposited shall not exceed the amounts indicated in Section 4.c above.

5. PUBLIC HEALTH; MEDICAL CARE; OTHER PERSONAL SERVICES; KNOWING ACCEPTANCE OF THE RISKS:

a. **Recommended Consultation with Personal Physician.** Guests are encouraged to discuss the advisability of travel and participation in onboard and shoreside activities with their personal physicians.

b. **Availability of Medical Care.** Due to the nature of travel by sea and the ports visited, the availability of medical care onboard the Vessel and in ports of call may be limited or delayed and medical evacuation may not be possible from the Vessel while at sea or from every location to which the Vessel sails.

c. **Relationship with Service Providers.** To the extent Guests retain the services of medical personnel or independent contractors on or off the Vessel, Guests do so at their sole risk. Any medical personnel attending to a Guest on or off the Vessel, if arranged by Carrier, are provided solely for the convenience of the Guest, work directly for the Guest, and shall not be deemed to be acting under the control or supervision of Carrier, as Carrier is not a medical provider. Likewise, any onboard concessions (including but not limited to the gift shops, spas, beauty salon, art program, photography, formalwear concessions) are either operated by or are independent contractors on board the Vessel, on Transport or elsewhere and are provided solely for the convenience of the Guest. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and not acting as agents or representatives of Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such persons or entities. Guest acknowledges that the Vessel's hairdresser, manicurist, art auctioneer, gift shop personnel, spa personnel, wedding planners and other providers of merchandise and personal services are employees of independent contractors and that Carrier is not responsible for their actions.

d. **Payment for Medical or Personal Care Services.** Guest shall pay for all medical care or other personal services requested or required, whether onboard or ashore, including the cost of any emergency medical care or transportation incurred by Carrier and any costs associated with the provision of medical services as referenced in the CLIA Passenger Bill of Rights. If Guest is unable to pay and the Carrier pays for such expenses, then Guest shall reimburse Carrier for those expenses.

e. **Health, Travel and Risk Acknowledgement.** GUEST ACKNOWLEDGES, UNDERSTANDS AND ACCEPTS THAT WHILE ABOARD THE VESSEL, IN TERMINALS AND BOARDING AREAS, OR DURING ACTIVITIES ASHORE AND/ OR WHILE TRAVELING TO OR FROM THE VESSEL, GUEST OR OTHER GUESTS MAY BE EXPOSED TO COMMUNICABLE ILLNESSES, INCLUDING BUT NOT LIMITED TO AIRBONE DISEASES LIKE INFLUENZA, COVID-19, COLDS AND NOROVIRUS. GUEST FURTHER UNDERSTANDS AND ACCEPTS THAT THE RISK OF EXPOSURES TO THESE COMMUNICABLE ILLNESSES AND OTHERS IS INHERENT IN MOST ACTIVITIES WHERE PEOPLE INTERACT OR SHARE COMMON FACILITIES, IS BEYOND CARRIER'S CONTROL, AND CANNOT BE ELIMINATED UNDER ANY CIRCUMSTANCES. GUEST KNOWINGLY AND VOLUNTARILY ACCEPTS THESE RISKS AS PART OF THIS TICKET CONTRACT, INCLUDING THE RISK OF SERIOUS ILLNESS OR DEATH ARISING FROM SUCH EXPOSURES, AND/OR ALL RELATED DAMAGES, LOSS, COSTS AND EXPENSES OF ANY NATURE WHATSOEVER.

6. SHORE EXCURSIONS, TOURS, FACILITIES OR OTHER TRANSPORTATION:

All arrangements made for or by Guest for transportation (other than on the Vessel) before, during or after the Cruise or CruiseTour of any kind whatsoever, as well as air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, including all related conveyances, products or facilities, are made solely for Guest's convenience and are at Guest's risk. The providers, owners and operators of such services, conveyances, products and facilities are independent contractors and are not acting as agents or representatives of Carrier.  Even though Carrier may collect a fee for, or otherwise profit from, making such arrangements and offers for sale shore excursions, tours, hotels, restaurants, attractions, the Land Tour and other similar activities or services taking place off the Vessel for a profit, Carrier does not undertake to supervise or control such independent contractors or their employees, nor maintain their conveyances or facilities, and makes no representation, whether express or implied, regarding their suitability or safety.  In no event shall Carrier be liable for any loss, delay, disappointment, damage, injury, death or other harm whatsoever to Guest which occurs on or off the Vessel or the Transport as a result of any acts, omissions or negligence of any independent contractors. See also Section 19 below.

Guest acknowledges that the Vessel will be sailing to foreign countries where the laws, regulations, customs and business practices may vary greatly from those of Guest's home country.  As a result, there may be significant differences in modes of transportation mode and their quality, infrastructure (e.g., poorly maintained roads), regulations, and driving practices in the countries visited during the Cruise. Guests are responsible for familiarizing themselves with the associated risks and travel warnings at www.travel.state.gov, or the equivalent travel advisory system in Guest's country, prior to sailing.

7. CANCELLATION, DEVIATION, OR SUBSTITUTION BY CARRIER:

a. **Cancellation by Carrier Generally.** Carrier has the right, without prior to notice to Guest, to cancel all or any portion of this Agreement at any time prior to Guest boarding the Vessel for the Cruise or commencing a Land Tour, whichever occurs first. In such case, Guest's sole and exclusive remedy shall be for the issuance of a refund or future cruise credit from Third Party Reseller for all or the proportionate value of the cancelled Cruise or CruiseTour, as set forth in Third Party Reseller's applicable terms and conditions. Unless otherwise provided herein, Guest agrees that a refund or future cruise credit from Third Party Reseller shall be Guest's sole and

exclusive remedy and Carrier shall have no liability for damages or compensation of any kind. Carrier's right to cancel this Agreement shall be in addition to Carrier's right to cancel the Cruise or CruiseTour.

b. **Deviations by Carrier.** Carrier may for any reason at any time and without prior notice, cancel, advance, postpone or deviate from any scheduled sailing, port of call, destination, lodging or any activity on or off the Vessel, or substitute another vessel or port of call, destination, lodging or activity. Carrier shall not be liable for any claim whatsoever by Guest, including but not limited to loss, compensation or refund, by reason of such cancellation, advancement, postponement, or deviation.  For the avoidance of doubt, the terms of this Section 7.b apply equally with respect to either a Cruise or CruiseTour.

c. **Cancellation or Deviation by Carrier Caused by Circumstances Beyond Carrier's Control.** If Carrier's performance hereunder is, hindered or adversely affected, or in the opinion of Carrier or the Master is likely to be hindered or adversely affected, in whole or in part, as a result of war, hostilities, blockages, prevailing weather conditions (e.g., tropical cyclones or the presence of ice), labor conflicts, strikes onboard or ashore, breakdown of Vessel, congestion, docking difficulties, medical or lifesaving emergencies, declared pandemics, public health emergencies or outbreak of communicable disease, quarantines, national or regional emergencies, seizure under legal process or any other cause whatsoever, or if Carrier or the Master considers that for any reason whatsoever, proceeding to, attempting to enter, or entering or remaining at the port on an itinerary may expose the Vessel to risk or loss or damage or delay, Guest and her baggage may be landed at any port, or if the Guest has not embarked on the Cruise or commenced the Land Tour the entire Cruise may be canceled, at which time the responsibility of Carrier shall cease.

d. **Early Termination Due to Mechanical Failures.** In the event that a Cruise (or the cruise component of a CruiseTour) is canceled or terminated early due to mechanical failures, Guest shall have a right to: (i) a full refund of the Cruise Fare from Third Party Reseller if the entire Cruise is canceled, or a partial refund if the Cruise is terminated early; (ii) transportation selected by Carrier to the Vessel's scheduled port of disembarkation or the Guest's home city (as determined by Carrier), if Guest has travelled to the Vessel; and (iii) lodging selected by Carrier, if disembarkation and an overnight stay in an unscheduled port are required due to the Cruise or cruise component of a CruiseTour being cancelled or terminated early because of such mechanical failures.

e. **Substitution and Transfers.** Carrier has the right to substitute the Vessel for any other vessel or means of transportation, regardless of whether owned or operated by the Carrier, and to re-berth Guest thereon, without liability or compensation to Guest of any kind. Carrier shall further have the right to transfer Guest and/or Guest's luggage to other carriers, whether by air, land or sea toward the final port of disembarkation.  Transfers for the convenience of Guest, or in compliance with a government order pursuant to Section 7.f, shall be at the sole and exclusive cost to Guest.

f. **Compliance with Government Orders.** Carrier shall have the right to comply with any orders, recommendations, or directions whatsoever given by any governmental entity or by persons purporting to act with such authority, without liability for loss, compensation of any kind whatsoever or refund to Guest from Carrier.

8. CANCELLATION BY GUEST; EARLY DISEMBARKATION:

a. **General.** The Cruise Fare, and related charges to Guests for taxes, fees and port expenses, and any fuel supplement surcharges, are established by Third Party Reseller, not Carrier. Similarly, the payment schedule, and cancellation and refund policies, for the Cruise Fare and related additional charges are established by Third Party Reseller, not Carrier.

b. **Refunds.** If a Cruise or CruiseTour reservation is cancelled by Guest (either before or after the Cruise or CruiseTour has begun), any amounts due to Guest shall be determined by Third Party Reseller. In the event of early disembarkation of Guest for any reason, including pursuant to any provision of this Agreement, such disembarkation shall be without refund, compensation, or liability on the part of Carrier whatsoever.  Any payments of the Cruise Fare shall be made to Third Party Reseller and not Carrier.

c. **Other Cancellation Charges.** For cancellations of items purchased from Carrier, such as air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, travel insurance, pre-booked onboard services (e.g., spa, photography or wedding services) and pre-booked arrangements (e.g., specialty dining), see the applicable terms and conditions for any applicable cancellation charges.

9. GUEST'S OBLIGATION TO COMPLY WITH AGREEMENT, APPLICABLE LAWS, AND RULES OF CARRIER; INDEMNIFICATION:

a. Guest shall at all times comply with the provisions of this Agreement, all applicable laws, and rules, policies and regulations of Carrier, the Vessel and the Transport (as the same may be changed from time to time with or without notice). Guest agrees not to enter any areas of the Vessel designated for crew only, including crew quarters, under any circumstances whatsoever. Guest further agrees that Carrier may prohibit or restrict Guest from bringing any alcoholic beverages for consumption onboard the Vessel and agrees to comply with any Carrier policy covering such matters. Nothing in this Agreement shall grant to Guest any right to market, advertise, promote, provide or sell products or services to other guests onboard the Cruise or CruiseTour and Guest shall be prohibited from doing so.

b. Guests are solely responsible to maintain in their possession all passports, visas and other travel documents required for embarkation, travel and disembarkation at all ports of call. Guests assume full responsibility to determine through their travel agent or the appropriate government authority the necessary documents. Guest agrees to provide to Carrier (at Carrier's reasonable request) any travel documents. Carrier shall return such travel documents to Guest by no later than the end of the Cruise.

c. Guest understands and agrees that Carrier has a zero tolerance policy for illegal activity and shall report such activity to the appropriate authorities.

d. Each adult Guest undertakes and agrees to supervise at all times any accompanying minors to ensure compliance with the provisions of this Section 9.

e. Carrier may, also change accommodations, alter or cancel any activities or deny service of alcohol to, confine to a stateroom or quarantine, search the stateroom, property or baggage of any Guest, change a Guest's Land Tour, disembark or refuse to embark the Guest and/or any Guest responsible for any minor Guest, or restrain any Guest at any time, without liability, at the risk and expense of the Guest when, in the sole opinion of Carrier or the Master, the Guest's conduct or presence, or that of any minor for whom the Guest is responsible, is believed to present a possible danger, security risk or be detrimental to himself or the health, welfare, comfort or enjoyment of others, or is in violation of any provision of this Agreement.

f. Guest, or if a minor, his parent or guardian, shall be liable for and indemnify Carrier, the Vessel and the Transport from any civil liability, fines, penalties, costs or expenses incurred by or imposed on the Vessel, the Transport or Carrier arising from or related to Guest's conduct or failure to comply with any provisions of this Section 9, including but not limited to: (i) any purchases by or credit extended to the Guest; (ii) requirements relating to immigration, customs or excise; or (iii) any personal injury, death or damage to persons or property caused directly or indirectly, in whole or in part, by any willful or negligent act or omission on the part of the Guest.

g. Carrier shall not be liable for any portion of the Cruise or CruiseTour Fare paid by any Guest who fails for any reason, to be onboard the Vessel or Transport by the embarkation cut-off time applicable to the specific Cruise or CruiseTour or the boarding cut-off time applicable at any port of call or destination or point of departure as the case may be, and shall not be responsible for lodging, meals, transportation or other expenses incurred by Guest as a result thereof. Embarkation procedures and cut-off times for cruises are available at https://www.RoyalCaribbean.com. Boarding procedure cut-off times for any port of call or destination or point of departure are as announced on the applicable Cruise or CruiseTour. Carrier shall have no obligation to any Guest to deviate from any scheduled sailing or port of call or destination.

h. Guest acknowledges that for certain voyages, such as a round-trip voyage commencing in a United States port, the Guest must complete the entire voyage and that failure to do so may result in a fine or other penalty being assessed by one or more governmental agencies. Guest hereby agrees to pay any such fine or penalty imposed because Guest failed to complete the entire voyage and to reimburse Carrier in the event it pays such fine or penalty.

i. Carrier may refuse to transport any Guest, and may remove any Guest from the Vessel or Transport at any time, for any of the following reasons: (i) whenever such action is necessary to comply with any government regulations, directives or instructions; (ii) when a Guest refuses to permit search of his person or property for explosives, weapons, dangerous materials or other stolen, illegal or prohibited items; (iii) when a Guest refuses upon request to produce positive identification; or (iv) for failure to comply with Carrier's rules and procedures, including, for example, Carrier's Guest Health, Safety and Conduct Policy or Carrier's policies against fraternization with crew; or (v) Guest's passage is denied by Carrier pursuant to its Refusal to Transport Policy. Carrier's Guest Health, Safety and Conduct Policy and Refusal to Transport Policy are available online at https://www.RoyalCaribbean.com.

j. In the interests of safety and security, Guests and their baggage are subject to inspection, including but not limited to monitoring electronically, with or without the Guest's consent or knowledge.

k. If Carrier exercises its rights under this Section 9, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation, loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation.

10. FORUM SELECTION; GOVERNING LAW; TIME LIMITS TO BRING SUIT; ARBITRATION:

a. **FORUM SELECTION & GOVERNING LAW:**

(i)  EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ALL DISPUTES, CLAIMS OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS.  GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS OF ENGLAND AND WALES.

(ii) THIS AGREEMENT AND ALL DISPUTES OR CLAIMS WHATSOEVER BY GUEST ARISING FROM OR RELATED TO THIS AGREEMENT SHALL IN ALL RESPECTS, AND WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW.  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.a.ii APPLIES TO ALL DISPUTES AND CLAIMS WHETHER RESOLVED IN COURT OR IN ARBITRATION.  EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, GUEST AGREES THIS CHOICE OF LAW SUPERSEDES AND PREEMPTS ANY PROVISION OF LAW OF ANY OTHER COUNTRY, STATE, OR TERRITORY.

b. **TIME LIMITS TO PROVIDE NOTICE AND FILE A CLAIM:**

(**i) FOR PERSONAL INJURY/ILLNESS/DEATH CLAIMS:**  NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR PERSONAL INJURY, ILLNESS OR DEATH OF ANY GUEST UNLESS WRITTEN NOTICE OF THE CLAIM, WITH FULL PARTICULARS, IS DELIVERED TO CARRIER AT THE FOLLOWING ADDRESS, C/O RCL CRUISES LTD., BUILDING 7, THE HEIGHTS, BROOKLANDS, WEYBRIDGE, SURREY, ENGLAND, KT13 0XW OR VIA EMAIL TO claims.intl@rccl.com, WITHIN SIX (6) MONTHS FROM THE DATE OF THE INJURY, ILLNESS OR DEATH AND SUIT IS COMMENCED (FILED) WITHIN ONE (1) YEAR FROM THE DATE OF SUCH INJURY, ILLNESS OR DEATH AND PROCESS SERVED WITHIN 120 DAYS AFTER FILING, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

USCA11 Case: 24-11803   Document: 17   Date Filed: 06/03/2026   Page: 139 of 314

**(ii) FOR ALL OTHER CLAIMS,** NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT, UNLESS ARBITRATION IS COMMENCED WITHIN ONE (1) YEAR FROM THE DATE SUCH CAUSE AROSE OR BE FOREVER BARRED, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

c. **MANDATORY ARBITRATION OF CERTAIN CLAIMS:** PLEASE READ THIS SECTION 10.c CAREFULLY. IT AFFECTS YOUR AND OUR RIGHTS IF THERE IS A DISPUTE.  It requires you and us to resolve most disputes in arbitration after first trying to work them out between you and us.  Arbitration is less formal than a lawsuit in court and uses a neutral arbitrator instead of a judge or jury.  Discovery is more limited in arbitration than in court.  Arbitrators can award the same individualized remedies that a court can award.  Their rulings are legally binding and subject to very limited review by courts.  Arbitration will take place on an individual basis. Class and representative proceedings are not allowed, and you and we cannot seek, and arbitrators cannot award, relief on behalf of others.

In this Section 10.c only, references to "we" "us", and "our" include Carrier's and/or Operator's past, present, and future parents, subsidiaries, affiliates and joint venturers, as well as our and each of those entities' agents, employees, predecessors, successors, and assigns.  In this Section 10.c only, references to "you" and "your" includes Guest, as well as your and each of those person's assignees, heirs, trustees, agents, or other representatives.  This Section 10.c does not preclude you or us from bringing issues to the attention of federal, state, or local agencies.  Such agencies can, if the law allows, seek relief against you or us on the other's behalf.  BY AGREEING TO ARBITRATE, YOU AND WE EACH WAIVE THE RIGHT TO SUE IN COURT, TO TRIAL BY JURY, OR TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION.  This Section 10.c shall survive termination of this Agreement or any other agreement between you and us.

(i) **Claims Subject to Arbitration:**  Except as otherwise provided in Section 10.c.ii below, any dispute or claim between you and us must be arbitrated. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to this Agreement and/or the Cruise, purchases of other goods or services, or any other aspect of the relationship between you and us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory;
- claims that arose before this Agreement or any prior agreement between you and us (including, but not limited to, claims relating to advertising or disclosures for any of our products or services);
- claims for mental or emotional distress or injury not arising out of bodily injury;
- claims relating to the retention, protection, use, or transfer of information about you or any of your reservations for any of our products or services;
- claims relating to communications with you, regardless of sender, concerning any of our products or services, including emails and automatically dialed telephone calls and text messages; and
- claims that may arise after the termination of this Agreement and/or the Cruise.

(ii) **Claims Not Subject to Arbitration:**  You and we agree that the following disputes or claims cannot be arbitrated:

- claims arising from personal injury, illness or death; and
- disputes over the scope and enforceability of this Section 10.c, whether a dispute or claim can or must be brought in arbitration, or whether Sections 10.c.iv, 10.c.vii, or 10.c.viii have been violated.

These exclusions from arbitration are intended to be interpreted narrowly.

(iii) **Pre-Arbitration Notice of Disputes and Informal Resolution:**  Before either you or we commence arbitration, the claimant must first send a written Notice of Dispute to the other ("Notice").  Any such Notice to Carrier must be sent by U.S. mail or professional courier service to Carrier c/o: Legal Department, Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida 33132 ("Notice Address"). Any such Notice to you will be sent to your address on file with your reservation for the Cruise. The Notice must include: (a) the claimant's name, mailing address, email address, and phone number; (b) the claimant's loyalty number (if applicable); (c) reservation number for the Cruise; and (d) onboard folio number (if applicable); (e) a description of the nature and basis of the claim or dispute; and (f) the specific relief sought. The Notice must be personally signed by you (if you are the claimant) or by our business representative (if we are the claimant). Please be advised that we cannot disclose information about your reservation to anyone but you, the Lead Guest or your travel agent (if you or the Lead Guest used a travel agent to book or service your Cruise reservation), unless you provided us with signed, written permission to do so. Accordingly, if you retained an attorney to submit your Notice, please also provide signed written authorization for us to discuss your reservation and share our records regarding you with your attorney.

After the Notice containing all of the information above has been received, within 60 days, either you or we may request an individualized discussion (by telephone or videoconference) regarding settlement ("Informal Settlement Conference"). You and we must work together in good faith to select a mutually agreeable time during business hours for the Informal Settlement Conference (which can be after the 60-day period). You and our business representative must both personally participate in the Informal Settlement Conference, unless otherwise agreed in writing. Your and our lawyers (if any) may also participate.

USCA11 Case: 26-11899   Document: 7   Date Filed: 06/03/2026   Page: 140 of 314

Any applicable statute of limitations or contractual limitations periods will be tolled during the "Informal Resolution Period," which is the period between the date that a fully complete Notice is received by either you or us and the later of: (i) 60 days later; or (ii) the date an Informal Settlement Conference is completed, if timely requested.

(iv) **Commencing Arbitration:**  An arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. Any court of competent jurisdiction will have authority to enforce this Section 10.c.iv, including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice and participating in a timely requested Informal Settlement Conference.  Any court of competent jurisdiction also may enjoin the assessment or collection of arbitration fees incurred as a result of such arbitrations.  Further, unless prohibited by applicable law, the arbitrator shall not accept nor administer any arbitration unless the claimant has complied with the Notice and Informal Settlement Conference requirements of Section 10.c.iii.

(v) **Arbitration Procedure:**  The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by Section 10.c.iv, and will be administered by the AAA. (If the AAA is unavailable or unwilling to administer arbitrations consistent with this Section 10.c, another arbitration provider shall be selected by mutual agreement or by the court.)  The AAA Rules are available online at www.adr.org or by writing to the Notice Address.  As in court, you and we agree that any counsel representing someone in arbitration certifies that they will comply with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose.  The arbitrator is authorized to impose any sanctions available under that rule, the AAA Rules, or applicable federal or state law against all appropriate represented parties and counsel.  The arbitrator may consider rulings in arbitrations involving different claimants against us, but an arbitrator's ruling is not binding in other proceedings.  Except as provided in Section 10.c.vii below, the arbitrator shall apply the substantive law that governs this Agreement, set forth in Section 10.a.ii, and can award the same individualized remedies (including punitive and statutory damages and statutory attorney's fees and costs) that a court could award under applicable law.  Unless you and we agree otherwise, the arbitration will be decided based on papers submitted by you and us.  The arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which either you or we are entitled.

(vi) **Arbitration Fees:**  We will pay all AAA filing, administration, case-management, hearing, and arbitrator fees ("AAA Fees") if we initiate an arbitration.  If the aggregate value of your claims is US$750 or less, we will pay all AAA Fees, so long as you have fully complied with the Notice and Informal Settlement Conference requirements in Section 10.c.iii. In such cases, we will pay the filing fee directly to the AAA upon receiving a written request at the Notice Address that you have commenced arbitration or, if the AAA makes you pay the filing fee, we will send that amount to the AAA and request that the AAA reimburse you.  If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules.  If the aggregate value of your claims is US$750 or more, you will pay all AAA Fees.  In such cases, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules or this Section 10.c.vi.  For mass arbitration filings, you agree to pay all administrative fees for AAA to initiate the mediation process for the mass arbitration filings.

(vii) **Requirement of Individual Arbitration:**  The arbitrator may award declaratory or injunctive relief only in favor of the individual claimant seeking relief and only to the extent necessary to provide relief warranted by that claimant's individual claim. YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.  Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person, and may not otherwise preside over any form of a representative, class, or private attorney general proceeding.  If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general proceedings; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court after all other claims and requests for relief have been arbitrated.

(viii) **Mass Arbitrations:**  If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. You agree to this process even though it may delay the arbitration of your claim. In the first stage, we and claimants' counsel will each select up to 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators. In the meantime, no other cases may be filed or proceed in arbitration, and the AAA must not assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties.  After the first stage is completed, the claimants must engage in a single mediation of all remaining cases, and we will pay the mediation fee.  If the remaining claimants and we cannot agree how to resolve the remaining cases after mediation, we and claimants' counsel will repeat the process of selecting and filing up to 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, with four differences.  First, a total of 100 cases may be filed in the third and later stages. Second, the cases will be randomly selected.  Third, arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available.  Fourth, mediation is optional at the election of counsel for the claimants.

Between stages, counsel will meet and confer regarding ways to improve the efficiency of the staged proceedings, including whether to increase the number of cases filed in each stage.  Either party may also negotiate with AAA regarding the amount or timing of AAA fees.

If this Section 10.c.viii applies to a Notice, the Informal Resolution Period for the claims and relief set forth in that Notice will be extended (including the tolling of any applicable statute of limitations or contractual limitations period for the claims and requested relief) until that Notice is selected for a staged proceeding, withdrawn, or otherwise resolved.  A court will have the authority to enforce this Section 10.c.viii, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of AAA fees.

This Section 10.c.viii and each of its requirements are intended to be severable from the rest of Section 10.c.viii.  If, after exhaustion of all appeals, a court decides that the staging process in this Section 10.c.viii is not enforceable, then the cases may be filed in arbitration and the payment of AAA filing, administration, case-management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed rather than when the arbitrations are initiated.

(ix) **Future Changes to this Section:**  Notwithstanding any provision in this Agreement to the contrary, you and we agree that if we make any future change to this Section 10.c (other than a change to the Notice Address), you may reject that change by sending us written notice within thirty (30) days of the first notice of the change to the Notice Address provided above.  To be effective, your rejection must include your name, mailing address, email address, phone number, booking reference, and a statement personally signed by you that you wish to reject the change to this Section 10.c.  By rejecting that future change, you are agreeing that you will arbitrate any dispute or claim between you and us in accordance with the language of this provision, as amended by any changes that you did not timely reject.

11. SECURITY:

IN THE EVENT OF AN IN REM PROCEEDING AGAINST THE VESSEL, GUEST HEREBY IRREVOCABLY AGREES THAT THE POSTING OF A LETTER OF UNDERTAKING FROM ANY OF CARRIER'S INSURERS SHALL CONSTITUTE AN ADEQUATE AND APPROPRIATE FORM OF SECURITY FOR THE IMMEDIATE RELEASE OF THE VESSEL IN LIEU OF ARREST.

12. LIMITATIONS OF LIABILITY:

a. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, CARRIER SHALL NOT BE LIABLE FOR INJURY, DEATH, ILLNESS, DAMAGE, DELAY OR OTHER LOSS TO PERSON OR PROPERTY, OR ANY OTHER CLAIM BY ANY GUEST CAUSED BY ACT OF GOD, WAR, TERRORISM, CIVIL COMMOTION, LABOR TROUBLE, GOVERNMENT INTERFERENCE, PERILS OF THE SEA, FIRE, ORDERS BY GOVERNMENT AGENCIES RESTRICTING TRAVEL FOR ANY REASON, PUBLIC HEALTH EMERGENCY, OR OUTBREAKS OF COMMUNICABLE DISEASE, INFLUENZA, COVID-19, COLDS AND NOROVIRUS, QUARANTINES, NATIONAL OR REGIONAL EMERGENCIES, THEFTS OR ANY OTHER CAUSE BEYOND CARRIER'S REASONABLE CONTROL, OR ANY ACT NOT SHOWN TO BE CAUSED BY CARRIER'S NEGLIGENCE.

b. GUEST AGREES TO SOLELY ASSUME THE RISK OF INJURY, DEATH, ILLNESS OR OTHER LOSS, AND CARRIER IS NOT RESPONSIBLE FOR GUEST'S USE OF ANY ATHLETIC OR RECREATIONAL EQUIPMENT; OR FOR THE NEGLIGENCE OR WRONGDOING OF ANY INDEPENDENT CONTRACTORS, INCLUDING BUT NOT LIMITED TO PHOTOGRAPHERS, SPA PERSONNEL OR ENTERTAINERS; OR FOR EVENTS TAKING PLACE OFF THE CARRIER'S VESSELS, LAUNCHES OR TRANSPORTS, OR AS PART OF ANY SHORE EXCURSION, TOUR OR ACTIVITY.

c. CARRIER HEREBY DISCLAIMS ALL LIABILITY TO THE GUEST FOR DAMAGES FOR EMOTIONAL DISTRESS, MENTAL SUFFERING OR PSYCHOLOGICAL INJURY OF ANY KIND UNDER ANY CIRCUMSTANCES, WHEN SUCH DAMAGES WERE NEITHER THE RESULT OF A PHYSICAL INJURY TO THE GUEST, NOR THE RESULT OF GUEST HAVING BEEN AT ACTUAL RISK OF PHYSICAL INJURY, NOR WERE INTENTIONALLY INFLICTED BY THE CARRIER. WITHOUT LIMITING THE PRECEDING SENTENCE, IN NO EVENT WILL CARRIER BE LIABLE TO GUEST FOR ANY CONSEQUENTIAL, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES.

d. ON INTERNATIONAL VOYAGES THAT EMBARK OR DISEMBARK IN A PORT OF A EUROPEAN UNION MEMBER STATE AND DO NOT EMBARK, DISEMBARK OR CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED UNDER EU REGULATION 392/2009 ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. ON INTERNATIONAL CRUISES THAT DO NOT EMBARK OR DISEMBARK IN EITHER A PORT IN A EUROPEAN UNION MEMBER STATE OR A U.S. PORT, AND WHICH DO NOT CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED IN THE ATHENS CONVENTION RELATING TO THE CARRIAGE OF GUESTS AND THEIR LUGGAGE BY SEA, 1974 AND THE PROTOCOL OF 2002 TO THAT CONVENTION (TOGETHER, THE "ATHENS CONVENTION") ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 400,000 SPECIAL DRAWING RIGHTS ("SDR") PER GUEST (APPROXIMATELY U.S. $552,000) IF THE GUEST PROVES THAT THE INCIDENT WAS A RESULT OF CARRIER'S FAULT OR NEGLECT. AN SDR IS AN INTERNATIONALLY RECOGNIZED MONETARY MEASUREMENT WHOSE VALUE FLUCTUATES DEPENDING ON THE DAILY EXCHANGE RATE AS PUBLISHED BY THE INTERNATIONAL MONETARY FUND AT WWW.IMF.ORG OR IN THE WALL STREET JOURNAL. IF THE LOSS OR DAMAGE WAS CAUSED BY A SHIPPING INCIDENT, DEFINED AS A SHIPWRECK, CAPSIZING, COLLISION OR STRANDING OF THE SHIP, EXPLOSION OR FIRE IN THE SHIP, OR DEFECT IN THE SHIP (AS DEFINED BY THE EU REGULATION AND ATHENS CONVENTION), CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000).  COMPENSATION FOR LOSS CAUSED BY A SHIPPING INCIDENT CAN INCREASE TO A MAXIMUM OF 400,000 SDRS PER GUEST (APPROXIMATELY U.S. $552,000) UNLESS CARRIER PROVES THAT THE SHIPPING INCIDENT OCCURRED WITHOUT CARRIER'S FAULT OR NEGLECT.  SHIPPING INCIDENTS DO NOT INCLUDE ACTS OF WAR, HOSTILITIES, CIVIL WAR, INSURRECTION, NATURAL DISASTERS, OR INTENTIONAL ACTS OR OMISSIONS OF THIRD PARTIES.  IN CASES WHERE THE LOSS OR DAMAGE WAS CAUSED IN CONNECTION WITH WAR OR TERRORISM, CARRIER'S LIABILITY FOR ANY PERSONAL INJURY OR DEATH (WHETHER OCCURRING DURING A SHIPPING INCIDENT OR A NON-SHIPPING INCIDENT) IS LIMITED TO THE LOWER OF 250,000 SDRS

USCA11 Case: 26-11895   Document: 7   Date Filed: 06/03/2026   Page: 142 of 314

PER GUEST (APPROXIMATELY U.S. $343,000) OR 340 MILLION SDRS (APPROXIMATELY $469,200,900) PER SHIP PER INCIDENT.  PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR CRUISES COVERED BY EU REGULATION 392/2009 OR THE ATHENS CONVENTION.

UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY FOR LOSS OR DAMAGE TO CABIN LUGGAGE IS LIMITED TO 2,250 SDR (APPROXIMATELY U.S. $3,181).

IN ADDITION, GUESTS EMBARKING A CRUISE IN A EUROPEAN MEMBER STATE PORT ARE AFFORDED RIGHTS UNDER EU REGULATION 1177/2010.

FOR A COPY OF EU REGULATION 392/2009, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/? URI=CELEX:32009R0392&FROM=EN .  FOR A COPY OF THE ATHENS CONVENTION AND THE 2002 PROTOCOL THERETO, VISIT HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/VOLUME%201463/VOLUME-1463-I-24817-ENGLISH.PDF AND HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/NO%20VOLUME/24817/A-24817-080000028053BF55.PDF (FULL TEXT IN ENGLISH BEGINS AT PAGE 40). FOR A COPY OF EU REGULATION 1177/2010, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/?URI=CELEX:32010R1177&QID=1643770111876&FROM=EN.

e. INTENTIONALLY OMITTED.

f. EXCEPT IN THE CASE OF PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST, OR WHERE THIS AGREEMENT EXPRESSLY PROVIDES OTHERWISE, GUEST AGREES THAT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, CARRIER'S AGGREGATE LIABILTY TO GUEST SHALL BE LIMITED TO A FUTURE CRUISE CREDIT NOT TO EXCEED THE VALUE OF THE CRUISE FARE PAID TO CARRIER FOR THE CRUISE OR CRUISETOUR ASSOCIATED WITH SUCH CLAIM.

g. THIRD PARTY BENEFICIARIES

The exclusions and limitations of liability of Carrier set forth in the provisions of this Ticket Contract (including, but not limited to, those contained in this Section 12) as well as all rights, defenses and immunities set forth in this Agreement (including, but not limited to, the forum selection, time limitation, and governing law provisions contained in Section 10) shall also apply to and be for the benefit of certain designated third party beneficiaries which include the parent, subsidiary, affiliate, and successor companies and assigns of all the entities described in Section 2.b above or in this Section 12.g; the officers, directors, employees, agents, crew and pilots of all the entities described in Section 2.b above or in this Section 12.g, and all agents, independent contractors,  suppliers, and concessionaires, physicians and medical personnel, retail shop personnel, health and beauty staff, fitness staff, shore excursion providers, tour operators (including, but not limited to, the LTO), shipbuilders, manufacturers and designers of the Vessel or Transport, and/or suppliers and installers of all component parts, launches, appurtenances, craft or facilities, whether provided at sea or on shore, belonging to the Vessel or any substituted ship or Transport, or owned or operated by its owners, operators, managers, agents, charterers, contractors, concessionaires or others; as well as owners and operators of all shoreside properties at which the Vessel or any substituted ship or the Transport may call.

13. FITNESS TO TRAVEL; DENIAL OF BOARDING; MINORS:

a. **Fitness to Travel.** Guest warrants that he and those traveling with him are fit for travel and that such travel will not endanger themselves or others.

b. **Minors.** Any Guest under the age of eighteen (18) shall be considered a minor and must travel with a parent or legal guardian or such other person as may be permitted by Carrier's policies.

c. **Minimum Age.** No Guest under the age of twenty-one (21) will consume any alcoholic beverages while on board the Vessel or Transport except as may be permitted by Carrier's policy. No Guest under the age of twenty-one (21) will be booked in a stateroom unless accompanied by an adult twenty-one (21) years of age or older, except for minors sailing with their parents or guardians in adjacent staterooms, or for under-aged married couples (proof of marriage is required) or except as otherwise permitted by Carrier's policy.  Carrier reserves the right to request proof of age at any time and Guest's age on the date of sailing determines his or her status for the entire cruise vacation. The accompanying adult Guest also agrees that, under no circumstances will a minor be left aboard the Vessel, except in the supervision of a Vessel-organized minor care program, while the adult Guest leaves the Vessel.

d. **Pregnancy and Infants.** Pregnant women who will enter the twenty-fourth (24th) week or more of estimated fetal gestational age at any time during the Cruise or CruiseTour will be ineligible to sail, and agree not to book the cruise or board the Vessel or Transport under any circumstances. No infants under a specific age (at least six (6) months for most cruises but twelve (12) months for other cruises) shall be booked on a cruise or CruiseTour, nor brought onboard the Vessel or Transport by any Guest under any circumstances. The most current minimum age requirements are available online at https://www.RoyalCaribbean.com.

e. **Special Needs.** Any Guest with mobility, communication or other impairments, or other special or medical needs that may require medical care or special accommodations during the cruise or CruiseTour, is strongly advised to notify Carrier of any such condition at the time of booking. Any Guest using a service animal must notify the Carrier at the time of booking. Guest agrees to accept responsibility and reimburse Carrier for any loss, damage or expense whatsoever related to the presence of any service animal brought on board the Vessel or Transport.  Guests acknowledge and understand that certain international safety requirements, shipbuilding standards, and/or applicable regulations involving design, construction or operation of the Vessel may restrict access to facilities or activities for persons with mobility, communication or other impairments or special needs.  Guests requiring the use of a wheelchair must provide their own wheelchair (that must be of a size and type that can be accommodated on the Vessel) as wheelchairs carried on board are for emergency use only.

USCA11 Case: 25-11899   Document: 7   Date Filed: 06/03/2025   Page: 143 of 314

f. **Policy Violations.** Carrier shall have the right to deny boarding for violations of Carrier's Refusal to Transport Policy, Carrier's Guest Health, Safety and Conduct Policy or any of the policies set forth in this Section 13. If Carrier exercises its rights under this Section 13 for violations of policy, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation.

g. **Recreational Water Facilities.** Our recreational water facilities do not have a lifeguard on duty. Children must be supervised by a parent or legal guardian at all times while in the pools, whirlpools and other recreational water feature areas.

14. ONBOARD ACTIVITIES RISK DISCLOSURE AND ACKNOWLEDGMENT:

Guest agrees to read the descriptions below of activities onboard the Vessel before boarding the Vessel.  Participation in the onboard activities is voluntary.  Not all activities are available on all vessels.  Guest agrees and acknowledges there may be a risk when participating in the activities described below.  In addition to reading the warning and acknowledgement of risk below, Guest agrees to read warning signs onboard the Vessel and convey both the warning and acknowledgment of risk below and warning signs onboard to every Guest named in their booking, including minors.

Guests may engage in supervised or unsupervised sporting activities including but not limited to, basketball, volleyball, and soccer. Guests must consider their own physical fitness and ability before participating.  Guests must wear footwear and clothing appropriate for the activity and follow posted rules or direction of staff.  Rules, equipment, and activity areas may not be regulation.  Age restrictions may apply for certain activities or competitions.

Fleetwide:

a. <u>Rock Climbing Wall</u>. Allows Guests to climb as high as 60 feet above deck (depending on the Vessel) on the Rock Climbing Wall while wearing a safety harness. Restrictions: Must be at least 6 years of age; weight restrictions apply based on equipment and must be able to fit into the harness.  Clothing: must wear shorts or pants, socks, dry clothes and climbing shoes which will be provided, no skirts or bikini bottoms.

On Several Vessels:

b. <u>Ice Skating Rink</u>. Guests may engage in unsupervised ice skating during specific hours. Restrictions: Children under 5 years of age must be accompanied on the rink by a parent or Legal Guardian.  Ice skates and helmets will be provided.  Must wear helmet, long pants and socks.  It is the responsibility of the Guest to make sure that their skates and helmet, and those of any minors, fit properly and are properly fastened.

c. <u>Zipline</u>. Allows Guests to race across on a Zip Line suspended nine decks above the Vessel's Boardwalk®.   Restrictions:  Must weigh no less than 75lbs and no more than 275 lbs, and be at least 52 inches tall.

d. <u>RipCord® by iFLY</u>. Allows Guests to float suspended in the air in this skydiving simulator on deck.    Restrictions: Must be at least 3 years of age.  Guests shorter than 6 feet must weigh less than 230 lbs.  Guests 6 feet and taller must weigh less than 250 lbs.  Must wear equipment provided.

e. <u>Circus Trapeze School</u>. Trapeze School at the SeaPlex® allows Guests to take flying trapeze lessons.  Safety mats are provided to cushion Your landing.  Restrictions: Must be at least 6 years of age, and able to climb a ladder and hang on a trapeze.

f. <u>Roller Skating Rink</u>. Guests may engage in unsupervised roller skating at the Vessel's roller-skating rink.  Restrictions: Children under 5 years of age must be accompanied on the rink by a parent or Legal Guardian. Helmets must be worn. All other safety equipment provided is optional, but highly recommended.  It is the responsibility of Guest to make sure that their skates, and helmet, and those of any minors, fit properly and are properly fastened.

g. <u>Sky Pad℠</u>. Allows Guests to participate in a supervised bungee trampoline experience. Guest must be strapped into a safety harness, will be fitted with a virtual reality headset, and suspended by bungee cords over a trampoline.  During this activity, Guest determines how high to jump or whether to jump at all.  Restrictions: Must be at least 5 years old to jump and at least 7 years old to jump while wearing a virtual reality headset.  Otherwise, wearing of virtual reality headset is optional.   Participants must weigh at least 20 lbs and no more than 240 lbs.

h. <u>FlowRider</u>. The FlowRider® surf simulator causes 30,000 gallons of water per minute to rush underneath the rider at 30 mph creating force similar to 5-ft ocean waves in the rear wipe-out area, whereas in the front wipe-out area the water depth may be as little as 1 inch. Although the fall area is padded, there is a high risk of injury upon falling and upon being swept by the rushing water into the back of the rear wipe-out area and forced against the back wall.  Participants must be at least 58 inches tall to stand up surf and 52 inches to Boogie Board.  No loose articles may be worn including knee braces, arm braces, leg braces, hats or sunglasses.

<u>WARNING/ACKNOWLEDGMNENT OF RISK</u>: THE ACTIVITIES LISTED ABOVE ARE ALL VOLUNTARY AND ARE NOT SUITABLE FOR ALL GUESTS. YOU OR YOUR CHILDREN MAY SUFFER MINOR OR SERIOUS PHYSICAL INJUR(IES) OR DEATH. THE RISKS OF INJURY INCLUDE (BUT ARE NOT LIMITED TO): BROKEN BONES, FRACTURES, CONCUSSIONS, DIZZINESS, MOTION SICKNESS, DISLOCATIONS, CONTUSIONS, TORN LIGAMENTS AND TENDONS, SPRAINS AND STRAINS, CUTS TO THE HEAD, BODY AND/OR LIMBS, BUMPS AND BRUISES, PROPERTY LOSS OR DAMAGE, ABRASIONS AND/OR LACERATIONS. ALTHOUGH RARE, CATASTROPHIC INJURIES MAY OCCUR, AND COULD INCLUDE PERMANENT DISABILITY, SPINAL INJURY, PARALYSIS, OR DEATH.  PARTICIPANTS ELECT TO VOLUNTARILY PARTICIPATE IN THE ACTIVITY(IES) WITH FULL KNOWLEDGE AND ACCEPTANCE OF ANY AND ALL RISKS ASSOCIATED WITH THE ACTIVITY AND IDENTIFIED ABOVE.  PARENTS AND LEGAL

USCA11 Case: 24-11889   Document: 7   Date Filed: 06/03/2025   Page: 144 of 314

GUARDIANS TRAVELLING WITH MINOR CHILDREN WHO ENGAGE IN THE ACTIVITY ARE DEEMED TO HAVE WARNED THE CHILDREN OF THESE RISKS AND ASSUMED THE RISK ON THE CHILD'S BEHALF.

15. USE OF PHOTOS, VIDEOS OR RECORDINGS:

a. **Capture and Use of Likeness.** Guest hereby grants to Carrier, and others working for Carrier or on its behalf, the unrestricted right and permission to visually and audiovisually record, capture, photograph Guest's name, likeness, silhouette, photograph, picture, voice, actions, conversations, statements, appearances, biographical data, monikers, signature, endorsement, social media handles, any performance of any musical compositions, and/or other distinctive attributes of any kind related to Guest and certain other intellectual property rights and characteristics and so-called publicity rights (collectively, "Likeness") and any result of Guest's appearance in any manner that Carrier desires, including but not limited to during or in connection with the Cruise or CruiseTour. Guest further grants Carrier, its parent, subsidiary and affiliated companies, and their respective agents, affiliates, legal representatives, and others working for them or on their behalf, and their respective licensors, licensees, successors or assigns (collectively with Carrier the "Grantees") the full, irrevocable, exclusive and unrestricted right to use, print, produce, publish, copy, display, perform, exhibit, transmit, broadcast, disseminate, market, advertise, sell, lease, license (with the right to sublicense), transfer, create derivative works from, publicly display and otherwise exploit Guest's Likeness, in whole or in part, severally or in connection with any and all photographs, films, and/or other recordings taken and/or made of or by me in connection with the Cruise or CruiseTour (the "Materials") on a perpetual, worldwide, royalty-free basis, in any and all media now known or hereinafter devised, for any lawful purpose whatsoever including but not limited to in connection with the advertising, promotion, marketing and publicity of the Grantees, and to permit others to do the same, which right shall include the full right and permission to edit, change or substitute any and all captions or photos Guest may use, take or post in connection with this Agreement.

b. **Ownership of Materials.** Carrier shall exclusively own all now known or hereafter existing intellectual property rights and interests (including the copyright, and all other allied and/or ancillary rights and interests) of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Materials and any other results and proceeds hereunder (such "Results and Proceeds", including, without limitation, all copyrights and renewals and extensions thereof). If under applicable law the foregoing is not effective to place authorship and ownership thereof and all rights in the Results and Proceeds in Carrier, then by way of assignment and transfer of present and future copyright and otherwise, Guest hereby irrevocably grants, transfers, sells, and assigns to Carrier, all right, title and interest therein, whether now in existence or hereafter created, including, without limitation, all rights of ownership and authorship in and to the Results and Proceeds and all versions thereof throughout the universe and in perpetuity to Carrier (or its designee). Without limiting the generality of the foregoing, Guest hereby grants Carrier the right to change, add to, take from, translate, reformat, or reprocess the Results and Proceeds in any manner Carrier may in its sole discretion determine.

c. **Carrier Consent Required.** Guest hereby agrees that any recording (whether audio or video or otherwise) or photograph of Guest, other guests, crew or third parties created or made during or in connection with the Cruise or CruiseTour, or depicting the Vessel, its design, equipment or otherwise, shall not be used for any commercial purpose, in any media broadcast or for any other nonprivate use without the express prior written consent of Carrier in each instance.

16. LEAD GUEST; YOUR TRAVEL AGENT:

a. **Lead Guest.** Lead Guest shall be responsible for the administration of, and correspondence with respect to, the Cruise or CruiseTour booking for all purposes, whether communicating with Carrier directly or through a travel agent. Lead Guest represents and warrants to Cruise Line that they have the requisite authority to make the booking, including any amendments and/or cancellations thereto, on behalf of each Guest named in the booking. By making a Cruise or CruiseTour booking, Lead Guest is deemed to have read, understood and agreed to this Agreement on behalf of themselves and each Guest named in the booking. The Lead Guest shall be responsible and liable for the: (a) full payment of any deposits and balances due; (b) confirmation and provision of details for each Guest named in the booking (including anyone who is later added or substituted); and (c) the prompt communication to each Guest named in the booking of any information issued by Cruise Line, including, without limitation, a copy of any booking confirmations, invoices and this Agreement.  If Lead Guest utilizes a travel agent in connection with the Cruise booking, Lead Guest's travel agent shall undertake the foregoing on Lead Guest's behalf.

b. **Travel Agent.** Guest acknowledges and confirms that any travel agent utilized by themselves or by the Lead Guest in connection with booking the Cruise and/or issuance of this Ticket Contract is, for all purposes, Guest's agent and Carrier shall not be liable for any representation made by said travel agent. Guest understands and agrees that receipt of this Ticket Contract or any other information or notices by Guest's travel agent or the Lead Guest shall be deemed receipt by Guest as of the date of receipt by the travel agent or Lead Guest. Guest acknowledges that Carrier is not responsible for the financial condition or integrity of any travel agent.

17. SEVERABILITY:

Any provision of this Agreement that is determined in any jurisdiction to be unenforceable for any reason shall be deemed severed from this Agreement in that jurisdiction only and all remaining provisions shall remain in full force and effect.

18. TRANSFERS AND ASSIGNMENTS:

This Ticket Contract may not be assigned, sold or otherwise transferred by the Guest.  Among other things, this means that the Guest cannot sell or transfer this Ticket Contract to someone else, and Carrier shall not be liable to the Guest or any other person in possession of a Ticket Contract for honoring or refunding such Ticket Contract when presented by such other person.  Carrier may assign, convey or transfer its rights in this Agreement to any parent, subsidiary or affiliate of Carrier who is scheduled to operate the Vessel at the time of the Cruise.

19. RELATIONSHIP TO OTHER PURCHASES; GLOBAL PURCHASE TERMS AND CONDITIONS:

To the extent permitted or required by law, this Agreement also covers Carrier's Royal Travel Protection℠ travel protection products, and any shore excursions, land and hotel packages purchased through Royal Caribbean Cruises Ltd., d/b/a Royal Caribbean International, or RCL Cruises Ltd.

Please note that the purchase of any goods or services, other than the Cruise or CruiseTour, whether purchased on the Vessel or off, made through Royal Caribbean Cruises Ltd. d/b/a Royal Caribbean International, or RCL Cruises Ltd., are also subject to Royal Caribbean International's Global Purchase Terms and Conditions.  Such goods and services include, but are not limited to, shore excursions, transportation, air arrangements, tours, hotels, restaurants, attractions and other similar activities or services.  Any dispute or claim arising out of the purchase of, or participation in, such goods or services must be brought against the independent contractor providing, owning and/or operating such services, conveyances, products or facilities.  For a copy of the Global Purchase Terms and Conditions please visit https://www.RoyalCaribbean.com/guest-terms/.  NOTWITHSTANDING ANY PROVISIONS OF THE GLOBAL PURCHASE TERMS AND CONDITIONS, ANY AND ALL DISPUTES OR CLAIMS MADE AGAINST CARRIER MUST BE BROUGHT IN ACCORDANCE WITH THE FORUM SELECTION, GOVERNING LAW, AND OTHER LIMITATION PROVISIONS SET FORTH IN THIS AGREEMENT.

20. OPERATOR:

Depending upon the Cruise, the Operator for a Royal Caribbean International sailing shall be one of the following entities:

- Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- RCL Cruises Ltd., Building 7, The Heights, Brooklands, Weybridge, Surrey, England, KT13 0XW
- RCL Cruises (Cyprus) Limited, Neocleous House, 195 Makarios III Avenue, 1-5th, Limassol, CY-3030 Cyprus.

The Operator of your Cruise will be indicated on your booking confirmation.

RR(CAN)DEC2023

# EXHIBIT C

**BOOKING CONDITIONS – ALL OTHER COUNTRIES**

**IMPORTANT NOTICE TO GUESTS:**

**You are viewing the Booking Conditions applicable to cruises with Royal Caribbean International (and any related goods and services booked through Royal Caribbean Group). These Booking Conditions are applicable to guests whose Primary Country of Residence is not listed as an option to select on the Cruise Ticket Contract/Booking Terms and Conditions page that can be found at https://www.royalcaribbean.com/guest-terms.**

**"Primary Country of Residence" means the country where you primarily reside at the time of booking the cruise. This should be indicated by you, your agent, or other representative at the time of booking the cruise or at online check-in.**

**These Booking Conditions are governed by the laws of England and Wales, and any claims or disputes must be resolved by alternative dispute resolution or under the laws and exclusive jurisdiction of the Courts of England and Wales.**

**If you have any questions about which Booking Conditions apply to your booking (or any related goods and services), please speak to your travel agent or your local Cruise Line representative.**

These Booking Conditions together with our Guest Conduct Policy and any other current Policies or Supplementary Terms form the basis of your contract with us and apply to your booking. In the event of any inconsistency, these Booking Conditions shall prevail unless we notify you otherwise. Where you make a booking directly with us, the parties to the contract are you, your local booking office, and the entity which will be operating the cruise ship ("Vessel") on which you sail (the "Carrier"). You will be advised of your local booking office and the relevant Carrier at the time of booking and/or on your booking confirmation. For a full list of local booking offices and Carrier entities, please refer to the final paragraph of these Booking Conditions.

"Carrier" shall include: (i) the Vessel, or any substituted ship; its launches or crafts (ii) the Vessel's operator, owner, manager and charterer; and (iii) with respect to the Land Tour portion of any CruiseTour, the operator of that Land Tour ("LTO").

If you book a cruise-only holiday, fly cruise holiday or build your own package with us, you can have the peace of mind in knowing that we shall have responsibility for the proper performance of all aspects of your holiday.

If you book a cruise via a travel agency, the travel agent's own booking conditions will apply to your booking, and these Booking Conditions shall also apply to the cruise portion of your booking. Please ensure you obtain a copy of your contract from your travel agent before or at the time of booking. In the event we are found liable to you on any basis, our liability and/or obligations to you or your travel agent will be no greater or different to the liability and obligations we have under these Booking Conditions. In any such situation, we will be fully entitled to rely on all defenses exclusions and limitations contained in these Booking Conditions as set out below.

**EU Guests Only:**

If you book a cruise-only holiday in conjunction with other services (such as flights, on-shore accommodation and/or ground transfers) which are arranged or provided by a travel agent or tour operator with whom you book and not provided by us, your contract for your entire holiday including the cruise and all other such services and arrangements will be with your travel agent or tour operator and not with us as they will be the 'organizer' for the purpose of the Directive (EU) 2015/2302 of the European Parliament and of the Council on Package Travel and Linked travel arrangements ("Directive (EU) 2015/2302"), if applicable in your Primary Country of Residence.

The combination of travel services offered to you is a package within the meaning of Directive (EU) 2015/2302 as enacted into, where applicable, the law of your Primary Country of Residence by The Package Travel and Linked Travel Arrangements Regulations 2018 and/or national laws by EEA member state. Therefore, all bookings will benefit from all EU rights applying to packages pursuant to the applicable law in force at the time of booking. Royal Caribbean Cruises Ltd will be fully responsible for the proper performance of the package as a whole. Additionally, as required by law, Royal Caribbean Cruises Ltd. has protection in place to refund your payments and, where transport is included in the package, to ensure your repatriation in the event that it becomes insolvent.

Key rights under Directive (EU) 2015/2302 are available for your review at https://www.legislation.gov.uk/uksi/2018/634/schedule/3/part/.

**GUEST HEALTH SAFETY AND CONDUCT POLICY, AND OTHER POLICIES**

It shall be a condition of boarding and remaining on-board any of our ships that all guests throughout their stay comply with our Guest Health Safety and Conduct Policy ("Guest Conduct Policy") and other current Policies as notified to you. These Policies are designed to ensure that all guests may participate in a safe and enjoyable cruise vacation and, as such, the Guest Conduct Policy sets forth standards of conduct for guests to follow throughout their cruise holiday, including transfers to and from ships, inside terminals, while on-board, at ports of call, during shore excursions and at our private destinations. Please review the Guest Conduct Policy and our other Policies at https://www.royalcaribbean.com/guest-terms or contact your local booking office for further details in advance of travel.

**1 BOOKING YOUR HOLIDAY.**

1.1 HOW DO I MAKE A BOOKING?

To book your chosen holiday, contact our Reservations Department, visit us online, or visit one of our authorized travel agents. Guests who purchase their holiday via our website, or otherwise, need to ensure that all booking details are correct at the time of booking, as amendment or cancellation charges may apply to any components that are requested to be changed afterwards, due to any error or

omission made by you. When booking with us you must agree that you have read, understood and are bound by these Booking Conditions as applicable at the time of booking.

**Deposits**

To complete a booking with us, you must pay a deposit (all or a portion of which may be non-refundable). Deposit amounts vary by cruise duration, package selection and stateroom category and are subject to change at any time. If you are making multiple bookings or booking consecutive cruises, a deposit will be required for each individual cruise. You will be advised of the required deposit amount and the applicable refundability terms at the time of booking.  The most up to date deposit terms are available on our website or by calling your local booking office.

If you add flights, hotels, transfers or other components to your holiday, you may be required to pay a higher non-refundable deposit to secure such additional components. Any increased non-refundable deposit payment required will be advised to you at the time of booking.

1.2 HOW WILL MY HOLIDAY BE CONFIRMED?

Providing your chosen holiday is available, you have completed the booking process, agreed to our Booking Conditions and we have received all appropriate payments, we will send our booking confirmation to you (if booking direct) or your travel agent). Please note it may not be possible to confirm your flight details at this point. If so, these will be confirmed to you at a later date. A binding contract between us only comes into existence when we send out our booking confirmation to you or your travel agent. A contract will exist at this point, even if we are unable to confirm your flight details at that time. This invoice will show the remaining balance due on your holiday and also your flight details (where applicable and/or available).

Please note that in cases where a pricing or information error has occurred, no binding contract will exist between us. Therefore, please check all details are correct as soon as you receive your booking confirmation, electronic cruise documents, flight tickets, Bonding Certificate (where applicable) and any other documents from your travel agent or us. If any details appear to be incorrect, you must immediately inform your travel agent or our Reservations Department if booking direct, in any event within 14 days of us sending the document to your travel agent or you for all documents other than flight tickets and e-tickets, and within 5 days for flight tickets and e-tickets, as it may not be possible to make changes later. We cannot accept any responsibility if you do not tell us about any mistake in any document issued within these applicable timeframes.

Once your flight tickets have been issued, you must travel as per the itinerary in sequence as originally booked. Any flight sector not used will invalidate the ticket and the rest of the itinerary will automatically be cancelled.

1.3 WHAT INFORMATION MUST I PROVIDE, AND WHY?

From time to time, we may be required to collect personal information relating to you and your party to pass on to applicable immigration authorities and/or government bodies, and air carriers. We may also need to pass the information you give us at the time of booking or later to the various suppliers who provide the elements which make up your holiday. You must provide us with any personal information legitimately requested by us at the time of booking your cruise or where requested later, by the date we require you to provide that information. This information includes certain data set out in your passport, emergency contact information and insurance details. We will inform you at the time of booking, or as soon as we become aware of the exact details required and the date that we require the information. We strongly recommend you visit our website and submit these details via your online account.

By providing us with the details requested under these Booking Conditions, you consent to the sharing of your personal data with third parties including where necessary the transfer of your personal data outside of your Primary Country of Residence and/or the European Economic Area for the purpose of fulfilling your holiday contract.

If you fail to supply the details requested, both fully and accurately, within the time limits we specify, we shall be entitled to refuse your booking or treat such failure to provide such information within the time limits specified as a cancellation by you of your holiday, or you may not be permitted to board your cruise ship and/or outward and/or return flight. We will not accept any liability in this situation, and we will not pay you any compensation or make any refunds. You will be responsible for your resulting onward/return travel arrangements. If failure to have this information results in fines, surcharges or other financial penalty being imposed on us, you will be responsible for re-imbursing us accordingly. Further, where we do not exercise our right to cancel your booking in these circumstances, you agree to reimburse us for any fines, surcharges or other financial penalties we incur as a consequence of any failure by you to provide full and accurate details within the time-limits we specified to you. Please also see our Privacy Policy on our website.

CRUISE CHECK-IN

We strongly recommend you check in for your cruise on the our app or via our website to submit any required information. Providing this information online and prior to your cruise will significantly speed up your check-in process and you will be able to board the ship sooner and avoid any possible delays and queues at the cruise terminal. If you have not completed online check-in, you will be required to complete this process at the pier no later than two hours prior to the published sailing time. All guests must be checked-in and onboard the ship no later than 90 minutes prior to the published sailing time or they will not be permitted to sail. You will need to have your booking ID and date of sailing to hand or, if we have already received this information from you at the time of booking, verify that the details we are holding are complete and accurate. If you do not have access to the Internet, please see your travel agent or contact our Reservations Department if you have a direct booking. They will advise you on how this information can be provided or verified. Our procedures may change, and we will inform you of any changes at the time of booking or as soon as possible thereafter.

FLIGHT BOOKINGS

At the time of issue of these terms and conditions EU airlines are required to pass certain personal information relating to passengers (principally, but not exclusively, information on the data page of a passenger's passport) to the US Authorities as well as applicable authorities in other countries where you are travelling in advance of the date of any flight booking. While we may obtain some of the information that we require from you at the time of booking, we also require that you provide us with certain additional personal information within specific time limits. We strongly recommend that you supply the personal details for all guests (including full names, dates of birth and passport details) through our online Check-In process as soon as possible after the booking is made, as this will help us ensure we can issue all flight and accurate details within the time limits we specify, we shall be entitled to refuse your booking or treat such failure to provide such information within the time limits specified as a cancellation of your holiday. If you have not supplied us with complete and accurate information, your party may not be allowed to board your cruise ship and/or any outward or return flight. Where this happens because of your failure to fully comply with such obligations we cannot accept any liability to you or any of your party and we will not pay you any compensation or make any refunds to you or your party in such circumstances and you will be responsible for your own onward/return travel arrangements. Further, if such failure to provide this information results in fines, surcharges or other financial penalty being imposed upon us, you will also be responsible for reimbursing us.

1.4 WHEN IS THE BALANCE DUE?

Depending on the type of cruise and/or package you purchase, your final balance due date will be between 60 – 150 days prior to departure. The final payment schedule for the balance due for your cruise holiday will be specified at the time of booking and set out in your booking confirmation. Bookings for cruise holidays within the balance due period will require payment of the full fare at the time of booking. We must receive the balance of the cruise and/or flight costs (after deducting the deposit you have paid) either at the time of booking or by the balance due date. If we have not received all monies due to us in full and on time, you will be deemed to wish to cancel your cruise and cancellation charges will be assessed.

If you use your credit or debit card to pay us directly for your cruise, please be aware that we may process that transaction via a bank in the US and your card issuer may choose to charge you a foreign processing fee. We advise you to check the terms and conditions of such foreign transactions with your card issuer in advance of making a payment to us.

1.5 WHAT HAPPENS TO MONEY PAID TO A TRAVEL AGENT?

Unless otherwise required by law, all monies paid by you to one of our authorized travel agents for your holiday with us will be held by the travel agent on your behalf until transferred to us. If you are unable to complete the online check-in process or print your boarding documents, this may be due to an outstanding balance on your booking. If you have booked via a travel agent, please speak to your travel agent so that the funds can be transferred to us.

1.6 WHAT DOES THE PRICE INCLUDE?

Unless otherwise indicated, all standard fly/cruise package and standard cruise only prices quoted on our website are per person in US Dollars and are based on two people sharing the specified stateroom. When booking directly with us, you may request to pay for your cruise holiday in an alternative booking depending on your Primary Country of Residence and local booking office.

Fly/Cruise or Air2Sea Packages: The standard fly/cruise or Air2Sea package price includes the following: carriage onboard the Vessel, full board, and ordinary Vessel food and entertainment; return international flights and connecting flights as detailed on your booking confirmation; hotel accommodation as stated in the itinerary (room only basis unless otherwise stated), and representatives at selected airports on standard departure dates. Standard fly/cruise package pricing as stated on our website is based on the lowest available local departure airport, which may be a regional airport, at the time of issue of these Booking Conditions. Please contact our Reservations Department for further information.

Cruise-Only Packages: The standard cruise-only price includes the following: carriage onboard the Vessel, full board, and ordinary Vessel food and entertainment. If you have booked a cruise only holiday, we shall only provide the services relating to the Vessel as set forth in the previous sentence.

Build-Your-Own Package: For Guests electing to build their own holiday package, the package price will vary depending on the services you select, but will always include the services related to the Vessel setforth above.

Some elements of your holiday will vary by itinerary, stateroom selection and fare type. All holiday elements featured are subject to availability at the time of booking. Please always check your booking confirmation on receipt to ensure it includes all relevant details.

**Exclusions**

a. Generally. Unless included in your package, the price does not include alcoholic beverages, specialized tea and coffee beverages, fresh or cold press juices, energy drinks, spa treatments and salon services, exercise classes, select premium dining and entertainment, internet access, casino and gambling activities, shore excursions, photographs, video arcade, phone calls, laundry services, satellite connection for mobile phones, travel insurance, medical insurance, baggage insurance, medical services, shoreside expenses or transfers, airfare, or hotel accommodations, or any other incidental charge or expense that you incur. Also excluded from the price are: (i) Taxes and Fees; and (ii) any Fuel Supplement, which, subject to applicable law and the terms of these Booking Conditions, Carrier expressly reserves the right to impose or pass along with no right of cancellation by Guest implied. This listing is not intended to be exhaustive and additional exclusions or fees may apply. See section 1.9 for further details relating to the limits of any price variation.

b. Taxes, Fees, and Port Expenses. Unless otherwise indicated on your booking confirmation, the price does not include fees, charges, costs and taxes imposed on Carrier, by governmental or quasi-governmental authorities, as well as third party fees and charges relating to the Vessel's navigation, operations or presence in a port or harbor (collectively, "Taxes and Fees"). By way of example, and not limitation, Taxes and Fees may include immigration-related fees, passenger head taxes, dockage fees, wharfage fees, inspection fees,

pilotage, canal tolls, navigation fees, environmental impact fees, charges relating to the cost of acquiring government-mandated carbon emission allowances, or charges related to berthing, stevedoring, baggage handling or storage, and security services. Guest acknowledges that Taxes and Fees are estimated by Carrier at the time of booking and subject to change.

c. Fuel Supplement. Where permitted by law, Carrier reserves the right, without prior notice to Guest, to impose a fuel supplement charge (the "Fuel Supplement"). Carrier may impose such Fuel Supplement either at the time of booking or thereafter at any time prior to sailing. If the Fuel Supplement is imposed at the time of booking, Carrier will display the amount and frequency (or a fixed price representing the same) together with the Cruise Fare, Taxes and Fees, and Gratuities on Carrier's website and Guest's booking confirmation. If at any time after booking, the closing price of: (i) West Texas Intermediate Fuel exceeds US$65.00 per barrel; or (ii) Henry Hub Natural Gas Spot Price exceeds US$3.00 per Metric Million British Thermal Unit on the New York Mercantile Stock Exchange, Carrier may impose a Fuel Supplement of up to US$12.00 (or its equivalent in the currency of the booking) per Guest, per day.  Carrier may, in its sole discretion, require Guest to prepay the Fuel Supplement prior to boarding the Vessel or apply such charge to Guest's onboard folio at the time of sailing.  Guest's refusal or failure to prepay any Fuel Supplement may be deemed as a cancellation by Guest.

d. Discretionary Service Charge. For your convenience, a discretionary service charge ("Service Charge") will be automatically added daily to the onboard account of each Service Charge, except as otherwise provided below. Service Charges are subject to adjustment, at your discretion, onboard the Vessel until the morning of disembarkation. Service Charges will not be automatically added to your onboard account if (i) the Service Charge included in the price, as reflected in your booking confirmation; (ii) you prepay the Service Charge; or (iii) prohibited by applicable law. The current applicable Service Charge rates are published on our website.

1.7 What are "from" prices?

The prices we publish are 'from' prices. Fly/cruise package pricing is based on the lowest fare available at the time of going to print from a local departure airport (which may be a regional airport and/or indirect flights). Please contact our Reservations Department, your travel agent or cruise specialist for further details. The 'from' cruise fare prices are calculated using the lowest stateroom category available, and this pricing may not be available on all sail dates shown. Prices will vary by ship, itinerary, sailing dates, stateroom category and additionally departure airport if you purchase a standard fly/cruise package. Prices may change at any time.

1.8 WHAT IS A 'GUARANTEE' BOOKING?

From time to time, we may offer guests the option to book a stateroom of a guaranteed minimum category type, rather than a specific stateroom (a "Guaranteed Booking"). When you make a Guaranteed Booking, you will not be assigned an exact stateroom until after booking. We may, in our discretion, assign you a stateroom at any time prior to sailing. Once your stateroom has been allocated to you, we are unable to accept any changes requested by you. The benefits to you of a Guaranteed Booking are that, after your booking has been confirmed, we may (at our discretion) upgrade your stateroom to one of a superior category to that originally booked at no extra charge to you. In any event, you are 'guaranteed' the minimum category of stateroom we agreed to offer at the time of booking. The stateroom we allocate will be suitable for the number of guests occupying it and this may mean you are allocated a room with upper berths which are accessed by a ladder. Upper berths may only be used by guests aged over 6 years old, so Guaranteed Bookings are not recommended for young families. If you have a specific requirement regarding your stateroom, or stateroom location, or are travelling with family or friends, (especially children) you want to be near, then we suggest you do not make a Guaranteed Booking.

1.9 WILL THE PRICE CHANGE?

We reserve the right to increase or decrease the prices of unsold holidays at any time. The price of your chosen holiday will generally be confirmed at the time of booking.

Unless otherwise prohibited by applicable law, once the price of your chosen holiday has been confirmed, then subject to the correction of errors, we will only increase or decrease the price in the following circumstances: (1) if there is a variation in the cost of any transport included in the price (including fuel); (2) if there is a change in the level of taxes or fees on the travel services included in the contract imposed by third parties not directly involved in the performance of the package, including tourist taxes, landing taxes or embarkation or disembarkation fees at ports and airports; and/or (3) there is an adverse change in the exchange rates which have been used to calculate the cost of your booking or charges of any sort).

**For All Guests, EXCEPT EU Residents:** In the event that we increase the price because of any of the reasons listed in the previous paragraph, you agree that we may do so without a right of cancellation implied and you further agree to pay such amounts upon receipt of an invoice from us detailing the charges. If you refuse or otherwise fail to make timely payment of any such amount due, we may deem such refusal or failure to pay as if you cancelled your booking and assess cancellation charges (if applicable).

**For EU Residents Only:** Price increases or decreases after booking will be passed on by way of a surcharge or refund. A surcharge or refund (as applicable) will be payable, subject to the conditions set out in this clause. If any surcharge is greater than 8% of the cost of your holiday (excluding any amendment charges), and we advise you in writing no later than 20 days prior to the start of your holiday, you will be entitled to choose one of options (A), (B) and (C) as set out in section 5.5.  We will tell you about any increase in the cost of your cruise by sending you or your travel agent a surcharge invoice or by email. You have 14 days from the issue date printed on the surcharge invoice or email to tell us if you want to choose option (B) or (C) as set out in section 5.5 below, failing which we shall deem you to have accepted the change and will invoice you accordingly for such additional costs and indicate the time period to make such additional payment. If you do not tell us in writing that you wish to choose either of these options within this period of time, we are entitled to assume that you do not wish to do so and will pay the surcharge. Any surcharge must be paid with the balance of the cost of the holiday or within 14 days of the issue date printed on the surcharge invoice, whichever comes first. Alternatively, we may charge such surcharge to your onboard account. Please note that travel arrangements are not always purchased in local currency and some apparent changes have no impact on the price of your holiday travel due to contractual and other protection in place. Please note

changes and errors occasionally occur. We reserve the right to correct errors in both advertised and confirmed prices and we will do so as soon as we become aware of the error. You must check the price of your chosen holiday at the time of booking. Please note: any changes you make to your booking may result in a change in price explained in section 1.11.

1.10 IF I HAVE TO CANCEL MY CRUISE HOLIDAY, WILL I RECEIVE A REFUND?

If you or anybody travelling with you wishes to cancel either your/their holiday booking, you must contact us (if booking direct) or your travel agent and give notice in writing using registered post or e-mail to ensure safe receipt of the cancellation notice. The holiday booking will only be cancelled on the date we receive the written notice of cancellation. Please note where your booking has been made via a travel agent, we can only accept their written cancellation of the booking. Insurance premiums and amendment charges cannot be refunded in the event of cancellation. Unless otherwise indicated on your booking confirmation, if you cancel you will have to pay the cancellation charges set out below and calculated on the total price of the booking:

| Cruise Length: | Days to Sailing*: | Cancellation Charge (Per Guest): |
|---|---|---|
| 1 – 4 nights | 75+ days | No charge (except for non-refundable deposit amounts) |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| 5 – 14 nights | 90+ days | No charge (except for non-refundable deposit amounts) |
| | 89 – 75 days | 25% of total price |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| 15+ nights | 120+ days | No charge (except for non-refundable deposit amounts) |
| | 119 – 61 days | 25% of total price |
| | 60 – 41 days | 50% of total price |
| | 40 – 25 days | 75% of total price |
| | 24 days or less | 100% of total price |

NOTE: In instances where the deposit amount paid is higher than the 25/50/75% of cruise fare cancellation charge, then the highest of the two amounts is payable as the cancellation charge, i.e. the full deposit amount is retained.

**Travel Agency Bookings:** If you have booked your trip with a travel agent, please note that other cancellation fees may apply, which may be charged by the travel agent. Please refer to your travel agent regarding the terms and conditions of cancellation that may apply to your booking with them.

**CruiseTour:** Guests who convert their cruise tours to a cruise only booking within forty-two (42) days of the start date of the tour segment of the cruise tour will be subject to a cancellation charge. The amount of that charge varies depending on the location of the cruise tour and/or its length.

**General:** Cancellation by Guest after the Cruise or CruiseTour has begun, early disembarkation of Guest for any reason, including pursuant to any provision of these Booking Conditions, or "no-shows," shall be without refund, compensation, or liability on the part of Carrier whatsoever. The cancellation charges set forth above are based on double occupancy staterooms and will be assessed on a per-Guest basis.  The retention penalties may vary for single occupancy staterooms, or for third, fourth or fifth Guests booked in a single stateroom. For cancellations of air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, travel insurance, pre-booked onboard services (e.g., spa, photography or wedding services) and pre-booked arrangements (e.g., specialty dining), see the applicable terms and conditions for any applicable cancellation charges. For the purposes of determining cancellation charges, the days to sailing means the date the arrangements you have booked with us commence.

1.11 CAN I MAKE CHANGES TO MY BOOKING AFTER IT HAS BEEN CONFIRMED?

It is your responsibility to confirm your ability to travel before making a booking. Depending on your selected fare type, once your Holiday is confirmed you do not have an automatic right to cancel or make certain changes, unless we have breached our obligations hereunder or otherwise provided under Applicable Law. If you wish to make a change to your Holiday, you must notify us at least 91 days before departure for flight-inclusive Holidays or final payment due date for all others. Depending on the nature of the change, you may be required to submit your request in writing. We will endeavour, but cannot guarantee, that we will be able to accommodate every change request.

If we accept your change request, a non-refundable fee will become immediately payable, together with any fare difference, costs incurred by ourselves, and costs or charges incurred or imposed by any third parties (e.g., airlines or ground transport providers), which may, in some cases, be the full cost of the fare. Amendment fees will be assessed as follows:

i) Name changes (the substitution of one Guest's details for another) can be requested up to 7 days before sailing and a fee not to exceed US$100 (or equivalent amount in the currency of your booking) per name change per booking will apply. The replacement guest must fulfil all necessary conditions for participation in the cruise (for example age, health, and visa requirements). Name changes to the lead guest or both names on a booking will be deemed a transfer.

ii) All other changes (for example, transfers, changes to ship, sail date, flights, or brand) can be requested up to the final payment due date and a fee not to exceed US$200 (or equivalent amount in the currency of your booking) per guest per booking will apply.

The change fees above are those imposed by us only. Transfers are accepted only on a "like for like" basis, i.e., same ship, sail date and stateroom. Depending on the change, some of our suppliers may treat name changes as cancellations and rebooking. Any promotions applied to a booking (for example, loyalty discounts, residency rates, or minimum occupancy) must be satisfied following any changes to the booking, or such promotion(s) will be forfeited, and the booking will be repriced at prevailing rates.

1.12 WILL I NEED TRAVEL INSURANCE?

All guests should ensure they purchased appropriate personal travel insurance for their needs before departure. This must include as a minimum cover for the cost of cancellation of your cruise by yourself and also the cost of medical treatment and assistance during and after your cruise including repatriation or quarantine costs in the event of accident or illness. It is your responsibility to make sure that the insurance you purchase is suitable and adequate for your particular needs and to purchase additional or alternative insurance if required. We would strongly recommend that you contact your travel agent or an independent insurance broker for details of suitable policies.

## 2. BEFORE YOU LEAVE HOME

2.1 ARE THERE ANY PROHIBITED ITEMS THAT I CANNOT TAKE WITH ME?

For the safety of our guests and crew, there are certain items that are not allowed on board. If these are found, they will be confiscated. You must not pack in any luggage or bring on board any item specified as dangerous or illegal (e.g. guns, explosives, drugs, animals, knives (ceremonial or other), drugs, animals, flammable items, etc.). Drones, hoverboards and baby monitors are also not permitted on board. Small quantities of non-alcoholic beverages can be brought on board in carry-on or hand luggage. Checking-in non-alcoholic beverages is not permitted. Accredited service animals are allowed on board for guests with disabilities, however emotional support animals are not permitted on board. In addition, we/the airline may specify other items which you must not bring with you and may also refuse to allow you to take on board any item which we/the airline, consider being inappropriate. Please contact the individual airline to confirm their current restricted items, although these are subject to change without prior notification. If we or the Master of the ship have reason to believe that any stateroom may contain any item or substance which should not have been brought on board, the Master or an authorised officer has the right to enter and search the stateroom concerned and seize any such item or substance. Please ensure that any sharp items, including but not limited to scissors, razor blades, nail clippers, tweezers, combs with metal prongs and knitting needles, are packed in your check-in luggage and not your hand luggage due to airport security measures.

2.2 WHAT ABOUT VALUABLE OR IMPORTANT ITEMS?

Please make sure that all valuable and important items (for example, medicines, jewelry, fragile items, important travel and other documents, video/camera/laptop/mobile phone etc.) are carried by hand and not packed in your luggage. Once on board please ensure your valuables are not left unsecured in your stateroom or elsewhere on board the ship. Special care must be taken of such items. For your protection once on board, all valuable and important items should be deposited with the Guest Services Desk or, in your stateroom mini-safe. You are also strongly advised to take out appropriate and adequate insurance to protect such items. We cannot accept any responsibility or liability for any valuable or important items, which are not deposited with the Guest Services Desk for safekeeping. For items which are so deposited, the maximum we will pay you if any item(s) is lost or damaged (for any reason) whilst in our care is the maximum which is payable under The Athens Convention (see section 5.8) in this situation. So that we may assist as much as possible, you must tell us about the problem as soon as possible. If you discover the loss, delay or damage when on board, you must immediately report it to the Guest Services Desk. The time limits for notifying any loss, delay or damage are detailed in Section 2.3 below.

2.3 WHAT SHOULD I DO IF MY PROPERTY IS LOST, DELAYED OR DAMAGED DURING MY CRUISE?

You must tell us about the problem as soon as you become (or should reasonably have become) aware of it, and in any event within the time limits set out below (whichever is sooner). This section applies in relation to any loss, delay or damage to property which occurs during your cruise or whilst getting on or off the ship or whilst using any services provided or arranged by us except for any claims in relation to air travel, including the process of getting on or off the aircraft (see section 2.4 below.) It is our guests' responsibility to remove all of their belongings from their stateroom when they depart their cruise. If an item is left on board, whilst we will assist you in trying to recover the item, if we are unable to do so, then we cannot be held responsible and we will refer you to your travel insurance to make a

claim for the item. Please note that items left behind may be destroyed. If you discover the loss, delay or damage when on board, you must immediately report it to the Guest Services Desk. The time limits for notifying any loss, delay or damage to us or the supplier concerned, are as follows:

- Any damage or delay, which is apparent, must be notified to ourselves and the supplier of the service concerned (if it is not us) before or, at latest, at the time of your departure from the ship or, for other services, whilst using or at the end of using those services.
- Any loss, damage or delay, which is not apparent, must be notified to ourselves and the supplier of the service concerned (if it is not us) within 15 days of your departure from the ship or the end of your using the service in question.

In the event that you do not notify us within these time limits, this may affect our ability to investigate the loss, delay or damage and may impact on the way the complaint is dealt with. If you can prove that the damage, delay or loss was our fault or the fault of the supplier of a service that we agreed to arrange as part of your holiday, we will compensate you for the loss or damage you can prove you have suffered as a result, subject to and in accordance with The Athens Convention where applicable. However, the maximum we will have to pay you for any damage, delay or loss in these circumstances is the maximum which is payable in respect of stateroom luggage under The Athens Convention. This will also be the case where any property is damaged, delayed or lost whilst not on board or getting on or off the ship but using other services (apart from air travel) which form part of the holiday we have contractually agreed to provide. In all cases, you must give credit for payments received from any airline and/or other supplier in connection with your claim. You must also give us details of any relevant insurance coverage you hold. In appropriate cases we are entitled to reduce your claim by the amount received from any/all insurance companies.

2.4 WHAT SHOULD I DO IF MY PROPERTY IS LOST, DELAYED OR DAMAGED DURING AIR TRAVEL?

Any damage, destruction, delay or loss suffered during any travel by air (including the process of getting on and off the aircraft) must be notified to the airline at the time of discovery or, in any event, in writing within 7 days of the end of the flight concerned for damage, destruction or loss or within 21 days of the luggage being made available for you in the event of delay. Guests with flights booked via our platforms should also contact our Guest Services team on board who will be able to assist. The maximum we or the airline will have to pay you in the event of any damage, destruction, delay or loss of luggage or property is the most which is payable under the relevant international convention or regulation. We will only be liable for any air travel that has been booked as part of a standard fly/cruise package or build your own package that incorporates flight services. For most international flights, this will be the Montreal Convention 1999. Where the Montreal Convention 1999 applies, the maximum we or the airline will have to pay you at present for loss, destruction, damage, delay of luggage is the maximum payable under the Convention. We and the airline will not be liable to pay any compensation in the case of delay affecting luggage if we or the airline can prove that the airline took all measures that could reasonably be required to avoid the delay or that it was impossible for the airline or its employees to take such measures. In the case of damage, destruction, delay or loss of luggage, if we or the airline prove that the damage, destruction, delay or loss was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation, or the person from whom he or she derives his rights, we and the airline will not be liable for the damage, destruction, delay or loss, to the extent that such negligence or wrongful act or omission caused or contributed to the damage, destruction, delay or loss. Subject to the above, we and the airline will only be liable for destruction or loss of, or of damage to, checked luggage on the condition only that the event which caused the destruction, loss or damage took place on board the aircraft or during any period within which the checked luggage was in the charge of the airline. However, neither we nor the airline will be liable if and to the extent that the destruction loss or damage resulted from the inherent defect, quality or vice of the luggage. In the case of unchecked luggage, including personal items, we and the airline will only be liable if the damage results from the airline's fault or that of its employees or agents. In all cases, you must give credit for payments received from any airline or other supplier in connection with your claim. You must also give us details of any relevant insurance coverage you hold. In appropriate cases we are entitled to ask you to reduce your claim by the amount received from any insurance companies.

2.5 WHAT IS MY LUGGAGE ALLOWANCE?

The maximum luggage allowance for guests boarding our ships is 200lbs (90kg) per guest, however, airlines also impose their own luggage allowance, with which you must also comply, this is usually less than the cruise allowance. There are always restrictions on the amount, size and weight of the luggage you may take on any flight, in particular where we are using non-scheduled services. We strongly recommend that you check with your airline directly for confirmation of your exact luggage allowance as allowances vary from airline to airline and excess luggage fees may apply. In some instances, baggage allowance can be limited to as little as 15kg. All luggage allowances are subject to variation by the airline concerned and you may be charged additional costs by the airline for excess luggage. Please note: If you are sailing on a transatlantic Ocean Voyages cruise and you have booked a fly cruise package, your luggage allowance will be limited to the lower allowance, specified by the airline. Please check with your airline for details. Please note, we reserve the right to strictly enforce the luggage allowance limitation.

2.6 WHAT ARE THE PASSPORT AND VISA REQUIREMENTS FOR MY HOLIDAY?

**Passport**

You must have your own valid 10-year (5 year for children) passport which is valid for at least 6 months after your expected return date. Obtaining a full passport may take up to 6 weeks, but you should allow longer at busy times of the year. If you or any member of your party is 16 or over and haven't yet got a passport, our recommendation is that you should apply for one at least 6 weeks before your holiday. Your national Passport Service has to confirm your identity before issuing your first passport and may ask you to attend an interview in order to do this. All guests should check with the relevant embassy prior to travel for the most up to date information on passenger requirements.

There may be a visa requirement for your cruise, particularly if you are visiting countries in the USA, Asia, Middle East, China, India and Australia. If you need assistance when applying for your visas, we recommend VisaCentral, a CIBT company.  To make sure you know about the visa requirements for your destination, please visit our dedicated visa portal at https://cibtvisas.co.uk/royalcaribbean or call your travel agent to speak to a visa consultant.

**THE VISACENTRAL PORTAL IS PROVIDED TO YOU FOR YOUR CONVENIENCE ONLY. IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOU HAVE ALL THE NECESSARY DOCUMENTATION TO ENTER EACH COUNTRY ON YOUR HOLIDAY ITINERARY, EVEN IF YOU DO NOT INTEND TO DISEMBARK THE VESSEL. YOU SHOULD CONFIRM ANY ENTRY/EXIT REQUIREMENTS WITH THE EMBASSY OR FOREIGN OFFICE (OR EQUIVELANT) FOR YOUR PRIMARY COUNTRY OF RESIDENCE.**

**If your holiday includes a flight or port of call in the United States of America, Australia, Canada, New Zealand, South Korea or the United Kingdom, you may be required to obtain prior electronic authorization before boarding a flight or arriving at a point of entry.**

**We do not accept any responsibility if you cannot travel because you have not complied with any passport, visa or immigration requirements. ADDITIONALLY, YOU MAY BE DENIED BOARDING, WITHOUT A RIGHT OF REFUND, OR SUBJECT TO FINES IF YOU DO NOT HAVE THE NECESSARY DOCUMENTATION.**

2.7 ARE THERE ANY FORMAL HEALTH REQUIREMENTS?

a. Recommended Consultation with Personal Physician. You are encouraged to discuss the advisability of travel and participation in onboard and shoreside activities with your personal physician at least 8 weeks before you travel.

b. Pregnancy. Pregnant women who will enter the twenty-fourth (24th) week or more of estimated fetal gestational age at any time during the Cruise or CruiseTour will be ineligible to sail, and agree not to book the Cruise or board the Vessel or Transport under any circumstances.

c. Availability of Medical Care. Due to the nature of travel by sea and the ports visited, the availability of medical care onboard the Vessel and in ports of call may be limited or delayed and medical evacuation may not be possible from the Vessel while at sea or from every location to which the Vessel sails.

d. Relationship with Service Providers. To the extent you retain the services of medical personnel or independent contractors on or off the Vessel, you do so at your sole risk. Any medical personnel attending to a guest on or off the Vessel, whether or not arranged by us, are provided solely for your convenience, work directly for you, and shall not be deemed to be acting under the control or supervision of Carrier, as Carrier is not a medical provider. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and not acting as agents or representatives of Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such medical personnel.

e. Payment for Medical or Personal Care Services. You agree to pay for all medical care or other personal services requested or required, whether onboard or ashore, including the cost of any emergency medical care or transportation incurred by Carrier and any costs associated with the provision of medical services. If you is unable to pay and Carrier pays for such expenses, then you agree to reimburse Carrier for those expenses.

f. Health, Travel and Risk Acknowledgement. YOU ACKNOWLEDGE, UNDERSTAND AND ACCEPT THAT WHILE ABOARD THE VESSEL, IN TERMINALS AND BOARDING AREAS, OR DURING ACTIVITIES ASHORE AND/ OR WHILE TRAVELING TO OR FROM THE VESSEL, YOU AND OTHERS TRAVELLING WITH YOU MAY BE EXPOSED TO COMMUNICABLE ILLNESSES, INCLUDING BUT NOT LIMITED TO AIRBONE DISEASES LIKE INFLUENZA, COVID-19, COLDS AND NOROVIRUS. YOU FURTHER UNDERSTAND AND ACCEPT THAT THE RISK OF EXPOSURES TO THESE COMMUNICABLE ILLNESSES AND OTHERS IS INHERENT IN MOST ACTIVITIES WHERE PEOPLE INTERACT OR SHARE COMMON FACILITIES, IS BEYOND CARRIER'S CONTROL, AND CANNOT BE ELIMINATED UNDER ANY CIRCUMSTANCES. YOU KNOWINGLY AND VOLUNTARILY ACCEPT THESE RISKS AS PART OF THESE BOOKING CONDITIONS, INCLUDING THE RISK OF SERIOUS ILLNESS OR DEATH ARISING FROM SUCH EXPOSURES, AND/OR ALL RELATED DAMAGES, LOSS, COSTS AND EXPENSES OF ANY NATURE WHATSOEVER.

# 3. FROM PLANE TO PORT

3.1 FLIGHT TERMS

All flights are subject to availability and the conditions of carriage of the applicable airline which may be viewed on the airline's dedicated website or are available on request. These conditions set out your rights and obligations which you must comply with. In the event that we incur costs because of your failure to comply with the conditions of carriage then we reserve the right to pass such costs on to you. Whilst the dates of your outward and return flights will be advised at the time of booking, the flight timings and/or routing may not be shown on your booking confirmation. Flight timings shown on your booking confirmation are for guidance only and may change. Your booking confirmation will show the latest planned timings. Your actual flight timings will be shown on the air arrangements page of your cruise e-docs, which you should check carefully as soon as you receive these. We may not be able to inform you of your flight timings and routing for bookings made more than 10 months before departure. Please note that your booked flight may not be the most direct route and may also involve multiple stops on route to your destination which may involve you disembarking from the aircraft. Where guests are travelling together but booked on different booking numbers, we cannot guarantee that we will be able to book the same flight

itinerary, as this is subject to availability. This information will be provided as soon as we are in a position to do so. A contract between us will come into existence when we send out the booking confirmation, even when we are unable to provide flight timings. The flight timings and airlines shown on your booking confirmation cannot be guaranteed and are subject to change. Whilst we endeavour to book the best connections between flights, a wait may be experienced at connecting airports. We are not always in a position to confirm the route, service (scheduled or non-scheduled), airline, aircraft type or the airport of destination, which will be used in conjunction with any flight included in your holiday. When this information is provided at the time of booking or subsequently, it is subject to change (including the substitution of non-scheduled flights for scheduled air services and/or rerouting of air travel due to scheduled air services being withdrawn or changed or being unavailable). Any such change will not entitle you to cancel or change to other arrangements without paying our normal charges. In any event the actual flight times will be those shown on your tickets, which will be dispatched to you approximately four weeks before departure. You must accordingly check your tickets very carefully immediately upon receipt for confirmation of correct flight times. It is possible that flight times may be changed even after tickets have been dispatched – we will contact you as soon as possible if this occurs. Any amendments to your flight or other arrangements will be subject to availability and will incur an administration charge of $150 per person along with any additional costs and charges incurred by us or imposed by the airlines or other supplier. If your flight tickets have been issued, standard airline cancellation penalties will also apply. In some cases, these could be the full cost of the ticket. If you wish to travel on a particular carrier, flight routing, if your departure and/or arrival date differ from the standard flight inclusive package, any additional costs and charges incurred by us or imposed by the airlines may be payable.

## 3.2 WHAT CLASS OF FLIGHT SEAT/TICKET IS BOOKED?

Unless you book and pay for an upgrade, you will fly economy class. Please contact your airline directly to pre-book your seats and note that there may be occasions when the airline is unable to assist due to the fact that you may be travelling on a group/seat block allocation. If you choose not to contact your airline in advance of travel then we strongly recommend that you check-in early if you have a particular seat request as we have no control over the allocation of seats – you will need to pay the airline directly if they charge a supplement – and they may only allow you to select your seats once your flight tickets have been paid for in full and issued. Flights are often full, your choice of seats may not be available, and it may not be possible to obtain seats together. At our discretion, we will arrange special group rates with some airlines (allocations) and, in some of these cases, you may not be able to pre-book your seats – they will be allocated to you when you check-in online or at the airport. Only fully fit and able-bodied guests may occupy exit row seats on aircraft. Emergency exit seats will therefore only ever be assigned at the discretion of the airline at check-in. Some flights will involve a change of aircraft. Where applicable, and we are in a position to notify you, this information will be shown on your booking confirmation. The flights used in conjunction with our cruises may be based on special fares and may not be by the most direct route. Flights may have at least one refueling and/or other stop and this may not be shown on your booking confirmation. Flights will either be by scheduled or non-scheduled service. Most airlines operate a non-smoking policy. Please note we do not guarantee 'travelling with' guests will be confirmed on the same flight arrangements, although we endeavour to meet this special request when we are able to. We/the airline will endeavour to satisfy any special service(s) requests such as special dietary requirements, meet and assist and wheelchair assistance. Regrettably we/the airline cannot guarantee your request. Some medical assistance and special meal requests may incur a charge, which will be invoiced accordingly. For all special requirements please contact your local booking office. Any request of this nature should be advised at the time of booking. Not meeting any special request for any reason will not be a breach of contract. Airlines may at their discretion refuse to carry guests with certain medical conditions. You must provide details of all medical and physical conditions, which affect you, and/or any member of your party at the time of booking. See also sections 4.3, 5.2 and 5.6 below. We do not guarantee that guests travelling within the same party will be confirmed on the same flight arrangements. The ability to pre-book your seats and complete online check-in varies between airlines and ticket class. Please visit your airline's website for details.

## 3.3 WHAT IF MY FLIGHT IS DELAYED?

Regrettably, flight delays do occasionally occur. In this event, the airline concerned may provide you with refreshments, and if necessary, may provide overnight accommodation depending on the expected length of the delay, the time of day and the airport in question. Where you have booked a fly/cruise holiday we cannot accept any liability for any delay, which is due to any of the reasons set out in section 5.7 of these Booking Conditions (which includes the behaviour of any passenger on the flight who for example fails to check in or board on time). If your flight is delayed, we will provide fly/cruise guests with alternative flights, subject to availability. Cruise-only guests who have made their own arrangements will need to contact their travel provider or airline for assistance.

Please Note: If your flight is cancelled or delayed, your flight ticket is downgraded or boarding is denied by your airline in circumstances that may entitle you to claim compensation against the airline under EC Regulation No 261/2004  (the 'Denied Boarding Regulations' 2004), the Montreal Convention, or under the national laws of your Primary Country of Residence, you must pursue the airline for the compensation due to you. All sums you receive or are entitled to receive from the airline concerned by virtue of any of these and similar laws represent the full amount of your entitlement to compensation or any other payment arising from such cancellation, delay, downgrading or denied boarding. This includes any disappointment, distress, inconvenience or effect on any other arrangements. The fact a delay may entitle you to cancel your flight does not automatically entitle you to cancel any other arrangements even where those arrangements have been made in conjunction with your flight. We have no liability to make any payment to you in respect of any flight cancellation or delay, downgrading of any flight ticket or denial of any boarding as the full amount of your entitlement to any compensation or other payment (as dealt with above) is covered by the airline's obligations under applicable law. If, for any reason, you do not claim against the airline and make a claim for compensation from us, you must, at the time of payment of any compensation to you, make a complete assignment to us of the rights you have against the airline in relation to the claim that gives rise to that compensation payment.

## 4. ON BOARD SHIP AND DURING MY CRUISE

## 4.1 WHAT ABOUT SPECIAL DIETS?

Carrier can generally accommodate the following special diets onboard: vegetarian, diabetic, low fat, low-sodium, low cholesterol diets. Other special diets such as kosher meals and lactose-free may be available upon advanced request. Special meal requests are offered

as a convenience to you may not be the same standard and offer the same range as the food provided under the general menu and must be requested in advance of sailing. If you require a special meal, you must notify us or your travel agent at the time of booking, or in no event later than 100 days prior to sailing, to ensure that we have sufficient time to confirm your arrangements. We will endeavour to, but cannot guarantee that we will be able to, accommodate reasonable requests. Please ask your travel agent for further information.

**ALLERGY NOTICE: Due to the nature food preparation at sea, we cannot guarantee that our galleys, food, or drink products are allergen free as cross contamination may occur. If you have food allergies, refrain from utilising any self-service food venues and speak to a member of restaurant staff before ordering and/or consuming any food or drink products.**

4.2 WHAT ABOUT SPECIAL SERVICES/ REQUIREMENTS?

We seek to assist those passengers with disability and reduced mobility by making reasonable endeavours to cater for those with special services/assistance requirements. For those with disability or reduced mobility we will seek to ensure comfortable travel through airports, piers and onboard by liaising with airlines, port agents, hotels, transport companies and of course our ships to make any reasonable and necessary arrangements for assistance for genuine medical reasons.

Please advise us in writing of any special requirements you may have before you make a booking e.g. the carrying of any special medical equipment, assistance animals, wheelchairs, assistance at the airport/port/onboard or relating to ship or hotel accommodation at the time of making a booking. We will also provide with your first Booking confirmation a "Guest Special Needs" form (also available on our website) which we ask you to complete and return to us no later than 90 days before travel as this gives you the opportunity to consider and advise us in detail of any special requirements you may have in writing. Based on the information you provide about any special needs you may have we will assess the suitability of the trip based on those needs as we owe you a legal a duty of care to ensure you are reasonably safe whilst in our care. If we consider that, because of your special needs, your booked holiday is unsuitable, we will contact you as soon as possible after you have provided information to us about your needs to explain our reasons and assess any possible alternatives. For all potential guests considering cruising with us, please feel free to contact your local booking office in advance of making a booking to discuss with us any special needs. We can then advise on an informal basis if we consider your chosen cruise is suitable. Please note that any sensitive personal information you provide to us will be treated in the strictest confidence. Where we cannot provide appropriate support or the services as requested, we will advise you as soon as possible. The request/ information can be emailed to special_needs@rccl.com. Should your needs change after booking or you become aware that you need assistance as described above you must notify us immediately and we will make reasonable efforts to assist you at that time.

4.3 CAN A SPECIAL REQUEST BE GUARANTEED?

Regrettably, no. We will endeavour to meet reasonable special requests, we regret we cannot guarantee that either we, or any supplier, will be able to do so. Not meeting any special request for legitimate reasons will not be a breach of contract. If a special request can only be met at an additional cost, except where contrary to the requirements of applicable law, that cost will either be invoiced prior to departure or will be payable locally. Confirmation that a special request has been noted and passed on to the supplier or the inclusion of the special request on your Booking confirmation or any other documentation is not confirmation that the request will be met. Unless specifically agreed by us in writing at the time of booking, we cannot accept any booking that is conditional on a special request being satisfied. Such bookings will be treated as normal bookings subject to the above comments on special requests.

4.4 CONSUMPTION OF ALCOHOL ON BOARD

The minimum drinking age for all alcoholic beverages onboard all vessels in our fleet depends on the location of the ship at the start of the cruise itinerary but can change during the sailing as local laws require. For ships originating in Europe, Asia, Australia and South America the minimum drinking age limit is eighteen (18). For ships originating in North America, the minimum drinking age is twenty-one (21). At private shoreside resorts such as Labadee and CocoCay and when in US & Canadian ports, the minimum drinking age is twenty–one (21). We reserve the right to vary minimum age limits without notice where local laws require or where we deem it desirable or necessary. If a guest that is below the minimum age limit to consume alcohol onboard has a birthday during a cruise itinerary that would then mean they meet the minimum age limit for consuming alcohol, they must notify the Guest Services Desk and provide evidence in the form of their passport as proof of age in order to allow the Guest Services Desk to update their details and permit them to purchase alcohol onboard. Please note that within the territorial waters of some countries on your itinerary or based on your embarkation port, the onboard shops may be closed or alternatively restrictions may be imposed on some items available for purchase or additional VAT added dependent on that country's VAT rules. Restrictions apply and this policy is subject to change without notice. Guests are allowed to bring on board, on embarkation day only, 1 bottle (75cl) of wine or champagne, per guest of drinking age, for consumption within their stateroom. When consumed in any shipboard restaurant, bar or dining venue, a corkage fee of not to exceed $50 applies per bottle. Alcoholic beverages that are purchased in ports of call or from onboard shops will be stored by the ship and delivered to guest staterooms on the last day of the sailing. Security may inspect containers (water bottles, soda bottles, mouthwash, luggage etc.) and will dispose of containers holding alcohol. The Guest Conduct Policy may be enforced, up to and including disembarkation, if a guest violates any alcohol policy. Guests under the age limits above will not have alcohol returned to them. Guests who violate any alcohol policies, (over consume, provide alcohol to people under stated age above, demonstrate irresponsible behaviour, or attempt to conceal alcoholic items at security and or luggage check points or any other time), may be disembarked or not allowed to board, at their own expense, in accordance with our Guest Conduct Policy. Carrier reserves the right to revoke or otherwise restrict drinking privileges of any guest, regardless of age. Applicable regulatory age restrictions apply while the ship is in port and until the vessel enters international waters.

4.5 SHORE EXCURSIONS AND RELATED Services

**The information contained relating to shore excursions on our systems and documentation is correct to the best of our knowledge at the time of issue.  Our descriptions may refer to activities that are available in the ports you are visiting. Please note that these excursions are owned and operated by local operators who are independent third parties. We have no**

USCA11 Case: 26-11899   Document: 7   Date Filed: 06/09/2026   Page: 157 of 314

responsibility for any such activities, as they are neither run, supervised nor controlled in any way by us. These activities are provided by local operators who are entirely independent of us and we act as the agent for these operators. They do not form any part of your contract with us even where we suggest particular operators/centres and/ or assist you in booking such activities in any way, unless they are expressly booked as part of your package holiday.

Agreements you enter into directly with providers in relation to shore excursions are between you and the local operators, and do not form any part of your contract with us, irrespective of the fact we may provide practical assistance to you in booking such activities or even make the booking on your behalf. Accordingly, we cannot accept any liability, whether in contract, tort or otherwise, in relation to such activities.

Shore excursions may involve or require physical exertion, or involve a degree of risk or danger, and you should carefully consider whether the shore excursion is suitable for you. It is your responsibility to adequately research any shore excursions and/or activities you intend to participate in and make any relevant enquiries of the third-party operators of same to ensure that you are prepared with appropriate attire for the excursion/activity, including any necessary attire for difficult/dangerous terrain, physical exertion for long periods, and/or extremes of weather. Accordingly, we cannot guarantee that shore excursions are available generally or for guests with disabilities – please contact us or your travel agent for information on specific excursions.

Special arrangements for those guests with reduced mobility or disability may be available on certain shore excursions that have been risk assessed as suitable. For details including any cost consequences for making those special arrangements, please email contact your local booking office with details of any special requirements. Where applicable, please also provide wheelchair/scooter dimensions, weight and battery type. Tours involving flights, special events, overland and hotel stays can result in costs to us and may be subject to a cancellation fee.

We cannot guarantee and do not make any representations as to the accuracy of any information given by us or local operators in relation to such activities or about the resorts/area/location you are visiting generally (except where this concerns the services which will form part of your contract) or that any particular excursion or activity which does not form part of our contract will take place, or the way in which it will take place, as these services are not under our control.

If you feel that any of the activities mentioned, which are not part of our contract, are vital to the enjoyment of your holiday, write to us immediately and we will tell you the latest known situation. If we become aware of any material alterations to resorts/area information and or such outside activities, which can reasonably be expected to affect your decision to book a holiday with us, we will pass on this information at the time of the booking, though we cannot guarantee to do so.

Notwithstanding the above, you acknowledge and agree that the very nature of recreational activities on the shore excursion that you are participating in can be dangerous, with inherent risk, dangers and hazards and personal injury (and sometimes death) can occur, and you agree to assume and accept all risks of personal injury or death which may occur.  The potential dangers and risks associated with these activities may include but are not limited to difficult and dangerous terrain, physical exertion for long periods, extremes of weather including sudden and unexpected changes and evacuation difficulties in the event of injury.

By using, participating in, engaging, or booking a shore excursion you accept these risks and agree that Royal Caribbean Cruises Ltd. trading as Royal Caribbean Group, and all of its subsidiaries, affiliates, employees, successors, assigns, affiliated ships, respective masters, officers and crew, operators, charterers, underwriters, agents, servants, administrators, contractors and third party operators are not liable to any claim you, your dependents or legal representatives (except where we have been negligent) for, breach of contract or statute or statutory duty resulting in personal injury or death, any direct/indirect or consequential loss or damage including without limitation of financial loss (such as loss of profits or use of capital or revenue or otherwise),or for any punitive, exemplary, special or incidental loss or damage whether such liability arises in contract, tort , equity, from its supply of the shore excursions.

By using, participating in, engaging, or booking a recreational activity you acknowledge, agree and understand that the risk warnings contained above constitute a 'risk warning' for the purposes of any relevant legislation.

Please Note: Any dispute or claim arising out of a shore excursion must be brought against the local excursion operator, however if such dispute or claim is made against any Royal Caribbean contracting entity, it must be brought in the Courts of England and Wales, in accordance with laws of England and Wales who shall have sole jurisdiction over such dispute or claim.

**Tenders**

In some ports the ship will anchor offshore and use smaller boats which hold around 100 people (known as tenders) to transport guests to shore. Guests will go to a tender platform from which you will board the tender. On occasion and due to operational reasons, it is necessary for us to switch from a docked port of call to a tender. Please note that passengers embark, travel in and disembark tenders at their own risk.

The tender services are provided by independent third parties and Carrier does not operate, supervise or control them in any way. Accordingly, we cannot guarantee that tenders are available or even suitable for guests generally or whether they are available and suitable for guests with disabilities or reduced mobility. Carrier is not liable or responsible for any illness, injury or death of any passenger or for any damage to, or loss of any luggage or other personal possessions of any passenger arising out of or in connection with travelling and alighting on the tenders, as these services are not under our control.

You are required to follow all directions given to you by the staff on the tenders. If you cause damage to the tender or its furnishings, or equipment, or any other property on the tender, or to any other passenger, you shall be fully liable for such

damage and indemnify Carrier against all costs or claims which arise.

4.6 consecutive cruises.

If consecutive cruises are taken (for example, a Western Caribbean cruise immediately followed by an Eastern Caribbean cruise), please note that there may be duplication of onboard programs, menus and entertainment. Please also note that due to the preparation of the ship between sailings, some shipboard facilities may not be available on changeover day. On the changeover day, it will be necessary for you to disembark the ship in order to comply with customs and immigration. It is also necessary for all consecutive cruise guests to re-register their SeaPass on changeover day for the new sailing; this must be done at the pier before you board the ship again for your next cruise. If you have booked the same stateroom for each sailing, you may leave luggage within your stateroom. If you have booked different staterooms for each sailing, you will need to pack your luggage at the end of the first sailing, and it will be stored for you until your new stateroom is ready for occupancy.

Please note that due to restrictions under the U.S. Passenger Vessels Services Act, we cannot accept reservations for consecutive itineraries that begin in one U.S. port and conclude in a different U.S. port. In the event such an itinerary is booked, we reserve the right to cancel one of the cruises at the guest's expense and/or the guest shall be responsible for any and all fines that result due to such booking.

4.7 ASSISTANCE

If you are in difficulty while on holiday and require assistance with health services, local authorities or consular assistance, please call us on +1 954-628-9290 for information. Agents speak English and Spanish language only and you will be charged the local costs to call the U.S.

4.8 SMOKING POLICY

Smoking is not permitted in any dining venue, casino, theatre, lounge, hallway, elevator or corridor. This policy includes smoking-like products such as electronic cigarettes. Smoking is not permitted inside any stateroom or on any stateroom balcony. Smoking is only permitted in designated areas of the ships. Our smoking policy is subject to change. Changes may be introduced where countries that we are sailing to/from enforce their local smoking regulations.

# 5. ADDITIONAL INFORMATION

5.1 WHAT IF I AM TRAVELLING WITH A GROUP?

Please consult your travel agent or us directly for deposit, payment, cancellation and other information. Terms and conditions for those travelling in a group may be different to those that apply to individual bookings.

5.2 WHAT ABOUT GUESTS WITH SPECIAL NEEDS?

You must ensure that you are medically and physically fit for travel, and that such travelling will not endanger yourself or anyone else. At the time of booking (or as soon as possible if the condition arises after booking) you must tell your travel agent (or us if booking direct) in writing about any assistance or requirements that you have relating to accommodation, seating or services on your holiday including medical assistance or a requirement to bring medical equipment onto the cruise. We also ask that you notify us of any medical or physical condition which will or may require medical treatment or attention during your holiday or which may or will affect your holiday in any way (including your use of any services or facilities) in order that we can prepare accordingly and make all reasonable efforts to accommodate you in a safe manner. Please provide as much information as possible. Our ships have a limited number of accessible staterooms, equipped with features designed to help guests with a mobility disability or other disability who may find a non-accessible stateroom restrictive. Guests who book these staterooms must sign and return the Guest Special Needs Form we provide in order for us to ensure that they are only allocated to those guests who have a genuine medical requirement for them. We reserve the right to reassign guests to a standard stateroom where there is no genuine medical need for an accessible stateroom or cancel the booking, in order to ensure the above. Please contact our Reservations Department or your travel agent for further information. Please be aware that some ports of call may not have an infrastructure capable of providing accessible access or transport for disembarking the ship. Guests who use wheelchairs must provide their own collapsible wheelchair and may find certain areas of the ship inaccessible. If you would like to bring a motorised wheelchair or scooter onboard you must complete the Guest Special Needs Form we provide and then send it to our Special Services Department by email at res.emea@rccl.com at time of booking to provide the dimensions as size limitation may apply and we may not be able to accommodate this request. Certain conditions (for example, use of tenders or some shore excursions) may prevent guests with wheelchairs from going ashore at certain ports of call. Guests affected by a disability or medical condition must be self-sufficient or travel with someone who can provide all necessary assistance.

We regret we must reserve the right to refuse to allow anyone to travel in accordance with EU Regulation 1177/2010. This includes a refusal in order to meet safety requirements established by international, union or national law or those competent authorities, or where the design of the ship or port infrastructure (including terminals) and equipment makes it impossible to carry out the embarkation, disembarkation or carriage of a guest in a safe or operationally feasible manner. Based on the information you provide about any special needs you may have, we will assess the suitability of the trip based on those needs as we owe you a legal a duty of care to ensure you are reasonably safe whilst in our care. If we consider that, because of your special needs, your booked holiday is unsuitable, we will make contact with you as soon as possible after you have provided information to us about your needs to explain our reasons and assess any possible alternatives. For all potential guests considering cruising please feel free to contact in advance of making a booking to discuss with us any special needs. We can then advise on an informal basis, if we consider your chosen cruise is suitable. Please note that any sensitive personal information you provide to us will be treated in the strictest confidence.

5.3 ARE THERE ANY AGE RESTRICTIONS?

On our ships which are sailing from ports in Europe, Asia, South America, Australia or New Zealand, no person under eighteen (18) (a 'minor') may sail on any cruise holiday or have a stateroom on his or her own unless accompanied by a parent, a legal guardian or authorised person* who is over the age of eighteen (18). Please note, that for any of our ships sailing from a port in the US or Canada, the minimum age for the above policy will be twenty-one (21). For minors under the age of eighteen (18) at the start of the sailing who are not travelling with at least one of their parents or a legal guardian, written authorisation to travel from a parent/legal guardian must be provided. *Minors travelling with an adult(s) who is not the parent or legal guardian shall be required to present (a) the minor's valid passport, (b) all applicable visas and (c) an original legally affirmed or notarised letter signed by at least one of the child's parents/ legal guardians. Where such letter is required, the letter must authorise the travelling adult to take the minor/s on the specified cruise and must authorise the travelling adult to supervise the minor, sign applicable sports waivers and permit any medical treatment that must be administered to the minor which in the opinion of the treating doctor needs to be carried out without delay. A letter can be legally affirmed or notarised by a practising lawyer, notary or commissioner for oaths for a fee. If such evidence is not produced, the minor(s) concerned will not be permitted to board the ship or undertake the cruise. Carrier will not be responsible for any costs, expenses or losses suffered as a result either by the minor affected, the person(s) paying for their cruise (if not the minor him/herself), or any persons travelling with the minor who decide not to continue with the holiday as a result of the failure to produce a letter of authorisation as set out above. Please note: that parent(s)/legal guardian travelling with a child who has a different surname to the parent(s)/legal guardian, will be required to produce official proof such as a full birth certificate/wedding certificate/divorce papers to prove that they are the parent(s)/legal guardian of the children concerned. Proof of legal guardianship is also required where there is a minor travelling with their legal guardian. Individual staterooms can be booked by married couples whose minimum age is sixteen (proof of marriage is required at time of booking). Individual staterooms may only be occupied solely by minors where such staterooms are adjacent (directly opposite or next door) to the stateroom of the parent or legal guardian of the minor. Onboard there are certain facilities where each entry is restricted by age. The minimum age for infants to sail is six (6) months, as of the date of sailing and twelve (12) months, as of the date of sailing for Transatlantic/Transpacific Ocean Voyages, Hawaii, Australian, selected South American cruises and other selected cruises. For the purposes of this policy, any cruise that has 3 or more days consecutive at sea will require infants to be 12 months old on the first day of the cruise/cruise tour. The health and safety of our guests is our number one priority. As such, in consideration of the limitations of the shipboard medical facility, equipment and staff, the company cannot accept waivers, releases or requests for exceptions to this policy.

5.4 WHAT ABOUT ADVANCED OR DELAYED SAILINGS AND CHANGES IN THE ITINERARY?

We regret we cannot guarantee that ships will call at every advertised port or follow every part of the advertised itinerary. Itineraries may change from time to time, both before and after your sailing departs. Both Carrier and the Master of the ship have the right to omit or substitute any port(s), call at any additional port(s), vary the order of call for ports, change the time of arrival at, departure from or time spent at any port of call, deviate from the advertised itinerary in any way or substitute another ship. Where possible, you will be advised of any significant changes to your confirmed itinerary before departure – see section 5.5. Changes to the last confirmed itinerary for your cruise may become necessary after you have departed for a variety of reasons such as prevailing weather and sea conditions, guest emergencies, providing assistance to other vessels and the ship being unable to operate at its normal speed(s) due to unexpected mechanical or technical problems. Normally, changes in the itinerary are to protect the interests and safety of our guests. We will of course do our best to avoid any changes that will have a significant detrimental effect on your last confirmed itinerary. However, we cannot accept any liability in respect of any changes that result from circumstances outside our control (see section 5.10) or which do not have a significant detrimental effect on your overall Cruise.

5.5 CAN YOU CHANGE OR CANCEL MY HOLIDAY?

Occasionally, we have to make changes to and correct errors in our terms and conditions or the brochure or on our website and other details both before, and after, bookings have been confirmed and, even more rarely, cancel confirmed bookings. There may be a requirement to carry out maintenance/ building works on your cruise or we may be required to comply with government or official orders that affect our services. Where the works are likely to seriously impair your holiday, or a relevant government or official order is published, we will notify you as soon as possible. Occasionally we may also be forced to cancel a US back-to-back cruise due to local legal restrictions preventing us from allowing you to travel on this basis but will endeavor to advise you promptly after making such a booking if this is necessary. Whilst we always endeavor to avoid changes and cancellations, we must reserve the right to do so. If we have to make a minor change, we will notify you at the time and in a manner corresponding to the nature and timing of the change, without a right a right of cancellation or compensation implied. If we have to make a significant change or cancel, we will tell you as soon as possible. For significant changes, if there is time to do so before departure, we will offer you the choice of the following options: (A) accepting the changed arrangements; (B) purchasing an alternative holiday from us; or (C) cancelling or accepting the cancellation in which case you will receive a refund of all monies you have paid to us.

**Significant Changes**

A significant change is a change to your confirmed holiday, which we can reasonably expect will have a significant effect on it. Examples of significant and minor (defined below) changes are as follows:

Significant change: a change from two days' port of calls to two days sailing instead on a four-night sailing; a change in departure airport (excluding changes between local airports) and a change in the time of your outbound flight by more than 12 hours.

Minor change: a change from one port of call to another; a change from one day's port of call to one day sailing; a change in timings for any port(s) of call but the ship still calls at all confirmed ports; a change in order of ports that are visited and a change in the time of your departure that is less than 12 hours.

5.6 CAN YOU REFUSE TO ALLOW ME TO TRAVEL?

If in our reasonable opinion or the reasonable opinion of the ship's Master or doctor, you are or appear to be unfit to travel for any reason or a risk or danger to yourself or a danger to others or behave in such a way as to cause or likely to cause danger, upset or distress to any third party or danger to property. In this situation, we are entitled without prior notice to refuse to allow you to travel on any ship and to terminate your cruise holiday at any time. You may then be left at any port or place at which the ship calls without us incurring any liability. You will have to pay any costs, expenses or losses suffered as a result, and we will not pay any compensation or give you any refund. Once your holiday has been terminated in this manner, we will not have any further responsibility towards you. To ensure a healthy sailing, we may also request that guests who arrive at check-in and are showing symptoms of gastrointestinal type illness or other illnesses that spread easily from person to person, may be asked following consultation with our medical staff to reschedule their cruise. The same right to refuse to allow you to travel or to use any services applies where you are or appear to be unfit to travel or otherwise behave badly as set out above during any other part of your holiday. If you have failed to give proper notice of any assistance or need you require in accordance with section 5.2 and in accordance with EU Regulation 1177/2010 we reserve the right to refuse to allow you to travel.

## 5.7 WHAT IS YOUR LIABILITY TOWARDS GUESTS?

Subject to section 5.8 below, we promise to make sure that the holiday arrangements we have agreed to make, perform or provide as applicable as part of our contract with you are made, performed or provided with reasonable skill and care. This means that, subject to these Booking Conditions, we will accept responsibility if, for example, you suffer death or personal injury because of our actions or your contracted holiday arrangements are not provided as promised or prove materially deficient as a result of the failure of ourselves, our employees, agents or suppliers to use reasonable skill and care in making, performing or providing, as applicable, your contracted holiday arrangements. It is your responsibility to show that reasonable skill and care has not been used if you wish to make a claim against us. In addition, we will only be responsible for acts or omissions of our employees, servants or agents if they were at the time of the alleged act or omission acting lawfully and performing duties or services on our specific instructions, and within the course of either their employment or their engagement by us.

**We will not be responsible for any injury, illness, death, loss (for example loss of enjoyment), damage, expense, cost or other sum or claim of any description whatsoever which results from any of the following:**

- The act(s) and/or omission(s) of the person(s) affected or any member(s) of their party; or
- The act(s) and/or omission(s) of a third party not connected with the provision of your holiday and which were unforeseeable or unavoidable; or
- An event or circumstances which we or the supplier of the services could not have foreseen or avoided even if taking all reasonable care; or
- The act and/or omission(s) of any person(s) who at the time of the alleged act or omission was not acting lawfully and performing duties or services on our specific instructions, and/or within the course of either their employment or their engagement directly by us; or
- 'force majeure' as defined in section 5.10.

We cannot accept any liability for any damage, loss, injury or expense ("Loss") that you may incur as a result of any statement, omission, representation, warranty, promise or information provided by you whether orally or written and regardless of the format or medium ("Communication") to us or your travel agent prior to booking your holiday with us, regardless of whether we acted on such Communication, or whether we could (or should) have foreseen that you would suffer or incur loss if we acted upon it; nor can we accept any Loss which did not directly result from any willful misconduct or negligent act or omission by us in performing the contract between us.

Additionally, we cannot accept liability for any business losses. We cannot accept responsibility for any services, which do not form part of our contract with you. This includes, for example, any additional services or facilities, which your hotel or any other supplier agrees to, provide for you where the services or facilities are not advertised in our brochure or on our website, and we have not agreed to arrange them. In addition, regardless of any wording used by us on our website, in any of our brochures or elsewhere, we only promise to use reasonable skill and care as set out above and we do not have any greater or different liability to you.

If the particular services which gave rise to the claim or complaint complied with local standards, laws and regulations applicable to those services at the time, the services will be treated as having been properly provided. This will be the case even if the services did not comply with the laws which govern these Booking Conditions, and which would have applied had those services been provided in country whose laws govern these Booking Conditions. The exception to this is where the claim or complaint concerns the absence of a safety feature, which might lead a reasonable holidaymaker to refuse to take the holiday in question.

## 5.8 WHAT IS YOUR LIMIT OF LIABILITY TOWARDS GUESTS?

Where applicable and to the fullest extent permitted by law, we shall rely on the financial limits specified in the  Convention relating to the Carriage of Passengers and their luggage by Sea 1974 as supplemented and/or varied by any other applicable legislation from time to time in force including, but not limited to Regulation (EC) No 392/2009 (together 'The Athens Convention') in relation to your cruise as well as the process of getting on and/or off the ship. For any claim involving death or personal injury or delay of or loss of or damage to luggage the only liability we have to you is in accordance with The Athens Convention. This means you are not entitled to make any claim against us which is not expressly permitted by The Athens Convention or which is in excess of the limits provided by The Athens Convention. Any claims covered under The Athens Convention must be made within the time limits set out in The Athens Convention. The Athens Convention limits the maximum amount we as the carrier have to pay if found liable in the event of death or personal injury and for claims concerning luggage and valuables. Where any claim or part of a claim (including those involving death or personal injury)

concerns or is based on any travel arrangements (including the process of getting on and/or off the transport concerned) provided by any air, rail or road carrier or any stay in a hotel, the maximum amount of compensation we will have to pay you will be limited. The most we will have to pay you for that claim or that part of a claim if we are found liable to you on any basis is, except as otherwise expressly set out in the Booking Conditions, the most the carrier or hotel keeper concerned would have to pay under the International Convention or Regulation which applies to the travel arrangements or hotel stay in question (for example, the Warsaw Convention as amended or unamended and the Montreal Convention for international travel by air and/or for airlines with an operating license granted by an EU country, the EC Regulation on Air Carrier Liability No 889/2002 for national and international travel by air). Please note: Where a carrier or hotel would not be obliged to make any payment to you under the applicable International Convention or Regulation in respect of a claim or part of a claim, we similarly are not obliged to make a payment to you for that claim or part of the claim. When making any payment, we are entitled to deduct any money that you have received or are entitled to receive from the transport provider or hotelier for the complaint or claim in question. Copies of the applicable International Conventions and Regulations are available from us on request. The current maximum limits that apply under the Athens Convention in the event of our liability for death or personal injury caused by a shipping incident is 250,000 SDRs (approximately £240,000) unless such is caused by an act of war, natural phenomenon, civil war, terrorism or any other exception set out in the Athens Convention. Where we are found to have been negligent this limit is increased to 400,000 SDRs (approximately £410,000). The limit of our liability for death and personal injury for non-shipping incidents is limited to 400,000 SDRs (approximately £379,000). In the event of our liability for damage and loss to baggage, where baggage is deposited with the ship, this is limited to 3,375 SDRs (approximately £4,000) and for damage and loss to cabin luggage this is limited 2,250 SDRs (approximately £2,500).

**THIRD PARTY BENEFICIARIES: Please note: Lead Guest accepts on behalf of themselves and their travelling party that Carrier's exclusions and limits of liability (including all rights, defences and immunities) specified in these Booking Conditions shall also apply to and benefit: (a) designated third parties include any parent, subsidiary, affiliate, assignee or successor company of all entities identified in this Clause, (b) the officers, directors, employees, agents, crew and pilots of all the entities identified in this Clause, (c) any and all agents, independent contractors, suppliers, concessionaires, physicians and medical personnel, retail shop personnel, health and beauty staff, fitness staff, shore excursion providers, tour operators, (d) shipbuilders, manufacturers and designers of the Vessel or Transport, (e) suppliers, installers and maintainers of all component parts, launches, appurtenances, craft or facilities (whether at sea or on shore) related to the Vessel or any substitute ship or Transport, owned or operated by their owners, operators, managers, agents, charterers, contractors, concessionaires or others, and (f) owners and operators of all shoreside properties or facilities at which the Vessel or any substituted ship or the Transport may call. This Clause is without prejudice to the applicable statutory rights of any guest.**

**5.8.1 ONBOARD ACTIVITIES RISK DISCLOSURE AND ACKNOWLEDGMENT**

Guest agrees to read the descriptions below of activities onboard the Vessel before boarding the Vessel. Participation in the onboard activities is voluntary. Not all activities are available on all vessels. Guest agrees and acknowledges there may be a risk when participating in the activities described below. In addition to reading the warning and acknowledgement of risk below, Guest agrees to read warning signs onboard the Vessel and convey both the warning and acknowledgment of risk below and warning signs onboard to every Guest named in their booking, including minors.

Guests may engage in supervised or unsupervised sporting activities including but not limited to, basketball, volleyball, and soccer. Guests must consider their own physical fitness and ability before participating. Guests must wear footwear and clothing appropriate for the activity and follow posted rules or direction of staff. Rules, equipment, and activity areas may not be regulation. Age restrictions may apply for certain activities or competitions.

*Fleetwide*:

a. Rock Climbing Wall. Allows Guests to climb as high as 60 feet above deck (depending on the Vessel) on the Rock Climbing Wall while wearing a safety harness. Restrictions: Must be at least 6 years of age; weight restrictions apply based on equipment and must be able to fit into the harness.  Clothing: must wear shorts or pants, socks, dry clothes and climbing shoes which will be provided, no skirts or bikini bottoms.

*On Several Vessels*:

b. Ice Skating Rink. Guests may engage in unsupervised ice skating during specific hours. Restrictions: Children under 5 years of age must be accompanied on the rink by a parent or Legal Guardian.  Ice skates and helmets will be provided.  Must wear helmet, long pants and socks.  It is the responsibility of the Guest to make sure that their skates and helmet, and those of any minors, fit properly and are properly fastened.

c. Zipline. Allows Guests to race across on a Zip Line suspended nine decks above the Vessel's Boardwalk. Restrictions: Must weigh no less than 75lbs and no more than 275 lbs, and be at least 52 inches tall.

d. RipCord by iFLY. Allows Guests to float suspended in the air in this skydiving simulator on deck. Restrictions: Must be at least 3 years of age.  Guests shorter than 6 feet must weigh less than 230 lbs. Guests 6 feet and taller must weigh less than 250 lbs.  Must wear equipment provided.

e. Circus Trapeze School. Trapeze School at the SeaPlex allows Guests to take flying trapeze lessons. Safety mats are provided to cushion Your landing. Restrictions: Must be at least 6 years of age, and able to climb a ladder and hang on a trapeze.

f. Roller Skating Rink. Guests may engage in unsupervised roller skating at the Vessel's roller-skating rink. Restrictions: Children under 5 years of age must be accompanied on the rink by a parent or Legal Guardian. Helmets must be worn. All other safety equipment

USCA11 Case: 26-11899   Document: 7   Date Filed: 06/03/2026   Page: 162 of 314

provided is optional, but highly recommended. It is the responsibility of Guest to make sure that their skates and helmet, and those of any minors, fit properly and are properly fastened.

g. <u>Sky Pad</u>. Allows Guests to participate in a supervised bungee trampoline experience. Guest must be strapped into a safety harness, will be fitted with a virtual reality headset, and suspended by bungee cords over a trampoline. During this activity, Guest determines how high to jump or whether to jump at all.  Restrictions: Must be at least 5 years old to jump and at least 7 years old to jump while wearing a virtual reality headset.  Otherwise, wearing of virtual reality headset is optional.   Participants must weigh at least 20 lbs and no more than 240 lbs.

h. <u>FlowRider</u>. The FlowRider surf simulator causes 30,000 gallons of water per minute to rush underneath the rider at 30 mph creating force similar to 5-ft ocean waves in the rear wipe-out area, whereas in the front wipe-out area the water depth may be as little as 1 inch. Although the fall area is padded, there is a high risk of injury upon falling and upon being swept by the rushing water into the back of the rear wipe-out area and forced against the back wall. Participants must be at least 58 inches tall to stand up surf and 52 inches to Boogie Board.  No loose articles may be worn including knee braces, arm braces, leg braces, hats or sunglasses.

WARNING/ACKNOWLEDGMNENT OF RISK: THE ACTIVITIES LISTED ABOVE ARE ALL VOLUNTARY AND ARE NOT SUITABLE FOR ALL GUESTS. YOU OR YOUR CHILDREN MAY SUFFER MINOR OR SERIOUS PHYSICAL INJUR(IES) OR DEATH. THE RISKS OF INJURY INCLUDE (BUT ARE NOT LIMITED TO): BROKEN BONES, FRACTURES, CONCUSSIONS, DIZZINESS, MOTION SICKNESS, DISLOCATIONS, CONTUSIONS, TORN LIGAMENTS AND TENDONS, SPRAINS AND STRAINS, CUTS TO THE HEAD, BODY AND/OR LIMBS, BUMPS AND BRUISES, PROPERTY LOSS OR DAMAGE, ABRASIONS AND/OR LACERATIONS. ALTHOUGH RARE, CATASTROPHIC INJURIES MAY OCCUR, AND COULD INCLUDE PERMANENT DISABILITY, SPINAL INJURY, PARALYSIS, OR DEATH.  PARTICIPANTS ELECT TO VOLUNTARILY PARTICIPATE IN THE ACTIVITY(IES) WITH FULL KNOWLEDGE AND ACCEPTANCE OF ANY AND ALL RISKS ASSOCIATED WITH THE ACTIVITY AND IDENTIFIED ABOVE.  PARENTS AND LEGAL GUARDIANS TRAVELLING WITH MINOR CHILDREN WHO ENGAGE IN THE ACTIVITY ARE DEEMED TO HAVE WARNED THE CHILDREN OF THESE RISKS AND ASSUMED THE RISK ON THE CHILD'S BEHALF.

5.9 IF I HAVE A COMPLAINT?

In the unlikely event you have a reason to complain whilst away, you must immediately notify the Guest Services Desk onboard ship and the supplier of the service(s) in question (if not us). This is to ensure that we are given the opportunity to address and to attempt to resolve any issue you raise. Any verbal complaint must be put in writing and given to the supplier and us as soon as possible. If a problem cannot be resolved to your satisfaction and you wish to follow this up on your return, you must contact the Customer Service Desk onboard or your local booking office.

You must give your booking reference number and full details of your complaint within 28 days of your return from holiday unless a different time limit applies to your claim — see section 2.1, 2.3, 2.4 and 5.8. We will only accept complaints from the lead name of a booking. If your complaint is written on behalf of other members of your travelling party, their full names and booking reference numbers must be clearly stated in the correspondence together with their authority for you to handle the complaint on their behalf. If you fail to follow this complaints procedure, your right to claim the compensation you may otherwise have been entitled to may be affected or even lost as a result.

We both agree that any dispute, claim or other matter arising out of or in connection with your contract or your holiday with us which cannot be settled by agreement, may be referred to an agreed Arbitration scheme which can be used for disputes relating to alleged breaches of contract and/or negligence claims. Alternatively, where you have specifically booked online, you may choose to take advantage of an approved online Dispute Resolution service. If the dispute is not resolved by Alternative Dispute Resolution, you must issue legal proceedings in the Courts of England and Wales. The contract between us is governed by the laws of England and Wales.

We can only pay you compensation if the following conditions are met:

- If asked to do so, the person(s) affected must transfer to us any rights they have against the supplier or whoever else is responsible for your claim and complaint.
- The person(s) affected must agree to cooperate fully with us and our insurers if we or our insurers want to enforce any rights transferred to us.

Where a dispute cannot be resolved to your satisfaction, as an alternative to court action, a more economic and independent alternative dispute resolution (ADR) forum may be available. Please ask your travel agent for details of the ADR forum available in your country of residence.

5.10 WHAT ABOUT CIRCUMSTANCES WHICH ARE OUTSIDE YOUR CONTROL?

Except where we specifically say otherwise in these Booking Conditions, we cannot accept any liability or pay any compensation where your holiday and/or any other services we have promised to arrange or provide cannot be provided at all, or as promised or you otherwise suffer any damage or loss (as more fully described in clause 5.7 above) as a result of circumstances which are outside our control ('force majeure'). When we talk about circumstances which are outside our control, we mean any event which we or the supplier of the service in question could not have predicted or avoided even after taking all reasonable care. Such events are likely to include war or threat of war, acts of terrorists or threats of such acts, riots or civil unrest, industrial action, government orders, natural or nuclear disaster, fire, adverse weather conditions, health risks, epidemics, pandemics, mechanical difficulties (which we could not have anticipated or avoided despite our normal comprehensive mechanical checks), the non-availability of ports and ancillary facilities; the inability of cruise operators to operate cruises as a direct or indirect result or consequence of any government or regulatory order

(including the loss of restriction of shipping or transit rights or the right of cruise operators to access ports and/or ancillary facilities) and all similar circumstances which are outside our control.

If, in the event of unavoidable and extraordinary circumstances, we cannot guarantee your timely return home from your cruise holiday, we shall be responsible for necessary accommodation for a period not exceeding three nights per traveler. Such limits may vary with regard to persons with reduced mobility, pregnant travelers and those with specific medical needs whom have made us aware of their needs at least 48 hours prior to travel. Likewise, if unavoidable and extraordinary circumstances prevent us from completing the voyage, and we notify you of this without undue delay before the start of the package commences, we will have no liability to you save for a refund of the amount paid for the holiday.

5.11 INSOLVENCY PROTECTION (EU GUESTS ONLY)

When you book a cruise-only holiday via one of our authorised travel agents, all monies you pay for that booking will be held by the travel agent on your behalf until we issue our booking confirmation. Until that point, your monies are not protected by our insolvency insurance (if any) held in your country. We therefore recommend that you use a travel agent who offers their own financial security arrangements so that in the event that the travel agent becomes insolvent before we issue our booking confirmation, all monies that you have paid to that travel agent will be refunded to you. In the event that our authorised travel agent becomes insolvent after we have issued our booking confirmation, then all monies you have paid to that travel agent for that cruise only holiday may be protected by our insolvency insurance (if any) held in your country. You will be required to pay any outstanding balance due (if any) directly to us (or any other travel agent nominated by us) in accordance with these Booking Conditions in order to receive your holiday. If you have booked a cruise-only holiday with us you should expect to receive from the travel agent a booking confirmation issued by us, which shows that we are responsible for the cruise part of your holiday only. Please note for the purpose of insolvency protection, this will include any additional components including any on shore hotel accommodation and/ or ground transfers arranged by us as part of your cruise booking with us.

You may book a cruise-only holiday in conjunction with other services (such as flights, onshore accommodation and/or ground transfers) that are arranged or provided by a travel agent or tour operator (acting as 'Travel Organiser') with whom you book. In this situation, where the Travel Organiser provides you with a package holiday incorporating third party services, your contract for your entire holiday including the cruise and all other such services and arrangements will be with your Travel Organiser and not us. Your holiday will not be protected by our insolvency insurance (if any) held in your country. Instead, you must check that your Travel Organiser has their own appropriate financial security arrangements to protect all monies you pay to that organiser for your holiday and to repatriate you if already abroad (if applicable) in the event of their insolvency.

You should receive a booking confirmation issued by the Travel Organiser showing that they are responsible for providing all elements of your holiday. In the event of insolvency of the Travel Organiser before we have received full payment from them for the cruise-only element of your holiday, your cruise-only booking may be cancelled and we will be under no obligation to provide you with that cruise, or any refund or any compensation. In such circumstances, you should seek compensation from the provider of financial security arrangements (if any) that the Travel Organiser has made.

5.12 COMMON INTEREST GROUPS AND IMMERSION SAILINGS

From time to time we may have various common interest groups on board attending for example conventions, conferences, seminars, training courses, competitions, tournaments or specialty holidays such as cookery and dancing courses. These groups may take place on the dates when you are sailing with us. While we envisage that this will not affect the overall normal day-today operation of the ship, there may be occasions when certain facilities are unavailable to you whilst these groups are on board. Some sailings are sold by the regional country market for that itinerary in higher numbers, so there may be a large majority of that region's guests on that sailing, such as our sailings in China, which will be largely sold to the Chinese market or our sailings from Southampton, which will be largely sold to the UK and Irish market. These sailings are known as Immersion sailings and this means that the product will be tailored to the local market onboard in terms of language, food and entertainment. However, English language will always be used alongside any local language on board all of our ships for any onboard announcements, onboard program and menus.

5.13 BOOKING CONDITIONS VALIDITY

These Booking Conditions are valid from the date above/below. You must ensure that you are using an up-to-date brochure when you book your holiday. We cannot accept any liability whatsoever for any mistakes and/or any incorrect/inaccurate information which results from the use of an out-of-date brochure.

5.14 WHAT OTHER CONDITIONS APPLY TO MY HOLIDAY?

Airlines, hotels, lodges, rental companies and our other suppliers have their own conditions, which will apply to your holiday, we strongly recommend that you refer to these. Some of these conditions may limit or exclude the airline's or other supplier's liability to you, often in accordance with International Conventions. Copies will be available from our suppliers.

PRIVACY STATEMENT

For the purposes of Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation), and the UK Data Protection Act, 2018 (the "Data Protection Regulations"), we are a Data Controller. In order to process your booking, we need to collect certain personal details from you. These details will include, where applicable, the names and addresses of party members, credit/ debit card or other payment details and special requirements; such as those relating to any disability or medical condition, which may affect the chosen holiday arrangements, and any dietary restrictions

USCA11 Case: 26-11899   Document: 7   Date Filed: 06/03/2026   Page: 164 of 314

which may disclose your religious beliefs. We may also need to collect other personal details such as your nationality, citizenship, gender and passport details in addition to the details mentioned above to provide to third parties in order to fulfill your holiday. We need to pass on your personal details to the companies and organizations that need to know them so that your holiday can be provided (for example your airline, hotel, the ship operator, other supplier, credit/debit card company or bank). We may also be required, either by law or by applicable third parties (such as Immigration such disclosures will only be made if permitted by the Data Protection Regulations or the General Data Protection Regulation (as applicable) and any associated legislation. Such companies, organisations and third parties may be outside the European Union, Norway, Iceland or Liechtenstein if your holiday is to take place or to involve suppliers outside these countries and we shall take steps to ensure that your personal information is kept safe in line with The Data Protection Regulations privacy standards. All details you give us in connection with your booking (including those relating to any disability or medical condition or your religious beliefs) will be kept confidential but may be shared with third parties if necessary in order to provide services to you e.g. transfers through air or land ports. You are generally entitled to ask us (by letter or e-mail) what details of yours are being held or processed, for what purpose and to whom they may be or have been disclosed. We may be entitled to charge a fee to respond to such a request. We promise to respond to your request within 40 days of receiving your written request and fee. In certain limited circumstances, we are entitled to refuse your request. If you believe that any of your personal details, which we are processing, are inaccurate or incorrect please contact us immediately. For full details of our privacy policy please go to our website and click "Privacy."

CCTV (CLOSED CIRCUIT TELEVISION)

We use CCTV to record images on all ships across our fleet, including the Vessel, for the security and safety of our crew and guests. For further information on how this information is used and how long it is stored for please reference our privacy policy or direct your inquiries to privacy@rccl.com.

COMPANY DETAILS

Royal Caribbean Cruises Ltd. and Celebrity Cruises Inc. are both Liberian companies with places of business in Miami, Florida, U.S.A. Each of the entities listed below are subsidiary businesses of Royal Caribbean Cruises Ltd. and are either: (A) the sales and marketing agent (i.e., local booking office) for Royal Caribbean Cruises Ltd. and/or Celebrity Cruises Inc.; and/or (B) the operators of certain vessels. The relevant ship operator will be listed on your booking confirmation.

1. <u>Local Booking Offices</u>.

- Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- Celebrity Cruises Inc., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- RCL Cruises Ltd., Building 7, The Heights, Brooklands, Weybridge, Surrey, England, KT13 0XW
- Royal Caribbean Cruises (Asia) Pte Ltd., 3 Anson Road #13-02, Springleaf Tower, Singapore 079909
- Royal Celebrity Mexico Cruceros, S. de R.L. de C.V., Manuel Avila Camacho No. 36 11000 Ciudad de Mexico, CDMX, Mexico
- RCL Cruises Travel (Cyprus) Ltd., Neocleous House, 195 Makarios III Avenue, 1-5th, Limassol, CY-3030 Cyprus.

1. <u>Ship Operators</u>.

- Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- Celebrity Cruises Inc., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- RCL Cruises Ltd., Building 7, The Heights, Brooklands, Weybridge, Surrey, England, KT13 0XW
- RCL Cruises (Cyprus) Limited, Neocleous House, 195 Makarios III Avenue, 1-5th, Limassol, CY-3030 Cyprus.
- Islas Galapagos Turismo y Vapores C.A., Av. Naciones Unidas E2-30 y Nuñez de Vela, edificio Metropolitan, Office 14-04, Quito, Ecuador
- Oceanadventures S.A., Av. Naciones Unidas E2-30 y Nuñez de Vela, edificio Metropolitan, Office 14-04, Quito, Ecuador

**Version Date: 17 December 2024**.

# HEINONLINE

DATE DOWNLOADED: Fri Mar 21 10:23:55 2025
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Relative to limitation of shipowners' liability., Public Law 74-662 / Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936).

ALWD 7th ed.
Relative to limitation of shipowners' liability., Public Law 74-662 / Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936).

APA 7th ed.
Relative to limitation of shipowners' liability., Public Law 74-662 Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936).

Chicago 17th ed.
"Public Law 74-662 / Chapter 521, 74 Congress, Session 2, An Act: Relative to limitation of shipowners' liability.," U.S. Statutes at Large 49 (1936): 1479-1481

McGill Guide 9th ed.
Relative to limitation of shipowners' liability., Public Law 74-662 / Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936).

AGLC 4th ed.
Relative to limitation of shipowners' liability., Public Law 74-662 / Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936)

MLA 9th ed.
Relative to limitation of shipowners' liability., Public Law 74-662 / Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936). HeinOnline.

OSCOLA 4th ed.
Relative to limitation of shipowners' liability., Public Law 74-662 / Chapter 521, 74 Congress. 49 Stat. 1479 (1919-1936) (1936).          Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Provided by:
Provided by Jenkins Law Library

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
   *Copyright Information*

Case 1:24-cv-23953-DPG   Document 57-2   Entered on FLSD Docket 03/26/2025   Page 2 of 4
USCA11 Case: 26-11899   Document: 7   Date Filed: 06/03/2026   Page: 166 of 314

[CHAPTER 520.]

### AN ACT

Authorizing the State Highway Board of the State of Georgia to replace, reconstruct, or repair the free highway bridge across the Savannah River at or near the city of Augusta, Georgia.

June 5, 1936.
[S. 4549.]
[Public, No. 661.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in order to facilitate interstate commerce, improve the postal service, and provide for military and other purposes, the State Highway Board of the State of Georgia is hereby authorized to replace, reconstruct, or repair the free highway bridge and approaches thereto across the Savannah River, known as the North Augusta Bridge, at or near the city of Augusta, Georgia, and to maintain and operate such bridge as a free highway bridge, in accordance with the provisions of an Act entitled "An Act to regulate the construction of bridges over navigable waters", approved March 23, 1906.

Savannah River, Georgia may bridge, at Augusta.

Maintenance as free highway bridge.
Construction.
Vol. 34, p. 84; U. S. C., p. 1474.

SEC. 2. There is hereby conferred upon the State Highway Board of the State of Georgia all such rights and powers to enter upon lands and to acquire, condemn, occupy, possess, and use real estate and other property needed for the location, replacement, reconstruction, repair, operation, and maintenance of such bridge and its approaches as are possessed by railroad corporations for railroad purposes or by bridge corporations for bridge purposes in the State in which such real estate or other property is situated, upon making just compensation therefor, to be ascertained and paid according to the laws of such State, and the proceedings therefor shall be the same as in the condemnation or expropriation of property for public purposes in such State.

Acquisition of real estate, etc., for location, approaches, etc.

Condemnation proceedings.

SEC. 3. The authority granted by this Act shall cease and be null and void unless the replacement, reconstruction, or repair authorized herein is actually commenced within two years and completed within four years from the date of the enactment of this Act.

Time limitation.

SEC. 4. The right to alter, amend, or repeal this Act is hereby expressly reserved.

Amendment.

Approved, June 5, 1936.

---

[CHAPTER 521.]

### AN ACT

Relative to limitation of shipowners' liability.

June 5, 1936.
[S. 4655.]
[Public, No. 662.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 4283 of the Revised Statutes, as amended (U. S. C., 1934 ed., title 46, sec. 183; Supp. I, title 46, sec. 183), is hereby amended to read as follows:

Limitation of shipowners' liability.
R. S., sec. 4283, p. 827.
U. S. C., p. 1998; Supp. I, p. 273.
*Ante,* p. 960.

"SEC. 4283. (a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

Liability of owner; amount.

"(b) In the case of any seagoing vessel, if the amount of the owner's liability as limited under subsection (a) is insufficient to pay all losses in full, and the portion of such amount applicable to the payment of losses in respect of loss of life or bodily injury is less

Seagoing vessels; liability when owner's interest insufficient to pay losses in full.

**1480**        74TH CONGRESS. SESS. II. CH. 521. JUNE 5, 1936.

than $60 per ton of such vessel's tonnage, such portion shall be increased to an amount equal to $60 per ton, to be available only for the payment of losses in respect of loss of life or bodily injury.

*Proportionate payment if amount insufficient for full settlement.*

If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts.

*Tonnage construed.*

"(c) For the purposes of this section the tonnage of a seagoing steam or motor vessel shall be her gross tonnage without deduction on account of engine room, and the tonnage of a seagoing sailing vessel shall be her registered tonnage: *Provided*, That there shall not be included in such tonnage any space occupied by seamen or apprentices and appropriated to their use.

*Proviso.*
*Space excluded.*

"(d) The owner of any such seagoing vessel shall be liable in respect of loss of life or bodily injury arising on distinct occasions to the same extent as if no other loss of life or bodily injury had arisen.

*Injuries, etc., arising on distinct occasions.*

"(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel.

*Privity or knowledge of master, etc., imputed to owner.*

"(f) As used in subsections (b), (c), (d), and (e) of this section and in section 4283A, the term 'seagoing vessel' shall not include pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels or their tenders, self-propelled lighters, nondescript self-propelled vessels, canal boats, scows, car floats, barges, lighters, or nondescript non-self-propelled vessels, even though the same may be seagoing vessels within the meaning of such term as used in section 4289 of this chapter, as amended."

*"Seagoing vessel" construed.*

SEC. 2. Chapter 6 of title 48 of the Revised Statutes, as amended, is hereby amended by inserting after section 4283A the following new section:

"SEC. 4283B. STIPULATIONS LIMITING LIABILITY FOR NEGLIGENCE INVALID.—It shall be unlawful for the manager, agent, master, or owner of any vessel transporting passengers between ports of the United States or between any such port and a foreign port to insert in any rule, regulation, contract, or agreement any provision or limitation (1) purporting, in the event of loss of life or bodily injury arising from the negligence or fault of such owner or his servants, to relieve such owner, master, or agent from liability, or from liability beyond any stipulated amount, for such loss or injury, or (2) purporting in such event to lessen, weaken, or avoid the right of any claimant to a trial by court of competent jurisdiction on the question of liability for such loss or injury, or the measure of damages therefor. All such provisions or limitations contained in any such rule, regulation, contract, or agreement are hereby declared to be against public policy and shall be null and void and of no effect."

*Stipulations limiting liability for negligence invalid.*

SEC. 3. Section 4285 of the Revised Statutes (U. S. C., 1934 ed., title 46, sec. 185) is hereby amended to read as follows:

"SEC. 4285. The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter, as amended, and the owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 4283, as amended, or (b) at his option shall transfer, for the benefit of claimants, to a trustee to be

*Proceedings to limit liability.*

*Deposit of security.*

*Optional transfer of interest to a trustee.*

74TH CONGRESS.   SESS. II.   CHS. 521, 522.   JUNE 5, 1936.   1481

appointed by the court his interest in the vessel and freight, together with such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 4283, as amended.  Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease." <span style="float:right">Termination of claims against owner.</span>

SEC. 4. Section 4289 of the Revised Statutes, as amended (U. S. C., 1934 ed., title 46, sec. 188), is hereby amended to read as follows: <span style="float:right">R. S., sec. 4289, p. 827. U. S. C., p. 1998. Application of provisions to all seagoing vessels, etc.</span>

"SEC. 4289. Except as otherwise specifically provided therein, the provisions of the nine preceding sections and of section 18 of the Act entitled 'An Act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade and for other purposes', approved June 26, 1884 (23 Stat. 57; U. S. C., 1934 ed., title 46, sec. 189), shall apply to all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters." <span style="float:right">Vol. 23, p. 57. U. S. C., p. 1999.</span>

SEC. 5. Section 2 of the Act entitled "An Act relative to limitation of shipowners' liability", approved August 29, 1935 (U. S. C., 1934 ed., Supp. I,[1] sec. 183a), is hereby repealed. <span style="float:right">Section repealed. *Ante*, p. 960. U. S. C., Supp. I, p. 273.</span>

Approved, June 5, 1936.

---

[CHAPTER 522.]

AN ACT

Granting authority to the Secretary of War to license the use of a certain parcel of land situated in Fort Brady Reservation to Ira D. MacLachlan Post Numbered 3, the American Legion, for fifteen years. <span style="float:right">June 5, 1936. [H. R. 190.] [Public, No. 663.]</span>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of War be, and he is hereby, authorized and directed to grant to Ira D. MacLachlan Post Numbered 3, the American Legion, Sault Sainte Marie, Michigan, a license to use and occupy a certain piece or parcel of land, with the building thereon, described as follows: <span style="float:right">Fort Brady Reservation, Mich. License to use land in, granted to Ira D. MacLachlan Post, American Legion.</span>

"Beginning at a point in the easterly boundary of Fort Brady Reservation two hundred and forty-eight and nine-tenths feet northward from the southeast corner of the reservation; thence north sixty-five degrees fifty-nine minutes west forty-nine and eight-tenths feet to the easterly edge of a roadway; thence north no degrees no minutes one hundred and forty-four and eight-tenths feet along the easterly edge of the roadway; thence south sixty-five degrees fifty-nine minutes east one hundred and eight and eight-tenths feet to the easterly boundary of Fort Brady Reservation; thence south twenty-four degrees one minute west one hundred and thirty-two and three-tenths feet along the easterly boundary of Fort Brady Reservation to the point of beginning." <span style="float:right">Description.</span>

for a period of fifteen years from the date of the issuance of such license. <span style="float:right">Term of license.</span>

SEC. 2. The issuance of such license shall be held to constitute a cancelation of the license under which the Ira D. MacLachlan Post Numbered 3, the American Legion, is now entitled to the use and occupation of such piece or parcel of land. <span style="float:right">Cancelation of present license.</span>

SEC. 3. The license issued as required by this Act shall be granted subject to the following conditions: <span style="float:right">Conditions imposed.</span>

1. That the building shall be used for the sole purpose of a clubhouse for the local American Legion Post of Sault Sainte Marie, Michigan. <span style="float:right">Use of building.</span>

2. That the building shall be kept in good repair, with proper sewerage connections to the river; that any use that may be made of the building or adjacent grounds shall in no way interfere with <span style="float:right">Upkeep, etc.</span>

---

[1] So in original.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

*C.B. et al.,*

      Plaintiffs,               No.  24-cv-25089-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation, and ARVIN JOSEPH MIRASOL, a citizen and
resident of the Republic of the Philippines,

      Defendants.

_____

*D.M. et al*,

      Plaintiffs,               No. 24-cv-24988-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation, and ARVIN JOSEPH MIRASOL, a citizen and
resident of the Republic of the Philippines,

      Defendants.

_____

*Doe (S.F.) et al*,

      Plaintiffs,               No. 24-cv-23953-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation, and ARVIN JOSEPH MIRASOL, a citizen and
resident of the Republic of the Philippines,

      Defendants.

_____

*Doe,*

      Plaintiff,               No. 24-cv-24039-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation,

       Defendant.

_____

*Doe et al,*

       Plaintiffs,               No. 25-cv-20138-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation,

       Defendant.

_____

*Doe et al,*

       Plaintiffs,               No. 25-cv-20485-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation,

       Defendant.

_____

*J.L.S. et al,*

       Plaintiffs,               No. 24-cv-24139-DPG

vs.

ROYAL   CARIBBEAN   CRUISES   LTD.,   a   Liberian
Corporation, and ARVIN JOSEPH MIRASOL, a citizen and
resident of the Republic of the Philippines,

       Defendants.

_____

*K.T. et al,*

       Plaintiffs,               No. 24-cv-24193-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

     Defendants.

---

*M.S. et al*,

     Plaintiffs,          No. 24-cv-24738-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

     Defendants.

---

*T.L. et al*,

     Plaintiffs,          No. 24-cv-25009-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, and ARVIN JOSEPH MIRASOL, a citizen and resident of the Republic of the Philippines,

     Defendants.

---

*V.V., et al*,

     Plaintiffs,          No. 25-cv-20051-DPG

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation,

     Defendant.

---

**[PROPOSED] ORDER GRANTING DEFENDANT ROYAL CARIBBEAN CRUISES, LTD.'S OMNIBUS MOTION TO STAY LITIGATION AND COMPEL ARBITRATION**

THIS CAUSE having come before the Court upon the Defendant Royal Caribbean Cruises, Ltd. ("Defendant")'s Omnibus Motion to Stay and Compel Arbitration, and the Court being fully advised in the premises, it is hereby ORDERED AND ADJUDGED:

Defendant's Omnibus Motion to Stay Litigation and Compel Arbitration is GRANTED. The proceedings in this case will be stayed pending the initiation, if any, of arbitration proceedings and their completion.

DONE AND ORDERED in Chambers in Miami, Florida this _____ day of March __, 2025.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

Copies furnished to all counsel of record.

# Appendix D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 24-CV-23953-DPG

JANE DOE (S.F.), on her own behalf and on behalf of all other similarly situated passengers who sailed aboard the *Symphony of the Seas* between December 1, 2023 and February 26, 2024, who used a cabin bathroom which was within the cabins assigned to Stateroom Attendant, Arvin Joseph Mirasol,

and

JANE DOE 1 (J.A.); JOHN DOE 1 (Q.A.); JOHN DOE 2 (D.A.); JANE DOE 2 (D.A.); JANE DOE 3 (D.B.); JANE DOE 4 (S.B.); JANE DOE 5 (M.B.); JANE DOE 6 (N.B.); JANE DOE 7 (D.B.); JANE DOE 8 (J.B.); JANE DOE 9 (L.E.); JUNIOR DOE 1 (S.F.), by and through parent and natural guardian JOHN DOE 3 (S.F.); JOHN DOE 3 (S.F.); JUNIOR DOE 2 (A.G.), by and through parent and natural guardian JANE DOE 10 (N.G.); JANE DOE 10 (N.G.); JOHN DOE 4 (R.G.); JUNIOR DOE 3 (R.G.), by and through parent and natural guardian JOHN DOE 4 (R.G.); JANE DOE 11 (V.L.); JUNIOR DOE 4 (C.N.), by and through parent and natural guardian JOHN DOE 5 (J.N.); JOHN DOE 5 (J.N.); JANE DOE 12 (M.N.); JUNIOR DOE 5 (S.N.), by and through parent and natural guardian JANE DOE 12 (M.N.); JOHN DOE 6 (G.P.); JANE DOE 13 (T.P.); JANE DOE 14 (L.R.); JOHN DOE 7 (M.R.); JUNIOR DOE 6 (S.R.), by and through parent and natural guardian JOHN DOE 8 (S.R.); JOHN DOE 8 (S.R.); JANE DOE 15 (L.R.); JOHN DOE 9 (T.R.); JANE DOE 16 (R.S.); JANE DOE 17 (K.D.); JUNIOR DOE 7 (T.D.), by and through parent and natural guardian JANE DOE 17 (K.D.); JOHN DOE 10 (E.S.); JANE DOE 18

- 1 -

(M.S.); JUNIOR DOE 8 (J.G.), by and through parent and natural guardian JOHN DOE 11 (C.G.); JANE DOE 20 (J.G.); JOHN DOE 12 (B.N.); JANE DOE 21 (S.C.); JUNIOR DOE 9 (A.N.), by and through parent and natural guardian JANE DOE 21 (S.C.); JUNIOR DOE 10 (A.N.), by and through parent and natural guardian JOHN DOE 12 (B.N.); JANE DOE 22 (T.D.); JOHN DOE 13 (N.D.); JUNIOR DOE 11 (E.D.) by and through parent and natural guardian JOHN DOE 13 (N.D.); JANE DOE 23 (M.V.); JOHN DOE 14 (R.V.); JUNIOR DOE 12 (C.V.) by and through parent and natural guardian JOHN DOE 14 (R.V.); JOHN DOE 15 (R.P.); JANE DOE 24 (H.P.); JOHN DOE 16 (R.P.); JANE DOE 25 (D.P.); JUNIOR DOE 13 (P.P.), by and through parent and natural guardian JOHN DOE 16 (R.P.); JOHN DOE 17 (M.G.); JANE DOE 26 (Y.G.); and JUNIOR DOE 14 (A.G.), by and through parent and natural guardian JANE DOE 26 (Y.G.); JANE DOE 27 (R.V.); JOHN DOE 18 (C.V.); JUNIOR DOE 15 (S.V.), by and through parent and natural guardian JOHN DOE 18 (C.V.); and JUNIOR DOE 16 (R.V.), by and through parent and natural guardian JOHN DOE 18 (C.V.),

     Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD., and ARVIN JOSEPH MIRASOL,

     Defendants.

_____/

**CLASS ACTION**

## SIXTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

- 2 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

The Plaintiffs[1] hereby sue Defendants and allege as follows:

## JURISDICTIONAL AND PRELIMINARY ALLEGATIONS

1. The Plaintiffs' citizenship and residency are as follows, and the sailing date and cabin number for each Plaintiff, when they sailed aboard the *Symphony of the Seas*, are as follows:

   a. JANE DOE (S.F.) is a citizen and resident of the State of New Hampshire, with a sailing date of February 24, 2024 and cabin number 9711;

   b. JANE DOE 1 (J.A.) is a citizen and resident of the State of Connecticut, with a sailing date of February 10, 2024 and cabin number 9688;

   c. JOHN DOE 1 (Q.A.) is a citizen and resident of the State of Maryland, with a sailing date of January 13, 2024 and cabin number 9703;

   d. JOHN DOE 2 (D.A.) is a citizen and resident of the State of Connecticut, with a sailing date of January 13, 2024 and cabin number 9708;

   e. JANE DOE 2 (D.A.) is a citizen and resident of the State of Connecticut, with a sailing date of January 13, 2024 and cabin number 9708;

   f. JANE DOE 3 (D.B.) is a citizen and resident of the State of Florida, with a sailing date of February 10, 2024 and cabin number 9690;

   g. JANE DOE 4 (S.B.) is a citizen and resident of the State of Connecticut, with a sailing date of February 10, 2024 and cabin number 9690;

   h. JANE DOE 5 (M.B.) is a citizen and resident of the State of Florida, with a sailing date of February 24, 2024 and cabin number 9686;

---

[1] The Plaintiffs are referred to by pseudonyms and their initials because of the nature of the allegations alleged herein.  The names of each Plaintiff have been provided directly to Defendant, ROYAL CARIBBEAN CRUISES LTD., and are available, upon request, to counsel and/or parties.

LIPCON, MARGULIES & WINKLEMAN, P.A.

i.  JANE DOE 6 (N.B.) is a citizen and resident of the State of Florida, with a sailing date of February 24, 2024 and cabin number 9686;

j.  JANE DOE 7 (D.B.) is a citizen and resident of the State of Maryland, with a sailing date of January 13, 2024 and cabin number 9703;

k.  JANE DOE 8 (J.B.) is a citizen and resident of the State of Connecticut, with a sailing date of February 10, 2024 and cabin number 9692;

l.  JANE DOE 9 (L.E.) is a citizen and resident of the State of Connecticut, with a sailing date of February 10, 2024 and cabin number 9692;

m.  JUNIOR DOE 1 (S.F.) is a citizen and resident of the State of New Hampshire, and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 3 (S.F.), with a sailing date of February 24, 2024 and cabin number 9711;

n.  JOHN DOE 3 (S.F.) is a citizen and resident of the State of New Hampshire, with a sailing date of February 24, 2024 and cabin number 9701;

o.  JUNIOR DOE 2 (A.G.) is a citizen and resident of the State of Massachusetts and is a minor who is represented by and through the minor's parent and natural guardian JANE DOE 10 (N.G.), with a sailing date of February 18, 2024 and cabin number 9696;

p.  JANE DOE 10 (N.G.) is a citizen and resident of the State of Massachusetts, with a sailing date of February 18, 2024 and cabin number 9698;

q.  JOHN DOE 4 (R.G.) is a citizen and resident of the State of Massachusetts, with a sailing date of February 18, 2024 and cabin number 9698;

r.  JUNIOR DOE 3 (R.G.) is a citizen and resident of the State of Massachusetts and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 4 (R.G.), with a sailing date of February 18, 2024 and cabin number 9696;

s.  JANE DOE 11 (V.L.) is a citizen and resident of the State of Florida, with a sailing date of February 24, 2024 and cabin number 9686;

t.  JUNIOR DOE 4 (C.N.) is a citizen and resident of the State of Massachusetts and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 5 (J.N.), with a sailing date of February 18, 2024 and cabin number 9694;

u.  JOHN DOE 5 (J.N.) is a citizen and resident of the State of Massachusetts, with a sailing date of February 18, 2024 and cabin number 9692;

v.  JANE DOE 12 (M.N.) is a citizen and resident of the state of Massachusetts, with a sailing date of February 18, 2024 and cabin number 9692;

w.  JUNIOR DOE 5 (S.N.) is a citizen and resident of the State of Massachusetts and is a minor who is represented by and through the minor's parent and natural guardian JANE DOE 12 (M.N.), with a sailing date of February 18, 2024 and cabin number 9694;

x.  JOHN DOE 6 (G.P.) is a citizen and resident of the State of Florida, with a sailing date of February 4, 2024 and cabin number 9708;

y.  JANE DOE 13 (T.P.) is a citizen and resident of the State of Florida, with a sailing date of February 4, 2024 and cabin number 9708;

z.  JANE DOE 14 (L.R.) is a citizen and resident of the State of Maryland, with a sailing date of January 13, 2024 and cabin number 9694;

aa.  JOHN DOE 7 (M.R.) is a citizen and resident of the State of Maryland, with a sailing date of January 13, 2024 and cabin number 9699;

bb.  JUNIOR DOE 6 (S.R.) is a citizen and resident of the State of Maryland who is represented by and through the minor's parent and natural guardian JOHN DOE 8 (S.R.), with a sailing date of January 13, 2024 and cabin number 9694;

cc. JOHN DOE 8 (S.R.) is a citizen and resident of the State of Maryland, with a sailing date of January 13, 2024 and cabin number 9699;

dd. JANE DOE 15 (L.R.) is a citizen and resident of the State of Michigan, with a sailing date of January 7, 2024 and cabin number 9688;

ee. JOHN DOE 9 (T.R.) is a citizen and resident of the State of Michigan, with a sailing date of January 7, 2024 and cabin number 9688;

ff. JANE DOE 16 (R.S.) is a citizen and resident of the State of Connecticut, with a sailing date of February 10, 2024 and cabin number 9688;

gg. JANE DOE 17 (K.D.) is a citizen and resident of the State of Indiana, with a sailing date of December 30, 2023 and cabin number 9696;

hh. JUNIOR DOE 7 (T.D.) is a citizen and resident of the State of Indiana and is a minor who is represented by and through the minor's parent and natural guardian JANE DOE 17 (K.D.), with a sailing date of December 30, 2023 and cabin number 9694;

ii. JOHN DOE 10 (E.S.) is a citizen and resident of the State of Indiana, with a sailing date of December 30, 2023 and cabin number 9696;

jj. JANE DOE 18 (M.S.) is a citizen and resident of the State of Indiana, with a sailing date of December 30, 2023 and cabin number 9694;

kk. JUNIOR DOE 8 (J.G.) is a citizen and resident of the State of Florida and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 11 (C.G.), with a sailing date of December 10, 2023 and cabin number 9580;

ll. JANE DOE 20 (J.G.) is a citizen and resident of the State of Florida, with a sailing date of December 10, 2023 and cabin number 9580;

mm. JOHN DOE 12 (B.N.) is a citizen and resident of the State of Virginia, with a sailing date of December 24, 2023 and cabin number 9710;

nn. JANE DOE 21 (S.C.) is a citizen and resident of the State of Virginia, with a sailing date of December 24, 2023 and cabin number 9710;

oo. JUNIOR DOE 9 (A.N.) is a citizen and resident of the State of Virginia and is a minor who is represented by and through the minor's parent and natural guardian JANE DOE 21 (S.C.), with a sailing date of December 24, 2023 and cabin number 9710;

pp. JUNIOR DOE 10 (A.N.) is a citizen and resident of the State of Virginia and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 12 (B.N.), with a sailing date of December 24, 2023 and cabin number 9710; and

qq. JANE DOE 22 (T.D.) is a citizen and resident of the State of Indiana, with a sailing date of January 13, 2024 and cabin number 9682;

rr. JOHN DOE 13 (N.D.) is a citizen and resident of the State of Indiana, with a sailing date of January 13, 2024 and cabin number 9682;

ss. JUNIOR DOE 11 (E.D.) is a citizen and resident of the State of Indiana and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 13 (N.D.), with a sailing date of January 13, 2024 and cabin number 9682;

tt. JANE DOE 23 (M.V.) is a citizen and resident of the State of Florida, with a sailing date of January 13, 2024 and cabin number 7330;

uu. JOHN DOE 14 (R.V.) is a citizen and resident of the State of Florida, with a sailing date of January 13, 2024 and cabin number 7330;

LIPCON, MARGULIES & WINKLEMAN, P.A.

vv. JUNIOR DOE 12 (C.V.) is a citizen and resident of the State of Florida and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 14 (R.V.), with a sailing date of January 13, 2024 and cabin number 7330;

ww. JOHN DOE 15 (R.P.) is a citizen and resident of the State of Maryland, with a sailing date of January 27, 2024 and cabin numbers 9434 and 3196, but he also used cabin numbers 9705 & 9709, including the bathrooms, during the cruise;

xx. JANE DOE 24 (H.P.) is a citizen and resident of the State of Maryland, with a sailing date of January 27, 2024 and cabin numbers 9434 and 3196, but she also used cabin numbers 9705 & 9709, including the bathrooms, during the cruise;

yy. JOHN DOE 16 (R.P.) is a citizen and resident of the State of Maryland, with a sailing date of January 27, 2024 and cabin number 9705;

zz. JANE DOE 25 (D.P.) is a citizen and resident of the State of Maryland, with a sailing date of January 27, 2024 and cabin number 9705;

aaa. JUNIOR DOE 13 (P.P.) is a citizen and resident of the State of Maryland and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 16 (R.P.), with a sailing date of January 27, 2024 and cabin number 9705;

bbb. JOHN DOE 17 (M.G.) is a citizen and resident of the State of Maryland, with a sailing date of January 27, 2024 and cabin number 9709;

ccc. JANE DOE 26 (Y.G.) is a citizen and resident of the State of Maryland, with a sailing date of January 27, 2024 and cabin number 9709; and

ddd. JUNIOR DOE 14 (A.G.) is a citizen and resident of the State of Maryland and is a minor who is represented by and through the minor's parent and natural guardian JANE DOE 26 (Y.G.), with a sailing date of January 27, 2024 and cabin number 9709.

eee. JANE DOE 27 (R.V.) is a citizen and resident of the State of Florida, with a sailing date of January 21, 2024 and cabin number 9709; JANE DOE 27 (R.V.) did not learn of her potential claim until she was notified by authorities between April 2024 and May 2024 because RCCL failed to notify her after learning that she may be a potential victim on February 26, 2024; JANE DOE 27 (R.V.) therefore claims that, pursuant to the discovery rule, she is not time-barred under RCCL's contractually-shortened, one-year statute of limitations;

fff. JOHN DOE 18 (C.V.) is a citizen and resident of the State of Florida, with a sailing date of January 21, 2024 and cabin number 9709; JOHN DOE 18 (C.V.) did not learn of his potential claim until he was notified by authorities between April 2024 and May 2024 because RCCL failed to notify him after learning that he may be a potential victim on February 26, 2024; JOHN DOE 18 (C.V.) therefore claims that, pursuant to the discovery rule, he is not time-barred under RCCL's contractually-shortened, one-year statute of limitations;

ggg. JUNIOR DOE 15 (S.V.) is a citizen and resident of the State of Florida and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 18 (C.V.), with a sailing date of January 21, 2024 and cabin number 9709; and

hhh. JUNIOR DOE 16 (R.V.) is a citizen and resident of the State of Florida and is a minor who is represented by and through the minor's parent and natural guardian JOHN DOE 18 (C.V.), with a sailing date of January 21, 2024 and cabin number 9709.

2. Defendant, ROYAL CARIBBEAN CRUISES LTD. ("RCCL"), is a foreign entity incorporated in Liberia with its principal place of business in Florida.

3.   Defendant, ARVIN JOSEPH MIRASOL ("MIRASOL"), is a citizen of the Republic of the Philippines.  MIRASOL was recently convicted by the United States for acts related to this matter and was sentenced to 30 years in prison.[2]

4.   The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.  In the alternative, if diversity jurisdiction does not apply, then this matter falls under the admiralty and maritime jurisdiction of this Court.

5.   At all times material hereto, RCCL personally or through an agent:

a.   Operated, conducted, engaged in or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

b.   Was engaged in substantial activity within this state;

c.   Operated vessels in the waters of this state;

d.   Committed one or more of the acts stated in Florida Statute §§ 48.081, 48.181 and/or 48.193;

e.   The acts of RCCL set out in this Complaint occurred in whole or in part in this county and/or state.

f.   RCCL was engaged in the business of providing to the public and to the Plaintiffs in particular, for compensation, vacation cruises aboard their vessels.

6.   At all times material hereto:

a.   MIRASOL was a crewmember aboard the cruise ship *Symphony of the Seas*;

b.   The *Symphony of the Seas* embarked and disembarked cruise passengers in Florida for cruise vacations which began and ended in Florida;

---

[2] *See United States v. Mirasol*, Case No. 24-cr-60046-MD (S.D. Fla. August 28, 2024) [ECF No. 35]; *see also*, https://www.justice.gov/usao-sdfl/pr/cruise-ship-employee-sentenced-30-years-prison-placing-hidden-cameras-inside-passenger.

c.  On the subject voyages, over half of the revenue passengers originally embarked and planned to finally disembark in the State of Florida, without regard to intermediate stopovers, as contemplated by Florida Statute § 910.006;

d.  MIRASOL committed crimes during the subject cruise aboard the *Symphony of the Seas*, which are prohibited by the criminal laws of the United States and the laws of Florida.   Specifically, MIRASOL violated 18 U.S.C. §1801 and Florida Statute §810.145, against the Plaintiffs who are nationals of the United States, and other passengers who are nationals of the United States.

7.  Defendants are subject to the jurisdiction of the Courts of this state.

8.  The causes of action asserted in this Complaint arise under the General Maritime Law of the United States.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

9.  At all times material hereto, RCCL owned, operated, managed, maintained and/or controlled the vessel, the *Symphony of the Seas* (the "vessel").

10. At all times material hereto, RCCL employed and controlled MIRASOL as a crewmember assigned as a stateroom attendant aboard the vessel.

11. At all times material hereto, MIRASOL was a member of the crew working as a stateroom attendant aboard the vessel and was acting in the course and scope of his employment.

12. On or about the dates of the voyages alleged specifically in Paragraph 1, each of the Plaintiffs were paying passengers aboard the vessel, which was in navigable waters.

13. At all times material hereto, MIRASOL was assigned by RCCL to serve as stateroom attendant for the Plaintiffs' cabins.  MIRASOL had access to Plaintiffs' cabins solely by means provided to him by RCCL through providing MIRASOL a key card pass to Plaintiffs' cabins to be

- 11 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

used in the course and scope of MIRASOL'S duties as a stateroom attendant.  As such, when MIRASOL accessed passenger cabins, including Plaintiffs' passenger cabins, it was in the course and scope of his duties as a stateroom attendant employed and subject to control by RCCL.

14. At all times material hereto, Plaintiffs had an expectation of privacy in their passenger cabins and passenger cabin bathrooms.

### Subject Incidents

15. During the subject cruises, upon information and belief, MIRASOL taped a video camera containing a memory card in the Plaintiffs' passenger cabin bathrooms and captured images of the Plaintiffs while undressed and engaging in private activities, without Plaintiffs' prior knowledge or consent.

16. Upon information and belief, MIRASOL transmitted and/or uploaded images of the Plaintiffs while undressed and engaging in private activities, to third parties and/or to the world wide web, including, but not limited to, the dark web, without Plaintiffs' prior knowledge or consent.

    a. Plaintiffs have consulted with an expert witness in law enforcement who has extensive experience investigating video voyeurism and child pornography cases.  The consulting law enforcement expert witness opines that based on the statements made by Mirasol which are part of the Federal criminal record[3] and are self-authenticating pursuant to the Federal Rules of Evidence, Rule 902, and the expert witness' education and experience, that it is more likely than not, within a reasonable degree of scientific probability within the  discipline of law enforcement investigation, that Arvin Mirasol disseminated and/or posted to the internet illicit images and videos that he obtained

---

[3] *See United States v. Mirasol*, Case No. 24-cr-60046-MD (S.D. Fla. June 5, 2024) [ECF No. 23].

- 12 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

during his video voyeurism and child pornography activities aboard the Symphony of the Seas between December 2023 and February 26, 2024.

b. Plaintiffs have consulted with an expert witness in psychology who has extensive experience treating registered sex offenders who engaged in video voyeurism and child pornography. The consulting psychology expert witness opines that based on the statements made by Mirasol which are part of the Federal criminal record[4] and are self-authenticating pursuant to the Federal Rules of Evidence, Rule 902, and the expert witness' education and experience, that it is more likely than not, within a reasonable degree of scientific probability within the discipline of psychology, that Arvin Mirasol disseminated and/or posted to the internet illicit images and videos that he obtained during his video voyeurism and child pornography activities aboard the Symphony of the Seas between December 2023 and February 26, 2024.

17. Further, on June 5, 2024, MIRASOL admitted that in connection with his intentionally hiding cameras in private passenger cabin bathrooms and under beds, and videoing passengers in their private cabin bathrooms aboard the vessel between December 2023 and February 26, 2024, that he, in fact, coerced and enticed minors to engage in sexually explicit conduct for the purpose of producing visual depictions of that conduct, knowing or having reason to know that such depictions would be transmitted into interstate or foreign commerce.[5]

18. As a result of MIRASOL'S actions, Plaintiffs reasonably believe that images of Plaintiffs undressed while engaging in private activities have been distributed in a manner to allow them to

---

[4] Id.

[5] See Transcript of Change of Plea Before The Honorable Melissa Damian, United States Judge, June 5, 2024. *United States v. Mirasol*, Case No. 24-cr-60046-MD (S.D. Fla. June 5, 2024) [ECF No. 43], p. 15, ll. 15-17; p. 17, l. 16 – p. 18, l. 16; p. 19, l. 8 – p. 20, l. 21.

- 13 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

be able to be immediately reproduced and posted to the world wide web, including the dark web. As a result of MIRASOL'S acts and Plaintiffs' reasonable beliefs as a result of MIRASOL'S acts, Plaintiffs suffer from severe emotional distress, which manifests physically, causing the Plaintiffs physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact to the Plaintiffs.  The Plaintiffs reasonably believe that these images may never be completely discovered by the Plaintiffs, not for lack of searching, but as a consequence of the vastness of the world wide web; it would be the digital equivalent of searching for specific shards of glass in the ocean.  And, if Plaintiffs found the images, Plaintiffs could neither permanently extract them from the world wide web, nor could Plaintiffs be sure that Plaintiffs found all of the images.  Accordingly, Plaintiffs live in constant fear, reasonably under the circumstances, that images of the Plaintiffs undressed while engaging in private activities are regularly viewed by others and used for illicit purposes.

**RCCL's Notice of Sexual Assaults and Video Voyeurism Activities on its Cruise Ships**

19. At all times material hereto, RCCL knew or should have known sexual assaults were reasonably foreseeable considering the prevalence of sexual assaults aboard RCCL's cruise ships. Pursuant to the Secretary of Transportation's statistical compilation of shipboard incidents, there were a total of 26 sexual assaults and rapes reported during RCCL cruises in 2023; and 22 sexual assaults reported during RCCL cruises in 2022.  These shipboard incidents are (required to be) reported by RCCL directly to the Secretary of Transportation and/or the Federal Bureau of Investigation (pursuant to the Cruise Vessel Security and Safety Act of 2010).[6]

20. Additionally, the Eleventh Circuit Court of Appeal previously referenced the required reporting of RCCL's sexual assaults to the Secretary of Transportation and/or the Federal Bureau

---

[6] See https://www.transportation.gov/mission/safety/cruise-line-incident-reports

LIPCON, MARGULIES & WINKLEMAN, P.A.

of Investigation and acknowledged "that Royal Caribbean was on notice a decade before [plaintiff's] cruise that sexual assaults on cruise ships were a serious problem." *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1049 (11th Cir. 2019) (citing *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011)).

21. The overall data concerning sexual assaults aboard cruise ships reported to the Secretary of Transportation and/or the Federal Bureau of Investigation show that sexual assault allegations on cruise ships rose in 2023, with 131 sex crimes reported to the Federal Bureau of Investigation in 2023 on ships embarking and disembarking in the United States, up from 87 in 2022 and 101 in 2019, before the COVID-19 pandemic shut the cruise industry down until mid-2021.[7]

22. Furthermore, from April 30, 2023 through May 1, 2023, a hidden Wi-Fi camera was surreptitiously installed in a public bathroom on the top deck of RCCL's cruise ship, *Harmony of the Seas*, during a cruise which left Miami on April 29, 2023.  That hidden camera recorded more than 150 people using the Royal Caribbean bathroom, including at least 40 minor children, in various stages of undress, until the hidden camera was discovered by a passenger on May 1, 2023 at 7:00PM and reported to the ship's security aboard the *Harmony of the Seas*.[8]

23. Accordingly, at all times material hereto, RCCL was aware of prior instances of sexual assaults, including video voyeurism occurring aboard RCCL cruise ships in the immediate year prior to the subject incident.  Yet RCCL failed to take adequate steps and/or provide adequate security and/or training and/or supervision to prevent such sexual assaults, including video voyeurism, to occur aboard its cruise ships.  Furthermore, RCCL failed to warn its passengers of

---

[7] See, <u>Sexual assaults rose on cruise ships last year, according to federal data</u>, USA Today, Jan. 31, 2024, Nathan Diller.
[8] See, <u>Man Arrested for Placing Hidden Camera in Royal Caribbean Cruise Ship's Public Bathroom: FBI</u>, NBC Miami, May 10, 2023, Brian Hamacher and Niko Clemmons.  See also, USA v. Froias, Case No. 23-cr-00190-FAB, U.S. District Court for Puerto Rico; Document 2-1.

LIPCON, MARGULIES & WINKLEMAN, P.A.

sexual assaults, including video voyeurism, occurring aboard its cruise ships. RCCL's motive for failing to warn its passengers is financial in nature; that is, RCCL willfully chooses not to warn its passengers about sexual assaults, including video voyeurism, aboard its cruise ships so as not to scare any prospective passengers away. And RCCL willfully chooses not to fortify its onboard security detail so as to thwart sexual assaults, including video voyeurism, aboard its cruise ships, because to do so would require RCCL to increase security spending and to divert berths reserved for passengers to accommodate additional security aboard its ships, thereby reducing revenue and profits. Such willful and outrageous conduct on the part of the Defendant exposes Defendant to punitive damages. *See Lobegeiger v. Celebrity Cruises, Inc.*, 11-21620, 2011 WL 3703329, 2011 U.S. Dist. LEXIS 93933 (S.D. Fla Aug. 23, 2011).

### Admissions by MIRASOL following arrest and Miranda warnings

24. Mirasol's hidden camera was discovered in the Plaintiffs' cabin bathroom on February 26, 2024.

25. On March 3, 2024, the vessel arrived into Port Everglades and Homeland Security Agents and Customs and Border Patrol Officers boarded the vessel and took custody of MIRASOL'S electronic devices including: an Android cellular device (IMEI 015734006047846), one Sandisk Micro SD Card, one Transcend 8 GB, one camera, one Sandisk USB Stick and one Apple watch (SN number G99T34E2KDH2).[9]

26. During examination of MIRASOL'S USB Stick device, law enforcement discovered numerous videos of naked females undressing the bathroom as well as videos of child pornography.[10]

---

[9] *See United States v. Mirasol*, Case No. 24-cr-60046-MD (S.D. Fla. June 5, 2024) [ECF No. 23].
[10] Id.

27. During a post Miranda interview, MIRASOL admitted to taping a video camera in the guests' bathrooms that he worked as a stateroom attendant. MIRASOL explained that he would place his camera in the bathroom, and he would "pleasure himself and masturbate" after retrieving the camera and viewing the videos. MIRASOL revealed that he has been placing these cameras in the bathrooms since he started working on *Symphony of the Seas* around December 2023. MIRASOL stated, "I want to control it, but I can't". Law enforcement questioned MIRASOL on how he decides what room he puts the camera in. MIRASOL stated, "If I like who is in that room, I place it". MIRASOL further stated he would choice [sp] females approximately (16) sixteen and over in age. MIRASOL acknowledges knowing that videoing underage girls was illegal. MIRASOL also stated that while the guests were taking a shower, he would enter the rooms and hide under the bed while recording them naked with his cellular device.[11]

### Allegations Regarding the Class of Passengers Assigned to Mirasol's Cabins between December 1, 2023 and February 26, 2024

28. From December 1, 2023 through February 26, 2024, RCCL operated cruises embarking on the following dates aboard the *Symphony of the Seas*:

    a.  December 2, 2023;

    b.  December 10, 2023;

    c.  December 16, 2023;

    d.  December 24, 2023;

    e.  December 30, 2023;

    f.  January 7, 2024;

    g.  January 13, 2024;

---

[11] Id.

h.   January 21, 2024;

i.   January 27, 2024;

j.   February 4, 2024;

k.   February 10, 2024; and

l.   February 18, 2024.

29. Thus, for approximately 12 cruises, MIRASOL committed sexual assault through video voyeurism to passengers assigned to passenger cabins for which MIRASOL served as stateroom attendant.

30. Upon information and belief, a RCCL stateroom attendant is assigned to a section of 16 to 20 passenger cabins.

31. Upon information and belief, the passenger cabins attended to by MIRASOL aboard the *Symphony of the Seas* slept between 2 to 4 passengers.

32. Thus, MIRASOL'S victims may include up to 960 passengers (up to 12 cruises; times up to 20 passenger cabins; times up to 4 passengers per cabin; equals up to 960 passengers).

33. Upon learning of MIRASOL'S acts of sexual assault through video voyeurism on passengers in the staterooms he attended to as a stateroom attendant since December 1, 2023, RCCL had a duty to inform all passengers who stayed in passenger cabins attended to by MIRASOL between December 1, 2023 and February 26, 2024.

34. RCCL breached its duty of reasonable care to its passengers by failing to notify all passengers in the staterooms MIRASOL attended to as a stateroom attendant from December 2023 through February 26, 2024.

LIPCON,   MARGULIES   &   WINKLEMAN,   P.A.

35. RCCL's motive for failing to notify its passengers affected by MIRASOL'S acts was financial in nature.  RCCL was concealing the information from its passengers in order to prevent them from filing a civil suit against RCCL for damages related to MIRASOL'S acts.

    a.  Notably, RCCL provides a contractually-shortened notice period of six months and statute of limitations of one year (as opposed to the Federal Statute of Limitations for Maritime Personal Injury of 3 years pursuant to 46 U.S.C. §30106).

36. MIRASOL's intentional acts[12] described herein and admitted by MIRASOL as occurring within cabins he served as a stateroom attendant aboard the vessel between December 2023 and February 26, 2024 are sexual assaults and sexual harassment that MIRASOL committed on passengers staying in and/or using the cabin bathrooms to which MIRASOL served as a stateroom attendant aboard the vessel between December 2023 and February 26, 2024.

37. 9 U.S.C. §402(a) provides, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

38. 46 U.S.C. §30527(a)(1) provides that "<u>The owner, master, manager, or agent of a vessel transporting passengers</u> between ports in the United States, or <u>between a port in the United States and a port in a foreign country</u>, <u>may not include in a regulation or contract a provision limiting,</u>

---

[12] See ¶26, wherein MIRASOL states his intentional acts.  Specifically, MIRASOL stated, "I want to control it, but I can't"; and when questioned on how MIRASOL decides what room he puts the camera in, he stated, "If I like who is in that room, I place it"; and that MIRASOL acknowledged knowing that videoing underage girls was illegal; and MIRASOL also stated that while the guests were taking a shower, he would enter the rooms and hide under the bed while recording them naked with his cellular device.

(A) the liability of the owner, master or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents[13]; or (B) <u>the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.</u>" (emphasis added).

39. At all times material hereto, Royal Caribbean's crewmember, Arvin Joseph Mirasol, acted intentionally when committing the sexual assault and/or sexual harassment of video voyeurism and child pornography aboard the Symphony of the Seas which inflicted emotional distress, mental suffering, and psychological injury on the Plaintiffs; as evidenced by the statements made by Mirasol which are part of the Federal criminal record[14] and are self-authenticating pursuant to the Federal Rules of Evidence, Rule 902.[15]

40. At all times material hereto, the vessel transported the Plaintiffs between a port in the United States (Fort Lauderdale, Florida) and a port in a foreign country.  The subject cruises all transported the Plaintiffs between Fort Lauderdale, Florida and foreign ports, as follows:

---

[13] 46 U.S.C. §30527(b)(1) provides that "Subsection (a) does not prohibit in a contract or in ticket conditions of carriage with a passenger <u>that relieves an owner</u>, master, manager, agent, operator, or crewmember of a vessel <u>from liability for infliction of emotional distress, mental suffering or psychological injury</u> <u>so long as the provision does not limit such liability when the emotional distress, mental suffering, or psychological injury is . . . (C) intentionally inflicted by a crewmember</u> or the owner, master, manager, agent or operator." (emphasis added).  Thus, subsection (b) would allow an owner to limit their liability by contract for infliction of emotional distress, mental suffering or psychological injury; <u>but does not allow an owner to contractually limit the right of a claimant for personal injury or death to a trial by court of competent jurisdiction</u>.  Further, subsection (b) does not allow an owner to contractually limit their liability for infliction of emotional distress, mental suffering or psychological injury if the emotional distress, mental suffering or psychological injury is intentionally inflicted by a crewmember.

Further, 46 U.S.C. §30527(b)(2) provides that "<u>This subsection does not limit the liability of a crewmember or the owner</u>, master, manager, agent, or operator of a vessel <u>in a case involving sexual harassment, sexual assault</u>, or rape."  Thus, subsection (b), in addition to not allowing an owner to contractually limit their liability for infliction of emotional distress, mental suffering or psychological injury if such was intentionally inflicted by a crewmember; also <u>does not allow an owner to contractually limit their liability in a case involving sexual harassment or sexual assault</u>.

[14] *See United States v. Mirasol*, Case No. 24-cr-60046-MD (S.D. Fla. June 5, 2024) [ECF No. 23].
[15] Id.  See also, ¶26 and FN13.

a. Symphony of the Seas, Southern Caribbean 9 day cruise itinerary, leaving Ft. Lauderdale, Florida on the following dates: December 2, 2023; December 16, 2023; January 13, 2024; January 27, 2024; February 10, 2024; February 24, 2024 – traveling to the following ports in a foreign country: Oranjestad, Aruba (day 4 of each cruise); Willemstad, Curacao (day 5 of each cruise); Labadee, Haiti (day 7 of each cruise).

b. Symphony of the Seas, Western Caribbean 7 day cruise itinerary: December 10, 2023, December 24, 2023, January 7, 2024; January 21, 2024; February 4, 2024; February 18, 2024 – traveling to the following ports in a foreign country: Labadee, Haiti (day 3 of each cruise); Falmouth, Jamaica (day 4 of each cruise); Nassau, Bahamas (day 6 of each cruise).

c. Symphony of the Seas, Eastern Caribbean 9 day cruise itinerary: December 30, 2023 – traveling to the following ports in a foreign country: Basseterre, St. Kitts (day 4 of cruise); Philipsburg, St. Maarten (day 5 of cruise); Labadee, Haiti (day 7 of cruise).

## CLASS ACTION ALLEGATIONS

41. The putative Class Representative is Plaintiff, JANE DOE (S.F.) ("Putative Class Representative").

42. At all times material hereto, the Putative Class Representative and Class Members herein, were passengers aboard Royal Caribbean's vessel, *Symphony of the Seas*, between December 1, 2023 and February 26, 2024 and who stayed in cabins aboard the vessel which were serviced by MIRASOL as Stateroom Attendant.

43. This action is brought by Plaintiffs on their own behalf, and by the Putative Class Representative on behalf of all others similarly situated, (the "Class Plaintiffs"), under the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

44. The class so represented by the Putative Class Representative in this action, and of which Plaintiffs are members, consists of passengers aboard Royal Caribbean's vessel, *Symphony of the Seas*, between December 1, 2023 and February 26, 2024 who stayed in cabins aboard the vessel which were serviced by MIRASOL as Stateroom Attendant, who were subjected to the sexual assault and sexual harassment by MIRASOL while he was employed by RCCL and a member of RCCL's crew, as outlined above.

45. This class of passengers reasonably believe that images of them undressed while engaging in private activities have been distributed in a manner to allow them to be able to be immediately reproduced and posted to the world wide web, including the dark web.  As a result of MIRASOL'S acts and the class of passengers' reasonable beliefs as a result of MIRASOL'S acts, the class of passengers suffer from severe emotional distress, which manifests physically, causing them physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact to the passengers.  The class of passengers reasonably believe that these images may never be completely discovered by them, not for lack of searching, but as a consequence of the vastness of the world wide web; it would be the digital equivalent of searching for specific shards of glass in the ocean.  And, if any members of the class found the images of themselves, they could neither permanently extract them from the world wide web, nor could they be sure that they found all of the images.  Accordingly, the members of the class live in constant fear, reasonably under the circumstances, that images of them undressed while engaging in private activities are regularly viewed by others and used for illicit purposes.

46. The exact number of members of the class is anticipated to be up to 960 passengers as described in paragraph 32. The class is so numerous that joinder at this anticipated amount of all members is impracticable. Thus, this action satisfies the requirements of Rule 23(a)(1).

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

47. There are common questions of law and fact that relate to and affect the rights of each member of the class and the relief sought is common to the entire class. The same misconduct on the part of Defendants, MIRASOL and RCCL, caused the same or similar injury to each class member.  All class members seek damages under Federal Law and U.S. General Maritime Law. Accordingly, this action satisfies the requirement of Rule 23(a)(2).

48. The claims of the Plaintiffs are typical of the claims of the class, in that the claims of all members of the class, including the named Plaintiffs, depend upon a virtually identical showing of the acts and omissions of Defendants, MIRASOL and RCCL, giving rise to the right of Plaintiffs to the relief sought herein. Defendants, MIRASOL and RCCL, were at all times material hereto engaged in the same conduct to the detriment of the entire class of Class Plaintiffs. Accordingly, this action satisfies the requirements of Rule 23(a)(3).

49. The Putative Class Representative is able to, and will, fairly and adequately protect the interests of the class. There is no conflict between the Putative Class Representative and other members of the class with respect to this action, or with respect to the claims for relief herein. The attorneys for the Putative Class Representative and the Plaintiffs, Lipcon, Margulies & Winkleman, P.A. are among the most experienced and capable in the field of maritime claims for cruise ship passenger injuries, including class actions, and have successfully represented claimants in other litigation relating to sexual assault and sexual harassment of cruise passengers by crewmembers. Three of the attorneys designated as counsel for Plaintiffs, Jason R. Margulies (who is Board Certified by the Florida Bar in Admiralty and Maritime Law), Michael A. Winkleman, and Jacqueline Garcell, will actively conduct and be responsible for the proposed class action herein. Further, proposed class co-counsel, The Moskowitz Law Firm, has decades of experience handling class action litigation.  Together, the proposed Class Co-Lead Counsel are among the most experienced and capable in the field of maritime claims for cruise ship passenger injuries and class

actions, and have successfully represented claimants in other litigation relating to sexual assault and sexual harassment of cruise passengers by crewmembers, have demonstrated a sound knowledge of the legal issues pertaining to Putative Class Representative's and the Class's claims against RCCL, and certainly have the collective financial wherewithal to capably prosecute these claims on a class-wide basis Accordingly, this action satisfies the requirement of Rule 23(a)(4).

50. This action is properly maintained as a class action under Rule 23(b)(3) inasmuch as questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.  In support of the foregoing, Class Plaintiffs allege that common issues predominate and can be determined on a class-wide basis regarding Defendant, MIRASOL's intentional torts against the Class Plaintiffs and RCCL's vicarious liability for MIRASOL's intentional torts against the Class Plaintiffs, as well as RCCL's failure to exercise reasonable care under the circumstances toward the Class Plaintiffs while aboard the vessel in connection with the threats of sexual assault and sexual harassment through video voyeurism of the Class Plaintiffs while in various states of undress and performing private intimate activities in the reasonably expected privacy of their cabin bathrooms aboard the vessel.

51. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because RCCL has failed to notify the individual Class Plaintiffs of MIRASOL's acts subsequent to RCCL's direct knowledge of MIRASOL's acts, arrest, and admission of the fact that MIRASOL engaged in these acts since December 2023 aboard the vessel in passenger cabins that he was assigned as Stateroom Attendant by RCCL.  Further, upon information and belief, RCCL is in sole and exclusive custody of the passenger manifests to show the identity and contact information of the passengers who were assigned to cabins serviced by MIRASOL aboard the vessel between December 2023 and February 26, 2024.  Thus, it is unlikely

- 24 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

that the vast majority of individual plaintiffs, having not been notified by RCCL, would discover the violations of their privacy, sexual harassment, and sexual assault; nor assume the burden and the cost of this complex litigation, and the Purported Class Representative and counsel is not aware of any significant numbers of class members who are interested in individually controlling the prosecution of a separate action. The interests of justice will be served by resolving the common disputes of the class members with Defendants, MIRASOL and RCCL, in a single forum, and individual actions by class members, many of whom are citizens and residents of different states would not be cost effective. The class consists of a finite and identifiable number of individuals which will make the matter manageable as a class action.

### COUNT I – INVASION OF PRIVACY BY VIDEO VOYEURISM AND SEXUAL ASSAULT AGAINST MIRASOL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

52. During the subject cruises, RCCL assigned Plaintiffs and all others similarly situated a passenger cabin during the subject cruise, which was a private quarter for the Plaintiffs' use.

53. During the subject cruise, MIRASOL intentionally and surreptitiously hid a camera in the cabin bathroom of the Plaintiffs and all others similarly situated assigned passenger cabin during the subject cruise, while working as a stateroom attendant, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

54. During the subject cruise, while Plaintiffs and all others similarly situated were taking a shower, MIRASOL entered the Plaintiffs' and all others similarly situated passenger cabin and hid under a bed and recorded Plaintiffs and all others similarly situated with his cellular device, for

the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

55. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were highly offensive to Plaintiffs and all others similarly situated and to reasonable persons.

56. As a direct and proximate result of the tortious actions of MIRASOL, the Plaintiffs and all others similarly situated were injured about Plaintiff's and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

**COUNT II – VICARIOUS STRICT LIABILITY FOR INVASION OF PRIVACY BY VIDEO VOYEURISM AND SEXUAL ASSAULT AGAINST RCCL**

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

LIPCON, MARGULIES & WINKLEMAN, P.A.

57. During the subject cruise, RCCL assigned Plaintiffs and all those similarly situated a passenger cabin during the subject cruise, which was a private quarter for the Plaintiffs and all others similarly situated use.

58. During the subject cruise, MIRASOL intentionally and surreptitiously hid a camera in the cabin bathroom of the Plaintiffs and all others similarly situated assigned passenger cabin during the subject cruise, while working as a stateroom attendant, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

59. During the subject cruise, while Plaintiffs and all others similarly situated were taking a shower, MIRASOL entered the Plaintiffs' passenger cabin and hid under a bed and recorded Plaintiffs and all others similarly situated with his cellular device, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

60. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were highly offensive to Plaintiff and all others similarly situated and to reasonable persons.

61. At all times material hereto, MIRASOL was hired, retained and/or employed by RCCL

62. At all times material hereto, MIRASOL was a member of the crew aboard the vessel owned and/or operated by RCCL.

63. At all times material hereto, RCCL was vicariously liable for the intentional tortious actions of its crewmembers/employees, including MIRASOL.

L I P C O N , M A R G U L I E S & W I N K L E M A N , P . A .

64. As a direct and proximate result of the tortious actions of MIRASOL, for which RCCL is vicariously liable, the Plaintiffs and all others similarly situated were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

### COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY VIDEO VOYEURISM AND SEXUAL ASSAULT AGAINST MIRASOL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

65. During the subject cruise, RCCL assigned Plaintiffs and all others similarly situated a passenger cabin during the subject cruise, which was a private quarter for the Plaintiffs' and all others similarly situated use.

66. During the subject cruise, MIRASOL intentionally and surreptitiously hid a camera in the cabin bathroom of the Plaintiffs and all others similarly situated assigned passenger cabin during the subject cruise, while working as a stateroom attendant, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

67. During the subject cruise, while Plaintiffs and all others similarly situated were taking a shower, MIRASOL entered the Plaintiffs' and all others similarly situated passenger cabin and hid under a bed and recorded Plaintiffs and all others similarly situated with his cellular device, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

68. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were extreme and outrageous.

69. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were committed intentionally and/or with a reckless disregard for the probability of causing Plaintiffs and all others similarly situated emotional distress.

70. MIRASOL'S intentional extreme and outrageous conduct toward Plaintiffs and all others similarly situated, once discovered by Plaintiffs and all others similarly situated, caused severe emotional distress to the Plaintiffs and all others similarly situated, which manifested itself physically, causing the Plaintiffs and all others similarly situated physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact to the Plaintiffs and all others similarly situated.

71. As a direct and proximate result of the intentional infliction of emotional distress by MIRASOL, the Plaintiffs and all others similarly situated were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs and all others similarly situated injuries, suffered handicap, lost earnings and lost earning

capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future. In addition, the Plaintiffs lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

## COUNT IV – VICARIOUS STRICT LIABILITY FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY VIDEO VOYEURISM AND SEXUAL ASSAULT AGAINST RCCL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

72. During the subject cruise, RCCL assigned Plaintiffs and all others similarly situated a passenger cabin during the subject cruise, which was a private quarter for the Plaintiffs and all others similarly situated use.

73. During the subject cruise, MIRASOL intentionally and surreptitiously hid a camera in the cabin bathroom of the Plaintiffs and all others similarly situated assigned passenger cabin during the subject cruise, while working as a stateroom attendant, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

74. During the subject cruise, while Plaintiffs and all others similarly situated were taking a shower, MIRASOL entered the Plaintiffs' and all others similarly situated passenger cabin and hid under a bed and recorded Plaintiffs and all others similarly situated with his cellular device, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

75. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were extreme and outrageous.

76. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were committed intentionally and/or with a reckless disregard for the probability of causing Plaintiffs and all others similarly situated emotional distress.

77. MIRASOL'S intentional extreme and outrageous conduct toward Plaintiffs and all others similarly situated, once discovered by Plaintiffs and all others similarly situated, caused severe emotional distress to the Plaintiffs and all others similarly situated, which manifested itself physically, causing the Plaintiffs and all others similarly situated physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact to the Plaintiffs and all others similarly situated.

78. At all times material hereto, MIRASOL was hired, retained and/or employed by RCCL

79. At all times material hereto, MIRASOL was a member of the crew aboard the vessel owned and/or operated by RCCL.

80. At all times material hereto, RCCL was vicariously liable for the intentional tortious actions of its crewmembers/employees, including MIRASOL.

81. As a direct and proximate result of the intentional infliction of emotional distress by MIRASOL, for which RCCL is vicariously liable, the Plaintiffs and all others similarly situated were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical

LIPCON, MARGULIES & WINKLEMAN, P.A.

expenses in the care and treatment of Plaintiffs' and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

## COUNT V – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY VIDEO VOYEURISM AND SEXUAL ASSAULT AGAINST MIRASOL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

82. During the subject cruise, RCCL assigned Plaintiffs and all others similarly situated a passenger cabin during the subject cruise, which was a private quarter for the Plaintiffs and all others similarly situated use.

83. During the subject cruise, MIRASOL intentionally and surreptitiously hid a camera in the cabin bathroom of the Plaintiffs' assigned passenger cabin during the subject cruise, while working as a stateroom attendant, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

84. During the subject cruise, while Plaintiffs and all others similarly situated were taking a shower, MIRASOL entered the Plaintiffs' and all others similarly situated passenger cabin and hid under a bed and recorded Plaintiffs and all others similarly situated with his cellular device, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and

engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

85. At all times material hereto, MIRASOL'S intrusions into Plaintiffs and all others similarly situated privacy were committed negligently and/or with a failure to exercise reasonable care for the Plaintiffs and all others similarly situated.

86. MIRASOL'S aforementioned acts, once discovered by Plaintiffs and all others similarly situated, caused severe emotional distress to the Plaintiffs and all others similarly situated, which manifested itself physically, causing the Plaintiffs and all others similarly situated physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact to the Plaintiffs and all others similarly situated.

87. As a direct and proximate result of the negligent infliction of emotional distress by MIRASOL, the Plaintiffs and all others similarly situated was injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

**COUNT VI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY VIDEO VOYEURISM AND SEXUAL ASSAULT AGAINST RCCL**

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

88. During the subject cruise, RCCL assigned Plaintiffs and all others similarly situated a passenger cabin during the subject cruise, which was a private quarter for the Plaintiffs and all others similarly situated use.

89. During the subject cruise, MIRASOL negligently intentionally and surreptitiously hid a camera in the cabin bathroom of the Plaintiffs' and all others similarly situated assigned passenger cabin during the subject cruise, while working as a stateroom attendant, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

90. During the subject cruise, while Plaintiffs and all others similarly situated were taking a shower, MIRASOL entered the Plaintiffs' passenger cabin and hid under a bed and recorded Plaintiffs and all others similarly situated with his cellular device, for the purpose of capturing images of the Plaintiffs and all others similarly situated undressed and engaging in private activities in the cabin bathroom, for his own use and/or to distribute and upload to the world wide web.

91. At all times material hereto, MIRASOL'S intrusions into Plaintiffs' and all others similarly situated privacy were committed negligently and/or with a failure to exercise reasonable care for the Plaintiffs and all others similarly situated.

92. MIRASOL'S aforementioned acts, once discovered by Plaintiffs and all others similarly situated, caused severe emotional distress to the Plaintiffs and all others similarly situated, which

manifested itself physically, causing the Plaintiffs and all others similarly situated physical sickness, sweating, nausea, insomnia, dizziness, crying, and physical pain, thereby causing physical impact to the Plaintiffs and all others similarly situated.

93. At all times material hereto, MIRASOL was hired, retained and/or employed by RCCL

94. At all times material hereto, MIRASOL was a member of the crew aboard the vessel owned and/or operated by RCCL.

95. At all times material hereto, RCCL acted negligently and its negligence permitted MIRASOL to perform the aforementioned acts, through RCCL's failure to:

a. Adequately vet and investigate MIRASOL before hiring MIRASOL;

b. Adequately train MIRASOL;

c. Adequately supervise MIRASOL;

d. Adequately inspect Plaintiffs' and all others similarly situated cabins;

e. Adequately inspect and screen for cameras and other electronic devices which may be mounted to walls and/or fixtures and used to surreptitiously capture images of passengers without their prior knowledge and consent;

f. Utilize a hidden camera detector[16] to search passenger cabins;

g. Make hidden camera detectors available to passengers to search passenger cabins after warning passengers of RCCL's prior incident(s) involving sexual assaults, including hidden cameras;

h. Provide adequate security aboard the vessel;

i. Adequately train security aboard the vessel;

---

[16] Hidden camera detectors are readily available commercially and can cost less than Fifty Dollars. See, e.g. https://www.amazon.com/RAVIAD-Detectors-Listening-Electronic-Sensitivity/dp/B0DHTRJFZ1?th=1

LIPCON, MARGULIES & WINKLEMAN, P.A.

j. Promulgate and enforce adequate policies and procedures to prevent video voyeurism aboard the vessel;

k. Promulgate and enforce adequate policies and procedures to inspect passenger cabins for hidden cameras, as both a preventative measure to deter the placement of hidden cameras in passenger cabins; as well as a protective measure to discover hidden cameras placed in passenger cabins;

l. Promulgate and enforce adequate policies and procedures to inspect crew cabins for contraband, including cameras which can be hidden in passenger cabins and illicit digital images on digital media and memory physically located in crew cabins;

m. Promulgate and enforce adequate policies and procedures with regard to conducting adequate interviews, assessments, background checks, peer reviews, investigations, confirmation of recommendations, and other enhanced vetting of employee crewmembers with direct access to passenger cabins.

96. As a direct and proximate result of the negligent infliction of emotional distress by RCCL, the Plaintiffs and all others similarly situated was injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiff's and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiff and all others similarly situated will suffer the losses and impairments in the future. In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

## COUNT VII – NEGLIGENT SECURITY AGAINST RCCL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

97. At all times material hereto, it was the duty of RCCL to provide the Plaintiffs and all others similarly situated with reasonable care under the circumstances while Plaintiffs and all others similarly situated were passengers aboard the vessel.

98. At all times material hereto, it was the duty of RCCL to provide reasonable security and/or implement reasonable security measures aboard the vessel.

99. At all times material hereto, RCCL voluntarily undertook and/or assumed the duty of security by retaining crewmembers to serve as security officers about the vessel and/or advertising its onboard security. For instance, as the Eleventh Circuit recognized in the case of *K.T.*, Defendant "assures all who are thinking of sailing with it that 'the safety and security of our guests and crew is our highest priority and fundamental to our operations.'[17] It boasts that it 'is committed to preventing illegal activity,' and '[d]uring each voyage, we remain dedicated to safeguarding our guests and crew.'[18] And it promises that the ship's Captain 'will take appropriate action to ensure the safety, security and wellbeing of our guests.'"[19] *K.T.*, 931 F.3d at 1047.

---

[17] *Safety & Security*, Royal Caribbean Cruises, https://www.royalcaribbean.com/resources/safety-and-security (last visited July 27, 2020).

[18] Id.

[19] *Royal Caribbean Guest Conduct Policy*, Royal Caribbean Cruises, https://www.royalcaribbean.com/content/dam/royal/resources/pdf/guest-conduct-policy.pdf (last updated Nov. 12, 2018).

- 37 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

100.     During the subject cruise, RCCL and/or its agents, servants and/or employees breached its duty to the Plaintiffs and all others similarly situated through its failure to:

a. Provide adequate supervision and/or security aboard the vessel, including, but not limited to, supervising stateroom attendants and/or inspecting passenger cabins for hidden cameras;

b. Provide adequate supervision and/or security to protect passengers aboard the vessel;

c. Provide adequate supervision and/or security presence aboard the vessel and/or perform random surprise inspections of passenger cabins following stateroom attendants' work in passenger cabins, so as to deter video voyeurism aboard the vessel;

d. Adequately supervise individuals working aboard the vessel to ensure they do not engage in video voyeurism aboard the vessel;

e. Adequately inspect crew cabins aboard the vessel for contraband, including cameras, which can be hidden in passenger cabins and illicit digital images on digital media and memory physically located in crew cabins;

f. Utilize a hidden camera detector to search passenger cabins;

g. Make hidden camera detectors available to passengers to search passenger cabins after warning passengers of RCCL's prior incident(s) involving sexual assaults, including hidden cameras;

h. Maintain and/or monitor security cameras on the vessel in order to identify potentially dangerous situations, incidents, and/or contraband being brought into passenger cabins, such as a camera which can be mounted to a wall or fixture;

i. Promulgate and enforce adequate policies and procedures to prevent video voyeurism aboard the vessel;

LIPCON, MARGULIES & WINKLEMAN, P.A.

j.  Promulgate and enforce adequate policies and procedures to inspect passenger cabins for hidden cameras, as both a preventative measure to deter the placement of hidden cameras in passenger cabins; as well as a protective measure to discover hidden cameras placed in passenger cabins;

k.  Promulgate and enforce adequate policies and procedures to inspect crew cabins for contraband, including cameras which can be hidden in passenger cabins and illicit digital images on digital media and memory physically located in crew cabins;

l.  Promulgate and enforce adequate policies and procedures with regard to conducting adequate interviews, assessments, background checks, peer reviews, investigations, confirmation of recommendations, and other enhanced vetting of employee crewmembers with direct access to passenger cabins;

m.  Failure to have adequate security aboard the vessel in terms of numbers and/or training and/or experience;

n.  Failure to adequately train security;

o.  Failure to adequately supervise security.

101.    The above acts and/or omissions caused and/or contributed to the subject incident because, had RCCL provided reasonable security and/or implemented reasonable security measures consistent with the foregoing, MIRASOL would not have been able to engage in an ongoing scheme to hide cameras in the cabin bathrooms of the passenger cabins for which he served as a stateroom attendant for months, including the Plaintiffs and all others similarly situated cabins on the subject cruises.

102.    At all times material hereto, RCCL knew or should have known of the foregoing conditions and conduct resulting in the subject video voyeurism of the Plaintiffs and all others

- 39 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

similarly situated and did not correct them, or the conditions and conduct existed for a sufficient length of time so that RCCL, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them. This knowledge was or should have been acquired through prior incidents of sexual assault and video voyeurism aboard RCCL's cruise ships, which did or should have revealed that further instances of sexual assault, including video voyeurism, was reasonably foreseeable, including, but not limited to, the allegations contained in paragraphs 19-23. In addition, RCCL was on notice and/or created the dangerous conditions by the lack of warnings and/or supervision and/or security and/or training.

103. As a direct and proximate result of RCCL's negligence, the Plaintiffs and all others similarly situated were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future. In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruise.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

## COUNT VIII – GENERAL NEGLIGENCE AGAINST RCCL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

104.     At all times material hereto, it was the duty of RCCL to provide the Plaintiffs and all others similarly situated with reasonable care under the circumstances while Plaintiffs and all others similarly situated were passengers aboard the vessel.

105.     During the subject cruise, Defendant, its agents and/or employees, breached its duty to exercise reasonable care, through its failure to:

a.  Provide reasonably safe conditions for the Plaintiffs and all others similarly situated during the voyage aboard the vessel (reasonably safe conditions include, but are not limited to, preventing an atmosphere wherein persons could target and/or sexually assault passengers, including but not limited to, hiding cameras in passenger staterooms);

b.  Promulgate and/or enforce adequate policies and/or procedures designed to prevent individuals working aboard the vessel from being able to bring cameras into passenger staterooms so that they can be hidden;

c.  Adequately train individuals working aboard the vessel;

d.  Adequately supervise individuals working aboard the vessel;

e.  Implement and/or enforce an adequate safety management system (SMS);

f.  Advise and warn passengers of the need to inspect their passenger cabins for hidden cameras;

g.  Utilize a hidden camera detector to search passenger cabins;

h.  Make hidden camera detectors available to passengers to search passenger cabins after warning passengers of RCCL prior incident(s) involving sexual assault, including hidden camera;

LIPCON, MARGULIES & WINKLEMAN, P.A.

i.   Adequately interview, assess, conduct background checks, obtain peer reviews, investigate, confirm recommendations, and conduct other enhanced vetting of employee crewmembers with direct access to passenger cabins;

j.   Promulgate and enforce adequate policies and procedures to interview, assess, conduct background checks, obtain peer reviews, investigate, confirm recommendations, and conduct other enhanced vetting of employee crewmembers with direct access to passenger cabins.

106.   The above acts and/or omissions caused and/or contributed to the subject incident because, had RCCL not failed to provide the foregoing, MIRASOL would not have been able to engage in an ongoing scheme to hide cameras in the cabin bathrooms of the passenger cabins for which he served as a stateroom attendant for months, including the Plaintiffs' and all others similarly situated cabins on the subject cruises.

107.   At all times material hereto, RCCL knew or should have known of the foregoing conditions and conduct resulting in the subject video voyeurism of the Plaintiffs and all others similarly situated and did not correct them, or the conditions and conduct existed for a sufficient length of time so that RCCL, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through prior incidents of sexual assault and video voyeurism aboard RCCL's cruise ships, which did or should have revealed that further instances of sexual assault, including video voyeurism, was reasonably foreseeable, including, but not limited to, the allegations contained in paragraphs 19-23.  In addition, RCCL was on notice and/or created the dangerous conditions by the lack of warnings and/or supervision and/or security and/or training.

LIPCON, MARGULIES & WINKLEMAN, P.A.

108.     As a direct and proximate result of RCCL's negligence, the Plaintiffs and the Class Plaintiffs were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruises.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

### COUNT IX – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST RCCL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

109.     At all times material hereto, RCCL and the Plaintiffs and all others similarly situated were parties to a passenger ticket contract, written by RCCL.

110.     The passenger ticket contract between RCCL and the Plaintiffs and all others similarly situated, contains an implied covenant of good faith and fair dealing.

111.     The passenger ticket contract between RCCL and the Plaintiffs refers to and incorporates RCCL's Guest Health, Safety, and Conduct Policy, and Carrier's "policies against fraternization with crew."

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

112.     RCCL's Guest Health, Safety, and Conduct Policy provides "Our crew members are friendly, outgoing and helpful, and they will do their very best to make a guest's vacation as enjoyable as possible.  Please do not misinterpret their friendliness.  Crew members are prohibited from engaging in physical relationships with guests.  Crew members are not permitted to socialize with guests beyond their professional duties, <u>and are not permitted to be in guest staterooms, except for the performance of their shipboard duties</u>." (emphasis added).

113.     At all times material hereto, Plaintiffs and all others similarly situated had performed all necessary prerequisites under the passenger ticket contract between RCCL and the Plaintiffs and all others similarly situated.

114.     On or about February 26, 2024, RCCL learned that MIRASOL had been hiding cameras in the passenger cabin bathrooms of the passenger cabins he was assigned to serve as Stateroom Attendant and committed acts of sexual assault through video voyeurism and hiding under beds in the passenger cabins he was assigned to serve as Stateroom Attendant to capture video and images of passengers showering.

115.     Shortly after February 26, 2024, RCCL knew or should have known that MIRASOL had been hiding cameras in the passenger cabin bathrooms of the passenger cabins he was assigned to serve as Stateroom Attendant and was committing acts of sexual assault through video voyeurism and hiding under beds in the passenger cabins he was assigned to serve as Stateroom Attendant to capture video and images of passengers showering, since he started working on the Vessel in December 2023.

116.     Upon learning of MIRASOL'S acts of sexual assault through video voyeurism on passengers in the staterooms he attended to as a stateroom attendant since December 1, 2023, RCCL had a duty, pursuant to the implied covenant of good faith and fair dealing within the

passenger ticket contract between RCCL and Plaintiffs and all others similarly situated, to inform all passengers who stayed in passenger cabins attended to by MIRASOL between December 1, 2023 and February 26, 2024 that they were potential victims of MIRASOL's sexual assault through video voyeurism and MIRASOL hiding under beds in passenger cabins to capture video and images of passengers showering.

117.    RCCL breached the implied covenant of good faith and fair dealing in its passenger ticket contract between RCCL and Plaintiffs and all others similarly situated, by failing to notify all passengers in the staterooms MIRASOL attended to as a stateroom attendant from December 2023 through February 26, 2024.

118.    RCCL's motive for failing to notify its passengers affected by MIRASOL'S acts was financial in nature.  RCCL was concealing the information from its passengers in order to prevent them from filing a civil suit against RCCL for damages related to MIRASOL'S acts.

a.  Notably, RCCL provides a contractually-shortened notice period of six months and statute of limitations of one year (as opposed to the Federal Statute of Limitations for Maritime Personal Injury of 3 years pursuant to 46 U.S.C. §30106).

119.    RCCL's conduct in failing to notify its passengers affected by MIRASOL's acts was not consistent with the Plaintiffs' and those similarly situated reasonable expectations under the passenger ticket contract and RCCL's Guest Health, Safety, and Conduct Policy, and Carrier's "policies against fraternization with crew."

120.    As a direct and proximate result of RCCL's breach of the implied covenant of good faith and fair dealing in the passenger ticket contract between RCCL and the Plaintiffs and those similarly situated, the Plaintiffs and all others similarly situated did not discover their injuries in time to provide notice to RCCL and file suit against RCCL and MIRASOL within the

contractually-shortened time limits provided by RCCL; and they were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruises.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.


## COUNT X – NEGLIGENT HIRING AND RETENTION AGAINST RCCL

The Plaintiffs reallege, incorporate by reference, and adopt the allegations set forth in paragraphs one (1) through fifty-one (51) as though alleged originally herein.

121.    At all times material hereto, it was the duty of RCCL to provide the Plaintiffs and all others similarly situated with reasonable care under the circumstances while Plaintiffs and all others similarly situated were passengers aboard the vessel; including exercising reasonable care in the hiring and retention of its crewmembers.

122.    During the subject cruise, Defendant, its agents and/or employees, breached its duty to exercise reasonable care in the hiring and retention of crewmember, Arvin Mirasol, through its failure to:

a. Adequately interview, assess, conduct background checks, obtain peer reviews, investigate, confirm recommendations, and conduct other enhanced vetting of Arvin Mirasol before providing him with direct access to passenger cabins;

b. Promulgate and enforce adequate policies and procedures to interview, assess, conduct background checks, obtain peer reviews, investigate, confirm recommendations, and conduct other enhanced vetting Arvin Mirasol before providing him with with direct access to passenger cabins;

c. Adequately supervise and regularly and frequently review the work of Arvin Mirasol during his employment with RCCL;

d. Adequately inspect passenger cabins within the group assigned to Arvin Mirasol after they had been entered by Arvin Mirasol so as to determine whether Arvin Mirasol was performing his work duties in a manner that was reasonably adequate and to ensure the reasonable safety and privacy of RCCL's passengers assigned to those passenger cabins;

e. Failing to timely discover MIRASOL's activities of video voyeurism and child pornography, which are sexual assaults and sexual harassments of RCCL passengers, during MIRASOL's employment with RCCL;

f. Failing to timely terminate MIRASOL from employment of RCCL;

g. Failing to timely terminate MIRASOL's access to private passenger cabins aboard the vessel;

h. Retaining MIRASOL aboard the vessel after RCCL should have discovered MIRASOL's activities of video voyeurism and child pornography, which are sexual assaults and sexual harassments of RCCL passengers.

LIPCON, MARGULIES & WINKLEMAN, P.A.

123.    The above acts and/or omissions caused and/or contributed to the subject incident because, had RCCL not failed to provide the foregoing, MIRASOL would not have been able to engage in an ongoing scheme to hide cameras in the cabin bathrooms of the passenger cabins for which he served as a stateroom attendant for months, including the Plaintiffs' and all others similarly situated cabins on the subject cruises.

124.    At all times material hereto, RCCL knew or should have known of the foregoing conditions and conduct resulting in the subject video voyeurism of the Plaintiffs and all others similarly situated and did not correct them, or the conditions and conduct existed for a sufficient length of time so that RCCL, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through prior incidents of sexual assault and video voyeurism aboard RCCL's cruise ships, which did or should have revealed that further instances of sexual assault, including video voyeurism, was reasonably foreseeable, including, but not limited to, the allegations contained in paragraphs 19-23.  In addition, RCCL was on notice and/or created the dangerous conditions by the lack of warnings and/or supervision and/or security and/or training.

125.    As a direct and proximate result of RCCL's negligence, the Plaintiffs and the Class Plaintiffs were injured about Plaintiffs' and all others similarly situated bodies, suffered physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiffs' and all others similarly situated injuries, suffered handicap, lost earnings and lost earning capacity, both past and future. The injuries are permanent and continuing in nature and Plaintiffs and all others similarly situated will suffer the

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

losses and impairments in the future.  In addition, the Plaintiffs and all others similarly situated lost related costs and damages incident to their cruises.

WHEREFORE, the Plaintiffs and all others similarly situated demand judgment for all damages recoverable under the law, including punitive damages, and demand trial by jury.

Respectfully submitted,

LIPCON, MARGULIES,
& WINKLEMAN, P.A.
*Attorneys for Individual Plaintiffs and Proposed Co-Lead Counsel for Class Plaintiffs*
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

And

THE MOSKOWITZ LAW FIRM, PLLC
*Proposed Co-Lead Counsel for Class Plaintiffs*
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
Mailing Address:
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423

By: */s/ Adam M. Moskowitz*
    **JASON R. MARGULIES** (FBN 57916)
    jmargulies@lipcon.com
    **MICHAEL A. WINKLEMAN** (FBN 36719)
    mwinkleman@lipcon.com
    **JACQUELINE GARCELL** (FBN 104358)
    jgarcell@lipcon.com
    **ADAM M. MOSKOWITZ** (FBN 984280)
    adam@moskowitz-law.com
    **JOSEPH M. KAYE** (FBN 117520)
    joseph@moskowitz-law.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 28, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

By: */s/ Adam M. Moskowitz*
**ADAM M. MOSKOWITZ**

[ SERVICE LIST ON THE FOLLOWING PAGE ]

## SERVICE LIST
*Jane Doe (S.F.), et al. v. Royal Caribbean Cruises Ltd., et al.*
**Case No. 24-CV-23953-DPG**

**Jason R. Margulies, Esq.**
jmargulies@lipcon.com
**Michael A. Winkleman, Esq.**
mwinkleman@lipcon.com
**Jacqueline Garcell, Esq.**
jgarcell@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

**Adam M. Moskowitz, Esq.**
adam@moskowitz-law.com
**Joseph M. Kaye, Esq.**
joseph@moskowitz-law.com
THE MOSKOWITZ LAW FIRM, PLLC
3250 Mary Street, Suite 202
Coconut Grove, Florida 33133
Telephone: (305) 740-1423
*Attorneys for Plaintiffs*

**Jerry D. Hamilton, Esq.**
jhamilton@hamiltonmillerlaw.com
**Krista Fowler Acuna, Esq.**
kacuna@hamiltonmillerlaw.com
**Kassandra Doyle Taylor, Esq.**
ktaylor@hamiltonmillerlaw.com
HAMILTON MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 379-3686
Facsimile: (305) 379-3690

**Hayley H. Ryan, Esq.**
COZEN O'CONNOR
200 S. Biscayne Boulevard, Suite 3000
Miami, Florida 33132
hryan@cozen.com
Telephone: (305) 397-0801
*Attorneys for Defendant, Royal Caribbean*

**Arvin Joseph Mirasol**
Inmate Number: 02507-511
FDC Miami, Federal Detention Center
P.O. Box 019120
Miami, FL 33101
(Via U.S. Mail)
*Defendant*

# Appendix E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-CV-23953-DPG/DSW

JANE DOE (S.F.), et al.,

     Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES, LTD., and
ARVIN JOSEPH MIRASOL,

     Defendants.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT ROYAL CARIBBEAN CRUISES, LTD.'S OMNIBUS MOTION TO STAY LITIGATION AND COMPEL ARBITRATION

**THIS CAUSE** is before the Court on the Omnibus Motion to Stay Litigation and Compel

Arbitration ("Motion"), [ECF No. 57], filed by Defendant Royal Caribbean Cruises, Ltd. ("Royal

Caribbean") in eleven related cases.[1] The Honorable Darrin P. Gayles, United States District

---

[1] While Royal Caribbean's Motion and Plaintiffs' Opposition are both consolidated filings, the Court's Report and Recommendation for the above-captioned case is not. On January 14, 2025, the Court issued an Order staying all deadlines pending the resolution of Royal Caribbean's forthcoming Consolidated Motion to Stay Litigation and Compel Arbitration and requiring Plaintiffs to file their consolidated response to the Motion to Compel by or before April 28, 2025. *See* [ECF No. 42]. Pursuant to this Order, Royal Caribbean filed its Consolidated Motion to Stay Litigation and Compel Arbitration against plaintiffs from eleven different cases, with the above-captioned case designated as the lead case. The cases include 1) *Doe (S.F.) et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-23953-DPG; 2) *Doe v. Royal Caribbean Cruises, Ltd., et al.*, No. 24-cv-24039-DPG; 3) *C.B. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-25089-DPG; 4) *D.M. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-24988-DPG; 5) *K.T. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24193-DPG; 6) *J.L.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24139-DPG; 7) *M.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24738-DPG; 8) *T.L. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-25009-DPG; 9) *V.V. v. Royal Caribbean Cruises Ltd. et al.*, No. 25-cv-20051-DPG; 10) *Doe v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20138- DPG; and 11) *Doe et al. v. Royal Caribbean Cruises, Ltd.*, No. 25- cv-20485-DPG. *See* [ECF No. 57] n.1. Plaintiffs then filed their Consolidated Response on behalf of Plaintiffs from the same eleven cases against which Royal Caribbean

1

Judge, referred this Motion to the undersigned for a Report and Recommendation. [ECF No. 71].

Upon review of the Motion, Plaintiffs' Response, [ECF No. 61], Royal Caribbean's Reply, [ECF

No. 63], Plaintiffs' Notices of Supplemental Authority, [ECF Nos. 65, 66, 69], Royal Caribbean's

Responses to Plaintiffs' Notices of Supplemental Authority, [ECF Nos. 67, 68, 70], and argument

of counsel at the October 27, 2025 hearing, the undersigned respectfully recommends that the

Motion be **DENIED** for the reasons outlined below.[2]

## I.      BACKGROUND

This is a case involving video voyeurism committed by Defendant Arvin Mirasol

("Mirasol"), who was a stateroom attendant aboard Defendant Royal Caribbean's ship, *Symphony*

*of the Seas*, for twelve cruises between December 2023 and February 2024. [ECF No. 95 ¶¶ 9, 11,

28–29]. Mirasol was the assigned stateroom attendant for Plaintiffs during their Royal Caribbean

cruises on the *Symphony of the Seas*. *Id.* ¶ 13.  Over the course of those twelve cruises, without

their knowledge or consent, Mirasol placed hidden cameras in Plaintiffs' cabin bathrooms and

captured videos of Plaintiffs, including minor children, while undressed and engaging in private

activities. *Id.* ¶¶ 15, 26. After retrieving the video recordings from the staterooms, Mirasol would

"pleasure himself and masturbate" while viewing the videos. *Id.* ¶ 27. Mirasol also entered

staterooms and hid under the bed to record guests with his cellular device while they were naked

---

brought its Motion. *See* [ECF No. 61] n.1 (citing [ECF No. 57] n.1). The eleven cases themselves have not been consolidated into one case. Therefore, the Court must analyze the facts and claims of the eleven complaints separately, and the Court will issue separate Reports and Recommendations for each case accordingly. This Report and Recommendation will address the facts alleged in the Sixth Amended Complaint of the above-captioned lead case.

2      Royal Caribbean asserts an argument that the Chilean and Canadian Plaintiffs' claims should be dismissed. [ECF No. 57 at 36]. Because the Chilean and Canadian Plaintiffs are not plaintiffs listed in the Sixth Amended Complaint for the above-captioned lead case, the Court will not address this argument in this Report and Recommendation.

in the shower. *Id.* On February 26, 2024, Mirasol's hidden camera was discovered in the cabin bathroom of one of the Plaintiffs.   *Id.* ¶ 24.

Plaintiffs later learned that Mirasol had placed hidden cameras in their respective cabin bathrooms and had taken video recordings. *Id.* ¶¶ 28(l); 40(b).  Plaintiffs claim that they suffered emotional distress with physical pain, mental anguish, loss of enjoyment of life, post-traumatic stress disorder, and other mental and/or nervous disorders when they learned of Mirasol's conduct. *Id.* ¶¶ 56, 64, 71, 81, 87, 96, 103, 108, 120, 125. Plaintiffs bring claims for Invasion of Privacy by Video Voyeurism and Sexual Assault against Mirasol (Count I), Vicarious Strict Liability for Invasion of Privacy by Video Voyeurism and Sexual Assault against Royal Caribbean (Count II), Intentional Infliction of Emotional Distress by Video Voyeurism and Sexual Assault against Mirasol (Count III), Vicarious Strict Liability for Intentional Infliction of Emotional Distress by Video Voyeurism and Sexual Assault against Royal Caribbean (Count IV), Negligent Infliction of Emotional Distress by Video Voyeurism and Sexual Assault against Mirasol and Royal Caribbean (Counts V and VI), Negligent Security against Royal Caribbean (Count VII), General Negligence against Royal Caribbean (Count VIII), Breach of Implied Covenant of Good Faith and Fair Dealing against Royal Caribbean (Count IX), and Negligent Hiring and Retention against Royal Caribbean (Count X). *See generally* [ECF No. 95].

Royal Caribbean moves to compel arbitration and stay litigation pursuant to the arbitration provision in Royal Caribbean's ticket contract ("Contract"). *See generally* [ECF No. 57]. The Contract requires arbitration of "claims for mental or emotional distress or injury not arising out of bodily injury." *Id.* at 17. The arbitration provision in the Contract also provides that "any dispute or claim between you and us must be arbitrated" and that the "agreement to arbitrate is intended to be broadly interpreted." *See id.* at 16. The arbitration provision "includes, but is not limited to,"

"claims arising out of or relating to this Agreement and/or the Cruise . . . or any other aspect of the relationship between you and us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory." *Id*. at 16–17.

Plaintiffs do not dispute the validity of the Contract, nor do they claim that Defendant has waived its right to arbitrate. Plaintiffs contend, however, that both the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. §§ 401–02, and 46 U.S.C. § 30527 ("Maritime Statute") preclude the Court from enforcing the arbitration provision. *See* [ECF No. 61]. Royal Caribbean contends that Mirasol's video voyeurism and self-masturbation without any physical contact with Plaintiffs does not qualify as a "sexual assault dispute" or a "sexual harassment dispute" under the EFAA.  Royal Caribbean also contends that because Plaintiff's alleged mental and emotional distress injuries do not arise from physical or bodily injury, the Contract's arbitration provision is not void under the Maritime Statute.  *See* [ECF No. 57 at 29–30]; *see generally* [ECF No. 63].

## II.        LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.*, reflects a liberal "policy favoring arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022). "[A]ny doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Doe v. Princess Cruise Lines, Ltd*., 657 F.3d 1204, 1213 (11th Cir. 2011). "In determining whether to compel arbitration, the Court considers three factors: (1) whether a valid written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate was waived." *Hilton v. Fluent, LLC*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018). "[T]he party resisting

arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Griggs v. Kenworth of Montgomery, Inc.,* 775 F. App'x 608, 612 (11th Cir. 2019).

The EFAA bars mandatory arbitration of cases that (1) "allege[] conduct constituting a sexual assault or sexual harassment dispute," (2) are "filed under Federal, Tribal, or State law," and (3) "relate[ ] to the sexual assault or sexual harassment dispute." *Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d 1371, 1380 (S.D. Fla. 2025) (citing 9 U.S.C. § 402(a)). The EFAA provides that its "applicability to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator." 9 U.S.C. § 402(b).  The threshold question of arbitrability under the EFAA is reserved for the Court. *See Yost v. Everyrealm*, 657 F. Supp. 3d 563 (S.D.N.Y. 2023) (citing 9 U.S.C. § 402(b)).

The Maritime Statute prohibits the owner of a vessel from "includ[ing] in a regulation or contract a provision limiting . . . the right of a claimant for personal injury or death to a trial by court of competent jurisdiction." 46 U.S.C. § 30527(a)(1)(B).

### III.   DISCUSSION

Royal Caribbean asserts that this Court must compel arbitration because Plaintiffs concede they signed the Contract, that it contains an arbitration provision, and that Royal Caribbean has not waived arbitration. [Reply at 1]. Plaintiffs, however, contend that their claims are not arbitrable because the Contract's arbitration provision is not enforceable under the EFAA and the Maritime Statute. [ECF No. 61 at 10–17]. Royal Caribbean, on the other hand, insists that Plaintiffs cannot rely on the EFAA or the Maritime Statute to avoid arbitration under the Contract. This Court must decide whether the EFAA and/or the Maritime Statute apply here and, if so, whether they bar mandatory arbitration of some or all of Plaintiffs' claims.

**A. The Applicability of the Ending Forced Arbitration Act**

Under the EFAA, in cases involving sexual assault and sexual harassment disputes, otherwise valid arbitration agreements are rendered unenforceable upon the plaintiff's election. 9 U.S.C. §§ 401–02.  In 2022, Congress amended the FAA by adopting the EFAA, which provides:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, …no predispute arbitration agreement … shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the ***sexual assault dispute or sexual harassment dispute***.

9 U.S.C. § 402(a)(emphasis added); *see also Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 530 (S.D.N.Y. 2024) (explaining that the effect of the EFAA is to amend the FAA).

 Plaintiffs frame their case as a "sexual assault dispute." *See* [ECF No. 61 at 13–14].  The EFAA defines the term "sexual assault dispute" as "a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent."  9 U.S.C. § 401(3).  Thus, with respect to a sexual assault dispute, under the EFAA, "no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal or State law and relates to . . . a dispute involving a nonconsensual sexual act or sexual contact as defined in [18 U.S.C. § 2246] or similar applicable Tribal or State law." *Doe (J.K.)*, 792 F. Supp. 3d at 1378 (alteration in original) (citing 9 U.S.C. §§ 402(a); 401(3)).

**1.  Plaintiffs Have Sufficiently Alleged a Sexual Assault Dispute Under the EFAA**

To invoke the EFAA for a sexual assault dispute, Plaintiffs must allege conduct constituting a nonconsensual "sexual act" or "sexual contact" under 18 U.S.C. § 2246.  Plaintiffs do not allege that Mirasol engaged in conduct that falls under the definition of "sexual act" under § 2246(2)(D), which requires specific types of contact, touching, or penetration between the

genitalia of another, which is not applicable here.  This Court must determine if Plaintiffs have sufficiently alleged that Mirasol engaged in conduct constituting "sexual contact, under § 2246(3), which is defined as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of *any* person." *See* § 2246(3) (emphasis added).

Royal Caribbean argues that Mirasol's conduct in masturbating while watching Plaintiffs on video falls short of "sexual contact" under § 2246(3) because Plaintiffs did not allege that Mirasol touched the private areas of Plaintiffs.  [ECF No. 57 at 33].  Under Royal Caribbean's interpretation of the EFAA, absent physical contact between Plaintiffs and Mirasol, the EFAA does not apply. *See id*. at 33–34.  Contrary to Royal Caribbean's position, multiple circuits, including the Eleventh Circuit, have held that masturbation—self pleasuring without contact with another person—qualifies as "sexual contact" under § 2246(3). *See U.S. v. Aldrich*, 566 F.3d 976, 979 (11th Cir. 2009) (holding that Congress's use of the phrase "any person" indicates that "sexual contact" under § 2246(3) includes masturbation); *U.S. v. Butler*, 65 F.4th 199, 203 (5th Cir. 2023) ("The plain meaning of 'sexual contact' includes masturbation because that act necessarily entails the 'intentional touching ... of the genitalia . . . of *any* person with an intent to . . . arouse or gratify the sexual desire of *any* person.'" (emphasis in original)); *U.S. v. Raiburn*, 20 F.4th 416, 422 (8th Cir. 2021) (holding that the plain meaning of "sexual contact" under 18 U.S.C. § 2246(3) includes the act of masturbating); *U.S. v. Pawlowski*, 682 F.3d 205, 212 (3d Cir. 2012) (finding that "sexual contact" includes masturbation because "the language of the statute is unambiguous: it is clear that 'of any person' includes a defendant himself and does not require the touching of the victim"); *U.S. v. Skinner*, 70 F.4th 219, 230 (4th Cir. 2023) (holding that the term "sexual contact" covers

masturbation because "'the intentional touching . . . of *any* person' is broad enough to cover a defendant's self-touching" (emphasis in original)); *U.S. v. Shafer*, 573 F.3d 267, 278 (6th Cir. 2009) ("[W]e hold that 'sexual contact,' as defined by § 2246(3), includes self-masturbation . . . .")

"The statute's operative phrase 'any person'" in ¶ 2246(3) "applies to all persons," regardless of whether the act is performed by the defendant or the victim. *Aldrich*, 566 F.3d at 979; *see also Butler*, 65 F.4th at 203. In *Aldrich*, the Eleventh Circuit ruled that the plain meaning of "sexual contact" under ¶ 2246(3) "includes the act of masturbating." 566 F.3d at 979. The Court concluded that the meaning of the phrase "any person" in the definition of sexual contact includes the touching of all people, including the defendant himself, who was sentenced under a two-level enhancement for masturbating in front of a minor female. *Id.* at 978–79. In interpreting the meaning of sexual contact" and concluding that the term "any person" did not require contact with "another person," the Court followed the canon of construction that requires statutes to be construed so that "no clause, sentence, or work shall be superfluous, void, or insignificant." *Id.* at 978 (citing *United States v. Ballinger*, 395 F.3d 1218, 1236 (11th Cir. 2005)). Applying this canon, the Court looked to the use of the term "another person" in § 2246(2)(D) and concluded that the plain meaning of sexual contact under 18 U.S.C. § 2246(3) includes the act of masturbating without contact with another person:

> We come to this conclusion based on our observation that § 2246(2)(D) defines a "sexual *act*" as the "intentional touching, not through the clothing, of the genitalia of *another person* who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of *any person*." (emphases added). We believe that § 2246(2)(D) clearly indicates that Congress used the phrase "any person" when it meant to include the offender himself, as well as another individual, and the phrase "another person" when it meant to exclude the offender.

> *Aldrich*, 566 F.3d at 979 (emphasis in original).

8

Undeterred by the Eleventh Circuit's ruling in *Aldrich*, Royal Caribbean insists that Plaintiffs must have "participated in, been present for, or aware of" Mirasol's masturbation to trigger the EFAA because the sexual contact must be "nonconsensual." [Reply at 21–24].  Nothing in the definition of "sexual contact" under § 2246(3), or the cases construing its meaning, justifies reading in a requirement of victim presence or awareness when the sexual contact occurs.  "Courts have no authority to alter statutory language . . . . We cannot add to the terms of [the] provision what Congress left out." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001) (alteration in original).

Royal Caribbean relies on the Eleventh Circuit's ruling in *United States v. Dawson*, 64 F.4th 1227 (11th Cir. 2023) in support of its position that masturbation is only "actionable" under the EFAA if it takes place in the victim's presence. [Reply at 22].  *Dawson* does not stand for this proposition. Neither the EFAA nor the definition of sexual contact under § 2246(3) were at issue in *Dawson*.  The court in *Dawson* was concerned with 18 U.S.C. § 2251,[3] a different statutory provision governing the sexual exploitation of children. 64 F.4th at 1232. Specifically, the *Dawson* court addressed the question of whether an "adult who films himself exposing his genitals and masturbating in the presence of a child where the child is the object of sexual desire in the film 'uses' that child to engage in sexually explicit conduct for purposes of 18 U.S.C. § 2251(a)." *Id*. at 1230. In *Dawson*, the defendant admitted to taking videos of himself masturbating in the presence of his daughter and including her in videos that he used for his own pleasure and distributed online. *Id.* at 1231. The defendant's daughter did not see him masturbate and testified

---

[3]     18 U.S.C. § 2251(a) makes it illegal for "[a]ny person [to] employ[ ], use[ ], persuade[ ], induce[ ], entice[ ], or coerce[ ] any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct . . . ." 18 U.S.C. § 2251(a).

that she never knew or understood what he was doing. *Id.* The defendant argued that § 2251(a) did not apply because his daughter was not aware of his masturbation and was not involved in his sexual conduct. *Id.* at 1232.

Upon construing § 2251(a), the Eleventh Circuit ruled that while § 2251(a) requires that a minor must be involved in the offender's sexually explicit conduct, the minor did not necessarily need to actively engage in her own sexually explicit conduct. *Dawson*, 64 F.4th at 1238. Notably, the court did not rule that presence was required, as Royal Caribbean suggests, but rather the court ruled that because the daughter was the "object of his sexual desire" the defendant used her "to engage in sexually explicit conduct for purposes of 18 U.S.C. § 2251(a)" even though she was merely present and did not herself engage in any sexual conduct. *Id.* at 1236–39. Neither the *Dawson* court's holding nor its reasoning authorizes this Court to read a requirement into "sexual contact" that the victim must be aware or present during Defendant's self-masturbation to trigger the EFAA.

The court's ruling in *Aldrich* does, however, require this Court to conclude that Mirasol's self-masturbation without touching Plaintiffs constitutes sexual contact under § 2246(3). Here, Plaintiffs allege that Mirasol's conduct was nonconsensual. [ECF No. 95 ¶¶ 15–16]. At the pleading stage, "a plaintiff need only plead nonfrivolous claims relating to sexual assault . . . with the sufficiency of those claims to be reserved for proper merits adjudication, be it a motion to dismiss, motion for judgment on the pleadings, motion for summary judgment, or trial." *Diaz-Roa*, 757 F. Supp. 3d at 533. Plaintiffs allege that Mirasol entered their staterooms, hid under their beds, recorded them undressed without their consent, and then used their video images for his own self-gratification and as the objects of his sexual desire—all without their consent. [ECF No. 95

10

¶¶ 15, 27]. This is enough to allege sexual contact under § 2246(3) and conduct constituting a sexual assault dispute under the EFAA.

### 2.   Plaintiffs' Claims are Sufficient to Trigger the EFAA

The next requirement under the EFAA is that Plaintiffs' case must be "filed under Federal, Tribal or State law and relate[] to the sexual assault dispute or sexual harassment dispute." 9 U.S.C. § 402(a). Courts in this district have ruled that while plaintiffs proceeding under the sexual harassment prong of the EFAA may be required to plead a violation of a particular federal, state, or Tribal law "prohibiting sexual assault," the same is not true for plaintiffs proceeding under the "sexual assault dispute prong." *See, e.g.*, *Doe (J.K.)*, 792 F. Supp. 3d at 1380–82; *Bulic v. Celebrity Cruises, Inc.*, No. 25-21231-CIV, 2025 WL 1783865, at *3–4 (S.D. Fla. June 27, 2025). The court in *Bulic*, in discussing *Gonzalez*, one of the cases cited by Royal Caribbean, explained that the difference in the pleading requirement under the sexual harassment and sexual assault dispute prongs of the EFAA:

> [c]rucially, however, the reasoning in *Gonzalez* turned on language specific to the sexual harassment prong — language that does not appear in the statute's separate definition of a sexual assault dispute . . . . [In sexual assault dispute cases], [i]t is enough that the dispute "involv[es] a nonconsensual sexual act or sexual contact," as defined in 18 U.S.C. section 2246 or similar applicable Tribal or State law. 9 U.S.C. § 401(3) (alteration added). That definition, grounded in the nature of the conduct rather than the legal theory invoked, stands in contrast to the statute's sexual harassment prong, which has been read to limit coverage to disputes "relating to conduct that is alleged to constitute sexual harassment under applicable" law. *Id.* § 401(4); *see also id.* § 401(3). The sexual assault prong's cross-reference to 18 U.S.C. section 2246 — absent from the sexual harassment prong — reinforces that distinction, supplying a substantive definition of qualifying acts without regard to how they are pleaded or labeled. *See id.* §§ 401(3)–(4).

*Bulic*, 2025 WL 1783865, at *4 (discussing *Gonzalez*, 757 F. Supp. 3d at 1322).

"Congress wrote the EFAA to apply when a plaintiff alleges a sexual assault *dispute*, not as Defendant submits, when a plaintiff pleads a specific sexual assault *claim,* let alone a violation

of a law explicitly prohibiting sexual assault." *Doe (J.K.)*, 792 F. Supp. 3d at 1379 (emphasis in original) (citing 9 U.S.C. §§ 401–02). *See id.*

Since Plaintiffs are proceeding under the sexual assault dispute prong of the EFAA, they are not required to bring claims under a federal or state law that specifically prohibits sexual assault. Plaintiffs have alleged ten counts under state common law that relate to the sexual assault dispute at issue in this case. *See* [ECF No. 95]. Plaintiffs have therefore satisfied the requirement that the case must be filed under state law and relate to the sexual assault dispute to proceed under the EFAA.

### 3.   The Ending Forced Arbitration Act Applies to Plaintiffs' Entire Case

The EFAA overrides the FAA's general policy in favor of arbitration and expressly provides that it applies to a "case" that "relates to the sexual assault . . . dispute." 9 U.S.C. § 402(a). "In this phrase, the 'case' is something separate and apart from the sexual assault dispute underlying it." *Doe (J.K.)*, 792 F. Supp. 3d at 1381 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Once the EFAA is triggered in a matter that relates to a sexual assault dispute, the Court cannot enforce arbitration, and the bar to arbitration applies to the entire case. *See id.* at 1383 ("[T]he Court finds that the text of the EFAA demands its application to any case where the facts alleged constitute a sexual assault dispute under the EFAA and the sexual assault dispute relates to the case . . . ."); *see also Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 558 (S.D.N.Y. 2023) (finding that once a case is filed under applicable law and relates to a sexual harassment dispute, an arbitration agreement becomes unenforceable "with respect to" that entire "case" relating to the dispute).

Plaintiffs allege conduct constituting a sexual assault dispute, that the case was filed under state law, and that the case relates to a sexual assault dispute. As such, Plaintiffs' case falls squarely under the EFAA, and at the Plaintiffs' election, this Court cannot compel arbitration.

## B. Applicability of the Maritime Statute

Plaintiffs also assert the Maritime Statute as an independent basis to preclude arbitration. The Contract's arbitration provision "is only enforceable if it does not run afoul of" the Maritime Statute, 46 U.S.C. § 30527, which prohibits cruise lines from requiring mandatory arbitration of passenger claims involving "personal injury" or "death" caused by the negligence or fault of the cruise line, its agents, or its employees. *Johnson v. Royal Caribbean Cruises, Ltd.*, 449 F. App'x 846, 848 (11th Cir. 2011). The Maritime Statute provides, in relevant part:

> (a) Prohibition. –
> (1) In general. The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, *may not include in a regulation or contract a provision limiting*—
> (A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or
> (B) *the right of a claimant for personal injury or death to a trial by court of competent jurisdiction*.

46 U.S.C. § 30527(a)(1) (emphasis added).

The parties agree that § 30527(a)(1)(B) precludes cruise companies from including in their cruise contracts mandatory arbitration provisions requiring passengers to arbitrate "personal injury" claims. They disagree, however, on whether the term "personal injury" encompasses emotional distress, mental suffering, and psychological injury claims not arising from physical injury as Plaintiffs have alleged in their Sixth Amended Complaint. *See generally* [ECF Nos. 61, 63].

Royal Caribbean contends that the term "personal injury" in § 30527(a)(1)(B) must be interpreted narrowly to mean only "physical injury" or "bodily injury." *See* [ECF No. 57 at 17]. Royal Caribbean urges this Court to consider the Maritime Statute's revision and legislative history and conclude that "personal injury" means physical/bodily injury. [Reply at 9–15]. On the other hand, Plaintiffs also advance their own interpretation of the statute's revision and legislative history and urge this Court to conclude that the term "personal injury" includes both physical and non-physical injuries.   [ECF No. 61 at 19–28]. This Court, however, must not begin with legislative history; instead, it must focus first on the statute's plain language.  *See In re Royal Caribbean Cruises Ltd.*, 991 F. Supp. 2d 1171, 1176 (S.D. Fla. 2013) ("The district court erred by ignoring the statute's plain language and instead focusing on the statute's underlying policy rationales . . . Those policy rationales were nowhere in the statute . . . ." (citations omitted)). "[W]here the clear and unambiguous language of a statute provides a bridge to Congress' intent, we need not and will not wade into the brackish waters of legislative history." *CBS*, 245 F.3d at 1222. As explained in detail below, the plain meaning of the term "personal injury" as used in the Maritime Statute can be gleaned from the statute itself.

1.     **"Personal Injury" Has a Plain and Unambiguous Meaning**

The Maritime Statute does not define "personal injury."  In the absence of a statutory definition of a term, courts "look to the common usage of words for their meaning." *Id.* To determine the plain meaning of "personal injury" in the Maritime Statute, the Court must "follow the rules of statutory construction." *See Johnson*, 449 F. App'x at 848 (citing *United States v. Silva*, 443 F.3d 795, 797 (11th Cir. 2006)). In evaluating the Maritime Statute, the Eleventh Circuit has instructed:

> "The first rule in statutory construction is to determine whether the language at
> issue has a plain and unambiguous meaning with regard to the particular dispute. If

the statute's meaning is plain and unambiguous, there is no need for further inquiry." *United States v. One 1990 Beechcraft,* 619 F.3d 1275, 1279 (11th Cir. 2010). Judges are to "ascertain—neither to add nor to subtract, neither to delete nor to distort" the words with which Congress has expressed its purpose. *62 Cases of Jam v. United States,* 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951).

*Id.*

To determine the common usage or ordinary meaning of a term, "courts often turn to dictionary definitions for guidance." *CBS*, 245 F.3d at 1223 (citations omitted). In Black's Law Dictionary, "personal injury," specifically defined under the broader term of "Injury," encompasses both non-physical and physical injury:

1. In a negligence action, any harm caused to a person, such as a broken bone, a cut, or a bruise; bodily injury.
2. Any invasion of a personal right, including mental suffering and false imprisonment. — Also termed *private injury.*

*Injury*, Black's Law Dictionary (8th ed. 2004)[4] (italics in original).[5]

The definition of "personal injury" includes the meanings advanced by both Royal Caribbean and Plaintiffs, but this alone does not create an ambiguity. "[M]ost words in English have multiple definitions. "Any ambiguity in the statutory language must result from the common usage of that language, not from the parties' dueling characterizations of what Congress 'really meant.'" *CBS*, 245 F.3d at 1225. "Multiple definitions do not make words inherently ambiguous

---

[4]   The primary approach for determining the ordinary meaning of a word "is by looking at dictionaries in existence around the time of enactment." *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021) (quoting *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016)).  Because Congress added the term "personal injury" to the Maritime Statute in 2006, the Court must look to dictionary definitions for "personal injury" as defined at that time.

[5]   Webster's Third New International Dictionary also demonstrates that the ordinary meaning and common usage of "personal injury" encompasses both mental and physical injury. *See Harleysville Ins. Co. v. Physical Distribution Servs., Inc.*, 716 F.3d 451, 458 (8th Cir. 2013) (defining "personal injury" as "an injury affecting one's physical and mental person as contrasted with one causing damage to one's property" and "an injury giving rise to a personal action at law" (citing *Webster's Third New International Dictionary* 97, 1686 (1993))).

15

as they are commonly used and understood." *See United States v. Fifty-Two Firearms*, 362 F. Supp. 2d 1308, 1315 (M.D. Fla. 2005). Because the ordinary and commonly understood meaning of "personal injury" includes more than just bodily injury, the Court cannot read "personal injury" with a singular meaning as "bodily injury," as Royal Caribbean asks this Court to do. Instead, the Court must presume that Congress meant for the Maritime Statute's use of "personal injury" to refer to the ordinary meaning of the term, which covers *both* bodily injuries and "any" invasion of a personal right. Black's Law Dictionary then provides two examples of "any" invasions of a personal right: mental suffering and false imprisonment. However, the use of the words "any" and "including" in the definition indicates that this list of examples is not exhaustive. "Any" invasion of a personal right not only includes mental suffering and false imprisonment, but it can also include other emotional injury claims that constitute an invasion of a personal right, such as claims for emotional distress or other psychological injuries. As such, the common usage and ordinary meaning of the term "personal injury" refers to bodily injury and any invasion of a personal right, including mental suffering and other emotional injury claims.

Based on the common use and ordinary meaning of "personal injury" as defined in Black's Law Dictionary, the Court finds that the term "personal injury" has a plain and unambiguous meaning. Specifically, the plain and unambiguous meaning of "personal injury" encompasses both bodily injury claims and emotional injury claims, such as claims for mental suffering, that flow from "[a]ny invasion of a personal right." *Injury*, Black's Law Dictionary (8th ed. 2004).

## 2. The Maritime Statute, Read as a Whole, Supports the Conclusion that "Personal Injury" Encompasses Emotional Injury Claims

The next step of the Court's analysis is to read the entirety of the pertinent statutory language. "When interpreting a statute, this Court must read the statute as a whole because statutory language depends on context . . . ." *Ala. Educ. Ass'n v. State Superintendent of Educ.*,

16

746 F.3d 1135, 1146 (11th Cir. 2014). "We do not look at one word or term in isolation." *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019). Relevant to this analysis, this Court must review § 30527(a) at issue here in conjunction with § 30527(b), which immediately follows:

> (a) Prohibition. –
> (1) In general. The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting—
> (A) the liability of the owner, master, or agent for ***personal injury*** or death caused by the negligence or fault of the owner or the owner's employees or agents; or
> (B) the right of a claimant for ***personal injury*** or death to a trial by court of competent jurisdiction.
>
> (b) Emotional distress, mental suffering, and psychological injury.--
> (1) In general.--Subsection (a) does not prohibit a provision in a contract or in ticket conditions of carriage with a passenger that relieves an owner, master, manager, agent, operator, or crewmember of a vessel from liability for infliction of emotional distress, mental suffering, or psychological injury so long as the provision does not limit such liability when the emotional distress, mental suffering, or psychological injury is--
> (A) the result of ***physical injury*** to the claimant caused by the negligence or fault of a crewmember or the owner, master, manager, agent, or operator;
> (B) the result of the claimant having been at actual risk of ***physical injury***, and the risk was caused by the negligence or fault of a crewmember or the owner, master, manager, agent, or operator; or
> (C) intentionally inflicted by a crewmember or the owner, master, manager, agent, or operator.
> (2) Sexual offenses.--This subsection does not limit the liability of a crewmember or the owner, master, manager, agent, or operator of a vessel in a case involving sexual harassment, sexual assault, or rape.

46 U.S.C. § 30527(a)–(b) (emphasis added).

When interpreting a statute, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *DePierre v. United States*, 564 U.S. 70, 83 (2011) (quoting *Sosa v. Alvarez*, 542 U.S. 692, 711 n.9 (2004)); *see also Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (citing A. Scalia & B. Garner,

Reading Law 170–171 (2012)) (finding that, in a given statute, "the same term usually has the same meaning and different terms usually have different meanings"). Here, the Maritime Statute uses "personal injury" in § 30527(a) and "physical injury" in § 30527(b). Because "personal injury" is a different phrase than "physical injury" within the same statute, the Court must "assume[] different meanings were intended." *See DePierre*, 564 U.S. at 83. Importantly, the Court "must presume that Congress said what it meant and meant what it said." *CBS*, 245 F.3d at 1222 (citing *United States v. Steele,* 147 F.3d 1316, 1318 (11th Cir.1998) (en banc)). The use of the term "physical injury" in § 30527(b) undermines Royal Caribbean's position that "personal injury" used in § 30527(a) should be narrowly interpreted to mean "physical injury."  There is nothing in § 30527(a) or (b) that suggests that the term "personal injury" should be limited to a subset of injuries to a person: personal injuries involving physical or bodily injury.

When Congress wanted to address only a subset of personal injuries—those involving physical injuries—it expressly did so in § 30527(b).  "Congress knew how to say 'personal *bodily* injury' when it wanted to" and that in the relevant statute, "Congress chose to use an unrestricted version of personal injury" that should be "construed broadly." *In re Adams*, 478 B.R. 476, 486 (Bankr. N.D. Ga. 2012).  Thus, a reading of the statute as a whole requires this Court to conclude that Congress intended for "personal injury" and "physical injury" to have different meanings within § 30527. The term "personal injury" should be given its full, commonly understood meaning, as discussed above, to encompass both non-physical (emotional, psychological, and mental) injury and physical injury.

Based on the plain meaning of the term "personal injury" and the Court's reading of the statute as a whole, § 30527(a)(1)(B)'s prohibition against mandatory arbitration of personal injury applies to Plaintiffs' emotional distress claims in this matter.  The Court, however, agrees with

Royal Caribbean that Plaintiffs' "contract-based, implied covenant claims [] fall under their agreement to arbitrate and [are] outside the scope of the Maritime Statute's bar on arbitration." [Reply at 16]. The Maritime Statute does not bar the arbitration of claims sounding in contract. Thus, Plaintiffs' claim for Breach of Implied Covenant of Good Faith and Fair Dealing (Count IX) would not be barred from arbitration under the Maritime Statute, but as discussed above, would be barred from arbitration under the EFAA.

## IV.  RECOMMENDATION

For the reasons stated herein, the undersigned hereby **RECOMMENDS** Royal Caribbean's Omnibus Motion to Stay Litigation and Compel Arbitration be **DENIED.**

## V.  OBJECTIONS

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1). Any response shall be filed within **seven (7) days** of the objections. The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3-1 (2016); *see Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 22nd day of April 2026.

_____
**DETRA SHAW-WILDER**
**UNITED STATES MAGISTRATE JUDGE**

cc:     The Honorable Darrin P. Gayles

19

All Counsel of Record

# Appendix F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:24-cv-23953-DPG/DSW

JANE DOE (S.F.), et al.,

     Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTD.
A foreign corporation for profit,

     Defendant.

_____/

**DEFENDANT ROYAL CARIBBEAN CRUISES, LTD.'S  OBJECTIONS TO THE
MAGISTRATE'S REPORT AND RECOMMENDATION**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

LEGAL STANDARD ......................................................................................................... 5

OBJECTIONS ..................................................................................................................... 6

    I.    The R&R Erroneously Found That EFAA Prohibits Arbitration ........................... 6

        a.    The SAC Must Allege *Nonconsensual* Sexual Assault to Bar Arbitration. 6

        b.    The R&R Confirms That the SAC Alleges Video Voyeurism, Not the Nonconsensual Sexual Assault Needed to Trigger EFAA ........................ 7

        c.    The R&R Improperly Deleted EFAA's *Nonconsensual* Requirement in Violation of Controlling Canons of Construction That the R&R Itself Cites ............................................................................................................. 8

        d.    The R&R Failed to Apply the Strong Policy Favoring Arbitration .......... 11

    II.    The R&R Erroneously Found That the Maritime Statute Unambiguously Prohibits Arbitration ............................................................................................. 13

        a.    The Maritime Statute is Facially Ambiguous, Which Requires the Court to Compel Arbitration and, at Minimum, Consider its Legislative History . 14

        b.    The Maritime Statute's Legislative History Makes Clear that Arbitration Must Be Compelled ................................................................................. 18

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Mobility v. Concepcion*,
 563 U.S. 333 (2011)..................................................................................................5

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
 475 U.S. 643 (1986)...................................................................................6, 12, 16, 17

*Bazemore v. Jefferson Capital Sys., LLC*,
 827 F.3d 1325 (11th Cir. 2016) ...............................................................................5

*Braunstein v. Gen. Life Ins. Co.*,
 2002 WL 31777635 (S.D. Fla. Nov. 19, 2002).......................................................17

*Bruce v. Adams & Reese, LLP*,
 2025 WL 611071 (M.D. Tenn. Feb. 25, 2025)........................................................13

*Burch v. P.J. Cheese, Inc.*,
 861 F.3d 1338 (11th Cir. 2017) ................................................................... *passim*

*Carnival Cruise Lines, Inc. v. Shute*,
 499 U.S. 585 (1991) ................................................................................................15

*Carroll v. Lowes Home Centers, Inc.*,
 2014 WL 1928669 (S.D. Fla. May 6, 2014)...........................................................17

*CBS Inc. v. PrimeTime 24 Joint Venture*,
 245 F.3d 1217 (11th Cir. 2001) ............................................................................2, 9

*Chan v. Soc'y Expeditions, Inc.*,
 39 F.3d 1398 (9th Cir. 1994) ..................................................................................18

*CompuCredit Corp. v. Greenwood*,
 565 U.S. 95 (2012)........................................................................................ *passim*

*Cosgun v. Seabourn Cruise Line*,
 666 F. Supp. 3d 1270 (S.D. Fla. 2023) ....................................................................5

*D.B.C. ex rel. M.A.M. v. Pierson*,
 2014 WL 2155017 (N.D. Ala. May 22, 2014)........................................................17

*Davis v. S. Energy Homes*,
 305 F.3d 1268 (11th Cir. 2002) .........................................................6, 12, 15, 16

ii

*Diaz-Roa v. Hermes Law, P.C.*,
   757 F. Supp. 3d 498 (S.D.N.Y. 2024)..................................................................12, 13

*Dole v. Petroleum Treaters, Inc.*,
   876 F.2d 518 (5th Cir. 1989) ....................................................................................17

*Durr v. Shinseki*,
   638 F.3d 1342 (11th Cir. 2011) ..........................................................................12, 16

*Erlich v. Menezes*,
   21 Cal.4th 543 (1999) ...............................................................................................17

*Est. of Myhra v. Royal Caribbean Cruises, Ltd.*,
   695 F.3d 1233 (11th Cir. 2012) ....................................................................15, 19, 20

*Farris v. Carnival Corp.*,
   2018 WL 3699333 (S.D. Fla. Apr. 5, 2018) ...............................................................6

*Geraci v. Conte*,
   2000 WL 1739294 (Ohio Ct. App. Nov. 22, 2000) ...................................................17

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991)........................................................................................6, 12, 16, 17

*Gravillis v. Coldwell Banker Residential Brokerage Co.*,
   143 Cal. App. 4th 761 (2006) ...................................................................................17

*Harkins v. Hillstone Rest. Grp., Inc.*,
   2025 WL 522674 (S.D. Fla. Feb. 18, 2025) .............................................................12

*In re Am. Online, Inc.*,
   168 F. Supp. 2d 1359 (S.D. Fla. 2001) ....................................................................17

*In re Elec. Mach. Enterprises, Inc.*,
   479 F.3d 791 (11th Cir. 2007) ....................................................................6, 12, 16, 17

*In re Wiand*,
   2012 WL 611896 (M.D. Fla. Jan. 4, 2012)..................................................................6

*Jones v. Waffle House.*,
   866 F.3d 1257 (11th Cir. 2017) ...............................................................................1, 5

*Knutsen v. State Farm Fire & Cas. Co.*,
   375 F. Supp. 3d 514 (D. Vt. 2019)............................................................................17

*Lindley v. F.D.I.C.*,
   733 F.3d 1043 (11th Cir. 2013) ................................................................................17

iii

*Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*,
   939 F.3d 1145 (11th Cir. 2019) ...........................................................16

*Mangum v. Ross Dress for Less, Inc.*,
   777 F. Supp.3d 519 (E.D. N.C. 2025)....................................................13

*Mitchell v. Raymond James & Assocs., Inc.*,
   2024 WL 4486565 (M.D. Fla. Aug. 23, 2024) .......................................12

*Moore v. Bamboo Retreats, LLC*,
   2021 WL 3029569 (Cal. Ct. App. July 19, 2021)....................................17

*Morgan v. Sundance, Inc.*,
   596 U.S. 411 (2022)..............................................................................12

*Moses H. Cone Mem'l Hosp. v. Mercury Const.*,
   460 U.S. 1 (1983).......................................................................1, 5, 12

*Nationwide Gen. Ins. Co. v. Pelkey*,
   2021 WL 2895643 (M.D. Fla. July 9, 2021) ..........................................17

*Nationwide Mut. Ins. Co. v. Pasiak*,
   2012 WL 310772 (Conn. Super. Ct. Jan. 9, 2012)..................................17

*Nationwide Prop. & Cas. Co. v. Lacayo*,
   2008 WL 4831743 (M.D. Ala. Nov. 3, 2008)..........................................17

*Nolde Bros. v. Loc. No. 358, Bakery & Confectionery Workers Union, AFL-CIO*,
   430 U.S. 243 (1977)...................................................5, 12, 16, 17

*Ruiz v. Butts Foods, L.P.*,
   2025 WL 1099966 (Tenn. Ct. App. Apr. 14, 2025)................................13

*Shearson/Am. Exp., Inc. v. McMahon*,
   482 U.S. 220 (1987)..............................................................................20

*State v. Moir*,
   369 N.C. 370 (2016) .............................................................................11

*Turner v. Sedgwick Claims Mgmt. Servs., Inc.*,
   2015 WL 225495 (N.D. Ala. Jan. 16, 2015)..........................................15

*U.S. v. Butler*,
   65 F.4th 199 (5th Cir. 2023) .................................................................10

*U.S. v. Pawlowski*,
   682 F.3d 205 (3d Cir. 2012)...................................................................10

iv

*U.S. v. Raiburn*,
   20 F.4th 416 (8th Cir. 2021) ...................................................................................10

*U.S. v. Shafer*,
   573 F.3d 267 (6th Cir. 2009) ..................................................................................10

*United States v. Aldrich*,
   566 F.3d 976 (11th Cir. 2009) ..............................................................................2, 9

*United States v. Ballinger*,
   395 F.3d. 1218 (11th Cir. 2005) ...........................................................................2, 9

*United States v. Burchell*,
   2021 WL 3726899 (D.S.D. Aug. 23, 2021).............................................................11

*United States v. Dawson*,
   64 F.4th 1227 (11th Cir. 2023) ..........................................................................10, 11

*United States v. Guinn*,
   644 F. Supp. 3d 939 (N.D. Okla. 2022)...................................................................11

*United States v. Hollow Horn Bear*,
   144 F.4th 1105 (8th Cir. 2025) ...............................................................................10

*United States v. Howard*,
   968 F.3d 717 (7th Cir. 2020) ..................................................................................11

*United States v. Martinez*,
   2024 WL 4491497 (D.S.D. Oct. 14, 2024)...............................................................10

*United States v. Negrete-Vaca*,
   2026 WL 267605 (N.D. Iowa Feb. 2, 2026).............................................................10

*United States v. Skinner*,
   70 F.4th 219 (4th Cir. 2023) ...................................................................................10

*United States v. Starr*,
   486 F. Supp. 2d 940 (N.D. Iowa 2007)....................................................................11

*United States v. Thompson*,
   2022 WL 3563704 (N.D. Okla. Aug. 18, 2022) ........................................................7

*Van De Hey v. EPAM Sys. Inc.*,
   2025 WL 829604 (N.D. Cal. Feb. 28, 2025) ...........................................................12

**Statutes**

9 U.S.C. § 2..........................................................................................................................5

v

9 U.S.C. § 401(4) ..............................................................................................7, 11

9 U.S.C. § 402(a) .....................................................................................................6

10 U.S.C. § 920 (b) ...............................................................................................11

18 U.S.C. §§ 2241-2248 ..........................................................................................7

18 U.S.C. § 2244(b) ...............................................................................................10

18 U.S.C. § 2246..............................................................................................7, 11

18 U.S.C. § 2246(3) ............................................................................................8, 9

28 U.S.C. § 636(b)(1) .............................................................................................1

28 U.S.C. § 636(b)(1)(C) ........................................................................................5

28 U.S.C. § 636(b)(2) .............................................................................................5

45 U.S.C. § 30527.................................................................................................2

46 U.S.C. App. § 183c ..........................................................................................18

1996 Amendment...................................................................................................19

Coast Guard Authorization Act, Pub. L. 104–324, § 1129(b), 110 Stat. 3901,
    3984–85....................................................................................................19

CODIFICATION OF TITLE 46, PL 109-304, October 6, 2006, 120 Stat 1485...........................19

Federal Arbitration Act ................................................................................. *passim*

Maritime Statute.......................................................................................... *passim*

Maritime Statute § 30527(a) ..........................................................................2, 3, 13

Maritime Statute § 30527(b)...........................................................................2, 3, 13

Sexual Abuse Act...................................................................................................10

Sexual Assault and Sexual Harassment Act ......................................................... *passim*

**Other Authorities**

Black's Law Dictionary ..........................................................................................16

Fed. R. Civ. P. 72(b)(2)............................................................................................1

Fed. R. Civ. P. 72(b)(3)............................................................................................5

H.R. REP. 109-170, 45, 2006 U.S.C.C.A.N. 972 2005 WL 1688342 ........................................... 19

Rule 12(b)(6) ................................................................................................................................ 12

Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), Royal Caribbean Cruises, Ltd. ("**Royal Caribbean**") files these Objections ("**Objections**") to the Magistrate's Report and Recommendation ("**R&R**") (ECF 110) denying Royal Caribbean's Motion to Compel Arbitration ("**Motion**").

## PRELIMINARY STATEMENT

The R&R contains infirmities that require the Court to grant these Objections and Royal Caribbean's Motion. Most glaring amongst them is the R&R's failure to apply only the facts actually alleged in the Sixth Amended Complaint (ECF 95) ("**SAC**") and not facts that simply were not alleged. Just as problematic is the R&R's failure to follow the canons of statutory construction that control this motion, including the "liberal federal policy favoring arbitration" under the Federal Arbitration Act ("**FAA**"), along with the admonition that courts must resolve "any doubts concerning the scope of arbitrable issues…in favor of arbitration." *See, e.g.*, *Jones v. Waffle House.*, 866 F.3d 1257, 1263-64 (11th Cir. 2017); *Moses H. Cone Mem'l Hosp. v. Mercury Const.,* 460 U.S. 1, 24–25 (1983).

Both of these infirmities are present in the R&R's treatment of Plaintiffs' request to deny the Motion based on the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("**EFAA**"). EFAA can only override Plaintiffs' agreements to arbitrate this dispute if Plaintiffs alleged a "sexual assault dispute" involving "nonconsensual sexual contact." But as the R&R acknowledges, "[t]his is a case involving video voyeurism" committed by Defendant Arvin Mirasol, and video voyeurism, nonconsensual or not, is not the kind of sexual contact which can void an arbitration agreement. Otherwise, the SAC includes a peripheral allegation that after retrieving his videos, Mirasol privately engaged in self-gratification outside the presence or knowledge of any Plaintiff—but the SAC never alleged that this private conduct was in any way "nonconsensual," as needed to constitute a "sexual assault dispute" under EFAA.

1

This is where the R&R goes wrong—it improperly reads the "nonconsensual" requirement out of EFAA. It pays lip service to canons of construction requiring courts not to "alter statutory language" and ensure "that no clause, sentence or word should be superfluous," (R&R at 8-9 (quoting *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001) and *United States v. Ballinger*, 395 F.3d. 1218, 1236 (11th Cir. 2005)), but it nonetheless goes on to violate those canons. In reading the word "nonconsensual" out of EFAA, the R&R improperly relies on decisional law interpreting statutes that, unlike EFAA, do not require "sexual contact" to be "nonconsensual." *See, e.g.*, *United States v. Aldrich*, 566 F.3d 976, 978-99 (11th Cir. 2009) (addressing sexual contact that did not need to be *nonconsensual* and involved direct video contact between the victim and defendant during self-gratification). Its failure to interpret each requirement of EFAA enabled the R&R to hold that EFAA applied.

As to the Maritime Statute, codified at 45 U.S.C. § 30527 ("**Maritime Statute**"), its content and structure strongly reaffirm and codify the distinctions made in Plaintiffs' ticket contracts, which differentiate between arbitrable emotional injury claims (like Plaintiffs' claims here), and inarbitrable "personal injury"/"bodily injury"—*i.e.*, physical injury—claims. Specifically, in the Maritime Statute, "personal injury"/"bodily injury" claims are governed under subsection 30527(a), which prohibits the limitation of liability of such claims, and, separately, the arbitration of such claims under the statute's protection of the right to a jury trial. On the other hand, emotional injury claims are governed by subsection 30527(b) and *can be arbitrated* because that section restricts the limitation of liability of such claims under certain circumstances, but places no restrictions on arbitration.

This is where the R&R imposes an interpretation of the Maritime Statute that is unworkable and exposes its ambiguities. Specifically, the R&R (at 14) concludes that emotional injury claims

2

are a subset of the "personal injury" claims addressed in subsection 30527(a)'s protection of the right to a jury trial. Under this misreading, though, Maritime Statute subsection 30527(a) would bar a ship owner from contractually restricting a passenger's right to a jury trial on emotional injury claims. Yet, at the same time, Maritime Statute § 30527(b) would allow a ship owner to completely eliminate the right to bring emotional injury claims, in court or otherwise. Such a reading cannot stand. It cannot be that the Maritime Statute, in one subsection, prevents an owner from taking away the right to pursue emotional injury claims before a jury and yet, in the very next subsection, authorizes an owner to take away the right to pursue emotional injury claims anywhere, be it in court or arbitration.

This ambiguity allows the Court to look to the legislative history of the Maritime Statute to determine if the ambiguity can be cleared up. And, as discussed in greater detail below, the legislative history does clear it up. It reveals that the term "personal injury" had previously been "bodily injury" (*i.e.*, physical injury) and that the change in terminology was not intended to substantively change the statute. Subsection 30527(a) was intended to address physical injuries with subsection 30527(b) addressing emotional injuries.

As addressed in more detail below, the Maritime Statute's legislative history only further supports that the restriction against arbitration in subsection 30527(a) does not apply to Plaintiff's emotional injury claims. The R&R does not contend with the ambiguity that its ruling improperly creates within the Maritime Statute or the legislative history that establishes that the arbitration clause in Plaintiffs' ticket contracts is enforceable. This is error.

The Court should grant Royal Caribbean's Objections and compel arbitration.

**FACTUAL BACKGROUND**

Plaintiffs assert claims against Royal Caribbean for mental and emotional distress arising from alleged nonconsensual video voyeurism of former crewmember, Arvin Mirasol ("**Mirasol**").

3

*See* SAC ¶¶ 9, 11, 28-29, 56, 64, 71, 81, 87, 96, 103, 108, 120, 125. While their claims center on the alleged nonconsensual video voyeurism, Plaintiffs also allege that occasionally, after retrieving his camera and returning to his stateroom, Mirasol would masturbate in private to his videos. *Id.* ¶ 27. Importantly, the SAC does not allege that Plaintiffs were injured through physical contact or had inappropriate contact with Mirasol.  It also makes clear that Plaintiffs were not aware of Mirasol's actions when they happened, only learning of Mirasol's secret recordings long after their cruise. *Id.* ¶ 35. These subsequent disclosures of Mirasol's actions caused their alleged emotional distress. *Id.* ¶¶ 15, 24, 45.

Plaintiffs also concede that they are parties to Royal Caribbean's passenger ticket contract ("**Contract**") ((ECF 57-1, Ex. A)) and that it governs this dispute. SAC ¶ 109; R&R at 3. The Contract contains a "broad[]," mandatory arbitration provision, requiring arbitration of "any dispute or claim between you and us," including all "claims arising out of or relating to this Agreement and/or the Cruise…or any other aspect of the relationship between you and us," regardless of the "legal theory." Contract, § 10(c)(i)-(ii). The Contract requires arbitration of all "claims for mental or emotional distress or injury" if the distress does not "aris[e] out of bodily injury." *Id.* § 10(c)(i). In short, if the passengers' damages did not originate from a physical injury, arbitration is required.

## PROCEDURAL HISTORY

Plaintiffs assert against Royal Caribbean claims for negligence (Counts VII-VIII, X) emotional distress (Count III, VI), breach of the implied covenant (Count IX), and vicarious strict liability (Counts II, IV), seeking to hold Royal Caribbean liable for Mirasol's actions.  Royal Caribbean moved to compel arbitration of all claims.  On April 22, 2026, the Magistrate issued its R&R recommending denial of Royal Caribbean's motion. While the R&R determined that the

4

Contract was valid (at 4), it recommended that (i) EFAA barred arbitration and (ii) the Maritime Statute permitted arbitration of only Plaintiffs' breach of implied covenant claim.

## LEGAL STANDARD

### I.     This Court Must Make Its Own Independent *De Novo* Determination

This Court must make a *de novo* determination as to all portions of the R&R to which Royal Caribbean objects. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). The Court "can accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(2); Fed. R. Civ. P. 72(b)(3) (same). It "may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

### II.    The Court Must Apply the Strong Presumption Favoring Arbitration and Resolve All Doubts in Favor of Arbitration

The Court must apply a "strong presumption favoring arbitrability" when interpreting the maritime arbitration agreement at issue in these Objections.  *Nolde Bros. v. Loc. No. 358, Bakery & Confectionery Workers Union, AFL-CIO,* 430 U.S. 243, 244 (1977).  It is "hornbook law" that the Federal Arbitration Act embodies a "'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Jones*, 866 F.3d at 1263-64 (quoting *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011)). Courts must resolve "any doubts concerning the scope of arbitrable issues…in favor of arbitration." *Moses H. Cone,* 460 U.S. at 24–25; *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016); *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1350 (11th Cir. 2017). This liberal policy favoring arbitration extends to maritime arbitration agreements, which are presumptively "valid, irrevocable, and enforceable." *Cosgun v. Seabourn Cruise Line,* 666 F. Supp. 3d 1270, 1294 (S.D. Fla. 2023) (quoting 9 U.S.C. § 2).

Plaintiffs therefore carry a heavy burden. *Farris v. Carnival Corp.,* 2018 WL 3699333, at *4 (S.D. Fla. Apr. 5, 2018); *In re Wiand*, 2012 WL 611896, at *4 (M.D. Fla. Jan. 4, 2012) (characterizing it as a "daunting" burden). They must show "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650 (1986).

Plaintiffs rely on two statutes to carry that heavy burden, meaning that they must establish that those statutes "clearly" and "*explicitly*" bar arbitration. *Davis v. S. Energy Homes*, 305 F.3d 1268, 1273 (11th Cir. 2002); *see also CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 104 (2012). "In every statutory right case that the Supreme Court has considered, it has upheld binding arbitration" unless the statute "*explicitly* preclude[d] arbitration." *Davis*, 305 F.3d at 1274. If Congress is "silent," the "FAA requires the arbitration agreement to be enforced." *CompuCredit*, 565 U.S. at 104; *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991). If a statute's application is unclear or "ambiguous," the Court must compel arbitration. *Davis*, 305 F.3d at 1274-76; *In re Elec. Mach. Enterprises, Inc.,* 479 F.3d 791, 796 (11th Cir. 2007). Only an undeniable statutory prohibition on an agreement to arbitrate—one that does not allow for contrary interpretation—allows a Court to override the parties' express agreement to arbitrate. *Burch*, 861 F.3d at 1350; *Davis,* 305 F.3d at 1274-76; *In re Elec.,* 479 F.3d at 796; *CompuCredit,* 565 U.S. at 104. Plaintiffs need "the most forceful evidence of a purpose to exclude the[ir] claim[s] from arbitration" to negate their agreement. *Gilmer*, 500 U.S. at 26; *AT&T*, 475 U.S. at 650.

## **OBJECTIONS**

### I.      **The R&R Erroneously Found That EFAA Prohibits Arbitration**

#### a.      **The SAC Must Allege *Nonconsensual* Sexual Assault to Bar Arbitration**

EFAA authorizes a "person alleging conduct constituting a sexual harassment dispute or sexual assault dispute" to elect to treat a "predispute arbitration agreement" as unenforceable. 9

6

U.S.C. § 402(a).  As the R&R (at 6) correctly concludes, Plaintiffs have chosen to frame this litigation only "as a 'sexual assault dispute,'" meaning  "a dispute involving a *nonconsensual* sexual act or sexual contact as such terms are defined [by the Sexual Abuse Act] in section 2246 of title 18."  9 U.S.C. § 401(4) (emphasis added); *see* 18 U.S.C. §§ 2241-2248 ("Sexual Abuse Act").  The R&R determined that the SAC alleges "nonconsensual sexual contact," but it only did so by improperly reading the determinative term "nonconsensual" right out of EFFA.  This crucial error requires the Court to grant these Objections and compel arbitration.

> **b.     The R&R Confirms That the SAC Alleges Video Voyeurism, Not the Nonconsensual Sexual Assault Needed to Trigger EFAA**

The R&R's "Background" section, in its first sentence, states, "[t]his is a case involving video voyeurism committed by Defendant Arvin Mirasol."  R&R at 2.  That is correct.  It also confirms that it was Defendant Mirasol's *video voyeurism*, not any sexual contact,[1] that was without Plaintiffs' consent: "*without their* knowledge or *consent*, Mirasol placed hidden cameras in Plaintiffs' cabin bathrooms and captured videos of Plaintiffs, including minor children, while undressed and engaging in private activities."  *Id.*  In stark contrast, the R&R does not say (nor could it say) that Mirasol pleasuring himself in private, without Plaintiffs' knowledge, presence, or participation, was nonconsensual: "[a]fter retrieving the video recordings from the staterooms, Mirasol would 'pleasure himself and masturbate' while reviewing the videos."  *Id.*  Importantly, this allegation says nothing about Mirasol's private self-pleasuring being nonconsensual.

These key acknowledgments are not a mistake; they come directly from the SAC's own allegations.  The SAC alleges only that Mirasol's use of a "video camera" to "capture[] images of the Plaintiffs" was done without their "consent"—in short, it addresses lack of consent only as to

---

[1] Notably, voyeurism comes nowhere close to the Sexual Abuse Act's definition of "sexual contact," a fact which neither Plaintiffs nor the R&R even tried to dispute. *United States v. Thompson*, 2022 WL 3563704, at *5 (N.D. Okla. Aug. 18, 2022) (voyeurism did not constitute a "sexual act" or "sexual contact" under 18 U.S.C. § 2246).

video voyeurism. *See also* R&R at 2 (citing SAC ¶ 15). On the other hand, the SAC does not label Mirasol's masturbation as nonconsensual. In particular, when the SAC alleges that Mirasol "'would pleasure himself and masturbate' after retrieving the camera and viewing the videos," it alleges nothing about a lack of consent. SAC ¶ 27.

        **c.**      **The R&R Improperly Deleted EFAA's *Nonconsensual* Requirement in Violation of Controlling Canons of Construction That the R&R Itself Cites**

Despite recognizing that the SAC alleges a lack of consent only as to video voyeurism, not Mirasol's subsequent self-pleasuring after he retrieved the video and was all alone, the R&R nonetheless concludes that the SAC sufficiently alleges a "sexual assault dispute" based on "nonconsensual sexual contact." This is error.

The R&R improperly focuses solely on the Sexual Abuse Act's definition of "sexual contact," even though that statutory section does not address the type of "*nonconsensual . . .* sexual contact" that EFAA requires. 18 U.S.C. § 2246(3) (emphasis added). In fact, "nonconsensual" is not mentioned in 18 U.S.C. § 2246(3) at all. Yet the R&R chooses to rely solely on the Sexual Abuse Act's limited definition of "sexual contact," thereby improperly reading EFAA's "nonconsensual" requirement out of EFAA.

The R&R explains its flawed reasoning in a way that only highlights its error. It points to Royal Caribbean's statement that Plaintiffs needed to have "participated in, been present for, or aware of, Mirasol's masturbation to trigger the EFAA because the sexual contact must be nonconsensual." R&R at 9. It then argues that "[n]othing in the definition of 'sexual contact" under [18 U.S.C. §] 2246(3), or the cases construing its meaning, justifies a requirement of victim presence or awareness when the sexual act occurs." *Id.* The R&R then ironically points to the canon of construction that a court cannot "alter statutory language" or "add to the terms" of the statute. *Id.*

But EFAA requires *nonconsensual* "sexual contact," pointing to 18 U.S.C. § 2246(3) to define only the "sexual contact" part of that requirement. 18 U.S.C. § 2246(3) does not define "nonconsensual," a critical statutory term, which the R&R erroneously gives no meaning whatsoever and no role in its analysis. In doing so, it improperly alters the EFAA statute and renders a critical statutory term superfluous. The alteration and voiding of statutory language blatantly violates canons of construction that the R&R itself acknowledges must apply: "[c]ourts have no authority to alter statutory language," (R&R at 9 (citing *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001))), and courts must "follow[] the canon of construction that requires statutes to be construed so that 'no clause, sentence or word should be superfluous, void, or insignificant.'" R&R at 8 (quoting *United States v. Ballinger*, 395 F.3d. 1218, 1236 (11th Cir. 2005)). This is error.

The R&R compounds the mistake by asserting that "Mirasol entered [Plaintiffs] staterooms, hid under their beds, recorded Plaintiffs undressed without their consent, and then used their videos for his own self-gratification—*all without their consent*." R&R at 10 (emphasis added). But the SAC does not allege that each of those steps—in particular, Mirasol's self-pleasuring in private—was "nonconsensual." To the contrary, the SAC alleges only that Mirasol's video voyeurism was without consent. The R&R's reliance on allegations not actually made in the SAC is also error.

The R&R then cites decisions that simply do not support its recommendation. These cases instead establish that no other court has reached the conclusion that the R&R recommends. For instance, *United States v. Aldrich*, 566 F.3d 976, 978-99 (11th Cir. 2009), had nothing to do with EFAA, did not include the statutory term *nonconsensual*, and involved direct video communication between the victim and defendant during masturbation, not an isolated act

9

performed later without the other party present, connected by phone or video, aware, or in a position to give or withhold consent. *United States v. Skinner*, 70 F.4th 219, 221-222 (4th Cir. 2023), did not involve EFAA or its "nonconsensual" statutory requirement either, instead addressing (unlike here) knowing, direct video communication with the victim and even a physical visit to her house. Nor did *United States v. Dawson*, 64 F.4th 1227, 1237-38 (11th Cir. 2023), involve EFAA or a "nonconsensual" requirement—instead it addressed sexual acts captured on video and committed while the perpetrator was present and touching the victim. *See also U.S. v. Butler*, 65 F.4th 199, 203-04 (5th Cir. 2023) (defendant directed minor to masturbate while he watched and, in turn, masturbated himself while the minor watched); *U.S. v. Shafer*, 573 F.3d 267, 271, 278 (6th Cir. 2009) (defendant caused minor to engage in sexually explicit conduct, including masturbation, for defendant's viewing); *U.S. v. Raiburn*, 20 F.4th 416, 418-22 (8th Cir. 2021) (defendant and minor knowingly exchanged sexually explicit images and videos of masturbation); *U.S. v. Pawlowski*, 682 F.3d 205, 208-09, 212 (3d Cir. 2012) (defendant masturbated live over web camera while minor watched).

On the other hand, federal statutes and case law which actually interpret "nonconsensual" sexual contact make clear what it necessarily entails: the presence, awareness and/or participation of another person. Indeed, the Sexual Abuse Act itself does not just define "sexual contact"—it separately prohibits "nonconsensual sexual contact" (*United States v. Hollow Horn Bear*, 144 F.4th 1105, 1110 (8th Cir. 2025)), which it defines as sexual contact "***with another person*** without that other person's permission." 18 U.S.C. § 2244(b) (emphasis added); *see also United States v. Martinez*, 2024 WL 4491497, at *3-4 (D.S.D. Oct. 14, 2024); *United States v. Negrete-Vaca,* 2026 WL 267605, at *4 (N.D. Iowa Feb. 2, 2026) (sex act is only "nonconsensual" when done "with the

10

other person" "by force or against the will of the other.").[2] There simply can be no *nonconsensual* sexual contact without the presence, awareness, or participation of "another person" (*State v. Moir*, 369 N.C. 370, 379 n.6 (2016)), *i.e.*, "at least two persons" (*United States v. Starr*, 486 F. Supp. 2d 940, 946-48 (N.D. Iowa 2007))—a holding which has been specifically and unanimously affirmed in the context of masturbation. *United States v. Guinn*, 644 F. Supp. 3d 939, 947, 953-54 (N.D. Okla. 2022) (masturbation, even in public, does not constitute nonconsensual sexual contact unless the victim is "present at the time this conduct occurred."); *United States v. Burchell*, 2021 WL 3726899, at *5-6 (D.S.D. Aug. 23, 2021) (no nonconsensual sexual contact under the Sexual Abuse Act where the victim was "sleeping and [did] not awaken"); *see also United States v. Dawson*, 64 F.4th 1227, 1238 (11th Cir. 2023) (holding that masturbation is only actionable where it takes place "in [the victim's] presence," and noting that it is "entirely different" and inactionable when one masturbates to someone "not immediately present") (citing *United States v. Howard*, 968 F.3d 717 (7th Cir. 2020) (noting that masturbation is inactionable where the victim is outside the defendant's presence, such as where they are "in a neighbor's yard or across the street"). The R&R offered nothing to suggest that Mirasol's private masturbation, which occurred outside the presence, participation, or awareness of anyone else, was nonconsensual—indeed, the SAC never even alleged it to be nonconsensual.

### d.     The R&R Failed to Apply the Strong Policy Favoring Arbitration

If there were any doubts about EFAA's applicability here, they must be resolved in favor of arbitration. The R&R acknowledges the strong presumption in favor of arbitration.  R&R at 4. It also acknowledges that the Contract's arbitration provision is valid *(id.),* that the Contract requires the arbitration agreement to be broadly interpreted (*id.* at 3), that there is a "liberal 'policy

---

[2] Similarly, Congress defined "sexual assault" to require the presence of "another person" (10 U.S.C. § 920 (b))—again, EFAA is only triggered where a "sexual assault" dispute occurs. 9 U.S.C. § 401(4).

favoring arbitration" (*id.* at 4 (*quoting Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022)), and that "any doubts" should be resolved "in favor of arbitration" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24-25).  Indeed, in light of the "strong presumption" favoring arbitration, arbitration must be compelled here if EFAA allows for any ambiguity whatsoever or any contrary interpretation. *Nolde*, 430 U.S. at 244; *Davis*, 305 F.3d at 1274-76; *In re Elec.*, 479 F.3d at 796; *Burch*, 861 F.3d at 1350; *CompuCredit*, 565 U.S. at 104; *Gilmer*, 500 U.S. at 26; *AT&T*, 475 U.S. at 650.  Here, not only is there a reasonable interpretation of EFAA which permits arbitration (which is alone sufficient), but there is no other reasonable interpretation.  The only other proposed reading of EFAA—which would equate masturbation itself, even when done in private and outside the presence or awareness of another, to "nonconsensual" sexual contact or "sexual assault"—is far too illogical to be permitted.  *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) ("if at all possible," a statute must "be read so as to avoid an [] absurd conclusion.").  EFAA must be interpreted to avoid this result, and any ambiguities must be resolved in favor of arbitration.

The R&R also failed to construe ambiguities in favor of arbitration when it concluded, without explanation, that a "plaintiff need only plead nonfrivolous claims relating to sexual assault" to trigger EFAA.  For this, the R&R cites only *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498 (S.D.N.Y. 2024), a non-controlling district court opinion that applied a nonfrivolous pleading standard which has been ignored or rejected by the Southern District of Florida and other courts across the country in favor of the ordinary plausibility standard.  R&R at 10; *Harkins v. Hillstone Rest. Grp., Inc.*, 2025 WL 522674, at *4, 8-9 (S.D. Fla. Feb. 18, 2025) (holding, months after *Diaz-Roa* was decided, that EFAA contains "a plausibility requirement."); *Mitchell v. Raymond James & Assocs., Inc.*, 2024 WL 4486565, at *7 (M.D. Fla. Aug. 23, 2024) (EFAA incorporates Rule 12(b)(6)'s requirement that a claim be "plausible."); *Van De Hey v. EPAM Sys.*

12

*Inc.*, 2025 WL 829604, at *3 (N.D. Cal. Feb. 28, 2025) (rejecting *Diaz-Roa* as a "minority" opinion, and holding EFAA incorporates a "plausibility standard."); *Mangum v. Ross Dress for Less, Inc.*, 777 F. Supp.3d 519, 526-28 (E.D. N.C. 2025) (rejecting *Diaz-Roa*: plaintiffs "must plausibly allege a sexual harassment dispute or sexual assault dispute."); *Bruce v. Adams & Reese, LLP*, 2025 WL 611071, at *14 (M.D. Tenn. Feb. 25, 2025) (EFAA only applies where complaint includes a "plausible sexual harassment/assault claim.") (citing cases); *Ruiz v. Butts Foods, L.P.*, 2025 WL 1099966, at *11 (Tenn. Ct. App. Apr. 14, 2025) (same).

Instead of relying on non-controlling, minority caselaw and reading EFAA's nonconsensual requirement out of the statute without any meaningful basis, the Court should apply the longstanding liberal policy favoring arbitration, honor the requirement that any doubts be resolved in favor of arbitration, and compel arbitration.

## II. The R&R Erroneously Found That the Maritime Statute Unambiguously Prohibits Arbitration

Contrary to the R&R's conclusion, the Maritime Statute is, at minimum, ambiguous as to whether emotional distress claims may be arbitrated—this requires the Court to compel arbitration. Much like Plaintiffs' Contracts (§ 10(c)(i)), the Maritime Statute distinguishes between, on the one hand, inarbitrable "personal injury" (*i.e.*, bodily injury) claims, and, on the other hand, emotional distress claims, which have no arbitration restriction. The Maritime Statute has two discrete sections: the first, which bars the arbitration or limitation of liability of "personal injury" claims (Section 30527(a)), and the second, which only prohibits the limitation of liability (but not arbitration) of certain kinds of "emotional distress" claims (Section 30527(b)). In explicitly mentioning emotional distress claims yet staying silent on their arbitrability, the Maritime Statute makes clear that they may be arbitrated.

The R&R presents another interpretation: that the restriction on arbitrating "personal injury" claims necessarily includes emotional distress claims, and that the separate section specifically addressing "emotional distress" claims (yet staying silent on their arbitrability), merely *permits* limiting liability for certain emotional distress claims.  R&R at 15-16.  In other words, according to the R&R, the Maritime Statute, which was intended to protect maritime passengers, bars ship owners from compelling arbitration of emotional distress claims, but allows them to instead simply eliminate such claims altogether.  This reading cannot stand.  For one, it makes no sense—the primary aim of the Maritime Statute was to crack down on the far more onerous limitation of liability clauses, which deprive maritime passengers of any judicial recourse whatsoever.  It is limitation of liability clauses which were intentionally treated more harshly, not the other way around.  And regardless, in merely proposing an alternative interpretation, the R&R cannot avoid that the Maritime Statute is, at minimum, ambiguous, which obligates the Court to compel arbitration.  It also requires the Court to examine the Maritime Statute's legislative history, which the R&R refused to consider, but which makes clear that Congress intentionally permitted the arbitration of emotional distress claims.  Congress' clearly expressed intent should not be ignored.

> **a.** **The Maritime Statute is Facially Ambiguous, Which Requires the Court to Compel Arbitration and, at Minimum, Consider its Legislative History**

Arbitration is required here since there are two potential interpretations of the Maritime Statute—and it is the R&R's which is the least reasonable.  In ruling that the Maritime Statute bars ship owners from arbitrating emotional distress claims while permitting them to limit their liability for such claims, the R&R flipped the statute's language and purpose on its head, ignoring that it is the far more onerous limitation of liability clauses which are the primary target of the statute.

14

The Maritime Statute was enacted to protect maritime passengers' right to judicial recourse, and, naturally, was therefore always principally concerned with limitation of liability clauses, which deprive passengers of any judicial recourse whatsoever. *Est. of Myhra v. Royal Caribbean Cruises, Ltd.*, 695 F.3d 1233, 1243 (11th Cir. 2012) ("Congress's concern in enacting the [Maritime Statute] was to forbid the unilateral imposition of a limitation of liability by a ship owner without any recourse to judicial process."); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 602 (1991) (Stevens, J., dissenting) (confirming that the "principal subject of the statute" is limitation of liability clauses). Arbitration clauses do not deprive a maritime passenger of recourse, but rather, only prescribe the adjudicative forum, and so Congress opted to apply lesser restrictions than those placed on limitation of liability clauses. *Turner v. Sedgwick Claims Mgmt. Servs., Inc.,* 2015 WL 225495, at *14 (N.D. Ala. Jan. 16, 2015) ("[T]he Supreme Court has frequently observed that an arbitration agreement is but a species of forum-selection agreement, which designates an arbitral forum rather than a judicial one.") (citing cases).[3]

That is precisely why the Maritime Statute expressly and specifically restricts limiting liability for emotional distress claims while staying silent on (and therefore permitting) the arbitration of such claims. Yet the R&R ignored this intentional decision by Congress, finding that the Maritime Statute—which never specifically mentions the arbitrability of emotional distress claims—somehow prohibited the arbitration of such claims without exception. But in staying "silent" on (*CompuCredit*, 565 U.S. at 101-04), and failing to "clearly and *explicitly*" prohibit the arbitration of emotional distress claims (*Davis*, 305 F.3d at 1273-76), the Maritime Statute and FAA necessarily permit it. *CompuCredit*, 565 U.S. at 101-04 (where statute only explicitly restricted the limitation of "liability" for certain claims but stayed "silent" on their arbitrability,

---

[3] Along these lines, the Maritime Statute actually permits forum selection clauses. *Est. of Myhra,* 695 F.3d at 1243.

the "FAA requires the arbitration agreement to be enforced according to its terms."). Since, at minimum, the Maritime Statute allows for two competing interpretations here, the "strong presumption" favoring arbitration must apply (*Nolde*, 430 U.S. at 244), and the parties' arbitration agreements must be enforced. *Davis*, 305 F.3d at 1274-76; *In re Elec.,* 479 F.3d at 796; *Burch*, 861 F.3d at 1350; *CompuCredit,* 565 U.S. at 104; *Gilmer*, 500 U.S. at 26; *AT&T*, 475 U.S. at 650.

This is particularly true considering the consequences of the R&R's interpretation, which inexplicably punishes arbitration clauses over the far more severe limitation of liability clauses. This interpretation cannot withstand judicial scrutiny. *Durr*, 638 F.3d at 1349 ("if at all possible," a statute must "be read so as to avoid an [] absurd conclusion."). At minimum, it obligates the Court to consider the Maritime Statute's legislative history, which the R&R refused to do. *Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.,* 939 F.3d 1145, 1161 (11th Cir. 2019) (statutory purpose and legislative history must be considered where textual reading "would lead to an absurd result.").

To justify ignoring the Maritime Statute's purpose and legislative history in favor of this illogical result, the R&R relied solely on Black's Law Dictionary to conclude that the statute's use of the term "personal injury" unambiguously included emotional distress claims. R&R at 15-16. But far from unambiguously establishing this, Black's Law Dictionary contains two competing definitions of "personal injury": the first, which encompasses "bodily injury" only (*e.g.*, "a broken bone, a cut, or a bruise,"), and the second, which includes "mental suffering" as well. R&R at 15 (citing Black's Law Dictionary). These competing definitions cannot support the R&R's conclusion. On the contrary, they show only that the term "personal injury" can mean "bodily injury" only (indeed, this is its first and therefore, primary definition), and that thus, the Maritime Statute can be interpreted—and therefore, must be interpreted—to permit arbitration. *Davis*, 305

F.3d at 1274-76; *In re Elec.,* 479 F.3d at 796; *Burch*, 861 F.3d at 1350; *CompuCredit,* 565 U.S. at 104; *Gilmer*, 500 U.S. at 26; *AT&T*, 475 U.S. at 650.  Notably, Black's Law Dictionary's first and primary definition is far from anomalous—both Plaintiffs' Contracts and courts across the country apply an identical definition.  *Nationwide Gen. Ins. Co. v. Pelkey,* 2021 WL 2895643, at *1 (M.D. Fla. July 9, 2021); *D.B.C. ex rel. M.A.M. v. Pierson,* 2014 WL 2155017, at *4 (N.D. Ala. May 22, 2014); *Nationwide Prop. & Cas. Co. v. Lacayo,* 2008 WL 4831743, at *3 (M.D. Ala. Nov. 3, 2008); *Nationwide Mut. Ins. Co. v. Pasiak*, 2012 WL 310772, at *8 (Conn. Super. Ct. Jan. 9, 2012); *Knutsen v. State Farm Fire & Cas. Co.,* 375 F. Supp. 3d 514, 520–22 (D. Vt. 2019); *Gravillis v. Coldwell Banker Residential Brokerage Co.,* 143 Cal. App. 4th 761, 770 (2006); *Erlich v. Menezes*, 21 Cal.4th 543, 554-555 (1999); *Geraci v. Conte*, 2000 WL 1739294, at *6 (Ohio Ct. App. Nov. 22, 2000)); *Moore v. Bamboo Retreats, LLC*, 2021 WL 3029569, at *3 (Cal. Ct. App. July 19, 2021).  In light of the strong presumption favoring arbitration, this definition must control.  *Nolde*, 430 U.S. at 244.

At minimum, these competing definitions make clear that the Court must consult the Maritime Statute's legislative history, which clarifies Congress' intent here.  *Lindley v. F.D.I.C.*, 733 F.3d 1043, 1055-57 (11th Cir. 2013) (reviewing legislative history after determining that a statute's term was ambiguous because it was susceptible to more than one reasonable interpretation); *Dole v. Petroleum Treaters, Inc.,* 876 F.2d 518, 520 (5th Cir. 1989) (consulting the purpose and legislative history of statute where there were two competing definitions of a term); *In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1372-73 (S.D. Fla. 2001) (competing interpretations and definitions within a statute necessitated a review of legislative history); *Carroll v. Lowes Home Centers, Inc.*, 2014 WL 1928669, at *3 (S.D. Fla. May 6, 2014) (finding the term "person" ambiguous where undefined and subject to competing reasonable meanings); *Braunstein v. Gen.*

17

*Life Ins. Co.*, 2002 WL 31777635, at *6 (S.D. Fla. Nov. 19, 2002) (finding statutory language ambiguous where competing grammatical readings produced differing interpretations, warranting resort to legislative history). It was error for the R&R to improperly disfavor arbitration, ignore the Maritime Statute's legislative history, and disregard its differing interpretations.

b.     **The Maritime Statute's Legislative History Makes Clear that Arbitration Must Be Compelled**

Upon examination of the Maritime Statute's legislative history, it is clear here that Congress intentionally barred the arbitration of physical injury claims only. When enacted in 1936, the Maritime Statute barred only the arbitration of "bodily injury"—*i.e.*, physical injury—claims, and the limitation of liability of such claims. 46 U.S.C. App. § 183c. Critically, Plaintiffs admitted that this did not bar the arbitration of emotional injury claims—indeed, they even admitted that maritime law did not recognize emotional injury claims at that time and did not do so until almost sixty year later, in 1994. ECF 61 at 21, n.28 (admitting emotional distress claims were first "cognizable under maritime law" in 1994) (citing *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1409 (9th Cir. 1994)). In short, Plaintiffs conceded that the Maritime Statute, as originally enacted and for decades thereafter, did not bar arbitrating emotional distress claims. Instead, they argued only that emotional distress claims somehow became inarbitrable "post-1994," (ECF 61 at 22 (arguing "psychological damages" were only covered as "bodily injury" under the Maritime Statute "post-*Chan*")), even though Congress never amended the Maritime Statute to state this.

Plaintiffs further conceded that, after 1994, when maritime law first recognized mental or emotional injuries, Congress never amended the Maritime Statute's arbitration restriction to cover such injuries, even though it did amend the statute to address the limitation of liability of such injuries. ECF 61 at 19. In particular, Plaintiffs conceded, as they must, that in 1996, Congress

18

amended the Maritime Statute but did not amend its arbitration restriction.  *Id.*; *see* Coast Guard Authorization Act, Pub. L. 104–324, § 1129(b), 110 Stat. 3901, 3984–85 ("**1996 Amendment**"). Rather than add mental or emotional injuries to the Maritime Statute's arbitration restriction, the 1996 Amendment created a completely different section that restricted only the limitation of liability of certain emotional injury claims.  *Id.*  Plaintiffs conceded, again as they must, that this new emotional distress section "does not alter" the Maritime Statute's arbitration restriction, which they conceded originally applied only to physical injury claims.  *See, e.g.*, ECF 61 at 19 (arguing amendment's separate "emotional distress" section applies only to the Maritime Statute's "bar on *limitation of liability clauses*" and "does not alter or qualify" its "separate prohibition on *arbitration clauses*").

Next, Plaintiffs did not, and cannot, dispute that when Congress subsequently amended the Maritime Statute for the final time in 2006, it did not alter the reach of its original arbitration restriction.  The 2006 Amendment swapped the outdated term "bodily injury" for its interchangeable, modern equivalent, "personal injury."  It made no "substantive change."  *Est. of Myhra*, 695 F.3d at 1243, n.29.  Rather, when Congress passed the 2006 Amendment, it clarified that it was acting only to "conform to the understood policy, intent, and purpose of the Congress in the ***original enactments***." CODIFICATION OF TITLE 46, PL 109–304, October 6, 2006, 120 Stat 1485 (emphasis added) *see also* H.R. REP. 109-170, 45, 2006 U.S.C.C.A.N. 972, 992, 2005 WL 1688342 (stating that the terms were only swapped for readability purposes).  The Eleventh Circuit recognized this in *Est. of Myhra*, stating that the 2006 Amendment was a "slight[]" "modifi[cation]" to the "language" that was not a "substantive change." 695 F.3d 1233, 1243, n.29. In sum, the 2006 Amendment confirms that the Maritime Statute's "original" "intent" to restrict the arbitration of only physical injury claims has never been substantively amended and, in fact,

has been reaffirmed. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 238 (1987) (noting that a statute could not override the parties' agreement to arbitrate where statute did not originally bar arbitration and Congress subsequently "disclaimed any intent to change it"); *see also Est. of Myhra*, 695 F.3d at 1243 n.29.

The Maritime Statute's legislative history makes clear that Congress has never wavered from its original intent to restrict the arbitration of physical injury claims only. Yet the R&R ignored this, disregarding Congress' carefully calculated intent and instead substituting in its own policy—one that incomprehensibly treats arbitration clauses far more harshly than limitation of liability clauses. This reading is far from the only reasonable interpretation, as needed to compel arbitration—it is the least reasonable interpretation, and one that defies Congress' clearly expressed intent. Accordingly, the strong presumption favoring arbitration must be applied here, and arbitration must be compelled.

## CONCLUSION

The Court should reject the Magistrate's Report and Recommendation and grant Royal Caribbean's Motion to Compel Arbitration and Stay Litigation.

## <u>REQUEST FOR HEARING</u>

Defendant hereby requests a hearing on its Objections to the Report and Recommendation, in light of the importance of the issues raised in the Objections, which will determine whether litigation will proceed at all. Defendant estimates that it will require at least one hour for oral argument.

**Respectfully submitted,**

_____

Kurt K. Lunkenheimer, Esq.
Florida Bar No. 1059216
COZEN O'CONNOR
200 S. Biscayne Blvd., Suite 3000
Miami, FL 33132
Telephone: (305) 704-5940
kklunkenheimer@cozen.com
hryan@cozen.com

John J. Sullivan, Esq. (*pro hac vice*)
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 453-3729
jsullivan@cozen.com

*Co- Counsel for Defendant, Royal Caribbean
Cruises, Ltd.*

and

Jerry D. Hamilton, Esq.
Florida Bar No. 970700
Krista Fowler Acuna, Esq.
Florida Bar No. 650791
Kassandra Doyle Taylor, Esq.
Florida Bar No. 68645
HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 379-3686

21

hmb-symphony-team@hamiltonmillerlaw.com

*Co- Counsel for Defendant, Royal Caribbean
Cruises, Ltd.*

22

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 11, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel in the above-captioned cases either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

_____
Kurt K. Lunkenheimer

## SERVICE LIST

Jason R. Margulies, Esq.
jmargulies@lipcon.com
Michael A. Winkleman, Esq.
mwinkleman@lipcon.com
Jacqueline Garcell, Esq.
jgarcell@lipcon.com
Marc E. Weiner, Esq.
mweiner@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

and

Adam M. Moskowitz
The Moskowitz Law Firm
Continental Plaza
3250 Mary Street
Suite 202
Miami, FL 33133
305.740.1423 main
786.309.9561 direct
adam@moskowitz-law.com

*Counsel for Plaintiffs, Jane Doe (S.F.), et al.*

23

# Appendix G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. 24-CV-23953-DPG

JANE DOE (S.F.), on behalf of herself and all
others similarly situated, et al.,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD., and
ARVIN JOSEPH MIRASOL,

      Defendants.

_____/

**PLAINTIFFS'[1] RESPONSE IN OPPOSITION TO**
**DEFENDANT ROYAL CARIBBEAN CRUISES LTD.'S OBJECTIONS TO REPORT**
**AND RECOMMENDATION [ECF NO. 110]**

Royal Caribbean's objections should be overruled and the Report and Recommendation

("R&R"), ECF No. 110, should be adopted in full. This is not a close case and there is no question

as to the nonconsensual nature of the subject acts, nor is there any ambiguity of the Federal

Maritime Statute. As Plaintiffs explained in opposing the motion to compel, Royal Caribbean's

omnibus motion seeks to take an admitted, four-month course of illegal and horrendous sexual

exploitation and abuse of numerous children committed by Royal Caribbean's own stateroom

attendant, Arvin Mirasol, who admittedly hid cameras in passenger cabin bathrooms and even hid

under passenger beds within passenger cabins while watching and videoing passengers in their

private passenger cabin bathrooms—spanning twelve cruises, affecting up to nearly a thousand,

including minors—and force the victims out of court (their chosen forum) and into separate,

---

[1] "Plaintiffs" include all plaintiffs among the eleven (11) different complaint/groups, as well as all
purported class members of the Class Action. See Mot., 1, n.1.

1

confidential arbitrations. ECF No. 61. It cannot be overstated that Mr. Mirasol already admitted to these actions he committed while he served as a Royal Caribbean cabin steward, and is spending his next 30 years in federal prison. The Magistrate Judge correctly concluded that two independent federal statutes forbid that result: (1) the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. §§ 401–02, and (2) the Maritime Statute at 46 U.S.C. § 30527. R&R at 6–19.

Under 28 U.S.C. § 636(b)(1), Rule 72(b)(3), and S.D. Fla. L. Mag. J.R. 4(b), the Court reviews *de novo* only those portions of the R&R to which Royal Caribbean makes specific, supported objections. General disagreement is not enough; an objector must identify the portion of the challenged finding and the specific basis for the objection. *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989). Here, although Royal Caribbean labels its filing as "objections," much of it simply repackages the same arguments the Magistrate Judge already considered and correctly rejected. There is no reason to disturb the R&R's factual findings, which track the Sixth Amended Complaint and the undisputed record.

Royal Caribbean raises two objections. First, it argues the R&R erred in holding that the EFAA applies because, in Royal Caribbean's view, the SAC alleges only nonconsensual voyeurism, not a "sexual assault dispute." ECF No. 116 at 6–11. Because the Magistrate Judge cited a substantial body of directly on-point authority from this Circuit and numerous other federal circuits addressing this precise issue, Royal Caribbean resorts to an untenable argument: that because Mirasol allegedly masturbated alone in his cabin—rather than while concealed beneath Plaintiffs' bed as he secretly recorded minor children undressing and showering—that Plaintiffs failed to allege Mr. Mirasol's acts were "nonconsensual." Second, it argues the R&R erred in concluding that § 30527 independently bars arbitration of emotional personal injury claims

because, according to Royal Caribbean, "personal injury" means only bodily injury, or at least is ambiguous enough that the FAA requires arbitration. *Id.* at 13–20. Both objections fail.

## ARGUMENT

### I.      The R&R correctly held that the EFAA bars arbitration.

The Magistrate Judge got the EFAA analysis right because the statute turns on alleged conduct, not on the labels Royal Caribbean wishes Plaintiffs had used. The EFAA applies when a case "relates to" a "sexual assault dispute," and that inquiry is for the Court—not an arbitrator— to decide. *Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d 1371, 1380 (S.D. Fla. 2025); *M.B. v. Celebrity Cruises, Inc.*, No. 1:25-cv-21231, ECF 25 at 6-8 (S.D. Fla., Jun 27, 2025) (Altonaga, J.) (unpublished); 9 U.S.C. § 402. And, as both recent Southern District cruise cases explain, the "sexual assault dispute" prong does not require a standalone sexual-assault cause of action; it is enough that the dispute involves qualifying nonconsensual conduct. *Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d at 1380 ("The text of the EFAA's operative provision further strengthens the conclusion that the EFAA's applicability to sexual assault disputes hinges on the facts alleged, not the claims pleaded."); *M.B. v. Celebrity Cruises, Inc.*, No. 1:25-cv-21231 at 8 ("Indeed, the statute's sexual assault prong imposes no requirement that a plaintiff bring her claim under a law explicitly prohibiting sexual assault.").

That is precisely what Plaintiffs alleged here. As both the opposition brief and the R&R explained, Mirasol used his position as Royal Caribbean's stateroom attendant to enter passengers' cabins, surreptitiously hide recording devices in cabin bathrooms, hide under passenger beds within passenger cabins, and record passengers without their knowledge or consent while undressed and engaged in private activity, and sexually gratified himself to those naked images of passengers engaged in what those passengers expected to be private activities in their private cabin

bathrooms.[2] ECF No. 61 at 2; R&R at 2, 10. The objections try to sever those facts into isolated boxes—voyeurism here, masturbation there—so Royal Caribbean can argue that only the first act was "nonconsensual." But the EFAA asks whether the dispute involves nonconsensual sexual contact; it does not require Plaintiffs to re-plead each component of a single sexual course of conduct in hermetically sealed paragraphs. The Magistrate Judge correctly read the SAC as a whole.

Royal Caribbean's contrary reading also runs headlong into Eleventh Circuit law on the very statutory definition incorporated by the EFAA. Under 18 U.S.C. § 2246(3), "sexual contact" includes self-touching and masturbation. The Eleventh Circuit has squarely held that the "plain meaning" of "sexual contact" under § 2246(3) "includes the act of masturbating," and that the phrase "any person" includes the offender himself. *United States v. Aldrich*, 566 F.3d 976, 979 (11th Cir. 2009). *Aldrich* thus answers Royal Caribbean's central premise: the statute does not require touching the victim's body. *Id.* It is enough that the defendant intentionally touched his own genitalia with the requisite sexual purpose, because Congress used "any person," not "another person." *Id.*

Royal Caribbean tries to escape *Aldrich* by adding an extra-textual requirement that the victim must be ***present for, aware of, or participating in the masturbation***. But that language is not in § 2246(3), nor is it in the EFAA, nor is it in *Aldrich*. Royal Caribbean thus does within its objections exactly what it accuses the R&R of doing: it rewrites the statute. The correct reading is the one the Magistrate Judge adopted: when a crewmember secretly records passengers without knowledge or consent and then uses those images as the object of his sexual gratification, that is

---

[2] Mirasol admitted to all of this in the Factual Proffer, signed by Mirasol and his attorney, and filed with the United States District Court for the Southern District of Florida, Case No. 24-60026-CR-DAMIAN/VALLE, D.E. 23.

sexual contact under § 2446(3) and is conduct constituting a sexual assault dispute under the EFAA.  R&R at 11.

The Magistrate Judge explained the strong reasoning for this distinction, "the court did not rule that presence was required, as Royal Caribbean suggests, but rather the court ruled that because the daughter was the 'object of his sexual desire' the defendant used her 'to engage in sexually explicit conduct for purposes of 18 U.S.C. § 2251(a)' even though she was merely present and did not herself engage in any sexual conduct."  R&R at 10.[3]

Royal Caribbean's fallback argument about pleading standards fares no better. Plaintiffs explained in their opposition that *Diaz-Roa* gives the EFAA its correct reading: a plaintiff need only plead nonfrivolous allegations relating to sexual assault, leaving merits questions for later adjudication. *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 533 (S.D.N.Y. 2024). Royal Caribbean counters with *Harkins*, which applied a plausibility requirement. *Harkins v. Hillstone Rest. Grp., Inc.,* 2025 WL 522674, at *4, 8-9 (S.D. Fla. Feb. 18, 2025). But the Court does not need to choose between those standards here, because the SAC satisfies either one. Even under

---

[3] It must be noted that the seminal facts at the core of these Objections – at their very best – can only be described as a desperate attempt to create any legal basis for these Objections.  Royal Caribbean actually argues that because their Cabin Steward masturbated (touching of "any person") *allegedly in his own cabin and allegedly alone* – facts not in Mirasol's Factual Proffer filed in Federal Court – his "masturbation" was somehow distinguishable from the long line of other masturbation video (not in-person) cases cited in support by the Magistrate Judge (citing supporting cases from the 11th Circuit and 3rd, 4th 5th, 6th and 8th Circuits). R&R at 7. Para. 27 of the Complaint states as follows:

> 27. During a post Miranda interview, MIRASOL admitted … he would "pleasure himself and masturbate" after retrieving the camera and viewing the videos. … "I want to control it, but I can't". Law enforcement questioned MIRASOL on how he decides what room he puts the camera in. MIRASOL stated, "If I like who is in that room, I place it". … MIRASOL also stated that while the guests were taking a shower, he would enter the rooms and hide under the bed while recording them naked with his cellular device.

*Harkins*, the EFAA applies when the plaintiff has asserted a plausible sexual-assault or sexual-harassment claim capable of surviving Rule 12(b)(6) review. *Id.* The allegations within the SAC here are far more than plausible: it identifies the actor, the method, the location, the lack of (knowledge and) consent (and ability to consent) of the victims (which include many minors), the sexual purpose, and the injuries. So even under Royal Caribbean's preferred standard, arbitration still fails.

And once the EFAA is triggered, it bars arbitration of the entire case. The statute makes arbitration agreements unenforceable "with respect to a case," not merely as to selected counts. 9 U.S.C. § 402(a); *Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d at 1383 n.5; *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498 at 532. That point matters here because Royal Caribbean chose to file a single omnibus motion directed at a consolidated group of related sexual-exploitation cases, while Plaintiffs' opposition correctly emphasized that Royal Caribbean was seeking to force all of the sexual assault victims into fragmented, private proceedings. ECF No. 61 at 7-8. The EFAA was enacted to prevent exactly that maneuver.

**II.    The R&R also correctly held that 46 U.S.C. § 30527 independently bars arbitration.**

Royal Caribbean's second objection fails for the same reason: it asks the Court to ignore the statute's text and replace it with a narrower policy choice which Congress did not make. Interpretation of § 30527 begins with the words Congress enacted, and if the meaning is plain there is no warrant to displace that text with policy arguments or selective legislative history. *In re Royal Caribbean Cruises Ltd.*, 991 F. Supp. 2d 1171, 1176 (S.D. Fla. 2013). Courts err when they ignore the clear statutory language of a maritime passenger-protection statute's plain meaning derived from the text in favor of "underlying policy rationales" not found in the text. *Id.* ("The district

6

court erred by ignoring the statute's plain language and instead focusing on the statute's underlying policy rationales…Those policy rationales were nowhere in the statute…").

The text favors Plaintiffs, and there is no ambiguity in the statute whatsoever. Section 30527(a)(1)(B) protects "the right of a claimant for personal injury or death to a trial by court of competent jurisdiction," so long as the subject passenger cruise touches a United States port of call. Congress did not say "bodily injury" or "physical injury" there. And the ordinary legal meaning of "personal injuries" is not limited to broken bones or bruises; it also encompasses nonphysical harms affecting emotions, reputation, or character. *United States v. Burke*, 504 U.S. 229 (1992) ("Nothing in this remedial scheme purports to recompense a Title VII plaintiff for any of the other traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages"). That is especially important here, where Plaintiffs allege severe emotional and psychological injury arising from a nonconsensual sexual-exploitation assault scheme aboard a cruise ship.

The structure of § 30527 confirms that reading. In subsection (a), Congress used the broader term "personal injury." In subsection (b), Congress used the narrower phrase "physical injury." When Congress uses different language in different parts of a statute, courts assume different meanings were intended. *DePierre v. United States*, 564 U.S. 70, 83 (2011). Royal Caribbean's interpretation collapses those distinct terms into one. The Magistrate Judge rightly refused to do that. If Congress had wanted subsection (a) to protect only bodily injury claims, it knew how to say so—as subsection (b) proves.

Further, Royal Caribbean is wrong in its argument that because the statute plainly bars arbitration of all personal injury cases occurring on a passenger ship touching a United States port, while, in another section, it permits the shipowner's contractual limitation of liability of emotional

7

distress claims under limited circumstances, it results in the statute's ambiguity. The bar on arbitration, which has nothing at all to do with limitations of liability, of <u>all</u> personal injury claims is easily reconciled with the legislative choice to allow contractual limitations of liability of a small subset of personal injury claims – *i.e.*, emotional distress claims (not those intentionally committed by a crewmember, nor involving sexual assault – both of which are at play here). There is no conflict between a bar on arbitration existing within the same statute as a small circumstantial exception to a ban on contractual limitation of liability of a few claims. Royal Caribbean's argument that "in explicitly mentioning emotional distress claims yet staying silent on their arbitrability, the Maritime Statute makes clear that they may be arbitrated," ECF 116 at 13, confuses the explicit subclasses of personal injury claims which do not need to be parsed out for statutory inclusion within the arbitration ban section of the statute, versus the limited subclass of personal injury cases which are explicitly excluded from the limitation of liability ban section of the statute. In other words, § 30527 does not stay silent on the bar of arbitrability of emotional distress only claims, they are included within the scope of "personal injury" claims. Thus, there is no ambiguity and construction of the statute by reference to its history is inappropriate. And even if the "emotional distress only" claims on the limitation of liability part of the statute (§ 30527(a)(1)(A) and (b)), somehow related to the arbitration part of the statute (§ 30527 (a)(1)(B)); so would the two exceptions to the exception which exist here – those "emotional distress only" cases which were: intentionally inflicted by a crewmember (§ 30527 (b)(1)(C)), <u>and</u> a case involving sexual assault (§ 30527 (b)(2)).

Royal Caribbean wants the tail to wag the dog here; references to a small exception of some "emotional distress only" cases – which do not exist here – which are excepted from a ban on contractual limitation of liability clauses for "personal injury" cases, to control the broad all

encompassing ban on arbitration clauses for all "personal injury or death" cases. In fact, this distinction solidifies the point that there is no ambiguity in the statute whatsoever – the exceptions for a small subset of "emotional distress only" claims to the statute's ban on contractual limitations on liability "for personal injury or death". Thus, the statutory language itself shows that the legislature considered "emotional distress only" claims to be a subset of "personal injury" claims. There is no ambiguity whatsoever.

Besides being irrelevant because of the unambiguous plain language of § 30527, Royal Caribbean's legislative-history argument does not save it. Myhra does say the 2006 recodification of the statute made no substantive change. *Est. of Myhra v. Royal Caribbean Cruises, Ltd.*, 695 F.3d 1233, 1243, n.29 (11th Cir. 2012). But that observation helps Plaintiffs, not Royal Caribbean, because *Myhra* also explains Congress's core concern and policy: shipowners should not use passenger contracts to limit liability or remove liability questions from judicial scrutiny. *Id*. at 1241. Royal Caribbean's proposed reading would do exactly what Congress sought to stop— contract away a passenger's right to a judicial forum in a covered personal-injury case.

Nor is Royal Caribbean right that the FAA's pro-arbitration policy changes the analysis. The FAA favors arbitration agreements as written, but it does not authorize a court to override a later-enacted, directly applicable federal statute. Here, the EFAA independently bars arbitration, and § 30527 provides an additional bar to the enforceability of Royal Caribbean's arbitration clause.

There is also a practical point the objections never answer. This case arises from admitted illegal sexual exploitation of children committed by Royal Caribbean's employee against Royal Caribbean's passengers on Royal Caribbean's ship. Plaintiffs' opposition brief emphasized that Royal Caribbean's response has been to resist notice, deny responsibility, and seek to force the

9

sexual assault victims into private arbitrations. ECF No. 61 at 10–11. The Magistrate Judge's interpretation gives effect to Congress's choice to protect passengers' access to court in exactly this kind of case. Royal Caribbean's interpretation would do the opposite.

Finally, even if the Court believed there were any real uncertainty about § 30527's scope or certainty of its text, that would not change the result here. The EFAA independently forecloses arbitration of this case in its entirety. So Royal Caribbean cannot obtain the relief it seeks even on its own view of the maritime statute.

## **CONCLUSION**

Royal Caribbean's objections identify no legal error and no material factual mistake. They ask the Court to narrow the EFAA by inserting words Congress did not use, and to narrow § 30527 by rewriting "personal injury" to mean only "physical injury" despite the statute's text, structure, and unambiguous plain meaning. The Magistrate Judge correctly refused both invitations.

For those reasons, Plaintiffs respectfully request that the Court overrule all objections, adopt the Report and Recommendation in full, deny Defendant's motion to compel arbitration, uphold the ban on Royal Caribbean's class action waiver, and grant the relief recommended by the Magistrate Judge.

Dated: May 15, 2026

Respectfully submitted,

**By: /s/ Adam M. Moskowitz**
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
Leo A. Wiesinger
Florida Bar No. 1058780
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
leo@moskowitz-law.com

**Jason R. Margulies, Esq.**
jmargulies@lipcon.com
**Michael A. Winkleman, Esq.**
mwinkleman@lipcon.com
**Jacqueline Garcell, Esq.**
jgarcell@lipcon.com
**Marc E. Weiner, Esq.**
mweiner@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204
*Attorneys for Plaintiffs*

11

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed on May 15, 2026, via the Court's CM/ECF system, which will send notification to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280

12

# Appendix H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-CV-23953-DPG/DSW

JANE DOE (S.F.), et al.,

     Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES, LTD., and
ARVIN JOSEPH MIRASOL,

     Defendants.

                                       /

## REPORT AND RECOMMENDATION ON CONSOLIDATION
## AND CASE MANAGEMENT

**THIS CAUSE** is before the Court *sua sponte* concerning consolidation and case management issues following the May 15, 2026, status conference.  The Honorable Darrin P. Gayles referred this case, along with ten (10) additional related cases ("Related Cases"),[1] to the undersigned for rulings on all pre-trial non-dispositive matters and for report and recommendations on all dispositive matters [ECF No. 71].  Upon consideration of the status conference discussion, the procedural history and the status of the Related Cases, this Court makes the following case management recommendations to promote fair and efficient case administration and to conserve judicial resources.

---

[1]     The cases include: (1) *Doe v. Royal Caribbean Cruises, Ltd.*, *et al.*, No. 24-cv-24039-DPG; (2) *C.B. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-25089- DPG; (3) *D.M. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-24988-DPG; (4) *K.T. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24193-DPG; (5) *J.L.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24139-DPG; (6) *M.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24738-DPG; (7) *T.L. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-25009-DPG; (8) *V.V. v. Royal Caribbean Cruises Ltd. et al.*, No. 25-cv-20051-DPG; (9) *Doe v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20138- DPG; and (10) *Doe et al. v. Royal Caribbean Cruises, Ltd.*, No. 25- cv-20485-DPG.

## I.      BACKGROUND

This case, along with the ten other Related Cases, involves video voyeurism committed by Defendant Arvin Mirasol ("Mirasol"), who was a stateroom attendant aboard Defendant Royal Caribbean's ship, *Symphony of the Seas*, for twelve cruises between December 2023 and February 2024. [ECF No. 95 ¶¶ 9, 11, 28–29].  Each of the Related Cases involves one of the twelve cruises at issue, is based on the same underlying facts, and presents common questions of law.  Plaintiffs in this case filed a Motion to Certify Nationwide Issue Classes, Pursuant to Federal Rules 23(a), 23(b)(3), and 23(c)(4) ("Class Motion"), [ECF No. 39].   The Class Motion seeks to certify two issues:  "(1) the applicability of the EFAA and whether it invalidates and renders unenforceable RCCL's ticket contract that requires individual arbitration (the "Arbitration Issue"), and (2) whether, when Mirasol accessed passenger cabins, including Plaintiffs' passenger cabins, it was in the course and scope of his duties as a stateroom attendant employed and subject to control by RCCL, rendering RCCL vicariously liable for his admitted wrongdoing (the "Vicarious Liability Issue")." *Id.* at 5.

At a January 14, 2025 status conference, the district court issued an order staying all deadlines in the Related Cases pending Royal Caribbean's then-forthcoming consolidated motion to compel arbitration. [ECF No. 42]. The district court ordered the plaintiffs in the Related Cases to file a consolidated response to the anticipated motion to compel arbitration. *Id.*

Royal Caribbean later filed an Omnibus Motion to Stay Litigation and Compel Arbitration ("Arbitration Motion"), [ECF No. 57], in the Related Cases. On April 22, 2026, this Court issued a Report and Recommendation on the Arbitration Motion, solely in this case, recommending that the district court deny the Arbitration Motion.  [ECF No. 110]. The Report and Recommendation

2

addresses the Arbitration Issue that Plaintiffs here seek to certify as a class issue. Royal Caribbean filed an objection to the Report and Recommendation, which remains pending. [ECF No. 116].

The Report and Recommendation notes that the issues raised by the Arbitration Motion are pleading-specific. [ECF No. 110 at 1–2 n.1]. While the plaintiffs in the Related Cases filed a consolidated response to the Arbitration Motion, they did not file a consolidated complaint. As such, the allegations in the complaints of each of the eleven Related Cases do not conform to each other. As such, the Report and Recommendation addressed the Arbitration Motion solely based on the allegations in the Sixth Amended Complaint filed in this action.

Following the issuance of the Report and Recommendation and discussions had during this Court's recent status conference, the plaintiffs in the Related Cases have filed notices and motions for leave to amend, seeking to conform their complaints to the Sixth Amended Complaint in this action.[2] Plaintiffs in the related actions seek to obtain a ruling on the Arbitration Motion based on their conformed amended complaints, if leave to amend is granted. If the related complaints do not conform to the Sixth Amended Complaint, this Court will need to file separate reports and recommendations in each of the related matters to analyze the arbitration issue based on the operative complaint in each matter, which could result in conflicting rulings depending on how

---

[2]       (1) *Doe v. Royal Caribbean Cruises, Ltd., et al.*, No. 24-cv-24039-DPG [ECF No. 59]; (2) *C.B. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-25089-DPG [ECF No. 45] (Notice of Adopting Allegations and Counts Contained Within Sixth Amended Complaint Filed in Case No. 24-cv-23953-DPG); (3) *D.M. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-24988-DPG [ECF No. 44]; (4) *K.T. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24193-DPG [ECF No. 53]; (5) *J.L.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24139-DPG [ECF No. 48]; (6) *M.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24738-DPG [ECF No. 44]; (7) *T.L. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-25009-DPG [ECF No. 42]; (8) *V.V. v. Royal Caribbean Cruises Ltd. et al.*, No. 25-cv-20051-DPG [ECF No. 28]; (9) *Doe v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20138-DPG [ECF No. 37]; and (10) *Doe et al. v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20485-DPG [ECF No. 30].

each complaint is pled – even though they all stem from Mirasol's conduct on the twelve Royal Caribbean cruises.

## II.   RECOMMENDATION

Upon careful consideration of the potential conflict from the pleading issue discussed above, the case status, and procedural posture of the Related Cases, the undersigned recommends that the Related Cases be consolidated under Federal Rule of Civil Procedure 42(a), which permits consolidation if "the actions before the court involve a common question of law or fact." Fed. R. Civ. P. 42(a).

FRCP 42(a) codifies "a trial court's inherent managerial power to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Nobel v. S. Fla. Stadium, LLC*, No. 24-CV-22751, 2024 WL 4433469, at *1 (S.D. Fla. Oct. 7, 2024). To determine if consolidation is appropriate, the court should consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overcome by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Hendrix v. Raybestos-Manhattan, Inc*. 776 F.2d 1492, 1495 (11th Cir. 1985) (quoting *Arnold v. Eastern Air Lines, Inc*. 681 F.2d 186, 193 (4th Cir. 1982)) (alteration in original).

Here, each of the Related Cases arises from Defendant Mirasol's video voyeurism on the same twelve Royal Caribbean cruises aboard the *Symphony of the Seas* and involves common questions of law and fact. There is a pending Class Motion seeking class certification of the prevailing common questions of law, including the Arbitration Issue addressed in this Court's Report and Recommendation on the Arbitration Motion.  Consolidating these cases does not pose any risk of prejudice or confusion. To the extent there is any, it is overcome by the benefit of (1)

4

avoiding inconsistent adjudication on the common factual and legal issues, and (2) conserving judicial resources that will be required to address each of the pending motions for leave to amend, which seek to conform the complaints in the related matters.  The Plaintiffs have coordinated their efforts in responding to the Arbitration Motion and are seeking to pursue their claims against Royal Caribbean under one conformed amended complaint. Consolidation is an efficient approach that will conserve judicial resources and minimize expense to the parties—and will likely obviate the need for the Court to adjudicate the Class Motion and/or certify an issues class. The *Hendrix* factors support the consolidation of the Related Cases, which will benefit the court and all parties.

Accordingly, this Court recommends that the district court enter an order to:

1. **Consolidate for all purposes** this case  with (1) *Doe v. Royal Caribbean Cruises, Ltd., et al.*, No. 24-cv-24039-DPG; (2) *C.B. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-25089- DPG; (3) *D.M. et al. v. Royal Caribbean Cruises Ltd., et al.*, No. 24-cv-24988-DPG; (4) *K.T. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24193-DPG; (5) *J.L.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24139-DPG; (6) *M.S. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-24738-DPG; (7) *T.L. et al. v. Royal Caribbean Cruises Ltd. et al.*, No. 24-cv-25009-DPG; (8) *V.V. v. Royal Caribbean Cruises Ltd. et al.*, No. 25-cv-20051-DPG; (9) *Doe v. Royal Caribbean Cruises, Ltd.*, No. 25-cv-20138- DPG; and (10) *Doe et al. v. Royal Caribbean Cruises, Ltd.*, No. 25- cv-20485-DPG.

2. **Designate** Case No. 24-cv-23953-DPG/DSW, as the lead case, with all future filings bearing this case number and with one master docket to be maintained for the consolidated action under this case number.

5

3.      **Appoint** the counsel in Case No. 24-cv-23953-DPG/DSW as Lead Consolidation Counsel responsible for coordinating the filing of motions, briefs, and discovery, if any, with counsel in the consolidated cases.

4.      **Direct** the Clerk of the Court to file a copy of the consolidation order in the Related Cases, and then administratively close those cases, except for the lead case, and terminate all motions therein as moot.

5.      **Set a deadline** for the Plaintiffs to file a consolidated amended complaint, which conforms to the Sixth Amended Complaint in Case No. 24-cv-23953-DPG/DSW, and set a briefing schedule for Royal Caribbean to file a consolidated motion to dismiss, if it deems it appropriate to do so. Plaintiffs and all counsel of record are instructed to indicate both the lead case number and the consolidated case numbers in the caption of any documents filed with the court. The word "**CONSOLIDATED**" must appear directly under the lead case number. Plaintiffs and counsel are directed to docket and file all documents in the lead case unless otherwise directed.

### III.    OBJECTIONS

Within **five (5) days** after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1). Any response shall be filed within **five (5) days** of the objections. The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3-1 (2016); *see*

*Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 19th day of May 2026.

 

**DETRA SHAW-WILDER**
**UNITED STATES MAGISTRATE JUDGE**

cc:     The Honorable Darrin P. Gayles

       All Counsel of Record

# Appendix I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. 24-CV-23953-DPG

JANE DOE (S.F.), on behalf of herself and all
others similarly situated, *et al.*,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD., and
ARVIN JOSEPH MIRASOL,

      Defendants.

_____/

**PLAINTIFFS'[1] SECOND SUPPLEMENT TO**
**MOTION FOR ISSUE CLASS CERTIFICATION AND FOR APPOINTMENT OF CO-**
**LEAD CLASS COUNSEL [ECF NO. 39]**

Plaintiffs file this Second Supplement in direct response to Magistrate Judge Shaw-Wilder's Report and Recommendation consolidating all of the related cases for all purposes and appointing Undersigned Counsel as Lead Consolidation Counsel. ECF No. 120. The Court inquired in the Report and Recommendation whether the relief provided in the R&R, namely (1) ordering consolidation under Rule 42(a), (2) a conformed consolidated pleading, and (3) coordinated consolidated leadership will "obviate the need for the Court to adjudicate the Class Motion and/or certify an issues class." ECF No. 120 at 4.

---

[1] "Plaintiffs" include—by agreement of all named Plaintiffs' counsel—plaintiffs among the eleven (11) different pending complaint/groups, as well as all purported class members of the Class Action. S*ee* Mot., 1, n.1.

1

Lead Consolidation Counsel respectfully submits that, rather than obviating the need for this narrow issue certification, consolidation makes issue certification more timely, easier, and more useful for the Court's administration and long-term adjudication of these claims.[2]

Plaintiffs have now filed the Consolidated Amended Complaint as ordered, and this case was referred to Magistrate Judge Shaw-Wilder for reports and recommendations *on all matters.* In that posture, Plaintiffs respectfully ask the Court to take the small next step, and recommend that the District Court also grant just some of the relief sought in Plaintiffs' Motion to Certify Nationwide Issue Classes [ECF No. 39], as supplemented by Plaintiffs' First Supplement [ECF No. 119] and this filing. Essentially by certifying just the main common question that were already answered by the Court in the First Report and Recommendation, all of these cases will be in a much more advanced position, before this case is appealed and possibly stayed for many more years.

## LEGAL ARGUMENT

I.    **Consolidation Solves a Case Management Problem, But Not the Rule 23 Problem.**

Plaintiffs certainly agree with the Court's well-reasoned consolidation analysis. These related cases all arise from the exact same underlying conduct, involve common questions, and benefit from coordinated treatment in one proceeding. ECF No. 120 at 1–5. Plaintiffs have already complied with that framework as they are concurrently filing a Consolidated Amended Complaint.

But the Rule 42 question and the Rule 23 question are not the same. Consolidation improves administration of the cases and Plaintiffs already before the Court. It does not determine

---

[2] The only three questions for certification are set out in the Supplement. As explained in the Supplement, there is no need to certify the question of vicarious liability, because Plaintiffs contend that that such an issue will not, and cannot, be questioned by Royal Caribbean in any of these cases.

whether this Court's rulings on these extensive and threshold arbitration and class-waiver issues will bind all absent passengers who fall within the proposed class definition. As the Supreme Court has explained, consolidation is "permitted as a matter of convenience and economy in administration," but it "does not merge the suits into a single cause, or change the rights of the parties." *Hall v. Hall*, 138 S. Ct. 1118, 1127 (2018).

That distinction is dispositive here. Even after consolidation, Royal Caribbean remains free to argue later that any favorable (or unfavorable) rulings on these threshold issues apply only to the currently named Plaintiffs in the consolidated action and not to absent class members. Rule 23(c)(4) is the simple mechanism that was enacted to resolve that problem.

## II.   The Consolidated Amended Complaint Strengthens, Not Weakens, the Case for Issue Certification.

The R&R correctly identified a pleading problem: absent a single conforming pleading, the Court risked having to analyze arbitrability through the lens of many different complaints, with the possibility of inconsistent rulings depending on how each case was pled. ECF No. 120 at 2–4. That concern supported consolidation.

Now that Plaintiffs have all filed the Consolidated Amended Complaint, that pleading concern has been eliminated. The threshold issues are now presented through one operative pleading in one consolidated action. That development does not eliminate the need for narrow issue certification. It confirms that the narrow and threshold issues identified in Plaintiffs' Motion and First Supplement are common, numerous, cleanly framed, typical, and ideally suited for one uniform determination. *See* ECF No. 119 at 6–13.

Put simply, the new pleading answers the concern identified in the R&R about non-conformed complaints. It does not answer the separate question whether the Court's rulings on those now-unified issues should bind absent class members.

### III.  Appointment of Lead Counsel Does Not Replace Rule 23(c)(4) or Rule 23(g).

The same is true of consolidation leadership appointment. Plaintiffs greatly appreciate the Court's effort to organize the consolidated proceeding efficiently, and are honored to serve as appointed leadership for the currently pending consolidated cases. But that is a case-management ruling, not a certification ruling.

Lead Counsel in a consolidated class action coordinates litigation among existing parties. Rule 23(c)(4) addresses whether particular common issues should proceed on a representative basis. Rule 23(g) addresses formal appointment of class counsel if a class is certified. Those are different questions serving different purposes. So while consolidation and leadership appointment may streamline the litigation, neither step creates the binding representative effect Plaintiffs seek through the pending motion. Only certification can do that and during the past six months of extensive briefing and hearings, there has been unanimous support among all Plaintiffs for this appointment.[3]

### IV.  The Court Should Decide Now Whether its Threshold Rulings Will Apply Uniformly to the Proposed Class.

Plaintiffs do not need to repeat here the Rule 23 analysis set out in their Motion and First Supplement. *See* ECF No. 119 at 6–13. Plaintiffs instead make the narrower point raised by the R&R: whether the new consolidation developments by the Court make issue certification unnecessary. To the contrary, now is the best time to decide it, and the next step is certainly not a giant one. The threshold issues have already been identified and litigated. The operative pleading is now consolidated. The cases are now being managed together. And the Court has already recognized the importance of avoiding inconsistent adjudications on common legal questions. ECF

---

[3] It may not come as any surprise that Royal Caribbean would prefer that no Plaintiffs' leadership be appointed for any purpose, but their view on this issue certainly holds less weight than that of the class members.

No. 120 at 3–5. In this posture, it is both practical and efficient to simply determine whether the Court's rulings on those few threshold issues will apply only to the named plaintiffs or uniformly to all passengers within the proposed class definition.

It is important to note that this determination should not be postponed until after appellate proceedings or later merits litigation. As Plaintiffs explained in their First Supplement, delay creates a substantial risk that the same threshold issues will need to be relitigated after years of additional proceedings, defeating the efficiencies that Rule 23(c)(4) is designed to secure. *See* ECF No. 119 at 6–8.

**V.      If Royal Caribbean Will Not Agree to Uniform Application, Certification Remains Necessary.**

There is a simple alternative to motion practice on this point: Royal Caribbean could simply agree that this Court's rulings on the three threshold issues identified in Plaintiffs' Motion and First Supplement should apply uniformly to all passengers who fall within the proposed class definition. If Royal Caribbean takes that position, the practical need for certification may narrow substantially.

But absent that agreement, Plaintiffs see no basis to leave the extensively briefed issue unresolved. Plaintiffs have heard no legitimate reason why the same threshold legal determinations arising from the same conduct and the identical passenger ticket contract should apply to some Mirasol-serviced passengers but not others. If Royal Caribbean opposes that uniform treatment, then the Rule 23 issue should be decided now. It must be remembered and noted that Plaintiffs sought certification of these basic common issues ***before*** the Court decided the R&R, and Judge Gayles or the Eleventh Circuit may certainly reverse course, meaning all parties face the same risks.

**CONCLUSION**

For those reasons, Plaintiffs respectfully submit that the answer to the Court's question is unequivocally yes: issue certification for just these three basic questions remains important notwithstanding the consolidation relief.

Plaintiffs therefore respectfully request that Magistrate Judge Shaw-Wilder consider this Second Supplement, require Royal Caribbean to file a Response within 20 days (or confirm they agree to the relief requested), set the Motion to Certify Nationwide Issue Classes [ECF No. 39], as supplemented by ECF No. 119 and this filing, for prompt hearing and decision, certify an issue class under Rule 23(c)(4), appoint the law firms of The Moskowitz Law Firm, PLLC and Lipcon, Margulies & Winkleman, P.A. as Co-Lead Class Counsel, and grant such other and further relief as the Court deems just and proper.

Dated: May 21, 2026                    Respectfully submitted,

**By: /s/ Adam M. Moskowitz**
Adam M. Moskowitz, Esq.
Florida Bar No. 984280
Joseph M. Kaye, Esq.
Florida Bar No. 117520
Leo A. Wiesinger, Esq.
Florida Bar No. 1058780
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
leo@moskowitz-law.com

**Jason R. Margulies, Esq.**
jmargulies@lipcon.com
**Michael A. Winkleman, Esq.**
mwinkleman@lipcon.com
**Jacqueline Garcell, Esq.**
jgarcell@lipcon.com
**Marc E. Weiner, Esq.**
mweiner@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed on May 21, 2026, via the Court's CM/ECF system, which will send notification to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280

# Appendix J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:24-cv-23953-GAYLES/SHAW-WILDER**

JANE DOE (S.F.), et al.,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES, LTD., and
ARVIN JOSEPH MIRASOL,

      Defendants.

                                    /

## <u>ORDER</u>

**THIS CAUSE** comes before the Court on Defendant Royal Caribbean Cruises, Ltd.'s ("Royal Caribbean") Omnibus Motion to Stay Litigation and Compel Arbitration (the "Motion"). [ECF No. 57]. The action was referred to Magistrate Judge Detra Shaw-Wilder, pursuant to 28 U.S.C. § 636(b)(1)(B), for a ruling on all pretrial, non-dispositive matters, and for a Report and Recommendation on any dispositive matters. [ECF No. 71]. On April 22, 2026, Judge Shaw-Wilder issued her report recommending that the Motion be denied (the "Report"). [ECF No. 110]. Royal Caribbean has objected to the Report, [ECF No. 116], and Plaintiffs have responded to the objections, [ECF No. 117].

A district court may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1). Those portions of the report and recommendation to which objection is made are accorded *de novo* review, if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3). Any portions of the report and recommendation to which *no* specific objection is made are reviewed only for clear error. *Liberty Am. Ins. Grp., Inc. v. WestPoint*

*Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001); *accord Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).

In her Report, Judge Shaw-Wilder found that both the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–02, and 46 U.S.C. § 30527 preclude the Court from enforcing the arbitration provision in Royal Caribbean's ticket contract based on Plaintiffs' claims. [ECF No. 110]. Royal Caribbean raises several objections to the Report, the majority of which rehash arguments it raised in the Motion. [ECF No. 116].

The Court has conducted a *de novo* review of the Motion and the record and agrees with Judge Shaw-Wilder's well-reasoned findings and recommendation that the Motion be denied.

## **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

(1)    Judge Shaw-Wilder's Report and Recommendation, [ECF No. 110], is **ADOPTED in full**; and

(2)    Royal Caribbean's Omnibus Motion to Stay Litigation and Compel Arbitration, [ECF No. 57], is **DENIED.**

**DONE AND ORDERED** in Chambers at Miami, Florida, this **Tuesday, May 26, 2026.**

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

2

# Appendix K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:24-cv-23953-DPG/DSW

JANE DOE (S.F.), et al.,

      Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTD.
A foreign corporation for profit,

      Defendant.

_____/

## NOTICE OF APPEAL

Notice is given that Defendant/Appellant, Royal Caribbean Cruises, Ltd., hereby appeals to the United States Court of Appeals for the Eleventh Circuit pursuant to 9 U.S.C. § 16(a)(1)(B), from this Court's May 26, 2026 Order Adopting the Report and Recommendation and Denying Defendant's Omnibus Motion to Stay Litigation and Compel Arbitration [ECF No. 125]. This appeal is taken from that Order, which adopted in full the Report and Recommendation issued on April 22, 2026 [ECF No. 110], and denied Defendant/Appellant's Omnibus Motion to Stay Litigation and Compel Arbitration [ECF No. 57].[1]

**Respectfully submitted,**

_____
Kurt K. Lunkenheimer, Esq.
Florida Bar No. 1059216

---

[1] Pursuant to the Supreme Court's Order in *Coinbase, Inc. v. Bielski*, the filing of this Notice automatically necessitates a stay of this action. 599 U.S. 736, 738, 743 (2023) (stay is all-encompassing, including a stay of all "pre-trial and trial proceedings."). This action must now be "administratively closed" until Royal Caribbean's appeal is resolved. *See, e.g., Mochan v. Madison Reed, Inc.*, 2023 WL 8634482 (S.D. Fla. Aug. 10, 2023).

COZEN O'CONNOR
200 S. Biscayne Blvd., Suite 3000
Miami, FL 33132
Telephone: (305) 704-5940
kklunkenheimer@cozen.com
John J. Sullivan, Esq. (*pro hac vice*)
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 453-3729
jsullivan@cozen.com

*Co- Counsel for Defendant, Royal Caribbean
Cruises, Ltd.*

and

Jerry D. Hamilton, Esq.
Florida Bar No. 970700
Krista Fowler Acuna, Esq.
Florida Bar No. 650791
Annalisa Gutierrez, Esq.
Florida Bar No. 97940
Kassandra Doyle Taylor, Esq.
Florida Bar No. 68645
HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 379-3686
hmb-symphony-team@hamiltonmillerlaw.com

*Co- Counsel for Defendant, Royal Caribbean
Cruises, Ltd.*

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 29, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel in the above-captioned cases either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

## SERVICE LIST

Jason R. Margulies, Esq.
jmargulies@lipcon.com
Michael A. Winkleman, Esq.
mwinkleman@lipcon.com
Jacqueline Garcell, Esq.
jgarcell@lipcon.com
Marc E. Weiner, Esq.
mweiner@lipcon.com
LIPCON, MARGULIES,
& WINKLEMAN, P.A.
2800 Ponce de Leon Boulevard, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

and

Adam M. Moskowitz
The Moskowitz Law Firm
Continental Plaza
3250 Mary Street
Suite 202
Miami, FL 33133
305.740.1423 main
786.309.9561 direct
adam@moskowitz-law.com

*Counsel for Plaintiffs, Jane Doe (S.F.), et al*

3